39

United States District Court
Southern District of Texas
FILED

OCT 2 9 2003

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY | § | |
| | § | |
| | § | CIVIL ACTION NO. B-02-205 |
| VS. | § | JUDGE ANDREW S. HANEN |
| | § | (JURY) |
| AMERICAN STANDARD INC. | § | |

# AMERICAN STANDARD INC.'S MOTION TO EXCLUDE OR ALTERNATIVELY LIMIT THE TESTIMONY OF PLAINTIFF'S MATERIAL EXPERT, THOMAS W. EAGAR

Defendant, American Standard Inc. (hereinafter "American Standard"), submits the following Motion to Exclude or Alternatively Limit the Testimony of Transcontinental Insurance Company's (hereinafter "Transcontinental") Materials Expert, Thomas W. Eagar:

## I.

## SUMMARY OF THE BASIS FOR EXCLUSION

Transcontinental identified Thomas W. Eagar as a specialist "in material analysis and metallurgy." *See* Exhibit A, which is Plaintiff's Designation of Expert Witnesses at page 2 (designation No. 2), which is attached hereto and incorporated by reference (hereinafter "Plaintiff's Designation"). Plaintiff's Designation outlines a number of opinions that Dr. Eagar purports to have developed. His report is attached as exhibit D to Plaintiffs' Designation. *See* Exhibit B, which is a true and correct copy of Dr. Eagar's report, which is attached hereto and incorporated by reference.

Dr. Eagar has no demonstrated experience in the design or manufacturer of plumbing products. He references no experience in designing, drafting or implementing warnings with respect to any products, much less plumbing products. He has no identifiable industry experience in the design, manufacture or marketing of plumbing products such as the subject

toilet. *See* Exhibit C, which is a true and correct copy of Dr. Eagar's curriculum vetae, which is attached hereto and incorporated herein by reference.

American Standard expects that Transcontinental will attempt to introduce anecdotal information through Dr. Eagar attempting to establish the following:

- Acetal products such as the water control device in question (hereinafter "ballcock assembly") have long been known to be susceptible to "chemical attack" or degradation as a result of exposure to chlorine in the water; that the knowledge to the scientific community of such propensity existed before the date of manufacture of this ballcock assembly, which was 1983;

- Brass, because it is a metal, and is "stronger" and "tougher" than the subject acetal (*see* Exhibit 1, page 2; *see also* Exhibit 2, page 2, paragraph 7) was a feasible alternative design in 1983; and

- American Standard negligently failed to warn of the hazards of chemical degradation.

However, he failed to reference such conclusions in his report or Plaintiff's Designations. *See* Exhibits A and B. He failed to reference information dating *prior to the date of manufacture* which should have put manufacturers such as American Standard on notice that acetal products were unsuitable for use in plumbing products—a conclusion reached by DuPont, the creator of Delrin (the acetal used in this product), *in the 1990s*. Indeed, it is expected that virtually all of the literature upon which Dr. Eagar will rely postdate the date of manufacture of this ballcock assembly. Similarly, Dr. Eagar has not gathered, or at least does not reference in his report, any information relating to the chlorine levels that existed in 1983, or even 1990,[1] in the water supply in Harlingen, Texas. References to national rivers such as the Mississippi mean nothing and do not shed any light on relevant subject matter. Instead, this becomes misleading, confusing and, of course, unduly prejudicial to American Standard.

Another way Dr. Eagar is expected to challenge the selection of acetal used in the ballcock assembly is by making reference to events or circumstances that occurred well after the date of manufacture of this particular toilet and ballcock assembly. For example, it is expected that Dr. Eagar will make reference to the following:

- Studies in the 1990s regarding chlorine degradation of acetal polymers in potable water;

- The fact that in the "early 1990s" DuPont discontinued sales of Delrin acetal for use in plumbing products;

- Polybutylene pipe class action settlements in the mid-1990s for plumbing products used in homes;[2]

- Studies of acetal sensitivity to chlorine that were not performed until the 1990s;

- Allegations that DuPont did not test acetal products in potable water or did not adequately test acetal products before placing them on the market;

- Decisions by various communities to limit or prohibit the sale of acetal-containing products for use in plumbing products;[3]

- Reference to American Standard warranties postdating the sale of this product which state that the use of cleaning products containing chlorine may void warranties; and

- References to current studies regarding the chemical composition of river water across the United States.

In short, because there is no direct evidence to support his position, Dr. Eagar plans to use irrelevant, prejudicial and otherwise inadmissible hearsay to propose to the jury that American Standard could foresee that the subject ballcock assembly would possibly be exposed

---

[1] The toilet in question (with the original ballcock assembly) was not installed at Valley Diagnostic Clinic, P.A. until some time in 1990. Transcontinental has offered no explanation for the gap between 1983 and 1990 and has offered no evidence of what happened to the toilet or ballcock assembly during that time or how it was used.
[2] There is no allegation that American Standard used polybutylene in the subject ballcock assembly or any other product.
[3] There is no evidence whatsoever that Harlingen or any other city in South Texas has restricted the sale of acetal products for use in plumbing products. Indeed, such products can be found on the shelves of local hardware stores as of today's date.

to harmful levels of chlorine when American Standard manufactured the subject ballcock assembly in 1983. Further, while such opinions are not contained in his report, it is anticipated that Dr. Eagar will criticize American Standard for failing to provide post-manufacture warnings or to recall its acetal-containing product, which, under Texas law, American Standard had not duty to do.

Dr. Eagar's purpose is to smear American Standard and its product with 1990s-era scientific testing and anecdotal experience without regard to the facts as they existed on the date of manufacture, his qualifications or expertise to reach such conclusions or reference to any cognizable claim existing under Texas law.

## II.

## ARUGMENTS AND AUTHORITIES SUPPORTING EXCLUSION

The testimony of Dr. Eagar is inadmissible for, at the very least, the following reasons:

- Dr. Eagar is not qualified to establish or state the standard of care applicable to American Standard;

- Dr. Eagar's opinions must be limited to the "state of the art" as it existed in 1983, the date of manufacture;

- There is no post-sale duty to warn or recall under Texas law, and this expert cannot speculate that any authority would have mandated a recall or taken action that would have prevented the occurrence in question. Consequently, the testimony offered through Dr. Eagar does not address the necessary issue of causation and is purely speculative;

- Dr. Eagar's opinions relating to warnings are unsubstantiated and contrary to the factual testimony, based on no demonstrable qualifications and are inadequate in that they fail to proffer a "warning" that would have been adequate under the circumstances.

### A. Dr. Eagar is not qualified to render his opinions.

A court should exclude the testimony of an expert witness who is not qualified by knowledge, skill, experience, training or education to render an opinion based on scientific,

technical or other specialized knowledge.  FED. R. EVID. 104(a); 702.  *See McCullock v. HB Fuller Company*, 61 F.3d 1038, 1042-43 (2nd Cir. 1995); *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741-42 (3rd Cir. 1994).  An expert should have a higher degree of knowledge, skill, experience, training or education about the subject of testimony than an ordinary person.  *McCullock*, 61 F.3d at 1043.

American Standard concedes that Dr. Eagar is a very intelligent, highly educated gentleman.  On the other hand, a review of his curriculum vitae clearly discloses that he has no experience relating to the subject matter about which he would be testifying in this case.  *See* Exhibit C.  Further, his previous litigation experience likewise reveals that he has no experience and has not been qualified as an expert in a plumbing product cases such as this one.  *See* Exhibit 3.  A court should exclude the testimony of an expert whose testimony is not reliable.  *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *see Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *see also* FED. R. EVID. 702.

Although an expert witness may be highly credited, his or her conclusions may still be based upon unreliable methodology.  Scientific evidence that is not grounded "in methods and procedures of science" is no more than "subjective belief or unsupported speculation."  *Daubert*, 509 U.S. at 590.  For the expert's testimony to be reliable, the following requirements must be met:

- The expert's testimony must be based on sufficient facts or data;

- The expert's testimony must be the product of reliable principals and methods; and

- The expert must apply principals and methods reliably to the facts of the case.

FED. R. EVID. 702; *United States v. Charley*, 189 F.3d 1251, 1266, n.20 (10th Cir. 1999).

In order for scientific, technical or other specialized knowledge to assist the trier fact to understand the evidence, it must be reliable. *Daubert*, 509 U.S. at 589-90. Evidentiary reliability is demonstrated by showing that the knowledge offered is more than speculative belief or unsupported speculation. *Id.* at 590. While certainty is not required, the knowledge asserted must be based on good scientific ground. *Id.* An expert's opinion must be based on scientific knowledge, *i.e.*, it must be derived by the scientific method. *Id.* Further, there must be a connection between the testimony offered and validation of the opinion so that it may be determined whether there are "good grounds" for the expert's opinion. *Id.* If an expert's opinion does not pertain to scientific knowledge, it lacks evidentiary reliability. *Id.*

Scientific knowledge requires more than guesswork, it must be grounded in a body of known facts or a body of ideas inferred from such facts; otherwise, reliability is lost, and the trier of fact is not assisted by what may be no more the speculation or subjective belief. *United States v. Posado*, 57 F.3d 428, 433 (5th Cir. 1995); *Viterbo v. Dow Chemical Co.*, 826 F.2d. 420, 424 (5th Cir. 1987). Moreover, expert testimony must be based on scientific knowledge that "fits the related facts" and not unrelated purposes in order to be helpful. *Daubert*, 509 US at 591.

The expert testimony of Dr. Eagar must pass the reliability and validity test of Rule 702. This court, as the "gatekeeper" charged with the responsibility to prevent the presentation of unreliable testimony by unqualified experts, has the responsibility to evaluate Dr. Eagar's testimony and offered opinions in light of the above authorities. Dr. Eagar does not set forth any experience outside of the context of litigation to support his conclusion. He does not rely on any authorities gleamed from an understanding or evaluation of plumbing products, including ballcock assemblies such as the one in question. He has not attempted to substantiate his opinion as a member of the community that designs, manufactures and markets toilets or ballcock

assemblies for use in toilets. Further, he has no demonstrated experience in working with, designing or marketing plastic products. His expertise is in metallurgy–work with metals–not with plastics. While he is very frequently published, a review of his curriculum vitae reveals that he has never published an article relating to plastics, failure analysis of plastics, design of plastic containing products, design of plumbing products or the design and implementation of warnings for any mechanical device or consumer product.

Courts have recognized that an expert's conclusion is not reliable simply because "an expert says it is so." *Viterbo*, 826 F.2d at 421; *see also Merrell Dow Pharmaceuticals v. Havner*, 953 S.W.2d. 706, 712 (Tex.1997). When the expert "br[ings] to court little more than his credentials and a subjective opinion," this is not evidence that would support a judgment. *Viterbo*, 826 F.2d at 421-22. In *Viterbo*, *supra*, the Fifth Circuit affirmed a summary judgment excluding expert testimony that was unreliable, holding that "[i]f an opinion is fundamentally unsupported, then it offers no expert assistance to the jury." *Id.* at 422; *see also Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 319 (7th Cir. 1996) ("an expert who supplies nothing but a bottom line supplies nothing of value to the judicial process"); *Turpin v. Merrell Dow Pharmaceuticals Inc.*, 959 F.2d1349, 1360 (6th Cir. 1992) (holding expert testimony legally insufficient because no understandable scientific basis was stated). Although experts commonly extrapolate from existing data, nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered. *Joiner*, 522 U.S. at 146 (*citing Turpin*, 959 F.2d at 1360).

In *Rosen v. Ciba-Geigy Corp.*, *supra*, a leading decision of the Seventh Circuit construing *Daubert*, the court noted that the basic objective of a trial court is "to make sure that when

scientists testify in court, they adhere to the same standards of intellectual rigor that are demanded in their professional work." 78 F.3d at 318. As one district court noted, "[e]xperts cannot float their conclusions on cushions of air; they must rest those conclusions upon foundations built from reliable scientific explanation." *Navarro v. Fuji Heavy Industries, Limited*, 925 F.Supp.1323, 1328 (N.D. Ill. 1996), *aff'd* 117F.3d 1027 (1997). The essential failing of the expert opinions at issue is that they show no adherence to the standards required by *Daubert* and its progeny.

Dr. Eagar provides no evidence of relevant qualifications, cites no pre-manufacture materials or scientific data and provides no testing, experience or even publication background to confirm or substantiate his opinions. None of his opinions have been subjected to peer review or publication. He ignores physical evidence, admissions by Transcontinental's investigative agents assigned to adjust the claim and the testimony of Valley Diagnostic personnel that completely contradicts his speculation as to the cause of the occurrence in question. He has not verified his opinions through testing. He has not attempted to create, nor has he created an alternative ballcock assembly design or formula of material for use in a ballcock assembly. He has not analyzed the efficacy of any alternative design from the standpoint of technological feasibility as well as economic feasibility.[4]

Dr. Eagar's opinions are also unreliable because he fails to account for obvious alternative explanations. *See Claar*, 29 F.3d at 502; *see also Daubert*, 509 U.S. at 594 (use of generally accepted scientific methods is one indication of reliability). Dr. Eagar's report does not even address possible alternative explanations–even those uncovered and identified as "the cause" of the occurrence in question by Transcontinental's adjuster assigned to evaluate this

claim. *See* Exhibit D, page 14, the GAB Robbins N.A., Inc. investigation file,[5] which is attached hereto and incorporated by reference. A reading of Dr. Eagar's report completely omits reference to the fact that the Clinic attributed this occurrence to a failure of a pin attached to the float arm on the subject water control device, not mentioning any reference at all to plastics failure in conversations just days after this occurrence. *See* Exhibit E, page 55, line 22 through page 56, line 2, which are excerpts from the deposition of Dennis Nickeloff, attached hereto and incorporated by reference. Indeed, not until lawyers became involved on behalf of Transcontinental did the theory of chemical degradation creep into this claim. *See* Exhibit D, page 22.

As stated above, to the extent Dr. Eagar has any opinions, he has generated them for purposes in this lawsuit, and no other. He does not identify himself as an expert in the design or manufacture of acetal materials, plumbing parts in general or the design, utilization or implementation of warnings for any products. His only exposure to acetal parts involves litigation. Opinions generated solely for the purposes of pending litigation simply are not admissible. *See Lust v. Merrell Dow Pharmaceuticals Inc.*, 89 F.3d 594, 597 (9th Cir. 1996) (affirming district court's conclusion that excluded expert testimony was unreliable in finding that it was reasonable to presume that the expert was "influenced by a litigation – driven financial incentive" because his opinions were not developed until he became a "professional plaintiff's witness").

---

[4] Under Texas law a design is not defective unless at the time of manufacture there was in existence a safer alternative design that was feasible both from an economic and mechanical perspective. *Boatland of Houston v. Bailey*, 609 S.W.2d 743, 746 (Tex. 1980).

[5] It is important to note that Mr. Nickoloff is identified as a "non-retained expert." See Exhibit 1, page 8, no. 19. Transcontinental is quick to point out that Mr. Nickoloff is only an expert "on cost associated with repair and damage to the building, contents and business interruption losses at Valley Diagnostics after the water loss" and is going to move to exclude evidence of the conclusions he reached after investigation of this claim just two days following the event in question. Ironically, he maintained those conclusions even five months later in his tenth and

**B. Since there is no post sale duty to warn or recall under Texas law, Dr. Eagar's testimony is irrelevant.**

In Texas, a manufacturer generally has no post-sale, or post-manufacture, duty to warn, recall or retrofit a product for product defects that are arise after the sale. *See McClennan v. American Eurocopter Corp., Inc.*, 245 F.3d 403, 430 (5th Cir. 2001) (applying Texas law). As such, to the extent Dr. Eagar offers such opinions at trial they are irrelevant. Consequently, they should be excluded.

Further, this court should limit Dr. Eagar's testimony to the statements made within his report. Dr. Eagar does not identify any opinion in his report to the effect that in 1983 a "safer" alternative design existed which was economically and technologically feasible.[6] Dr. Eagar's report fails to contain a "complete statement" of all opinions to be expressed and the basis and reasons therefore. FED. R. CIV. P. 26(a)(2)(B).

**C. Dr. Eagar's testimony regarding an alleged negligent failure to warn is speculative, incomplete and based on conclusions he is not qualified to make.**

In a single sentence, Dr. Eagar expresses his opinions regarding an alleged marketing defect in the subject product: "There were no warnings attached or molded to the incident valve alerting the user of these foreseeable hazards." *See* Exhibit B, page 2 (next to last paragraph).

Ironically, the "subject valve" when utilized for its intended purposes, is partly submerged in water. The feasibility of the warning that might have been supplied with this product is clearly dubious at best. Setting this reality aside, Dr. Eagar's opinion is purely speculative, he is not qualified to make it, and his report is wholly inadequate to support the rendition of such a conclusion.

---

"final" report regarding the cause of the occurrence and testified that he often investigated the causes of water losses. *See* Exhibit D, 36; *see also* Exhibit E, page 41, lines 14-18 and page 45, line 23 through page 46, line 3.

[6] Dr. Eagar's report also similarly fails to offer evidence of an adequate warning which American Standard should have provided, as is discussed below in more detail.

Dr. Eagar's statement above does not offer any support for his conclusion that a warning was necessary under the circumstances. He completely ignores the fact that Valley Diagnostic Clinic- the consumer in question – is a medical clinic containing 19 physicians. It has its own maintenance department, consisting of two maintenance personnel, one of whom has twenty years experience in maintenance for the clinic. Dr. Eagar ignores the fact that the subject toilet was placed on the second floor of the clinic in a bathroom used by patients for testing purposes, yet the toilet itself is a residential toilet, not a commercial one. He further ignores that the toilet, located in a bathroom with no drain in the event that it overflows, placed directly over the radiographic imaging department of the clinic, a department containing millions of dollars worth of radiological equipment, including equipment which contained radioactive components. Dr. Eagar argues that it was commonly known in the 1990's that acetal was subject to chemical degradation. Yet, Dr. Eagar fails to acknowledge or even consider the possibility that the maintenance personnel at the clinic where similarly acquainted.

Transcontinental's only effort to establish that American Standard had a duty to warn users of the susceptibility of acetal in its toilets is through Dr. Eagar. He, however, does not list any experience whatsoever in his resume that would relate to the design, presentation or implementation of warnings of consumer or commercial products. He has not empirically tested the effectiveness of any particular warnings to support his theory that American Standard had a duty to warn, nor has he empirically tested what warning might or might not have been effective to the consumer such as the Clinic or otherwise. Dr. Eagar certainly does not offer any opinion, empirical or otherwise, that the occurrence made the subject of this lawsuit would have been prevented if there had been a proposed warning on the subject toilet. Indeed, he ignores the

consistent testimony of Valley Diagnostic personnel that they never opened the tank on this toilet to peer inside and perform any maintenance.

Transcontinental made no such disclosure with respect to Dr. Eagar, or any other expert, in their designation of experts. *See* Exhibit A. Dr. Eagar's opinion glaringly omits reference to such information and, under Rule 26 of the Federal Rules of Civil Procedure, he should not be allowed to testify as to opinions outside the scope and letter of his report.

**B. Dr. Eagar's testimony is unduly prejudicial.**

Even if his testimony were not speculative and irrelevant, and unsupported by appropriate qualifications, which it is, Eagar's testimony would result in undue prejudice to American Standard and should be excluded on that basis alone. FED. R. EVID. 403; *Christophersen v. Allied Signal Corp.*, 939 F.2d 1106, 1112 (5th Cir. 1991) (noting that rule 403 "serves as a general screening function for otherwise admissible evidence" providing for the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice); *see also E.I. DuPont de Nemours Apersand Co., Inc. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995) (holding that once the trial judge determines that the experts testimony is relevant and reliable he must then determine whether to exclude the evidence because its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence).

Should the court admit Eagar's testimony *in toto* and allow testimony by an unqualified "expert" on areas outside of his report, American Standard would have to bring forth almost thirty years of scientific development and technology to refute the question of knowledge as it existed on the day of manufacturer. Similarly, American Standard would have to refute a standard of warning that not only does not exist under Texas law but has not been explained

adequately by Transcontinental in the expert report and designation it provided. The development of products since 1983 would have to be put on trial. The technology changes since then would similarly be put on trial. It would be virtually impossible for a jury to segregate the knowledge and technology as it existed from 1983 forward from the information that was known or reasonably ascertainable by American Standard on the date of manufacture.

Finally, as anticipated, the opinions of this expert constitute spinning targets that American Standard could knock down one by one, but they simply would keep coming in a never-ending shooting gallery type of trial if he were allowed to testify outside the scope of his report. There must be some reasonable limit on this expert's ability to speculate on facts and conclusions about which he is not qualified to testify nor can he support. Should the court not limit the testimony of Dr. Eagar as requested herein, the ability to try this case in one week could easily be in jeopardy.

## III.

## CONCLUSION

For the foregoing reasons American Standard asks this court to exclude the testimony of Dr. Eagar or alternatively, to limit it within the restraints of rule 702 and 403 of the Federal Rules of Evidence as set forth above. This Defendant generally prays that it receives such other and further relief, above general and special, at law and equity, to which it is entitled.

Respectfully submitted,

**GERMER GERTZ, L.L.P.**
550 FANNIN, 7TH FLOOR
BEAUMONT, TEXAS 77701
(409) 654-6700 - TELEPHONE
(409) 835-2115 - FACSIMILE

By:____________________________
**JAMES R. OLD, JR.**
STATE BAR NO. 15242500
FEDERAL ID NO. 10751

**ATTORNEY-IN-CHARGE FOR DEFENDANT, AMERICAN STANDARD INC.**

**OF COUNSEL:**
DALE M. "RETT" HOLIDY
STATE BAR NO. 00792937
FEDERAL ID NO. 21382
GERMER GERTZ, L.L.P.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument was served by certified mail, return receipt requested, postage pre-paid and properly addressed on counsel of record as listed below on this the 28th day of October 2003.

C. Wesley Vines
COZEN O'CONNOR
1717 Main Street, Suite 2300
Dallas, Texas 75201

____________________________
**JAMES R. OLD, JR.**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY | § | |
| Plaintiff, | § | |
| AND | § | |
| VALLEY DIAGNOSTIC CLINIC, P.A. | § | CIVIL ACTION NO. B-02-205 |
| Intervenor, | § | |
| v. | § | |
| AMERICAN STANDARD, INC. | § | |
| Defendant. | § | |

**PLAINTIFFS' DESIGNATION OF EXPERT WITNESSES**

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW TRANSCONTINENTAL INSURANCE COMPANY, Plaintiff herein and files pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, this its designation of the following expert witnesses who may be called to testify at the trial of this cause. All exhibits are incorporated herein by reference.

1. Paul Carper, P.E.
202C FM1960, E. Bypass, Suite 148
Humble, TX 77338
Phone: (281) 548-3561LeRoy Terry

Paul Carper, P.E. is a retained expert and is a Senior Mechanical Engineer and Partner at Verite Forensic Engineering, LLC. Mr. Carper is expected to testify that the American Standard toilet flush valve flooded as a result of the fill valve shank fracturing while in service, allowing the uncontrolled flow of water to the tank, spilling onto the floor. Mr. Carper's résumé, Fee Schedule, Record of Deposition and Trial Testimony

are attached hereto as Exhibit "A". His report is attached hereto as Exhibit "B". All documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for Paul Carper in anticipation of his testimony have been produced, and/or are available for further examination at Paul Carper's office.

2. Thomas W. Eagar
Massachusetts Institute of Technology
Department of Materials Science
and Engineering
Building 4, Room 136
77 Massachusetts Avenue
Cambridge, MA 02139
Phone: (617) 253-3229

Dr. Thomas W. Eager is a retained expert and Professor of Materials Engineering in the Department of Material Science and Engineering at Massachusetts Institute of Technology. He specializes in material analysis and metallurgy and is expected to testify regarding his investigation of the American Standard toilet flush valve. Based upon Dr. Eager's investigation, he has formed the following opinions: 1) the incident valve is made of acetal plastic; 2) acetal plastic is susceptible to degradation and environmentally assisted cracking in waters containing chlorine or other halogens at relatively low concentrations 3) the acetal plastic of the valve is severely degraded 4) acetal is susceptible to cracking, oxidation of the plasticizer, softening, swelling and surface hardening when exposed to calcium hypochlorite 5) plastics have strength and toughness which are 10 to 100 times lower than common metals such as brass, used in plumbing fixtures. Additionally, Dr. Eager will opine that the toilet valve failed due to environmentally assisted cracking and deterioration under normal and expected conditions, making the product defective in its design and unreasonably dangerous for use in its intended application. Dr. Eager's résumé,Litigation Identification and Fee Schedule are attached hereto as Exhibit "C". Dr. Eager's report is attached hereto as Exhibit "D". All documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for Thomas W. Eagar, Sc.D., P.E. in anticipation of his testimony have been produced, and/or are available for further examination at Dr. Eager's office.

3. Mr. Kurt E. Harms, CPA
Buchanan Clarke Schlader LLP
Certified Public Accountants
2550 Renaissance Tower
1201 Elm Street
Dallas, TX 75270
Phone: (214) 760-0300

Kurt Harms is a retained expert and a partner with Buchanan Clarke Schlader, LLP a national Certified Public Accounting firm, which specializes in forensic accounting services. Mr. Harms is expected to testify as to the business income loss value as a result of the flood loss that occurred on March 4, 2001. Mr. Harms bases his opinions on the analysis performed on the financial information, as reflected in his report submitted by Valley Diagnostics Clinic. Mr. Harms further bases his opinions on his education, experience in measuring business income losses and accounting functions performed during his analysis. Mr. Harms' résuméis attached hereto as Exhibit "E". Mr. Harms' report is attached hereto as Exhibit "F". All documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for Kurt Harms in anticipation of his testimony are attached hereto or have been produced, and/or are available for further examination at Kurt Harm's office.

4.    Rod Miller, M.B.A., CMPE
      Executive Director
      Valley Diagnostic Clinic, P.A.
      2200 Haine Drive
      Harlingen, TX 78550-8599

Rod Miller is a non-retained expert and the executive director of Valley Diagnostic Clinic. He is expected to testify as to the damages sustained at the clinic, business income loss, the reasonable repair and/or replacement costs associated with damage to the building, its contents and business interruption losses at Valley Diagnostics after the water damage that occurred on March 4, 2001. He will testify as to which items of equipment were temporarily damaged, which items were permanently damaged, and, respectively, the reasonable and necessary cost of repair or the diminution in the fair market value and/or the replacement value of the items. Plaintiff is not in possession of a résuméor curriculum vitae for Mr. Miller.

5.    Ruben Flores, C.M.R.T.
      Radiology Manager
      Valley Diagnostic Clinic, P.A.
      2200 Haine Drive
      Harlingen, TX 78550-7965

Ruben Flores is a non-retained expert and employed with Valley Diagnostic Clinic as the Chief X-Ray Technician. He is expected to testify as to the damages sustained to the clinic, the damages to the diagnostic equipment, damages to the x-ray films. He will testify as to which items of equipment were temporarily damaged, which items were permanently damaged, and, respectively, the reasonable and necessary cost of re-

pair or the diminution in the fair market value and/or the replacement value of the items. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Flores.

6.    Alan Garcia
      All Valley Restoration
      Rt. 10, Box 15A
      Harlingen, TX 78552

Alan Garcia is a non-retained expert and employed with All Valley Restoration. Mr. Garcia was involved in early clean up work of Valley Diagnostic Clinic after the water damage occurred and was involved with transporting the damaged radiology films to Belfor. He is expected to testify as to the damages sustained to the clinic, and has knowledge of the damages to Valley Diagnostic's real and personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Garcia.

7.    Mark Mellen
      Jeff M. Falcone
      Diagnostic Imagining, Inc.
      4646 Perrin Creek, Suite 220
      San Antonio, TX 78217
      (210) 655-2160

Mark Mellen and Jeff Falcone are non-retained experts and employees of Diagnostic Imagining, Inc. They examined some of the water damaged radiology equipment and have knowledge of its condition. They are expected to testify as to the damages sustained to Valley Diagnostic's personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Mellen or Mr. Falcone.

8.    Kevin Jones
      Rachelle Gillis, Media Recovery Manager
      Theresa Williams, Vice President of Marketing
      Belfor USA
      2425 Blue Smoke South Court
      Fort Worth, TX 76105
      (817) 535-6193

Kevin Jones, Rachelle Gillis and Theresa Williams are non-retained experts and employees of Belfor USA. They have knowledge of Belfor's efforts to restore the damaged radiology films. They are expected to testify as to the damages sustained to Val-

ley Diagnostic's personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résuméor curriculum vitae for Mr. Jones, Ms. Gillis or Ms. Williams.

9. Palma Sales
MF Banks
10631 Harwin Avenue, Suite 616
Houston, Texas 77036
(713) 988-8818

Palma Sales is a non-retained expert and employee of MF Banks. MF Banks removed the damaged radiology equipment from Valley Diagnostic. Palma Sales or a representative from MF Banks are expected to testify as to the damages sustained to Valley Diagnotic's personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Palma Sales.

10. Jack Schwartz, Project Consultant
Jamie Murdock
Jeff Wilson
NBD International, Inc.
241 Myrtle Street
P.O. Box 1003
Ravenna, Ohio 44266
(330) 296-0221

Jack Schwartz, Jamie Murdock and Jeff Wilson are non-retained experts and employees of NBD International, Inc. NBD International, Inc. was hired by CNA to investigate the Valley Diagnostic claim for damage to its real and personal property. They are expected to testify as to the damages sustained to Valley Diagnotic's real and personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Schwartz, Jamie Murdock or Mr. Wilson.

11. William H. Newman
Medical Equipment Transport Specialist
1508 "C" Street
Floresville, Texas 78114
(210) 602-9269

William Newman is a non-retained expert and employee of Medical Equipment Transport Specialist. Mr. Newman has knowledge regarding removal of the damaged radiology equipment from Valley Diagnostic. He is expected to testify as to the damages sustained to Valley Diagnostic's personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Newman.

12. Mike Koch
Flagship Reconstruction
10661 Haddington, Suite 110
Houston, TX 77088
(713) 827-8888

Mike Koch is a non-retained expert and employee of Flagship Reconstruction. Mr. Koch is expected to testify as to the damages sustained to Valley Diagnostic's real and personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Koch.

13. Jim Jenkins
Regional Quality Control Manager
Marshall Erdman & Associates
3001 Summit Avenue, Suite 200
Plano, TX 75047
(972) 881-0882

Jim Jenkins is a non-retained expert and the Regional Quality Control Manager for Marshall Erdman & Associates. He has knowledge of the water damage to plaintiff's building and the requirements for repairing the building. Mr. Jenkins is expected to testify as to the damages sustained to Valley Diagnostic's real and personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résuméor curriculum vitae for Mr. Jenkins.

14. Dr. Carlos Maldonado
Radiologist and Radiation Safety Officer
Valley Diagnostic Clinic, P.A.
2200 Haine Drive
Harlingen, TX 78550
(956) 425-7200



Dr. Carlos Maldonado is a non-retained expert and a Radiologist and Radiation Safety Officer employed with Valley Diagnotic. Dr. Maldonado is expected to testify as to the damages sustained to Valley Diagnostic's real and personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Dr. Maldonado.

15. Edward Lee C. Friederichs, Products Sales Manager
Siemen Medical Systems, Inc.
2002 North Highway 360
Grand Prairie, TX 75050-1423
(972) 660-2700

Edward Lee C. Friederichs is a non-retained expert and a Product Sales Manager employed with Siemen Medical Systems, Inc. Mr. Friederichs has examined some of the water damaged radiology equipment and has knowledge of its condition. He is expected to testify as to the damages sustained to Valley Diagnostic's personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résuméor curriculum vitae for Mr. Friederichs.

16. Keith Holmes, Chief of Maintenance
Richard Lowe, Maintenance
Valley Diagnostic Clinic, P.A.
220 Hayne Drive
Harlingen, TX 78550
(956) 425-7200

Keith Holmes and Richard Lowe are non-retained experts and maintenance employees of Valley Diagnostics. They have knowledge of the damages to Valley Diagnostic's real and personal property and knowledge of the maintenance of the building. Mr. Holmes and Mr. Lowe are expected to testify as to the damages sustained to Valley Diagnostic's real and personal property, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résuméor curriculum vitae for Mr. Holmes and Mr. Lowe.

17. Pamela Moore
CNA Insurance Company
P. O. Box 105233
Atlanta, GA 30348-5233
Phone: (678) 473-3928

Ms. Moore is a non-retained expert and employee of CNA Insurance Company who is anticipated to testify regarding damages, her knowledge of the claim, the reasonable costs associated with repair and damage to the building, contents and business interruption losses at Valley Diagnostics after the water loss, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résuméor curriculum vitae for Ms. Moore.

18. Robert Dudeck
General Adjuster
CNA Insurance
10 N. Marvine Avenue
P.O. Box 185
Auburn, NY 13021
Phone: (305) 258-6962

Mr. Dudeck is a non-retained expert and the General Adjuster of CNA Insurance Company who is anticipated to testify regarding damages, his knowledge of the claim, the reasonable costs associated with repair and damage to the building, contents and business interruption losses at Valley Diagnostics after the water loss, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Dudeck.

19. Dennis Nickoloff
General Adjuster
GAB Robins North America, Inc.
632 Ed Carey Drive
Suite 700
Harlingen, TX 78550-7965
Phone: (956) 423-0770

Mr. Nickoloff is a non-retained expert and a General Adjuster of GAB Robins North America, Inc. who is anticipated to testify regarding damages, his knowledge of the claim, the reasonable costs associated with repair and damage to the building, contents and business interruption losses at Valley Diagnostics after the water loss, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Nickoloff.

20. Ivars Rudzitis, General Adjuster
Hentze McKissic, Quality Assurance Inspecter
Leo F. Malo, Vice President

Dallas Claim Service Center
600 North Pearl Street, Suite 1800
Dallas, TX 75201
(214) 220-5515

Mr. Rudzitis is a non-retained expert and a General Adjuster, Hentze McKissic is a non-retained expert and Quality Assurance Inspector, Leo F. Malo is a non-retained expert and Vice President of Dallas Claim Service Center who are anticipated to testify regarding damages, their knowledge of the claim, the reasonable costs associated with repair and damage to the building, contents and business interruption losses at Valley Diagnostics after the water loss, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résuméor curriculum vitae for Mr. Rudzitis, Mr. McKissic or Mr. Malo.

21. Hal Arnold
Beneke/Adjusters International
16225 Park Ten Place Drive,
Suite 500
Houston, TX 77084
(281) 433-0421

Mr. Arnold is a non-retained expert and a Public Adjuster of Beneke Adjusters International who is anticipated to testify regarding damages, his knowledge of the claim, the reasonable costs associated with repair and damage to the building, contents and business interruption losses at Valley Diagnostics after the water loss, including the reasonable and necessary repair costs and/or diminution in the fair market value, depending on whether the subject was temporarily or permanently damaged. Plaintiff is not in possession of a résumé or curriculum vitae for Mr. Arnold.

22. Jeff Windschitl
222 Cavalcade Street, 7709-3213
P.O. Box 8768
Houston, TX 77249-8768
Phone: (713) 692-9151

Mr. Windschitl is a non-retained expert and a Metallurgy Supervisor in the Metallurgy lab at Southwestern Laboratories. Mr. Windschitl performed the testing of the subject toilet valve at Southwestern Laboratories in order to assist Dr. Eager in his anaylsis. He is expected to testify regarding the test results that were obtained as follows:

> A core section of the sample was analyzed using micro-Fourier transform infrared spectoroscopy (FTIR) in the attenuated total reflectance (ATR) mode. Subsequent library searching and interpretation indicated



that the resulting spectrum exhibited absorption bands consistent with a polyacetal homopolymer, such as DuPont's Delrin, or a polyacetal co-polymer, such as Ticona's Celcon. Because of their chemical simialrities, a polyacetal homopolymer cannot be distinguished from a copolymer via FTIR.

23. A Representative of Border Construction Company
1605 Highway 77 West
P.O. Box 521
San Benito, TX 78586

A representative of Border Construction Company will be a non-retained expert who is anticipated to testify regarding damages, the reasonable costs associated with repair and damage to the building after the water loss. Plaintiff is not in possession of a résuméor curriculum vitae for a representative of Border Construction Company.

Plaintiff also designates the following:

24. Any and all other experts who have been or may be identified by any party to this lawsuit. Additionally, other persons have been identified by other parties as persons with knowledge of relevant facts. Those persons are expected to testify regarding factual matters, and have not been formally retained by this party as expert witnesses. However, to the extent that any testimony by such persons may constitute expert opinions, said persons are hereby designated as experts.

Respectfully submitted,

C. WESLEY VINES
Texas Bar Number 20586050
COZEN O'CONNOR
1717 Main Street, Suite 2300
Dallas, Texas 75201
Telephone (214) 462-3000
Telecopier (214) 462-3299

**ATTORNEYS FOR PLAINTIFF**

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the above and foregoing document was served on all parties to this lawsuit, by and through their counsel of record, on the 27th day of June, 2003, addressed as follows:

James R. Old, Jr., Esq.
GERMER GERTZ, L.L.P.
550 Fannin, suite 700
Beaumont, TX 77701
______ Certified Mail, Return Receipt Requested
______ Hand-Delivery
__✓__ Facsimile Transmission
__✓__ Overnight Delivery
______ Regular U.S. Mail

Dale M. "Rhett" Holidy, Esq.
GERMER, GERTZ, L.L.P.
Three Allen Center
333 Clay, Suite 4105
Houston, TX 77002
______ Certified Mail, Return Receipt Requested
______ Hand-Delivery
__✓__ Facsimile Transmission
__✓__ Overnight Delivery
______ Regular U.S. Mail

Gordon D. Laws, Esq.
GARY, THOMASSON, HALL & MARKS
P. O. Box 2888
Corpus Christi, TX 78403-2888
______ Certified Mail, Return Receipt Requested
______ Hand-Delivery
__✓__ Facsimile Transmission
__✓__ Overnight Delivery
______ Regular U.S. Mail

C. WESLEY VINES

DALLAS1\1106331\1 112639.000

 

# CURRICULUM VITAE OF PAUL L. CARPER, P.E.

May 2003

## I. GENERAL INFORMATION

Senior Mechanical Engineer – Partner
Verité Forensic Engineering, LLC.
1036-A First Street
Humble, Texas 77338
281.548.3561

Mechanical engineering consultant with experience in local, national, and international matters. Has provided testimony in numerous state and federal court cases.

## II. PROFESSIONAL SUMMARY

### A. EDUCATION:

Bachelor of Science in Mechanical Engineering, May 1983
Texas A & M University
College Station, Texas 77843

### B. PROFESSIONAL REGISTRATION – CERTIFICATION:

Licensed Professional Engineer, State of Texas
Certificate No. 75811

American Society of Nondestructive Testing – Level III Certification in Basic, Ultrasound, and Radiography test methods.

### C. EXPERIENCE:

Senior Mechanical Engineer – Partner
Verité Forensic Engineering, LLC.
Humble, Texas
August 1998 to present

Forensic engineering analysis of disaster related incidents/accidents, including automotive, pedestrian, commercial trucking and motorcycle accident reconstruction, gas system and appliance testing, and failure analysis of general mechanical systems.

Senior Mechanical Engineer
S.E.A., Inc.
Houston, Texas
December 1993 to July 1998

Senior mechanical engineer responsible for forensic engineering projects including vehicular accident reconstruction and failure analysis of mechanical systems. Vehicular accident investigations involved automobiles, pedestrians, bicycles, motorcycles and tractor-trailers.

Senior Engineer
Lockheed Engineering and Sciences Company
Houston, Texas
June 1991 to October 1993

Project engineer responsible for design, manufacture, destructive/ nondestructive material testing, and failure analysis of components at the NASA – Johnson Space Center facility. Managed radiography laboratory and machine shop.

Materials and Processes Engineer – Structures and Design
Lockheed/Ft. Worth (formerly General Dynamics/FW)
Ft. Worth, Texas
November 1985 to January 1991

Responsible for developing and implementing hardware and procedures for the testing and production of advanced aerospace materials. Held secret security clearance.

Applications Engineer
ITL/Veritas Technologies
Houston, Texas 77084
March 1984 to June 1985

Operated test equipment in field assignments involving pipeline and vessel testing to applicable codes. Conducted laboratory tests of engineering materials.

D.      TRAINING – SEMINARS:

Vehicle Related:

Vehicle Fire Investigation – presented by I.A.A.I – Cody, Wyoming,
September 2002, 20 hours.

Driving Schools – Included high performance car and motorcycle
instruction on closed race courses, with emphasis on vehicle control
concepts. August 1997 and June 1998.

Commercial Vehicle Inspection and Accident Investigation – Texas
Engineering Extension Service, March 1997, 40 hours.

Motorcycle Accident Investigation – Institute of Police Technology
and Management, December 1996, 40 hours.

Advanced Accident Reconstruction – Texas Engineering Extension
Service, April 1995, 40 hours.

Nondestructive Testing:

Radiography/Radiation Safety – General Dynamics, Ft. Worth, Texas,
1988, 40 hours.

Ultrasonic Testing – Level I and II, Westinghouse Technical Institute,
Pittsburgh, Pennsylvania, 1984, 80 hours.

E.      TEACHING – INSTRUCTION:

State Bar of Texas, Professional Development Program. Advanced
Expert Witness Course 2001, faculty member on topic – *The Auto
Accident Reconstruction Expert.*

U.S. Bureau of Alcohol, Tobacco & Firearms (ATF), Mechanical
Aspects of Fire Investigation, November 2001.

Texas State Fire Marshal's Training School, 2000. Taught topic on
natural gas and propane systems at advanced fire investigation class.

Houston Community College and Tomball Community College.
Taught topics on gas systems and the investigation of gas appliance
fires, 1999 and 2000.

Various presentations given on Accident Reconstruction to claims groups and related organizations, 1996 – on.

F.    PUBLICATIONS:

*Tractor-Trailer Accidents* – Eugene Beckham and Paul L. Carper, "For The Defense," Defense Research Institute, Inc., March 2001.

*Development of Fracture Control Methodology for Threaded Fasteners in the Space Program* – Julie A. Henkener, Attibele R. Shamala, Paul L. Carper, Royce G. Forman, Charles L. Salkowski, ASTM Publication 1236/Structural Integrity of Fasteners.

G.    TECHNICAL COMMITTEES – PROFESSIONAL SOCIETIES:

Member, *Technical Committee for Excellence*, Houston Fire Department, January, 2001.

Member Society of Automotive Engineers (SAE)

Member American Society of Mechanical Engineers (ASME)

Member American Society of Nondestructive Testing (ASNT)

VFE

# VERITY FORENSIC ENGINEERING, LLC.

June 2003

## FEE SCHEDULE FOR PROFESSIONAL SERVICES

| | | Hourly Rate |
|---|---|---|
| David A. Reiter, P.E., CFI | Electrical | $200 |
| Paul L. Carper, P.E. | Mechanical | $185 |
| Mark V. Sutherland, E.E., CFEI | Electrical | $135 |
| Technician | | $40 to $60 |
| Clerical | | $35 |

## EXPENSES

Travel and field expenses are billed at cost.

Photographs and reprints are billed at $1.50 per print. Photograph CDs are billed at $10 each. Digital Photographic Albums vary with content.

Travel time, as well as trial and deposition preparation and testimony time, are billed at the standard rates listed above.

Mileage is billed at $0.50 per mile.

Rates are subject to change without notice.

1036 A First Street ♦ Humble, TX 77338 ♦ Telephone 281-548-3561 ♦ Fax 281-548-3562
Mailing Address: P.O. Box 909 Humble, Texas 77347

Jun 24 03 01:13p VFE 281-548-3562 p.2

Jun 23 03 12:25p VFE

## RECORD OF DEPOSITION AND TRIAL TESTIMONY

**Paul L. Carper, P.E.**

| Case Name | Testimony Type | Date |
|---|---|---|
| Allstate v. Whirlpool, et al | Depo | 5/29/03 |
| Sheila Watts v. Colbert | Depo | 7/22/02 |
| State of Texas v. Proffitt | Trial | 6/6/02 |
| Gonzales v. Bollas and Valsamis, Inc. | Trial | 5/16/02 |
| Cearly v. U-Haul | Depo | 4/15/02 |
| R.K. Adams | Depo | 3/6/02 |

| Case Name | Testimony Type | Date | Court/Case# |
| --- | --- | --- | --- |
| Tullis v. Union Pacific, Guajardo v. Union Pacific | Depo | 8/30/01 | 49th District, Webb County, Texas, 2000-CVE-000-914-D1, 2000-CVE-000-915-D1 |
| Stout v. Hallmark | Depo | 7/16/01 | 333rd District, Harris County, Texas, 1999-41989 |
| Mitchell v. Charles Brooks | Trial | 5/22/01 | District Court of Oklahoma County, Oklahoma Case CJ-2000-031-66 |
| Mitchell v. Charles Brooks | Depo | 5/8/01 | District Court of Oklahoma County, Oklahoma Case CJ-2000-031-66 |
| Diaz v. Daro | Trial | 12/12/00 | County Civil Court at Law Number 4, Harris County, TX 653623 |
| Budget Rent A Car Systems v. Romero and Ford Motor Co. | Depo | 10/27/00 | 2nd Judicial District Court, New Mexico, CV 98-10684 |
| Vargas, et al v. Joe Guerra Exxon, et al | Depo | 9/15/00 | 49th District, Webb Co., Texas, 97-CVQ-000034-D1 |
| Olvera v. Garcia, et al | Trial | 6/28/00 | 295th District, Harris Co., Texas, 1998-62871 |

| Case Name | Testimony Type | Date | Court/Case# |
|---|---|---|---|
| Vaswani v. Herbert, et al | Depo | 4/26/00 | Number 1 Probate Court, Travis County, Texas, 70,674-A |
| Washington v. Allen, et al | Trial | 11/10/99 | 239th District, Brazoria Co., Texas, 95-G-2704 |
| Rains v. Elron Enterprises | Depo | 11/3/99 | 125th District, Harris Co., Texas, 98-23939 |
| Quast v. Geo-Air | Depo | 11/2/99 | 152nd District, Harris Co., Texas, 98-36844 |
| Chavarria v. Valley Transit Co., and Roel | Trial | 10/14/99 | 79th District, Jim Wells Co.,Texas, 97-06-35819 |
| Berrones v. Liendo, Zapata Lease and Zapata County | Trial | 9/22/99 | 49th District Court, Zapata County, Texas, Cause 4,221 |
| Marshall v. All States Freight, Miller, and Daimler Chrysler | Trial | 9/8/99 | U.S. District Court, Eastern District of Oklahoma, CIV-99-059-S |

| Case Name | Testimony Type | Date | Court/Case# |
|---|---|---|---|
| Marshall v. All States Freight, Miller, and Daimler Chrysler | Depo | 8/12/99 | U.S. District Court, Eastern District of Oklahoma, CIV-99-059-S |
| Helminger v. U-Haul and Republic Western | Depo | 8/9/99 | U.S. District Court, Eastern District of Louisiana, C.A. 97-0856 |
| Cottonport Gin Co., Inc. v. Millers Mutual | Depo | 7/9/99 | U.S District Court, Western District of Louisiana, C.A. 98-0993 |
| Smith v. Archer | Depo | 6/25/99 | Jefferson County Circuit Court, Alabama, CV-98-199 |
| Berrones v. Liendo, Zapata Lease and Zapata County | Depo | 6/24/99 | 49th District Court, Zapata County, Texas, Cause 4,221 |
| Resendez v. Arrington | Trial | 3/24/99 | County Court at Law No. 2, Fort Bend County, Texas, 15,308 |
| Watson v. Rees Enterprises, Inc. | Depo | 3/10/99 | Division I Circuit Court, City of St. Louis, Missouri, 972-09824, 972-09879 |
| Haynes v. J&B Contractors | Trial | 10/28/98 | 341st District Court, Webb County, Texas, 96-CVE-01543-D3 |

| Case Name | Testimony Type | Date | Court/Case# |
|---|---|---|---|
| McGrew, et ux. v. Walls Industries, Inc. | Depo | 8/24/98 | 267th District Court, Jackson County, Texas, 97-6-10800 |
| McKinney v. Perez and Aguero | Trial | 7/29/98 | 49th District Court, Webb County, Texas, C-965-1370-D1 |
| Randhawa v. Robertshaw and Rimkus | Depo | 6/29/98 | 61st District Court, Harris County, Texas, 93-050250 |
| Dorothy Wilson and Yola Chavis v. Toyota Motor Sales | Depo | 4/30/98 | U.S. District Court, Eastern District of Texas, Lufkin Division, 97CV-00066 |
| Gatens v. Guerrero | Depo | 4/21/98 | 150th District, Bexar County, Texas, 97-CI-04034 |
| Chavarria v. Valley Transit Co., and Roel | Depo | 4/16/98 | 79th District, Jim Wells Co.,Texas, 97-06-35819 |
| Bruun v. Schneider | Depo | 2/4/98 | 295th District, Harris Co., Texas, 96-56850 |

| Case Name | Testimony Type | Date | Court/Case# |
|---|---|---|---|
| Alvarado v. Beach and Morgantown Freight Co. | Trial | 1/15/98 | U.S. District Court, Western District of Texas, El Paso, EP-97-CA-70-H |
| Reeves v. White Industries | Depo | 12/2/97 | 152nd District, Harris Co., Texas, 96-16148 |
| Wicker v. U-Haul, et al. | Depo | 10/13/97 | 285th District, Bexar Co., Texas, 96-CI-18207 |
| Leutz v. Continental Airlines, et al | Trial | 05/06/97-05/07/97 | 152nd District, Harris County, Texas, 95-032674 |
| Leutz v. Continental Airlines, et al | Depo | 05/05/97 | 152nd District, Harris County, Texas, 95-032674 |
| Foster v. Montgomery Ward, et al | Depo | 03/06/97 | 60th District, Jefferson County, Texas, B0151172 |
| McZeal v. Blessing Oil Co. | Trial | 09/05/96 | 58th District, Jefferson County, Texas, A-141,470 |
| Springfield Corp. and L-I v. American Manufacturers Mutual Ins. Co. | Depo | 08/22/96 | U.S. District Court, Eastern District of Louisiana, Section T, Magistrate 4, 95-3611 |

| Case Name | Testimony Type | Date | Court/Case# |
|---|---|---|---|
| Gutierrez v. Culberson et al | Trial | 08/08/96 | 229th District, Duval County, Texas, 15,633 |
| Gutierrez v. Culberson et al | Trial | 07/03/96 | 229th District, Duval County, Texas, 15,633 |
| Gutierrez v. Culberson et al | Depo | 05/29/96 | 229th District, Duval County, Texas, 15,633 |
| Riles v. Bell | Depo | 10/30/95 | Probate Court 1, Harris County, Texas, 266,319-401 |
| Lucio v. Ketchum | Depo | 09/07/95 | 79th District, Brooks County, Texas, 94-12-06453-CV |

# VERITÉ FORENSIC ENGINEERING, LLC.

May 27, 2003

Mr. Wes Vines
Cozen O'Connor
2300 BankOne Center
1717 Main Street
Dallas, TX 75201

RE: ***Toilet Valve Failure Analysis- Preliminary Report***
DOL: 3/5/01
VFE File: 010309
Insured: Valley Diagnostic Clinic

Dear Mr. Vines,

In accordance with your request, Verité Forensic Engineering (VFE) has examined the subject toilet, which flooded at the Valley Diagnostic Clinic in Harlingen, Texas, causing extensive damage.

VFE was specifically requested to determine the cause of the water damage.

The following work was performed on this project:

- A field trip to Valley Diagnostic Clinic, at 2200 Haine Drive in Harlingen, Texas was conducted on March 19, 2001
- A laboratory examination was conducted on May 15, 2001 at VFE's facility in Humble, Texas.
- A small material sample was removed from the toilet valve on June 5, 2001 for laboratory analysis.
- A second field trip to Valley Diagnostic Clinic was conducted on July 3, 2001.

Photographs and notes were taken to document the condition of the toilet and failed component. These photographs were supplied to you previously.

1036 A First Street ♦ Humble, TX 77338 ♦ Telephone 281-548-3561 ♦ Fax 281-548-3562
Mailing Address: P.O. Box 909 Humble, Texas 77347

## DESCRIPTION

The subject toilet was located in Room 2126 of the Cardiology area, as shown in **Attachment 1.** The water supply connection was documented, and the toilet was removed. The toilet was manufactured by American Standard, as was the toilet valve mechanism, which had model number 3140.

Inspection of the toilet revealed that the shank of the fill valve was fractured around a majority of its diameter, approximately 2 inches above the bottom of the tank. The shank of the valve is "upstream" of the valve portion of the device, and is therefore exposed to water supply pressure constantly. The fracture of the shank would cause an uncontrolled, substantial flow of water into the tank, beyond the drain capacity of the overflow tube. It was noted that the pivot pin for the fill valve float arm was partially extended. However, it was determined that the float arm pivoted freely and functioned properly, actuating the valve.

Laboratory testing of a small segment taken from the threaded fitting area of the valve shank indicated that the plastic material it was fabricated from was consistent with a polyacetal homopolymer such as Delrin or Celcon. The laboratory report is enclosed as **Attachment 2.** It was observed that the plastic valve material that was constantly exposed to water was white in appearance, whereas the unexposed areas were gray in color. This included the areas inside the shank prior to the valve (supply water only), and those areas exposed to tank water.

## CONCLUSION

- **The subject toilet flooded as a result of the fill valve shank fracturing while in service, allowing the uncontrolled flow of water to the tank, spilling onto the floor.**

## SIGNATURE AND SEAL

By the signature and seal of the undersigned engineer, Verité Forensic Engineering, LLC., certifies that the opinions forwarded in this report are based on a reasonable degree of engineering certainty, the training, knowledge and experience of the engineer, and are in consideration of all the known facts to date relating to this matter.

Paul L. Carper, P.E.
Texas Registration No. 75811

Attachment 1

May 28 03 02:15p VFE

STORK®

SwL

SOUTHWESTERN LABORATORIES

222 Cavalcade Street, 77009-3213
P.O. Box 8768, Houston, Texas 77249-8768
Tel (713) 692-9151 Fax (713) 696-6307

*Attention:* *Paul L. Carper*
**Verite Forensic Engineering**
**P.O. Box 909**
**Humble, TX 77347**
**(281) 548-3561, 281/548-3562**

W/O. No.: VER025-06-08-14574
Date: 6/25/2001
P.O. No.: VFE010309

**PROJECT INFORMATION**

| | | | |
|---|---|---|---|
| *Material:* | One sample from a ballcock (valve) from a toilet | | |
| *Identification:* | VEF010309 | | |
| *Date Received* | 06/08/2001 | | |
| *Specifications:* | NONE | *Date of Test:* | 06/21/2001 |
| *Test Equipment:* | Testing was performed by Stork Technimet, Inc. a sister division of Stork Southwestern Laboratories | | |

**TEST RESULTS**

A core section of the sample was analyzed using micro-Fourier transform infrared spectroscopy (FTIR) in the attenuated total reflectance (ATR) mode. Subsequent library searching and interpretation indicated that the resulting spectrum exhibited absorption bands consistent with a polyacetal homopolymer, such as DuPont's Delrin®, or a polyacetal copolymer, such as Ticona's Celcon®. Because of their chemical similarities, a polyacetal homopolymer cannot be distinguished from a copolymer via FTIR.

**NOTE:** The submitted material will be discarded after a period of 30 days unless otherwise directed.

**SOUTHWESTERN LABORATORIES**

Our letters and reports are for the exclusive use of the client to whom they are addressed and shall not be reproduced except in full without the approval of the testing laboratory. The use of our name must receive our written approval. Our letters and reports apply only to the sample tested and/or inspected, and are not indicative of the quantities of apparently identical or similar products.

**Attachment 2**

# THOMAS W. EAGAR

MIT, Room 4-136
77 Massachusetts Ave
Cambridge, MA 02139
Voice: (617) 253-3229
FAX: (617) 252-1773
tweagar@mit.edu

Home:
138 Claflin St.
Belmont, MA 02478
(617) 484-0571

## PROFESSIONAL INTERESTS:

Materials processing and manufacturing; special interests in welding and joining of metals, ceramics and electronic materials; deformation processing; alternate manufacturing processes; manufacturing management; materials systems analysis; selection of materials and failure analysis.

## EDUCATION:

S.B. Metallurgy and Materials Science,
Massachusetts Institute of Technology, 1972
Sc.D. Metallurgy, Massachusetts Institute of Technology, 1975
--- Business Administration, Lehigh University, 1975-76
--- Program for Senior Executives, Sloan School of Management,
Massachusetts Institute of Technology, 1988

## EMPLOYMENT:

Bethlehem Steel Corporation
Homer Research Laboratories
Research Engineer, 1974-1976
Massachusetts Institute of Technology
Department of Materials Science and Engineering
Assistant Professor of Materials Engineering, 1976-1980
Associate Professor of Materials Engineering, 1980-1987
US Office of Naval Research - Tokyo
Liaison Scientist, 1984-1985
Massachusetts Institute of Technology
Professor of Materials Engineering, 1987-
Professor of Engineering Systems, 2000-
Leaders for Manufacturing Professor, 1988-1993
Department Head, Materials Science and Engineering (Acting), March 1989
–August, 1989

Richard P. Simmons Professor of Materials Engineering, 1990-1993
Director, Materials Processing Center, 1991-1993
POSCO Professor of Materials Engineering, 1993-1999
Co-Director, Leaders for Manufacturing Program, 1993-1995
Department Head, Materials Science & Engineering, 1995-2000
Thomas Lord Professor of Materials Engineering and Engineering Systems, 2001-

**HONORS AND AWARDS:**
International Junior Civitan of the Year, 1968
Dennison K. Bullens Scholarship, 1969-1971
Foundry Educational Foundation Scholarship, 1970-1971
Phi Lambda Upsilon, Member 1971
Tau Beta Pi, Member, 1971; Distinguished Service Award, 1980
National Science Foundation Graduate Fellowship, 1972-1974
Metallurgy and Materials Prize, Boston Section AIME, 1972
Adams Memorial Membership Award, American Welding Society, 1979-1983
Charles H. Jennings Memorial Medal, American Welding Society, 1983, 1991
Champion H. Mathewson Gold Medal, TMS-AIME, 1987
Henry Krumb Lecturer, TMS/SME-AIME, 1987
National Science Foundation Creativity Extension Award, 1988-1990
ASM International, Fellow, 1989
Houdremont Lecturer, International Institute of Welding, 1990
Richard P. Simmons Professorship, 1990-1993
Warren F. Savage Award, American Welding Society, 1990, 1996
William Spraragen Award, American Welding Society, 1990, 1993
Comfort A. Adams Lecturer, American Welding Society, 1992
Henry Marion Howe Medal, ASM International, 1992
William Irrgang Award, American Welding Society, 1993
Leaders for Manufacturing Professorship, 1988-1993
Richard P. Simmons Professorship, 1990-1993
POSCO Professorship, 1993-1999
Thomas Lord Professorship, 2001-
American Welding Society, Fellow, 1994, Honorary Member, 1999
Nelson W. Taylor Lecturer, Pennsylvania State University, 1995
National Academy of Engineering, 1997
General Electric Distinguished Lecture, Rensselaer Polytechnic Institute, 2001
Silver Quill Award, American Welding Society, 2002
American Association for the Advancement of Science, Fellow, 2003

**ACTIVITIES:**
National Academy of Engineering, Member
American Welding Society, Fellow and Honorary Member; *Welding Journal*, Principal Reviewer; Awards Committee, Professional Certification Committee
American Council of International Institute of Welding, Member
ASM International, Fellow
American Institute of Mining, Metallurgical and Petroleum Engineers, Member
Tau Beta Pi, Member, New England District Director (1977-1980), MIT

Chapter Advisor, 1977- 2001, Chief Advisor, 2002 -
American Association for the Advancement of Science, Fellow
Society of Automotive Engineers, Member
American Ceramic Society, Member
Society of Manufacturing Engineers, Member
American Society of Mechanical Engineers, Member
American Society for Testing and Materials, Member
Materials Research Society, Member
Registered Professional Engineer, Massachusetts Certificate Number 29726
Navy Joining Center, Technical Advisory Board
Editorial Board, *Science and Technology of Welding and Joining*
National Research Council, Ocean Studies Board, Committee on Future Needs in Deep Submergence Science, Member
Automatic Welding Journal (Ukraine), Member International Editorial Council, 2002
National Research Council, Board of Manufacturing and Engineering Design, Member

**TEACHING EXPERIENCE:**

| Undergraduate: | Graduate: | Professional: |
|---|---|---|
| Thermodynamics | Kinetics | Materials Selection |
| Chemical Metallurgy | Deformation Processing | Welding and Joining Processes |
| Physical Metallurgy | Welding and Joining Processes | Failure Analysis |
| Materials Processing | Materials Selection | Non-destructive Testing |
| Solid State Chemistry | Product Design | |
| Physical Chemistry | | |
| Essentials of Engineering | | |

**PUBLICATIONS:**

1. "Metallurgical Considerations for Optimizing the Superconducting Properties of $Nb_3Al$," J.G. Kohr, T.W. Eagar, and R.M. Rose, *Metall. Trans., 3(5),* 1177, 1972.

2. "Preliminary Measurements of the Critical Current Density of $Nb_3Al_{0.8}Ge_{0.2}$ Ribbon", R. Loberg, T. W. Eagar, I. M. Puffer, R. M. Rose, in *Proc of Fourth Int. Conf. on Magnet Technology*, Brookhaven National Lab, 1972.

3. "Fabrication and Jc(H,T) Measurements on $Nb_3Al_{.75}Ge_{.25}$ Ribbon," R. Loberg, T.W. Eagar, I.M. Puffer and R.M. Rose, *Appl. Phys. L., 22(2).* 69, 1973.

4. "Resistive Measurements on an Improved NbAlGe Superconducting Ribbon," T.W. Eagar and R.M. Rose, *IEEE Nucl. S., NS-20 (3),* 742, 1973.

5. "Improved Jc in Mechanically Fabricated $Nb_3Al$ Wires and Ribbons," T.W. Eagar and R.M. Rose, *IEEE Magnet., Mag-11(2),* 214, 1975.

6. "LNG Hull Steels with Improved High Heat Input Weldability," T.W. Eagar and J.C.

Baker, ASM-ASTM-MPC Symposium on Low Temperature Properties of Ship Plate, 1976.

7. "Sources of Weld Metal Oxygen Contamination During Submerged Arc Welding," T.W. Eagar, *Welding J., 57(3),* 76s, 1978.

8. "Electromagnetically and Thermally Driven Flow Phenomena in Electroslag Welding," A.H. Dilawari, J. Szekely and T.W. Eagar, *Metall. Trans., 9B(9),* 371, 1978.

9. "An Analysis of Heat and Fluid Flow Phenomena in Electroslag Welding," A.H. Dilawari, T.W. Eagar and J. Szekely, *Welding J., 57(1),* 24s, 1978.

10. "A Mathematical Model of Heat and Fluid Flow Phenomena in Electroslag Welding," J. Szekely and T.W. Eagar, in *Proc. of IIW Coll. on Applications of Numerical Techniques in Welding*, Dublin, Ire., 1, 1978.

11. "Oxygen and Nitrogen Contamination During Arc Welding" T.W. Eagar, in *Proc. of Welding-Physical Metallurgy and Failure Phenomena*, R.J. Cristoffel, ed., General Electric, Schenectady, NY, 31, 1979.

12. "The Analysis of Magnetohydrodynamics and Plasma Dynamics in Metals Processing Operations," C.W. Chang, J. Szekely, and T.W. Eagar, in *Proc. of the Sagamore Conf. on Recent Advances in Metals Processing*, 1, 1977.

13. "On the Micromechanics of Multifilamentary Superconducting Composites," S.F. Cogan, D.S. Holmes, I.M. Puffer, T.W. Eagar, and R.M. Rose, *IEEE Magnet., Mag-15(1),* 684, 1979.

14. "Superconducting Cu-$Nb_3Sn$ Composites Produced by Cold Extrusion of Fine Powders," R. Flukiger, S. Foner, E.J. McNiff Jr., B.B. Schwartz, J. Adams, S. Forman, T.W. Eagar, and R.M. Rose, *IEEE Magnet., Mag-15(1),* 689, 1979.

15. "The Modelling of Gas Velocity Fields in Welding Arcs," C.W. Chang, T.W. Eagar and J. Szekely, *Arc Physics and Weld Pool Behavior*, The Welding Institute, Cambridge, Eng., 381, 1980.

16. "Ductility of Stabilized Ferritic Stainless Steel Welds," G.B. Hunter and T.W. Eagar, *Metall. Trans., 11A(2),* 213, 1980.

17. "The Effect of SAW Parameters on Weld Metal Chemistry," C.S. Chai and T.W. Eagar, *Welding J., 59(3),* 93s, 1980.

18. "Heat Generation Patterns and Temperature Profiles in Electroslag Welding," T. DebRoy, J. Szekely and T.W. Eagar, *Metall. Trans., 11B(12),* 593, 1980.

19. "Temperature Profiles, the Size of the Heat Affected Zone and Dilution in Electroslag Welding," T. DebRoy, J. Szekely and T.W. Eagar, *Mat. Sci. Eng., 56(2),* 181, 1982.

20. "Oxygen and Nitrogen Contamination During Submerged Arc Welding of Titanium," T.W. Eagar, in *Proc. of the Int. Conf. on Welding Research in the 1980's*, Osaka University, Osaka, Japan, 113, 1980.

21. "Slag-metal Equilibrium During Submerged Arc Welding," C.S. Chai and T.W. Eagar, *Metall. Trans., 12B(3),* 539, 1981.

22. "Automated Welding--Research Needs," T.W. Eagar, in *Modeling of Casting and Welding Processes*, AIME, Warrendale, PA, 487, 1981.

23. "Mathematical Modeling of the Temperature Profiles and Weld Dilution in Electroslag Welding of Steel Plates," T. DebRoy, J. Szekely and T.W. Eagar, in *Modeling of Casting and Welding Processes,* AIME, Warrendale, PA, 197, 1981.

24. "Physics of Arc Welding," T.W. Eagar, in *AIP/AISI Conf. on Applications of Physics in the Steel Industry*, AIP, New York, 272, 1981.

25. "Slag-Metal Reactions in Binary CaF2-Metal Oxide Welding Fluxes," C.S. Chai and T.W. Eagar, *Welding J., 61(7),* 229s, 1982.

26. "The Effect of Electrical Resistance on Nugget Formation During Spot Welding," J.G. Kaiser, G.J. Dunn and T.W. Eagar, *Welding J., 61(6),* 167s, 1982.

27. "High Cycle Fatigue of Weld Repaired Cast Ti-6Al-4V," G.B. Hunter, F.S. Hodi and T.W. Eagar, *Metall. Trans., 13A(9),* 1589, 1982.

28. "A Parametric Study of the Electroslag Welding Process," W.S. Ricci and T.W. Eagar, *Welding J., 61(12)*, 397s, 1982.

29. "Selective Evaporation of Metals From Weld Pools," A. Block-Bolten and T.W. Eagar, *Trends in Welding Research in the United States*, S.A. David, ed., ASM International, Metals Park, OH, 53, 1982.

30. "Laser Welding of Aluminum and Aluminum Alloys," C.A. Huntington and T.W. Eagar, *Welding J., 62(4),* 105, 1983.

31. "Measurements of the Force Exerted by a Welding Arc," T.D. Burleigh and T.W. Eagar, *Metall. Trans., 14A(6),* 1223, 1983.

32. "Changes of Weld Pool Shape by Variations in the Distribution of Heat Source in Arc Welding," N.S. Tsai and T.W. Eagar, in *Modelling of Casting and Welding Processes II*, J.A. Dantzig and J.T. Berry, eds., AIME, New York, 317, 1984.

33. "Comparison of Theoretically Predicted and Experimentally Determined Submerged Arc Weld Deposit Compositions," U. Mitra, R.D. Sutton, and T.W. Eagar, *Metall. Trans., 14B(9),* 510, 1983.

34. "Slag Metal Reactions During Submerged Arc Welding of Alloy Steels," U. Mitra and T.W. Eagar, *Metall. Trans., 15A(1),* 217, 1983.

35. "Convection in Arc Weld Pools," G.M. Oreper, T.W. Eagar, and J. Szekely, *Welding J., 62(11),* 307, 1983.

36. "Temperature Fields Produced by Travelling Distributed Heat Sources," N.S. Tsai and T.W. Eagar, *Welding J., 62(12),* 346s, 1983.

37. "Influence of Surface Depression and Convection on Arc Weld Pool Geometry," M.L. Lin and T.W. Eagar, in *Transport Phenomena in Material Processing,* PED, Vol. 10/HTD, 29, M.M. Chen, J. Mazumder, and C.L. Tucker III, eds., ASME, New York, 63, 1983.

38. "Metal Vaporization From Weld Pools," A. Block-Bolten and T.W. Eagar, *Metall. Trans., 15B(3),* 461, 1984.

39. "Prediction of Weld Metal Composition During Flux Shielded Welding," C.S. Chai and T.W. Eagar, *J. Mat. Energy Sys., 5(3),* 160, 1983.

40. "Selection of Processes for Welding Steel Rails," N.S. Tsai and T.W. Eagar, *Railroad Rail Welding*, Railway Systems and Management Assoc., Northfield, NJ, 421, 1985.

41. "Metallurgical and Process Variables Affecting The Resistance Spot Weldability of Galvanized Sheet Steels," S.A. Gedeon, D. Schrock, J. LaPointe, T.W. Eagar, SAE Technical Paper 840113, Warrendale, PA, 1984.

42. "Distribution of the Heat and Current Fluxes in Gas Tungsten Arcs," N.S. Tsai and T.W. Eagar, *Metall. Trans., 16B(4),* 841, 1985.

43. "The Size of the Sensitization Zone in 304 Stainless Steel Welds," N.S. Tsai and T.W. Eagar, *J. Mat. Energy Sys., 6(1),* 33, 1984.

44. "A Method of Filming Metal Transfer in Welding," C.D. Allemand, R. Schoeder, D.E. Ries and T.W. Eagar, *Welding J., 64(1),* 45, 1985.

45. "Influence of Arc Pressure on Weld Pool Geometry," M.L. Lin and T.W. Eagar, *Welding J., 64(6),* 163s, 1985.

46. "Slag Metal Reactions During Submerged Arc Welding of Steel," U. Mitra and T.W. Eagar, in *Proc. of Int. Conf. on Quality and Reliability in Welding*, 2, Chinese Mech. Eng. Soc., Harbin, PRC, B.24.1, 1984.

47. "An Improved Method of Multiwavelength Pyrometry," G.B. Hunter, C.D. Allemand, and T.W. Eagar, in *Thermosense VII, Proc. SPIE 520*, SPIE, Bellingham, WA, 40, 1985.

48. "Multiwavelength Pyrometry: An Improved Method," G.B. Hunter, C.D. Allemand, and T.W. Eagar, *Opt. Eng., 24(6),* 1081, 1985.

49. "Electron Beam and Laser Materials Processing in Japan," T.W. Eagar, *Welding J., 65(7),* 19, 1986.

50. "Pressures Produced by Gas Tungsten Arcs," M.L. Lin and T.W. Eagar, *Metall. Trans., 17B(9),* 601, 1986.

51. "Resistance Spot Welding of Galvanized Steel: Part I, Materials Variations and Process Modifications," S.A. Gedeon and T.W. Eagar, *Metall. Trans., 17B(12),* 879, 1986.

52. "Resistance Spot Welding of Galvanized Steel: Part II, Mechanisms of Spot Weld Nugget Formation," S.A. Gedeon and T.W. Eagar, *Metall. Trans., 17B(12),* 887, 1986.

53. "Measurement of Dynamic Electrical and Mechanical Properties of Resistance Spot Welds," S.A. Gedeon, C.D. Sorensen, K.T. Ulrich, and T.W. Eagar, *Welding J., 66(12),* 387s, 1987.

54. "Metal Vapors in Gas Tungsten Arcs Part I: Spectroscopy and Monochromatic Photography," G.J. Dunn, C.D. Allemand, and T.W. Eagar, *Metall. Trans., 17A(10),* 1863, 1986.

55. "Metal Vapors in Gas Tungsten Arcs Part II: Theoretical Calculations of Transport Properties," G.J. Dunn and T.W. Eagar, *Metall. Trans., 17A(10),* 1871, 1986.

56. "Cinematography of Resistance Spot Welding of Galvanized Steel Sheet," C.T. Lane, C.D. Sorensen, G.B. Hunter, S.A. Gedeon, and T.W. Eagar, *Welding J., 66(9),* 260s, 1987.

57. "Prototype Device for Multiwavelength Pyrometry," G.B. Hunter, C.D. Allemand, and T.W. Eagar, *Opt. Eng., 25(11),* 1222, 1986.

58. "The Role of Transient Convection in the Melting and Solidification in Arc Weldpools," G.M. Oreper, J. Szekely and T.W. Eagar, *Metall. Trans., 17B(4),* 735, 1986.

59. "Effects of Surface Depression and Convection in GTA Welding," M.L. Lin and T.W. Eagar, *Advances in Welding Science & Technology*, S.A. David, ed., ASM International, Metals Park, OH, 47, 1986.

60. "Digital Signal Processing as a Diagnostic Tool for Gas Tungsten Arc Welding," C.D. Sorensen and T.W. Eagar, *Advances in Welding Science & Technology,* S.A. David, ed., ASM International, Metals Park, OH, 467, 1986.

61. "The Physics and Chemistry of Welding Processes," T.W. Eagar, *Advances in Welding Science & Technology,* S.A. David, ed., ASM International, Metals Park, OH, 291, 1986.



62. "Non-Uniform Current Distribution in Spot Welding," R. Bowers and T.W. Eagar, in *AWS Sheet Metal Welding Conference*, Detroit, MI, October, 1986.

63. "Visible Light Emissions During Gas Tungsten Arc Welding and its Applications to Weld Image Improvement," E. Kim, C. Allemand and T.W. Eagar, *Welding J., 66(12),* 369s, 1987.

64. "The Real Challenge in Materials Engineering," T.W. Eagar, *Technology Review*, *90* (2), 24, 1987 (also published in Japanese in Berufu, 43, 1987).

65. "Materials Science and Engineering in the US - Past, Present & Future," T.W. Eagar, *Bulletin of Japan Institute of Metals, 26(2),* 119, 1987 (Japanese).

66. "The Promise of New Materials - Real or Imaginary," T.W. Eagar, *J. of Metals,* 20, 1987.

67. "Transient Thermal Behavior in Resistance Spot Welding," E.Kim and T.W. Eagar, in *AWS Detroit Section Sheet Metal Welding Conference III*, Southfield, MI, 1988.

68. "Brazing Alloy Design for Metal/Ceramic Joints," R.R. Kapoor and T.W. Eagar, *Ceramic Engineering Science Proceedings*, *10 (11-12)*, 1613, American Ceramic Society, Westerville, OH, 1989.

69. "Parametric Analysis of Resistance Spot Welding Lobe Curve," E.W. Kim and T. W. Eagar, *SAE 1988 Transactions, J. of Materials, 97(2),* 1989, SAE paper 880278.

70. "Ceramic-Metal Bonding Research in Japan," T.W. Eagar, *Welding J., 66(11),* 35, 1987.

71. "Slag-Metal Reactions During Welding - Part I: Evaluation and Reassessment of Existing Theories," U. Mitra and T.W. Eagar, *Metall. Trans., 22B(2),* 65, 1991.

72. "Slag-Metal Reactions During Welding - Part II: Theory," U. Mitra and T.W. Eagar, *Metall. Trans., 22B(2),* 73, 1991.

73. "Slag-Metal Reactions During Welding - Part III: Experimental Verification of the Theory," U. Mitra and T.W. Eagar, *Metall. Trans., 22B(2),* 83, 1991.

74. "Modelling of Oscillations in Partially Penetrated Weld Pools," C.D. Sorensen and T.W. Eagar, *J. Dynamic Systems and Control, 112(9),* 469, 1990.

75. "Measurement of Oscillations in Partially Penetrated Weld Pools Through Spectral Analysis," C.D. Sorensen and T.W. Eagar, *J. Dynamic Systems and Control, 112(9),* 463, 1990.

76. Electrode Geometry in Resistance Spot Welding," R.J. Bowers, C.D. Sorensen and T.W. Eagar, *Welding J., 69(2),* 45s, 1990.

77. "Assessing Hydrogen Assisted Cracking Fracture Modes in High Strength Steel

Weldments," S.A. Gedeon and T.W. Eagar, *Welding J., 69(6),* 213s, 1990.

78. "Wettability of Silver Based Reactive Metal Brazing Alloys on Alumina," R.R. Kapoor, E.S. Podszus and T.W. Eagar, *Scripta Metallurgica, 22*, 1277, August 1988.

79. "Oxidation Behavior of Silver and Copper Based Brazing Filler Metals for Silicon Nitride/Metal Joints," R.R. Kapoor and T.W. Eagar, *J. of the American Ceramic Society, 72(3),* 448, 1989.

80. "Thermochemical Analysis of Hydrogen Absorption in Welding," S.A. Gedeon and T.W. Eagar, *Welding J., 69(7),* 264-s, 1990.

81. "Analyses of Electrode Heat Transfer in Gas Metal Arc Welding," Y-S. Kim, D. McEligot, T.W. Eagar, *Welding J., 70(1),* 20s, 1991.

82. "Enhancement of the Weldability in Resistance Welding," C.M. Calva and T.W. Eagar, in *AWS Detroit Section Sheet Metal Welding Conference IV*, Southfield, MI, 1990.

83. "Modelling of Metal Transfer in Gas Metal Arc Welding," Y-S. Kim and T.W. Eagar, in *Edison Welding Institute Annual North American Welding Research Seminar*, Columbus, OH, 1988.

84. "Modeling of Welding Distortion in Complex Structures," A. Moshaiov and T.W. Eagar, *Automation in the Design and Manufacture of Large Marine Systems*, C. Chryssostomidis, ed., Hemisphere Publishing Corporation, New York, 235, 1990.

85. "Measuring the Residual Ferrite Content of Rapidly Solidified Stainless Steel Alloys," J.W. Elmer and T.W. Eagar, *Welding J., 69(4),* 141s, 1990.

86. "Measurement of Transient Temperature Response During Resistance Spot Welding," E.W. Kim and T.W. Eagar, *Welding J., 60(8),* 303s, 1989.

87. "Microstructural Development During Solidification of Stainless Steel Alloys," J.W. Elmer, S.M. Allen and T.W. Eagar, *Metall. Trans., 20A(10),* 2117, 1989.

88. "Technology Transfer and Cooperative Research in Japan," T.W. Eagar, *Welding J.,* 39, 1989.

89. "Fundamental Aspects of Electroslag Welding of Titanium Alloys," T.W. Eagar, J.H. Devletian, S.J. Chen, W.E. Wood and I.L. Caplan, *Recent Trends in Welding Science and Technology*, S.A. David and J. M. Vitek, eds., ASM International, Materials Park, OH, 419, 1990.

90. "The Influence of Cooling Rate on the Ferrite Content of Stainless Steel Alloys," J.W. Elmer, S.M. Allen and T.W. Eagar, *Recent Trends in Welding Science and Technology*, S.A. David and J. M. Vitek, eds., ASM International, Materials Park, OH, 165, 1990.

91. "Non-Contact True Temperature Measurements for Process Diagnostics," M.A. Khan, C.D. Allemand and T.W. Eagar, in *Proc. of Materials Research Society Symposium on Process Diagnostics: Materials, Combustion, Fusion, 117*, 119, 1988.

92. "Parametric Study of Heat Flow During Resistance Spot Welding," E.W. Kim and T.W. Eagar, *Modeling and Control of Casting and Welding Processes IV*, A.F. Giamei and G.J. Abbaschian, eds., TMS, Warrendale, PA, 1988.

93. "An Iconoclast's View of the Physics of Welding - Rethinking Old Ideas," T.W. Eagar, *Recent Trends in Welding Science and Technology*, S.A. David and J. M. Vitek, eds., ASM International, Materials Park, OH, 341, 1990.

94. "Temperature Distribution and Energy Balance in the Electrode During GMAW," Y-S. Kim and T.W. Eagar, *Recent Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park, OH, 13, 1990.

95. "The Transition from Shallow to Deep Penetration During Electron Beam Welding," J.Elmer, W.H. Giedt and T.W. Eagar, *Welding J., 69(5)*, 167s, 1990.

96. "Characterization of Spatter in Low Current GMAW of Titanium Plate," S.T. Eickhoff and T.W. Eagar, *Welding J., 69(10)*, 382s, 1990.

97. "Metal Transfer in Pulsed Current Gas Metal Arc Welding," Y-S. Kim and T.W. Eagar, *Welding J.,72 (7)*, 279-s, 1993.

98. "Improving the Calculation of Interdiffusion Coefficients," R.R. Kapoor and T.W. Eagar, *Metall. Trans., 21A(12)*, 3039, 1990.

99. "Effect of Second Phase Particles on Direct Brazing of Alumina Dispersion Hardened Copper," A.A. McFayden, R.R. Kapoor and T.W. Eagar, *Welding J., 69(11)*, 399s, 1990.

100. "Tin-Based Reactive Solders for Ceramic/Metal Joints," R.R. Kapoor and T.W. Eagar, *Metall. Trans., 20B(12)*, 919, 1989.

101. "Thermochemistry of Joining," T.W. Eagar, in *Elliott Symposium on Chemical Process* Metallurgy, P.J. Koros and G.R. St. Pierre, eds., Iron and Steel Society, Warrendale, PA, 197, 1991.

102. "Challenges in Joining Emerging Materials," T.W. Eagar, in *Proc. of International Conference on Advances in Joining Newer Structural Materials*, Montreal, Canada, 1990, Pergamon Press, Oxford, 3, 1990. (English and French)

103. "Physics of Arc Welding Processes," T.W. Eagar, *Advanced Joining Technologies*, T.H. North, ed., Chapman and Hall, London, U.K., 61, 1990.

104. "Thermodynamic Data from Diffusion Couples - I," R.R. Kapoor and T.W. Eagar, *Acta Metallurgica, 38(12)*, 2741, 1990.

105. "Thermodynamic Data from Diffusion Couples - II," R.R. Kapoor and T.W. Eagar, *Acta Metallurgica, 38(12)*, 2755, 1990.

106. "Non-Contact Temperature Measurement - I: Interpolation-Based Techniques," M.A. Khan, C. Allemand and T.W. Eagar, *Review of Scientific Instruments, 62(2)*, 392, 1991.

107. "Non-Contact Temperature Measurement - II: Least Squares-Based Techniques," M.A. Khan, C. Allemand and T.W. Eagar, *Review of Scientific Instruments, 62(2)*, 403, 1991.

108. "Whither Advanced Materials," T.W. Eagar, *Advanced Materials & Processes, 139(6)*, 25, 1991.

109. "The Future of Metals," T.W. Eagar, *Welding J., 70(6)*, 69, 1991.

110. "Single-Phase Solidification During Rapid-Resolidification of Stainless Steel Alloys," J.W. Elmer, T.W. Eagar and S.M. Allen, in *Proc. of the Materials Weldability Symposium*, ASM International, Materials Park, OH, 143, 1990.

111. "Analysis of Metal Transfer in Gas Metal Arc Welding," Y-S. Kim and T.W. Eagar, *Welding J. 4*, 269s-276s, 1993.

112. "Calculation of Electrical and Thermal Conductivities of Metallurgical Plasmas," G.J. Dunn and T.W. Eagar, *Welding Research Council Bulletin 357*, Welding Research Council, New York, 1, 1990.

113. "Joining of Aluminum Matrix Composites by Plasma Spraying," T. Itsukaichi, M. Umemoto, I. Okane, T.W. Eagar and K. Fukui, in *Proc. of the International Conference on New Advances in Welding and Allied Processes, Vol II*, International Academic Publishers, Beijing, China, May 1991.

114. "Plasma Spray Joining of Aluminum Matrix Composites Using Osprey Composite Powder," T. Itsukaichi, T.W. Eagar, M. Umemoto, and I. Okane, *Transactions of the Japan Welding Society, 10(2)*, 309, 1992. (Japanese)

115. "Transient Liquid Phase Bonding Processes," W.D. MacDonald and T.W. Eagar, *The Metal Science of Joining*, M.J. Cieslak, J.H. Perepezko, S. Kang, M.E. Glicksman, eds., Metallurgical Society, Warrendale, PA, 93, 1991.

116. "Infrared Radiation from an Arc Plasma and Its Application to Plasma Diagnostics," T. Ohji and T.W. Eagar, *J. of Plasma Physics and Chemistry, 12(4)*, 403, 1992.

117. "Transient Liquid Phase Bonding," W.D. MacDonald and T.W. Eagar, *Annual Review of Materials Science, 22*, 23, 1992.

118. "Materials Manufacturing," T.W. Eagar, *MRS Bulletin, 4*, 27, 1992.

119. "Problems in Engineering and Science Education: Why Do We Have a Weakness in Materials Synthesis and Processing?," T.W. Eagar, *MRS Bulletin, 9,* 36, 1992.

120. "Resistance Welding: A Fast, Inexpensive and Deceptively Simple Process," T.W. Eagar, in *International Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park,OH, 347, 1992.

121. "Low Temperature Transient Liquid Phase Bonding of Ti-6Al-4V," W.D. MacDonald and T.W. Eagar, *International Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park, OH, 1083, 1992.

122. "Investigations of Drop Detachment Control in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar, J.H. Lang, *International Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park, OH, 1009, 1992.

123. "Metal Transfer Control in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar, J.H. Lang, in *Tenth Symposium on Energy Engineering Sciences*, Argonne National Laboratory, Argonne, IL, May, 1992.

124. "Low Temperature Transient Liquid Phase (LTTLP) Bonding for Au/Cu and Cu/Cu Interconnections," M. Hou and T.W. Eagar, Trans. of ASME, *J. of Electronic Packaging, 114*, 443, 1992.

125. "Low Stress Die Attach by Low Temperature Transient Liquid Phase Bonding," J.W. Roman and T.W. Eagar, in *1992 International Symposium on Microelectronics, 52,* (sponsored by the International Society for Hybrid Microelectronics, ISHM), San Francisco, CA, 81, 1992.

126. "Characterization of Spatter in Low-Current GMAW of Titanium Alloy Plate," S.T. Eickhoff and T.W. Eagar, in *Proc. of the Technical Program from the 1990 TDA International Conference on Products and Applications*, Orlando, FL, October 1990.

127. "High Energy Electron Beam Welding & Materials Processing," V.R. Dave, D.L. Goodman, T.W. Eagar, K.C. Russell, in *Proc. of AWS High Energy Electron Beam Welding & Materials Processing*, 156, 1993.

128. "High Energy Electron Beam (HEEB) Processing of Advanced Materials," V.R. Dave, D.L. Goodman, M. Farnush, T.W. Eagar, K.C. Russell, in *Proc. of AWS-HEEB Processing of Advanced Materials*, Chicago, IL, 537, 1992.

129. "Joining of 6061 Aluminum Matrix-Ceramic Particle Reinforced Composites," R. Klehn, T.W.Eagar, *WRC Bulletin 385,* 1, 1993.

130. "In-Space Welding, Visions and Realities," D. Tamir, T. A. Siewert, K. Masubuchi, L. Flanigan, R. Su, and T.W. Eagar, in *Proc. of Thirtieth Space Congress: "Yesterday's Vision is Tomorrow's Reality", (4),* 1.9, Cocoa Beach, Florida, 1993.

131. "Evolving Manufacturing Practices: Lessons for the Quality Control Engineer," T.W. Eagar, *Materials Evaluation, 51(10)*, 1184, 1993.

132. "Joining of Advanced Materials," T.W. Eagar, W.A. Baeslack, R. Kapoor, *Encyclopedia of Advanced Materials*, D.Bloor, M. Flemings, R. Brook, S. Mahajan, eds., Pergamon Press, Oxford, 1207, 1994.

133. "Advanced Joining Processes," T.W. Eagar, W.A. Baeslack, *Encyclopedia of Advanced Materials*, D. Bloor, M. Flemings, R. Brook, S. Mahajan, eds., Pergamon Press, Oxford, 1221, 1994.

134. "Leaders for Manufacturing: Educating for the Future," T.W. Eagar, *AAAS Science and Technology Policy Yearbook*, A.H. Teich, S.D. Nelson, C. McEnaney, eds., AAAS, 229, 1994.

135. "Welding Process Decoupling for Improved Control," D.E. Hardt, T.W. Eagar, J.H. Lang and L. Jones in *Proc. of 11th Symp. on Energy Engineering Sciences*, Argonne National Laboratory, Argonne, IL, 287, 1993.

136. "Heat and Metal Transfer in Gas Metal Arc Welding using Argon and Helium," P.G. Jonsson, T.W. Eagar and J. Szekeley, *Metall. Trans., 26B(4)*, 383, 1995.

137. "The Only Constant is Change," T.W. Eagar, *Welding Journal, 74(12)*, 63, 1995.

138. "Cleaning and Reflow of Pb-Sn-C4 Solder Bumps," C. Lee, D. Crafts, T.W, Eagar, Trans. of ASME, *J. of Electronic Packaging, 117(4)*, 277, 1995.

139. "Redefining the University-Industry Relationship for Manufacturing Excellence," T.W. Eagar, W. C. Hanson, T.L. Magnanti and D.B. Rosenfield, in *Proc. of the 4th Annual Pittsburgh Manufacturing Systems Engineering Conf.*, 1993.

140. "Bringing New Materials to Market," T.W. Eagar, *Technology Review*, 42, February/March, 1995.

141. "Welding and Joining: Moving from Art to Science," *Welding Journal, 74(6)*, 49, 1995.

142. "Evaluation Method for Electrochemical Migration Susceptibility in Pure Water," (Japanese), T. Takemoto, R.M. Latanision, T.W. Eagar and A. Matsunawa, in *Proc. of 1st Symposium on Microjoining and Assembly Technology in Electronics*, Japan Welding Society Committee of Microjoining, Tokyo, 105, 1995.

143. "The Temporal Nature of Forces Acting on Metal Drops in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar, J.H. Lang, *Trends in Welding Research*, H.B. Smartt, J.A. Johnson, S.A. David, eds., ASM International, Materials Park, OH, 365, 1996.

144. "Plasma Spray Joining of Al-Matrix Particulate Reinforced Composites," T. Itsukaichi, T.W. Eagar, M. Umemoto and I. Okane, *Welding Journal, 75(9)*, 285s, 1996.

1998.

159. 'The Quiet Revolution in Materials Processing," T.W. Eagar, in *Proc. of Third Pacific Rim International Conference on Advanced Materials and Processing*, M.A. Imam, R. DeNale, S. Hanada, et al., eds.,TMS, Warrendale, PA, 1, 1998.

160. "Magnitude Scaling of Free Surface Depression During High Current Arc Welding, P.F. Mendez and T.W. Eagar, in *Trends in Welding Research*, ASM International, 13-18, June 1-5, 1998.

161. "In Search of the Perfect Weld," T.W. Eagar, *Trends in Welding Research*, J.M. Vitek, S.A. David *et al*, eds., ASM International, Materials Park, OH, 261, 1999.

162. "Study of Chromium in Gas Metal Arc Welding Fume," T.W. Eagar, P. Sreekanthan, N.T. Jenkins *et al.,Trends in Welding Research*, J.M. Vitek, S.A. David *et al*, eds., ASM International, Materials Park, OH, 374, 1999.

163. "Magnitude Scaling of Free Surface Depression during High Current Arc Welding," P.F. Mendez and T.W. Eagar, *Trends in Welding Research*, , J.M. Vitek, S.A. David *et al*, eds., ASM International, Materials Park, OH, 13, 1999.

164. "Liquid Infiltrated Powder Interlayer Bonding (LIPIB) - A Process for Large Gap Joining," W.D. Zhuang and T.W. Eagar, *Science and Technology of Welding and Joining*, 2000 Volume 5, Number 3, 125-134.

165. "Images of a Steel Electrode in Ar-2%O2 During Constant-Current Gas Metal Arc Welding," L.A. Jones, T.W. Eagar and J.H. Lang, *Welding Journal*, Welding Research Supplement, April 1998, 135-s-141-s.

166. "Estimation of the Characteristic Properties of the Weld Pool During High Productivity Arc Welding," P.F. Mendez and T.W. Eagar in 5th International Seminar "Numerical Analysis of Weldability," 1999. Graz-Seggau, Austria.

167. "Order of Magnitude Scaling of Complex Engineering Problems," P.F. Mendez and T.W. Eagar, *Seventeenth Symposium on Energy Engineering Sciences*, Argonne, IL, pp. 106-113, May 13-14, 1999.

168. "Humping Formation in High Current GTA Welding," P.F. Mendez, K.L. Niece and T.W. Eagar, in *Proceedings of the International Conference on Joining of Advanced and Specialty Materials II*, Cincinnati, OH, November 1999.

169. "Order of Magnitude Scaling of the Cathode Region in an Axisymmetric Transferred Electric Arc," P.F. Mendez, M.A. Ramirez, G. Trapaga, T.W. Eagar in *Metallurgical and Materials Transactions B*, June 2001, Vol. 32B, p.547-554.

170. "Modeling of Materials Processing Using Dimensional Analysis and Asymptotic Considerations," P.F. Mendez and T.W. Eagar in Proc. of THERMEC'2000, International

145. "Abrasion Resistant Active Braze Alloys for Metal Single Layer Technology," R.K. Shiue, S.T. Buljan and T.W. Eagar, *Science and Technology of Welding and Joining 2(2)*, 71, 1997.

146. "Large Gap Joining of Ti-6Al-4V with Mixed Powder Interlayers," W.D. Zhuang and T.W. Eagar, *Science and Technology of Welding and Joining 2(4)*, 139, 1997.

147. "Diffusional Breakdown of Nickel Protective Coatings on Copper Substrate in Silver-Copper Eutectic Melts," W.D. Zhuang and T.W. Eagar, *Metall. Trans., 28A(4)*, 969, 1997.

148. "Transient Liquid Phase (TLP) Bonding using Coated Metal Powders," W.D. Zhuang and T.W. Eagar, *Welding Journal, 76(4)*, 157s, 1997.

149. "High Temperature Brazing by Liquid Infiltration," W.D. Zhuang and T.W. Eagar, *Welding Journal, 76(12)*, 526s, 1997.

150. "Dynamic Behavior of Gas Metal Arc Welding," L.A. Jones, P. Mendez, D. Weiss, and T.W. Eagar, presented at the 9th Annual Conference on Iron and Steel Technology, Pohang, Korea, August 1997.

151. "A Systematic Strategy for Optimizing Manufacturing Operations," J. Kerkhoff, T.W. Eagar, and J. Utterback, *Production and Operations Management, (7)1*, 67, 1998.

152. "Isothermal Solidification Kinetics of Diffusion Brazing," W.D. MacDonald and T.W. Eagar, *Metall. Trans., 29A(1)*, 315, 1998.

153. "Magnetic Forces Acting on Molten Drops in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar and J.H. Lang, *Journal of Physics, Part D: Applied Physics, 31(1)*, 93, 1998.

154. "A Dynamic Model of Drops Detaching from a Gas Metal Arc Welding Electrode," L.A. Jones, T.W. Eagar and J.H. Lang, *Journal of Physics, Part D: Applied Physics 31(1)*, 107, 1998.

155. "Electrochemical Migration Tests of Solder Alloys in Pure Water," T. Takemoto, R.M. Latanision, T.W. Eagar and A. Matsunawa, *Corrosion Science, 39(8)*, 1415, 1997.

156. "Quiet Revolution in Materials Manufacturing and Production," T.W. Eagar, *Journal of Metals, 50(4)*, 19, 1998.

157. "The Plasma-Enabled Recovery of Titanium Metal by the Electrolysis of Titanate Slags," H.R. Larson and T.W. Eagar, *Journal of Metals, 50(9)*, 56, 1998.

158. "How Welding Fumes Affect the Welder," J.M. Antonini, G.G. Krishna Murthy, R.A. Rogers, R. Albert, T.W. Eagar, G.D. Ulrich, and J.D. Brain, *Welding Journal, 77(10)*, 55,

Conference on Processing and Manufacturing of Advanced Materials, Las Vegas, NV, December 4-8, 2000.

171. "Scaling of the Cathode Region of a Long GTA Welding Arc," P.F. Mendez, M.A. Ramirez, G. Trapaga and T.W. Eagar, *Advances in Computational Engineering & Sciences*, Volume I, Tech Science Press, Palmdale, CA, 689-694, 2000.

172. "Effect of Electrode Droplet Size on Evaporation and Fume Generation in GMAW," P.F. Mendez, N.T. Jenkins, T.W. Eagar, Gas Metal Arc Welding for the 21st Century, Orlando, FL, American Welding Society, December 6-8, 2000.

173. "Strain Energy Distribution in Ceramic/Metal Joints," J.-W. Park, P.F. Mendez and T.W. Eagar, *Acta Materialia*, Volume 50, issue 5, pp.883-899, March 2002.

174. "Modeling of Welding Processes through Order of Magnitude Scaling," P.F. Mendez and T.W. Eagar, Metal Technologies, MMT-2000, Ariel, Israel, November 13-15, 2000.

175. "Modeling of Materials Processing Using Dimensional Analysis and Asymptotic Considerations," P.F. Mendez and T.W. Eagar, accepted by *Journal of Materials Processing Technology*, 2001.

176. "Welding Processes for Aeronautics," P.F. Mendez and T.W. Eagar, *Advanced Materials & Processes*, 159 (5), pp. 39-43, 2001.

177. "Why Did the World Trade Center Collapse? Science, Engineering and Speculation," C. Musso and T.W. Eagar, *Journal of Materials*, pp. 8-11, December 2001.

178. "Strain Energy Release in Ceramic-to-Metal Joints with Patterned Interlayers," J.-W. Park, J.J. Kim, T.W. Eagar, *Journal of the American Ceramic Society*, submitted September 2001.

179. "Strain Energy in the Filler Metal and the Shear Strength of the Concentric Ceramic-to-Metal Brazed Joints," J.L. Wiese, J.-W. Park, T.W. Eagar, *Scripta Materialia*, submitted 2001.

180. "Thermodynamic Model of the Zr-O System," R. Arroyave and T.W. Eagar, *Calphad*, submitted 2001.

181. "Scaling Laws in the Welding Arc," P.F. Mendez, M.A. Ramirez, G. Trapaga and T.W. Eagar, *Mathematical Modelling of Weld Phenomena 6*, Institute of Materials, London, UK, 2002.

182. "Residual Stress Release in Ceramic-to-Metal Joints by Ductile Metal Interlayers," J.W. Park, P.F. Mendez and T.W. Eagar, *Scripta Metallurgica et Materialia*, submitted 2002.

183. "Carbide Formation in Alloy 718 During Electron Beam Solid Freeform Fabrication," J.E. Matz and T.W. Eagar, accepted by *Metall. Trans.*, 2002.



184. "Application of the Transient Liquid Phase Bonding to Microelectronics and MEMS Packaging," J.W. Park and T.W. Eagar, IEEE Conference Proceedings on Advanced Packaging Materials and Processes, 2002.

185. "Interfacial Microstructure of Partial Transient Liquid Phase Bonded $Si_3N_4$-to-INCONEL 718 Joints," J.J. Kim, J.-W. Park and T.W. Eagar, accepted *Materials Science and Engineering A* (2001).

186. "Elastoplastic Behavior of Dissimilar Material Joints, Part 1 Theory and Numerical Analysis," M. Tateno and T.W. Eagar, submitted to Transactions of the ASME, *Journal of Applied Mechanics*, 2002.

187. "Experimental Characterization of Temperature Profiles in One Dimensionally Simulated Resistance Spot Welding of Bare and Zinc Coated Steel," E. Kim and T.W. Eagar, *Welding Journal*, submitted July 2002.

188. "Manganese in Welding Fume and Worker Health," M.C. Balmforth, N.T. Jenkins, T.W. Eagar, *Welding Journal*, submitted 2002.

189. "Freshly generated stainless steel welding fume induces greater lung inflammation in rats as compared to aged fume," J.M. Antonini, R.W. Clarke, G.G. Krishna Murthy, P. Sreekanthan, N. Jenkins, T.W. Eagar, J.D. Brain, Elsevier Science *Toxicology Letters* 98 (1998), 77-86.

190. "New Trends in Welding in the Aeronautic Industry," P.F. Mendez and T.W. Eagar, 2nd Conference of New Manufacturing Trends, Bilboa, Spain, November 19 – 20, 2002.

191. "Metal Substrate Effects on the Thermochemistry of Active Brazing Interfaces," R. Arroyave and T.W. Eagar, Acta Materialia, accepted June, 2003.

192. "Feasibility of Using Earth-bounded NDT Techniques for the Space Environment," V. Nikou, P.F. Mendez, K. Masubuchi, T.W. Eagar, Conference on Emerging Technologies in Non-Destructive Testing, Thessaloniki, Greece, May 26-28, 2003.

193. "Joining $LaMO_3$ Perovskite Ceramics to Nickel-based Super Alloys Using Brazing/TLPB Techniques," R. Arroyave, T.W. Eagar, H.R. Larson, Abstracts of Papers, 225th ACS National Meeting, New Orleans, LA, United States, March 23-27, 2003, FUEL-111 (CODEN: 69DSA4 AN 2003:182444 CAPLUS)

194. "Hollow-Cored, Long-Fiber Metal Matrix Composites for Thermal Packaging Applications," Christopher Musso and Thomas Eagar, *Proceedings of ICCE/9*, July 2002, p.549-550.

195. "Submicron Particle Chemistry: Vapor Condensation Analogous to Liquid Solidication," Neil T. Jenkins and Thomas W. Eagar, *Journal of Materials*, June 2003, Volume 55, No. 6, p.44-47.

**PATENTS:**

1. "Method of Resistance Welding," T.W. Eagar, J.G. Kaiser, and G.J. Dunn, Patent No. 4,365,134, Dec. 21, 1982.

2. "Non-hygroscopic Welding Flux Binders," E.A. Barringer and T.W. Eagar, Patent No. 4,512,822, April 23, 1985.

3. "Large Diameter Stud and Method and Apparatus for Welding Same," T.E. Shoup, D.J. Maykut, and T.W. Eagar, Patent No. 4,531,042, July 23, 1985.

4. "Non-Hygroscopic Welding Flux Binders," E.A. Barringer and T.W. Eagar, Patent No. 4,557,768; December 10, 1985.

5. "Laser Instrument," R.J. Cabrera, T.W. Eagar and J. Santangelo, Patent No. 4,580,558, April 8, 1986.

6. "Laser Instrument," R.J. Cabrera and T.W. Eagar, Patent No. 4,646,734, March 3, 1987.

7. "Non-Hygroscopic Welding Flux Binders," E.A. Barringer and T.W. Eagar, Patent No. 4,662,952, May 5, 1987.

8. "Age-Hardenable Sterling Silver," T.W. Eagar, D.P. Agarwal, L.L. Bourguignon and R.E. Marcotte, Patent No. 4,810,308, March 7, 1989.

9. "Emissivity Independent Multiwavelength Pyrometry," M.A. Khan, C.D. Allemand and T.W. Eagar, Patent No. 5,132,922, July 21, 1992.

10. "Silver Alloys of Exceptional and Reversible Hardness," T.W. Eagar, D.P. Agarwal, L.L. Bourguignon and R.E. Marcotte, Patent No. 4,869,757, September 26, 1989.

11. "Wear Resistant Bond for an Abrasive Tool," R.K. Shiue, R. Andrews, T.W. Eagar, B. Miller and S-T. Buljan, Patent No. 5,846,269, December 8, 1998.

12. "Abrasive Tool Containing Coated Abrasive Grain,"R.K. Shiue, B. Miller, S.T. Buljan, E. Schulz and T.W. Eagar, Patent No. 5,855,314, January 5, 1999.

13. "Removable Bond for an Abrasive Tool," R.K. Shiue, T.W. Eagar, B. Miller and S-T. Buljan, Patent No. 6,245,443, June 12, 2001.

**PATENTS PENDING:**

"Filtration Element for Severe Service Applications," M. Mutsakis, J.P. Puglia, G.M. Freedland, T.W. Eagar and H.R. Larson, Patent Application No. 09/809,818, filed March 16, 2001.

**PATENT APPLICATION:**

"Methods for Forming Articles Having Very Small Channels Therethrough, and Such Articles, and Method of Using Such Articles," C.S. Musso and T.W. Eagar, filed March 12, 2002.

**Thomas W. Eagar**
**Litigation Identification**
**June 17, 2003**

1. Welding Asbestos Litigation – deposition in Cambridge, MA on May 24, 1995 re: Asbestos Litigation, New Castle County Delaware, and telephonic deposition in Boston, MA on July 7, 1999 re: Shipe et al. v Lincoln Electric, Company et al.; Ralph Davies, Davies McFarland and Carroll, defendant's attorney.

2. Bicycle Failure – deposition in Boston, MA on December 18, 1997, re: Jeffrey Crawn v. Benteler; trial in Easton, PA, May 21, 1999; James Dodd-O; Thomas, Thomas, and Hafer, Harrisburg, PA, plaintiff's attorney.

3. Failure of Machinery – deposition in Raynham, MA on May 29, 1998 and trial in Boston, MA on May 14, 1999 re: Hartford Steam Boiler v. Sentinel Products, Rosemary Connolly, Robins, Kaplan, Miller and Ciresi, plaintiff's attorney.

4. Helicopter Mishap – deposition in Boston, MA on May 3, 1999 and trial testimony in Bisbee, AZ on October 5 and 6, 1999 re: Jenkins v. Bell Helicopter; Steve Yost, Goodwin Raup, defendant's attorney.

5. Fall From Ladder – deposition in New York City, NY on June 29, 1999 re: Borchers' v. Werner; Dan McNamara, DeCicco, Gibbons and McNamara, defendant's attorney.

6. Steel Bearings – deposition in Boston, MA on June 30, 1999 and trial in Los Angeles, January 22, 2001 re: United States v. NMB Corporation; John McKay, Shaw Pittman, defendant's attorney.

7. Truck Accident – trial in Somerville, MA on July 28, 1999 re: Commonwealth of Massachusetts v. Dana Smith; Ed Mahoney Law Offices of Richard W. McLeod, defendant's attorney. Trial in Cambridge, MA on October 31 and November 5, 2002, John Nelson, Law Offices of Brian Cullen, defendant's attorney.

8. Failure of Hydraulic Cylinder – deposition in Boston, MA on July 28, 1999, and November 5, 1999 re: Marcantonio v. Sterling Industrial; Richard Edwards, Campbell, Campbell, and Edwards, defendant's attorney.

9. Screw Failure – trial in Rochester, NY on October 8, 1999 re: Torchia v. Van Dorn DeMag; Beryl Nussbaum, Woods Oviatt, Gilman, defendant's attorney.

10. Aerial Bucket Truck – deposition in Boston, MA, on October 26, 1999 re: Christopher Finney v. Asplundh Tree Expert Company; Darrell Warta, Foulston & Siefkin, defendant's attorney.

11. Pipe Failure – arbitration in New York City on October 27, 1999, re: Winter Club v. Burley Construction; Richard Flanagan, Flanagan and Cooke, plaintiff's attorney.

12. Ladder Accident – trial in New Brunswick, NJ on December 10, 1999 re: Norcross v. Werner, Don Crowley, Methfessel and Werbel, defense attorney.

13. Ladder Collapse – deposition in Cambridge, MA, December 13, 1999, re: Landou v. Werner, J. Scott Donington, Champi and Donington, defense attorney.

14. Welding Fume – deposition in San Francisco, CA, January 17, 2000, re: Thornsby v. Lincoln Electric Company et al., Al Norris, Crosby, Heafey, Roach & May, defense attorney.

15. Copper Wire – Dispute Resolution Board, January 25-27, 2000 and March 5, 2000, Westbrooke, CT, BBC/MEC v. Amtrak, Nancy Feinrider, Kalkines, Arky, Zall and Bernstein, defense attorney.

16. Failed Hose Coupling – deposition in Weslaco, TX, March 3, 2000, re: Rivera v. Van Dorn DeMag, Mark Ferris, Jones, Galligan, Key and Lozano, defense attorney.

17. Copper Elbow Failure – deposition in New York City, March 16, 2000, Turner Construction v. Elkhart Products, Mark Mullen, Cozen & O'Connor, plaintiff's attorney.

18. Ladder Collapse – trial in Brooklyn, NY, April 14-17, 2000, Santata v. Seagrave et al, Herb Waichman, Parker & Waichman, plaintiff's attorney.

19. Patent Infringement – trial in Madison, WI, May 24 and 25, 2000, Rayovac v. Duracell, Ed DeFranco, Fish & Neave, defendant's attorney.

20. Metal Bellows – deposition in Cambridge, MA, June 8, 2000, Apache Oil v. Titeflex Corporation, Michael Quinn, Bonenberger & Quinn, plaintiff's attorney.

21. Building Fire – trial in Rochester, NY, June 16, 2000, Sodoma Farms Inc. v. Niagara Mohawk, Chris Fallon, Cozen & O'Connor, plaintiff's attorney.

22. Pipe Failure – trial in Brooklyn, NY, June 27, 2000, Flight Safety International v. The Port Authority of New York and New Jersey, Jack Brown, Cozen & O'Connor, plaintiff's attorney.

23. Cable Failure – deposition in Houston, TX, November 10, 2000, Salazar v. Morse Industries, Mark Farris, Jones, Galligan Key and Lozano, plaintiff's attorney. Trial in Edinburgh, TX, September 18 – 19, 2002, Roger Braugh, Sico White & Braugh, plaintiff's attorney.

24. Broken Weld – trial in Dedham, MA, November 15, 2000, Anderson v. Braintree Hospital, John Bruce, Foster & Eldridge, defendant's attorney.

25. Helicopter Accident – deposition in Cambridge, MA, November 21, 2000, Kennedy v. Bell Helicopter, Dan Laurence, Mills Meyer & Swartling, defendant's attorney.

26. Electrical Contacts – deposition in Cambridge, MA, December 7, 2000, Campbell v. GE, William Clark, Cozen & O'Connor, plaintiff's attorney.

27. Medical Instrument – telephonic deposition in Cambridge, MA, December 28, 2000, Jerome v. Codman, Thomas Lucas, Cassiday Schade and Gloor, defendant's attorney.

28. Aircraft Mishap – deposition in Kansas City, MO, January 10 and 11, 2001, Snyder et al. v. Teledyne Continental Motors, John Turner, Turner & Sweeney, plaintiff's attorney.

29. Steel Cutting – trial in New York City, February 5 and 6, 2001, Liberty Mutual v. Design Build, E. Rinaldi, Cozen & O'Connor, plaintiff's attorney.

30. Helicopter Engine Failure – deposition in New Orleans, LA, February 15, 2001 and trial in Lafayette, LA, April 25-26, 2001, Bertrand v. Air Logistics, Robert Kerrigan, Deutsch, Kerrigan & Stiles, defendant's attorney.

31. Brazed Joints – deposition in Montpelier, VT, March 2, 2001, Northeast Granite v. Pyramid Supply, William Clark, Cozen & O'Connor, plaintiff's attorney.

32. Broken Screw – deposition in Boston, MA, March 9, 2001, Krueger v. Codman. Robert Houghton, Shuttleworth & Ingersoll, defendant's attorney.

33. Automobile Accident – deposition in Beaumont, Texas, April 6, 2001, Thornton v. Ford, Ken Lewis, Bush Lewis & Roebuck, plaintiff's attorney.

34. Automobile Accident – deposition in Norwood, MA, April 27, 2001, Pierce v. GM, Ralph Monaco, Conway and Londregan, plaintiff's attorney. Trial in New London, CT, July 18, 2001, Pierce v. GM, Ralph Monaco, plaintiff's attorney.

35. Fan Motor Failure – deposition in Hartford, CT, June 5, 2001, Colorpix v. Broan, Stuart Blackburn, Law Offices of Stuart Blackburn, plaintiff's attorney.

36. Helicopter Mishap – deposition in San Antonio, TX, June 18, 2001, Stutzman v. Torrington, Ernest Cannon, plaintiff's attorney.

37. Electrical Arc – deposition in Cambridge, MA, July 17, 2001, Chryczyk v. The Prime Group, Kathy McCabe, Cassiday Schade & Gloor, defendant's attorney.

38. Brake Spring Failure – deposition in Chicago, IL, July 20, 2001 and January 31, 2002. Trial in Chicago, IL, March 19, 2002, Dexter Axle v. Omiotek, Pat Gloor, Cassiday Schade & Gloor, plaintiff's attorney.

39. Helicopter Mishap – deposition in Seattle, WA, August 3, 2001, Wehling v. Bell, Dan Laurence, Mills Meyers & Swartling, defendant's attorneys. Trial in Seattle, WA, October 3 and 4, 2001.

40. Aluminum Casting Failure – trial in Brockton, MA, October 10, 2001, Davidson v. Polaris, Tim Mattson, Bowman & Brooke, defendant's attorney.

41. Gas Heater Corrosion – deposition in Cambridge, MA, October 16 and 29, 2001, Copco Steel and Atlas Steel v. Document Services, John Schleiter, Daar, Fisher, Kanaris & Vanek, plaintiff's attorney.

42. Weld Failures – deposition in Cambridge, MA, October 19, 2001, JWR Resources v. Long Airdox, Shawn George, George & Lorenson, defendant's attorney.

43. Helicopter Mishap – deposition in Cambridge, MA, October 24, 2001, Harvey v. Bell Helicopter, Jim Doran, Waller Lansden Dortsch & Davis, defendant's attorney.

44. Patent Infringement – trial in Washington, D.C., October 25 and 30, 2001, 3M v. Kinik, Anthony Roth, Morgan Lewis & Bochius, defendant's attorney.

45. Offshore Oil Rig - hearing in Houston, TX, October 26, 2001, Ed Murphy, Beirne Maynard & Parsons, defendant's attorney.

46. Steel Shaft Fracture – deposition in Cambridge, MA, November 9, 2001, Epsilon Products v. Krupp Mannesmann, Brian Lincicome, Cozen & O'Connor, plaintiff's attorney.

47. Oil Tank Failure – deposition in Cambridge, MA, January 25, 2002, Farlee v. L.K. Walton, Scott Donington, Donington and Sena, plaintiff's attorney.

48. Fire – deposition in Boston, MA, February 12, 2002, Rotando v. Atlantic Heating and Air Conditioning, David Groth, Cozen & O'Connor, plaintiff's attorney.

49. Fire – deposition taken in Philadelphia, PA, February 22, 2002. Trial in Newark, NJ, May 9, 2002, O'Brien v. GEC Alstohm, Thomas McKay, Cozen & O'Connor, plaintiff's attorney.

50. Broken Steel Stud – deposition in Los Angeles, CA, March 27, 2002, Souza v. Van Dorn DeMag, Craig Sears; Harrington, Foxx, Dubrow and Canter, defense attorney.

51. Electrical Fire – deposition in Baltimore, MD, March 28, 2002, Hoon v. Lightolier, Peter Rossi, Cozen & O'Connor, plaintiff's attorney.

52. Fatigue Failure – deposition in Philadelphia, PA, April 12, 2002. Trial in Philadelphia, PA, May 21, 2002, TCM v. Standard Steel, Bruce McKissock, McKissock & Hoffman, defendant's attorney.

53. Hydrogen Cracking – trial in Clearfield, PA, April 23, 2002, Equimeter v. Charkan, James DeVittorio, Law Offices of James DeVittorio, defendant's attorney.

54. Metal Pan – deposition in Cambridge, MA, May 3, 2002, Good v. Alcan. Paul Casteleiro, Law Offices of Paul Casteleiro, defendant's attorney.

55. Electrical Contacts – hearing in Brownsville, TX, May 16, 2002, Manuel Cruz v. BRK Brands, Inc., James Heller, Cozen & O'Connor, defendant's attorney. Deposition in Philadelphia, PA on June 20, 2002.

56. Automobile Accident – deposition in Cambridge, MA, June 11, 2002, Stone v. Subaru, Shawn George, George and Lorsenson, plaintiff's attorney.

57. Fire – trial in Whitehorse, Yukon, Canada, July 9 and 10, 2002, Trans North Turbo v. North 60 Petro, Rick Davison, Parlee McLaws, defendant's attorney.

58. Paint Adhesion – deposition in Chicago, IL, September 11, 2002, Holden v. Wismarq, Kathy McCabe, Cassiday Schade & Gloor, defendant's attorney.

59. Fan Motor Failure – deposition in Charlotte, NC, October 10, 2002, Automotive Parts Express v. Broan Nu-Tone, Tracey Eggleston, Cozen & O'Connor, plaintiff's attorney.

60. Electrical Arc – deposition in Cambridge, MA, October 21, 2002, Great Northern Insurance v. Magnetek, Inc., Richard Bailey, Cozen & O'Connor, plaintiff's attorney.

61. Weld Failure – deposition in Cambridge, MA, November 8, 2002, Brown v. Homes of Merit, Ren Werrenrath, Fisher Rushmer & Werrenrath, defense attorney.

62. Copper Corrosion – trial in Cambridge, MA, November 18, 2002, Smith v. Gill Services, David Volkin, Fitzhugh, Parker & Alvaro, defendant's attorney.

63. Bolt Failure – deposition in Cambridge, MA, December 11, 2002, Boettge v. Karis Family Enterprises, Kathy McCabe, Cassiday Schade & Gloor, defendant's attorney.

64. Aircraft Engine Failure – trial in Cambridge, MA, January 30, 2003, Snyder v. Superior Air Parts, David Cook, Kreindler and Kreindler, plaintiff's attorney.

65. Compressed Gas Tank Failure – deposition in Milwaukee, WI, February 11, 2003, Choates v. Western Industries, Mark Foley, Foley & Lardner, defense attorney.

66. Explosion – deposition in Dallas, TX, March 5, 2003, Cain Foods v. Whirlwind, Duane Hermes, Hermes Sargent Bates, defendant's attorney.

67. Electrical Contacts – deposition in Philadelphia, PA, March 7, 2003, Morales v. BRK, Jim Heller, Cozen & O'Connor, defendant's attorney.

68. Helicopter Mishap – deposition in Cambridge, MA, April 2, 2003, Auerbach v. Cav-Air, Greg Palmer, Wicker Smith O'Hara, McCoy Graham & Ford, defense attorney.

69. Ladder Mishap – deposition in Boston, MA, April 3, 2003; hearing on April 14, 2003 in Boston, MA, Erickson v. Werner, Brian Voke, Campbell Campbell Edwards & Conroy, defense attorney.

70. Grinding Wheel Mishap – telephonic deposition in Cambridge, MA, April 14, 2003, Zach Wamsley v. CSC Holding Corporation, John Turner, Turner & Sweeney, plaintiff's attorney.

71. Electric Motor Failure – deposition in Philadelphia, PA, on April 16, 2003, Lapp v. Emerson Electric, Marty Duffey, Cozen & O'Connor, plaintiff's attorney.

72. Electrical Fire – deposition in Boston, MA, April 29, 2003 and May 20, 2003, Freidlander v. Bunker Electric, Jim Cullen, Cozen & O'Connor, plaintiff's attorney.

73. Electrical Cable Failure – deposition in Newark, NJ, May 13, 2003 and deposition in Cambridge, MA, May 19, 2003, PSE&G v. Co-Steel, Andrew Gibbs, Cozen & O'Connor, defendant's attorney.

74. Hose Coupling Failure – deposition in Albany, NY, May 14, 2003, Citicorp v. Dustbusters, David Groth, Cozen & O'Connor, plaintiff's attorney.

75. Gas Explosion – deposition in New York City, NY, May 23, 2003, Shalit v. Apple Tree Construction, Michael Sommi, Cozen & O'Connor, plaintiff's attorney.

76. Welding Fume – trial in New York City, June 17, 2003, Gomez v. Lincoln Electric Company, Jay Maylish, Kaye Scholer, defendant's attorney.

# FEE SCHEDULE

**DR. THOMAS W. EAGAR**

| | |
|---|---|
| All work including investigative, deposition and trial | $325.00/hour plus expenses |

**WORK PERFORMED BY STAFF**

| | |
|---|---|
| Senior Engineer | $150.00/hour |
| Engineer | $100.00/hour |
| Administrative Support | $ 60.00/hour |



THOMAS W. EAGAR, Sc.D., P.E.
ROOM 4-136
MASSACHUSETTS INSTITUTE OF TECHNOLOGY
CAMBRIDGE, MA 02139-4307
617-253-3229
FAX 617-252-1773

June 27, 2003

Cozen & O'Connor
2300 Bankone Center
1717 Main Street
Dallas, Texas 75201-7335

Attention: Wes Vines

RE: Valley Diagnostics

Dear Mr. Vines,

At your request, I have investigated the failure of an American Standard toilet valve, which failed at Valley Diagnostics causing extensive damage. My investigation has consisted of the following:

1. Inspection visually and with aided magnification of the failed valve.

2. Review of photographs of the valve as installed in the water closet after the failure.

3. Review of the scientific literature.

4. Review of chemical analysis of valve plastic as reported by Paul L. Carper of Verite Forensic Engineering.

Based upon this investigation, I have made the following observations and I have formed the following opinions within a reasonable degree of engineering certainty.

1. The incident valve is made of acetal plastic.

2. Acetal plastic is susceptible to degradation and environmentally assisted cracking in waters containing chlorine or other halogens at relatively low concentrations.

3. One manufacturer of acetal toilet valves indicates that chlorine concentrations greater than 30 ppm are harmful to the acetal plastic.

4. The Nalco Water Handbook notes that the Mississippi River at Vicksburg, MS contains more than 30-ppm chlorine.

5. The acetal plastic of the incident valve is severely degraded. It has changed from medium gray to white. The surface is rough and has the texture of a dried riverbed. There is an extensive crack, the fracture surfaces of which have turned white due to exposure.

6. *Chemical Resistance*, Volume 1, of the Plastics Design Library 1994, rates acetal as susceptible to cracking, oxidation of the plasticizer, softening, swelling and surface hardening when exposed to calcium hypochlorite.

7. Plastics have strength and toughness ratios which are 10 to 100 times lower than common metals, such as brass, used in plumbing fixtures. (See e.g. M.F. Ashby, *Materials Selection in Mechanical Design.*)

Based upon this investigation, it is my opinion that the toilet valve failed due to environmentally assisted cracking and deterioration of the plastic due to exposure to the warm, chlorine containing water in the water supplies of the Rio Grande Valley. Since these temperatures and salinity levels are normal and expected in a number of municipal water supplies throughout the United States, this toilet valve was defectively designed and is unreasonably dangerous for use in its intended application. There were no warnings attached or molded into the incident valve alerting the user of these foreseeable hazards.

These opinions are based upon the information available. If further information becomes available, such information will also be considered.

Sincerely yours,

Thomas W. Eagar

Thomas W. Eagar

jh



BUCHANAN CLARKE SCHLADER LLP
certified public accountants

Kurt E. Harms, CPA

Kurt Harms is a partner with Buchanan Clarke Schlader, LLP a national Certified Public Accounting firm, which specializes in forensic accounting services. Mr. Harms holds a bachelors degree in business administration, with a specialization in accounting. He is a Certified Public Accountant in the states of New Jersey and Texas, and is a member of the American Institute of Certified Public Accountants, the New Jersey Society of Certified Public Accountants and the Texas Society of Certified Public Accountants. He is an expert in forensic accounting. A copy of Mr. Harms' curriculum vitae is attached as Exhibit A. He has not published any articles in the past 10 years.

Mr. Harms has formed an opinion as to the business income loss value as a result of the loss that occurred on March 4, 2001 in Harlingen, Texas. Mr. Harms bases his opinions on the analysis performed on the financial information submitted by Valley Diagnostics Clinic. Mr. Harms further bases his opinions on his education, experience in measuring business income losses and accounting functions performed during his analysis. Mr. Harms has relied upon the documents enclosed and as listed on Exhibit B.

Mr. Harms has testified in the following cases in the past four years, Vanderver vs. Hartford Insurance Company (May 2000), G. Hirsch vs. Chubb Group of Insurance Companies (April 1999 and July 2000), Riceland Foods vs. Kentucky Tennessee Clay (March 2001), OPPD vs. Siemens AG and Argus Gesellschaft (August and December 2001) Matchmaker.com vs. Bedford Central Joint Venture (December 2002) and Oakridge Baptist Church v. Utica National Insurance Company (June 2003).

Mr. Harms is being compensated at the rate of $175 per hour for consulting and testifying services related to this case.

Mr. Harms reserves the right to supplement this report as necessary pursuant to Federal Rule of Civil Procedure 26(e)(2).

Kurt E. Harms



ALBUQUERQUE
ATLANTA
DALLAS
HOUSTON
INDIANAPOLIS
KANSAS CITY
NEW YORK
BCS
BUCHANAN CLARKE SCHLADER LLP
certified public accountants

John Buchanan
Michael Clarke
Diana Ebling
Suzanne Francisco
Ashley Hansen
Kurt Harms
Peter Jones
Steven Meils
David Schlader

**Exhibit A**

# Kurt E. Harms

**Summary of qualifications**

- Professional accountant since 1985. Domestic and international experience in the field of forensic accounting and investigative auditing. Consultation and expertise in the measurement of economic damages in both property and liability insurance claims as well as commercial litigation.
- Significant experience attained in the measurement of financial damages concerning manufacturing operations throughout the world.
- Expert testimony experience in deposition and at trial.
- Clients include law firms, corporations, sole proprietorships, partnerships and major commercial and casualty insurance companies.
- Fraud detection training obtained from the United States Treasury Department. Experience in detection of tax avoidance, corporate employee fidelity and embezzlement.

**Professional experience**

**May 1, 1999 onwards**
**Partner**
**Buchanan Clarke Schlader,LLP**
**Dallas, Texas**

**January 1 to April 30, 1999**
**Partner**
**Baliban Clarke Schlader, LLP**
**Dallas, Texas**

**September 1990 to December 1998**
**Manager**
**Campos & Stratis, LLP**
**Dallas, Texas**

- Worked on numerous commercial and industrial insurance losses both domestically and internationally.
- Attained forensic, auditing and accounting skills during progression from hire date to present.
- Significant experience in measuring manufacturing losses involving business interruption and extra expense.
- Assisted general adjusters, engineers and contractors in determining methods to mitigate business interruption losses.
- Performed various physical inventory counts and valuations of both in site and out of site inventory losses for raw materials, work in process and finished goods.

2550 Renaissance Tower • 1201 Elm Street • Dallas, Texas 75270
Tel [214] 760-0300 • Fax [214] 760-0301 • www.bcsllp.com



**1985 – 1990** **Internal Revenue Service**
**Revenue Agent** **Newark, New Jersey**

Audited Federal Income tax returns of corporations, partnerships and individuals to ascertain their correct federal tax liability and compliance with tax laws. Assisted Criminal Investigations Division and District Council in investigating and testifying on criminal tax matters. Developed an expertise of income tax laws, audit skills, effective interviewing techniques, fraud detection, and indirect methods of verifying the accuracy of books and records. Applied accounting and auditing techniques in re-construction and corroboration of taxpayer financial statements, tax returns and documents. Instructor of computer classes and revenue training.

**Education and qualifications**

**1982 – 1987** **Glassboro State College**
**Glassboro, New Jersey**

Bachelor of Science—Business Administration
Concentration in Accounting

**Certified Public Accountant**

- Texas 1991, Certificate Number 56179
- New Jersey 1991, Certificate Number 19687

**Additional professional activities**

Provided seminars to insurance personnel and professionals with in the insurance industry. Topics have included basic and intermediate business interruption measurements, and inventory losses. Seminars also given to the Texas Arson Society and various other professional groups.

**Summary of experience**

Petrochemical industries, energy, telecommunications, manufacturing, retail, banking and financial institutions, real estate, technology, semiconductor and computer industries, restaurants and food distribution, automobile dealerships, hotel and hospitality, insurance brokerage, professional practices, clothing and fashion.

**Professional affiliations**

- American Institute of Certified Public Accountants
- Texas Society of Certified Public Accountants
- New Jersey Society of Certified Public Accountants

 

BUCHANAN CLARKE SCHLADER LLP
certified public accountants

# Exhibit B

List of documents relied upon:

1. Detailed Trial Balance – General Ledger for the radiology salaries, benefits – FICA, for the period November 1, 2000 through January 18, 2002.

2. Detailed Trial Balance – General Ledger for the radiology - supplies – medical for the period November 1 through December 31, 2000 and March 3 through June 11, 2001, radiology – supplies – other for the period November 1 through December 31, 2000, January 1 through 31, 2001 and March 5 through June 7, 2001, radiology – supplies – film for the period November 1 through December 31, 2000, January 1 through 31, 2001 and November 1 through December 31, 2000, January 1 through 31, 2001 and March 14 through June 6, 2001 and radiology – supplies, instruments and equipment for March 1, 2001, radiology – other fees – license for the period November 1 through December 31, 2000, radiology – other fees – outside services for the period November 1 through December 31, 2000 and January 1 through 31, 2001 and radiology – repairs and maintenance – general for January 1 through 31, 2001.

3. Correspondence between our firm and Valley Diagnostics Clinic.

4. Daily radiology charges by CPT for the period March 5, 2001 through January 31, 2002.

5. Radiology charges and collections by month for January 2000 through February 2002.

6. Monthly consolidated income statement for Valley Diagnostic Clinic for November 2000 through January 2001 and July 2001. This statement includes the current month, same month last year, year to date and year to date last year.



ALBUQUERQUE
ATLANTA
DALLAS
HOUSTON
INDIANAPOLIS
KANSAS CITY
NEW YORK
BCS
BUCHANAN CLARKE SCHLADER LLP
certified public accountants

John Buchanan
Michael Clarke
Diana Ebling
Suzanne Francisco
Ashley Hansen
Kurt Harms
Peter Jones
Steven Heils
David Schlader

June 24, 2003

Wes Vines, Esquire
Cozen & O' Connor
2300 Bankone Center
1717 Main Street
Dallas, Texas 75201-7335

Re: Valley Diagnostics Clinic
Harlingen, Texas
Business Income Loss
Date of Loss: March 4, 2001
Claim Number: 64673311P6
Our File Number: 76030

Dear Mr. Vines:

The purpose of this report is to evaluate the above-captioned matter and to state our findings and opinions thereon. Our analysis was limited to the scope of work outlined by the adjuster and to the available books, records and information that we considered pertinent and necessary to evaluate the claim. Use of this report is strictly limited to you and your principals involved in the above-captioned matter. The following comments relate to the extent of our work and the results of our analysis.

**Background**

Valley Diagnostics Clinic operates a medical clinic in Harlingen, Texas. We understand that on March 4, 2001, the facility was damaged by water resulting in the partial shutdown of the radiology department. As a result, Valley Diagnostic Clinic states that they have suffered a business income loss however no claim has been provided to our office. We have been requested to provide an analysis of the business income loss for the period of March 4 through December 31, 2001.

**Conclusion**

Based on our analysis of the available books, records and information provided to-date, we calculate a business income loss for March 4 through December 31, 2001 totaling $66,515, as shown on Schedule 1. Our analysis considers the decreased revenue as a result of the partial shutdown of the radiology department, the continuing expenses, actual technician payroll costs




and the co insurance provision provided by the policy in effect at the time of the loss. Please note that we have not compiled, reviewed or audited the statements and financial information provided to us by Valley Diagnostics Clinic and accordingly do not comment on their accuracy. The statements provided are the reflection of the financial condition as presented by Valley Diagnostics Clinic. Our firm has not undertaken any procedures to determine the accuracy of these reports, thus any errors, omissions or mistakes in the presentation of these reports are responsibility of Valley Diagnostics Clinic.

We attach the CV for Kurt Harms, Partner who authored this report, as Exhibit A. The documents relied upon to arrive at our conclusions are listed on Exhibit B. The Schedules prepared by this firm to arrive at our conclusions are provided with this report. We trust the above explanation and attached exhibits are clear. However should you require additional information please feel free to contact Kurt Harms at our office.

We provide our findings in the following paragraphs and attached schedules.

## Analysis

### Projected daily charges

In order to determine the historical charges and collections we requested access to the financial information for the Radiology Department, which was operated by Dr. Moldonado. It is our understanding that Dr. Moldonado practice was the most severely affected area of the clinic. Mr. Rod Miller, Executive Director of Valley Diagnostic Clinic provided us with the radiology department monthly charges (amounts billed for services performed) and collections (amounts collected for services performed) for the period January 2000 through February 2001, as shown on Schedule 2. Charges during this period of time equate to $3,471,986, which when divided by the number of operating days (295) yields an average daily charge of $11,769, as shown on Schedule 2 and summarized on Schedule 1. Based upon our analysis of the monthly charges, it does not appear that seasonality is a factor in the ability to generate revenue. Accordingly, we use the historical average daily charge to project charges during the period of restoration.

### Lost charges

We obtained the number of days in each month the clinic was open for the period March 4 through December 30, 2001, as shown on Schedule 1. Multiplying the daily average charge of $11,769 by the number of days in the loss period (209) yields projected charges of $2,459,721. We were provided the daily general ledger – radiology charges for the same period of time, which indicates that the clinic achieved charges totaling $818,562, as shown on Schedule 3 and summarized by month on Schedule 1. We understand that some operating equipment was relocated to temporary offices and rental equipment was brought to the clinic to mitigate the



loss of revenue. Subtracting the charges achieved from the projected charges of $2,459,721 yields lost charges of $1,641,159, as shown on Schedule 1.

**Charges vs. collections**

As with most doctor offices, it is common that charges are reduced by insurance companies for office visits and procedures performed as well as balance due from patients are written off due to the inability to collect. Accordingly, not all amounts charged can be collected from patients or their insurance companies due to limitations of coverage or limits on the types of services provided. Utilizing the historical charges and collection information, we compute fees collected for the fourteen months ended February 28, 2001 of $2,010,260, as shown on Schedule 2. Dividing this amount by the charges billed for the same period of $3,471,986 yields a collection rate of 57.90%, as summarized on Schedule 1 and detailed on Schedule 2. Applying this rate to reduced charges of $1,641,159, yields collectible reduced revenue of $950,231 for the period March 4 through December 31, 2001, as shown on Schedule 1.

**Business income value and rate**

Valley Diagnostic Clinic does not prepare income statements for the individual operating departments. Accordingly, we utilize the Detail Trial Balance – General Ledger for the radiology department to determine the operating expenses for the twelve months ended December 31, 2000. We utilize the historical collections to determine the revenue received for the twelve months ended December 31, 2000. Please note that we did not audit or compile this information and, therefore, do not comment on its accuracy. However, we utilize this information to calculate a business income rate (net income plus fixed and continuing expenses expressed as a percentage of revenue collected) of 73.49%, as summarized on Schedule 1 and detailed on Schedule 4. Please note that we have not continued any portion of the payroll expense as we were provided the actual continuing payroll and benefits during the period of interruption, as discussed in the following paragraph. Applying this rate to reduced revenue of $950,231 yields a business income loss, prior to consideration of continuing payroll expenses, totaling $698,325 for the period March 4 through December 31, 2001, as shown on Schedule 1.

**Continuing payroll expense**

Valley Diagnostic Clinic, the radiology department in particular, continued to pay its key employees – Registered Vascular Ultrasonographer, Nuclear Medicine Technologists, Registered Radiological Technologists and Certified Scan Technologists during the period of interruption. These employees and the radiology staff also assisted in restoring confidential patient records and examined x-ray film to determine if it could still be used in patient related matters. We obtained the bi-weekly general ledger payroll expenses and benefits (FICA) for the pre and post loss period. Based upon the payroll expenses for the periods ended November 13, 2000 through February 16, 2001, payroll expenses for the radiology department averaged $10,584 / pay period, as shown on Schedule 5. We confirmed that during the period of

 

BUCHANAN CLARKE SCHLADER LLP
certified public accountants

restoration, bi-weekly payroll expenses did not exceed this amount. As shown on Schedule 5, we list the payroll and benefits incurred for each pay period and monthly total. We utilize these totals to determine the actual payroll expenses during the loss period of $182,119, as shown on Schedule 1. Since some technicians and radiology staff personnel were working with patients that ultimately generated revenue, a portion of the payroll expenses should not be considered as expenses associated with the business income loss. As shown on Schedule 8, we compare the projected charges to the actual charges achieved to yield the lost charges. Dividing the lost charges by the projected charges yields the percentage of lost revenue, which when multiplied by the actual continuing payroll expenses on a monthly basis yields the lost portion of payroll expense. As shown on Schedule 1, we provide the percentage of lost revenue and continuing payroll expenses on a monthly basis, which yields a total of continuing payroll expenses related to the loss event totaling $121,844.

Combining the business income loss (excluding payroll as a continuing expense) of $698,325 and the loss related continuing payroll expenses of $121,844 yields a total loss value of $820,169, as shown on Schedule 1.

**Co-insurance value and collectible percentage**

The policy in effect at the time of loss provides a business income loss limit of $562,000 with 80% coinsurance for Valley Diagnostics Clinic. We obtained the consolidated income statement for the twelve months ended January 31, 2001, as shown on Schedule 7. Please note that we did not audit or compile this information and, therefore, do not comment on its accuracy. However, we utilize this information to calculate a gross earnings rate, which is the net income plus all expenses that are insured under the policy at the time of loss excluding materials and supplies consumed during the treatment of patients and goods or services purchased from others and consumed in the treatment of patients totaling $8,667,087, as shown on Schedule 7. Multiplying this amount by the co-insurance percentage of 80% yields the value at risk of $6,933,670, as shown on Schedule 6. Dividing the policy limit of $562,000 by the value at risk of $6,933,670 yields the collectible percentage of 8.11%, as summarized on Schedule 1 and detailed on Schedule 6. Multiplying the collectible percentage of 8.11% by the combined business income loss yields a collectible loss value of $66,515, as shown on Schedule 1.

**Summary**

Based on our analysis of the available books, records and information provided to-date, we calculate a business income loss for March 4 through December 31, 2001 totaling $66,515, as shown on Schedule 1. Our analysis considers the decreased revenue as a result of the partial shutdown of the radiology department, the continuing expenses, actual technician payroll costs and the co insurance provision provided by the policy in effect at the time of the loss. Please note that we have not compiled, reviewed or audited the statements and financial information provided to us by Valley Diagnostics Clinic and accordingly do not comment on their accuracy. The statements provided are the reflection of the financial condition as presented by Valley

Diagnostics Clinic. Our firm has not undertaken any procedures to determine the accuracy of these reports, thus any errors, omissions or mistakes in the presentation of these reports are responsibility of Valley Diagnostics Clinic.

We trust the foregoing comments and attached schedules are clear. However, should you require any clarification from our workpapers please feel free to contact Kurt Harms at our office.

Very truly yours,

Buchanan Clarke Schlader LLP

Buchanan Clarke Schlader LLP
Certified Public Accountants

BCS Buchanan Clarke Schlader LLP
certified public accountants

Schedule 1

CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

**Analysis of Business Income Loss**
**March 4, 2001 through December 31, 2001**
**Radiology Department**
**As Calculated**

| June 1 ugh 30, 2001 | July 1 through 31, 2001 | August 1 through 31, 2001 | September 1 through 30, 2001 | October 1 through 31, 2001 | November 1 through 30, 2001 | December 1 through 31, 2001 | Total | Schedule reference |
|---|---|---|---|---|---|---|---|---|
| $11,769 | $11,769 | $11,769 | $11,769 | $11,769 | $11,769 | $11,769 | $11,769 | 2 |
| 21 | 21 | 23 | 19 | 23 | 20 | 19 | 209 | 3 |
| 247,149 | 247,149 | 270,687 | 223,611 | 270,687 | 235,380 | 223,611 | 2,459,721 | |
| 98,823 | 90,934 | 93,935 | 90,524 | 78,485 | 115,188 | 73,812 | 818,562 | 3 |
| 148,326 | 156,215 | 176,752 | 133,087 | 192,202 | 120,192 | 149,799 | 1,641,159 | |
| 57.90% | 57.90% | 57.90% | 57.90% | 57.90% | 57.90% | 57.90% | 57.90% | 2 |
| 85,881 | 90,448 | 102,339 | 77,057 | 111,285 | 69,591 | 86,734 | 950,231 | |
| 73.49% | 73.49% | 73.49% | 73.49% | 73.49% | 73.49% | 73.49% | 73.49% | 4 |
| 63,114 | 66,470 | 75,209 | 56,629 | 81,783 | 51,142 | 63,741 | 698,325 | |
| 18,045 | 15,831 | 23,892 | 14,768 | 15,234 | 17,797 | 19,653 | 182,119 | 5 |
| 60.01% | 63.21% | 65.30% | 59.52% | 71.01% | 51.06% | 66.99% | | 8 |
| 10,830 | 10,006 | 15,601 | 8,789 | 10,817 | 9,088 | 13,166 | 121,844 | |
| 73,944 | 76,476 | 90,810 | 65,418 | 92,600 | 60,230 | 76,907 | 820,169 | |
| 8.11% | 8.11% | 8.11% | 8.11% | 8.11% | 8.11% | 8.11% | 8.11% | 6 |
| $5,997 | $6,202 | $7,365 | $5,305 | $7,510 | $4,885 | $6,237 | $66,515 | |
| $29,011 | $35,213 | $42,578 | $47,883 | $55,393 | $60,278 | $66,515 | | |

*Accompanying text is an integral part of this report.*



BCS
BUCHANAN CLARKE SCHLADER LLP
certified public accountant

CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

Schedule 2

**Analysis of Charges and Collections**
**Radiology Department**
**For The Period January 2000 Through February 2001**
**As Calculated**

| Description | Charges | Collections | Collections as a % of charges |
|---|---|---|---|
| January 2000 | $214,942 | $143,529 | 66.78% |
| February | 280,097 | 128,480 | 45.87% |
| March | 279,515 | 176,671 | 63.21% |
| April | 217,674 | 131,886 | 60.59% |
| May | 234,540 | 132,235 | 56.38% |
| June | 212,441 | 133,613 | 62.89% |
| July | 265,560 | 132,365 | 49.84% |
| August | 242,560 | 150,977 | 62.24% |
| September | 218,689 | 134,798 | 61.64% |
| October | 218,689 | 157,708 | 72.12% |
| November | 250,034 | 125,137 | 50.05% |
| December | 249,937 | 136,809 | 54.74% |
| January 2001 | 301,203 | 156,166 | 51.85% |
| February | 286,105 | 169,886 | 59.38% |
| Total | 3,471,986 | 2,010,260 | 57.90% |
| Divided by number of operating days (A) | 295 | 295 | |
| Daily average | $11,769 | $6,814 | 57.90% |

(A) Valley Diagnostic Clinic informed us that the radiology department worked 253 days for the period January through December 2000 and 42 days for the period January through February 2001, or a combined total of 295 days for the period January 2000 through February 2001.

*Accompanying text is an integral part of this report.*



BUCHANAN CLARKE SCHLADER LLP
certified public accountants

CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

Schedule 3

**Analysis of Actual Charges**
**As Calculated**

| Day of month | March | April | May | June | July | August | September | October | November | December |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | $0.00 | $4,923.00 | $3,643.00 | $0.00 | $7,599.25 | $0.00 | $1,119.00 | $4,695.00 | $0.00 |
| 2 | | 2,828.00 | 4,607.00 | 0.00 | 6,822.00 | 5,647.50 | 0.00 | 2,413.00 | 4,572.00 | 0.00 |
| 3 | | 1,667.00 | 2,472.00 | 0.00 | 5,207.00 | 6,043.00 | 0.00 | 2,300.00 | 0.00 | 6,003.59 |
| 4 | | 2,006.00 | 1,327.00 | 4,448.00 | 0.00 | 0.00 | 4,443.12 | 2,361.00 | 0.00 | 5,865.00 |
| 5 | $4,161.00 | 1,725.00 | 0.00 | 3,619.00 | 3,267.00 | 0.00 | 8,571.00 | 2,087.00 | 6,071.00 | 5,818.00 |
| 6 | 6,980.00 | 1,985.00 | 0.00 | 5,061.00 | 3,334.00 | 3,712.00 | 5,799.00 | 0.00 | 6,765.50 | 3,500.00 |
| 7 | 2,272.00 | 0.00 | 1,592.00 | 5,214.00 | 0.00 | 4,540.00 | 6,429.00 | 0.00 | 8,255.00 | 4,051.00 |
| 8 | 1,528.00 | 0.00 | 2,477.00 | 2,728.00 | 0.00 | 2,844.00 | 0.00 | 4,159.87 | 7,820.00 | 0.00 |
| 9 | 2,625.00 | 1,230.00 | 2,446.00 | 0.00 | 4,054.00 | 2,643.00 | 54.00 | 2,727.00 | 6,291.59 | 0.00 |
| 10 | 0.00 | 1,788.00 | 4,122.00 | 0.00 | 3,990.00 | 2,835.00 | 4,825.00 | 2,963.00 | 0.00 | 3,852.00 |
| 11 | 0.00 | 1,132.00 | 2,442.00 | 8,211.00 | 3,944.00 | 0.00 | 5,888.00 | 1,347.00 | 0.00 | 3,829.00 |
| 12 | 750.00 | 1,956.00 | 0.00 | 5,869.00 | 3,068.18 | 0.00 | 5,356.00 | 1,952.00 | 3,922.00 | 4,832.00 |
| 13 | 936.00 | 1,073.00 | 0.00 | 6,167.00 | 2,608.09 | 3,798.00 | 5,155.00 | 54.00 | 5,064.50 | 4,298.75 |
| 14 | 2,085.00 | 0.00 | 2,997.00 | 1,029.00 | 0.00 | 5,307.00 | 5,616.00 | 0.00 | 5,588.00 | 4,881.00 |
| 15 | 2,655.00 | 0.00 | 4,027.00 | 2,830.00 | 0.00 | 7,651.00 | 0.00 | 2,174.00 | 4,966.00 | 0.00 |
| 16 | 2,205.00 | 3,569.00 | 3,106.00 | 0.00 | 2,065.00 | 2,359.00 | 0.00 | 2,438.00 | 7,521.00 | 0.00 |
| 17 | 0.00 | 1,766.00 | 4,347.18 | 0.00 | 4,709.00 | 3,321.00 | 3,522.00 | 1,839.00 | 0.00 | 3,398.75 |
| 18 | 0.00 | 2,143.00 | 3,564.41 | 3,449.00 | 4,682.25 | 0.00 | 5,371.00 | 3,191.00 | 0.00 | 3,115.00 |
| 19 | 1,401.00 | 3,991.00 | 0.00 | 5,883.00 | 4,783.00 | 0.00 | 2,307.00 | 3,352.09 | 6,394.00 | 2,610.00 |
| 20 | 2,067.00 | 5,453.00 | 0.00 | 3,598.00 | 4,303.00 | 4,205.00 | 5,882.00 | 0.00 | 3,481.00 | 3,412.00 |
| 21 | 2,025.00 | 0.00 | 2,602.00 | 5,785.00 | 0.00 | 2,697.00 | 6,583.00 | 0.00 | 5,594.50 | 3,752.00 |
| 22 | 1,987.00 | 0.00 | 3,525.00 | 6,348.00 | 0.00 | 4,263.00 | 0.00 | 4,341.00 | 0.00 | 0.00 |
| 23 | 1,775.00 | 2,971.00 | 3,518.00 | 0.00 | 3,897.00 | 3,166.00 | 0.00 | 4,856.00 | 0.00 | 0.00 |
| 24 | 0.00 | 2,873.41 | 3,841.09 | 0.00 | 5,919.00 | 4,723.00 | 4,467.00 | 5,302.09 | 0.00 | 0.00 |
| 25 | 0.00 | 4,333.00 | 3,481.00 | 5,432.00 | 5,681.00 | 0.00 | 3,304.00 | 4,074.00 | 0.00 | 0.00 |
| 26 | 2,573.50 | 3,100.00 | 0.00 | 3,737.00 | 3,321.00 | 0.00 | 2,545.00 | 5,283.00 | 5,525.00 | 2,713.00 |
| 27 | 2,819.00 | 3,786.00 | 0.00 | 4,951.00 | 5,367.00 | 3,954.00 | 1,776.00 | 0.00 | 4,588.00 | 3,122.00 |
| 28 | 2,322.00 | 0.00 | 0.00 | 5,593.00 | 0.00 | 2,255.00 | 2,631.00 | 0.00 | 7,783.00 | 2,815.00 |
| 29 | 1,714.00 | 0.00 | 4,985.00 | 5,228.00 | 0.00 | 4,546.00 | [illegible] | 5,798.09 | 5,373.00 | 0.00 |
| 30 | 2,414.00 | 2,276.00 | 4,808.00 | 0.00 | 3,598.00 | 2,463.00 | 0.00 | 6,025.00 | 4,917.50 | 0.00 |
| 31 | | | 4,705.00 | | 6,314.09 | 3,363.00 | 0.00 | 6,329.00 | | 1,944.00 |
| Total | $47,294.50 | $53,651.41 | $75,914.68 | $98,823.00 | $90,933.61 | $93,934.75 | $90,524.12 | $78,485.14 | $115,187.59 | $73,812.09 |
| Number of operating days | 20 | 21 | 22 | 21 | 21 | 23 | 19 | 23 | 20 | 19 |

(A) Source: General Ledger - daily radiology charges

*Accompanying text is an integral part of this report.*



CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

Schedule 4

**Analysis of Business Income Value and Rate**
**Radiology Department**
**Based Upon The Twelve Months Ended December 31, 2000**
**As Calculated**

| Description | Amount | Percentage of revenue | Business income Value | Business income Rate |
|---|---|---|---|---|
| Revenue (A) | $1,684,208 | 100.00% | $1,684,208 | 100.00% |
| Less: expenses: | | | | |
| Salaries - technicians | 234,752 | 13.94% | | |
| Benefits - FICA | 17,482 | 1.04% | | |
| Supplies: | | | | |
| Medical | 69,511 | 4.13% | | |
| Other | 16,862 | 1.00% | | |
| Film | 19,229 | 1.14% | | |
| Instruments and equipment | 14,757 | 0.88% | | |
| Other fees: | | | | |
| License | 2,022 | 0.12% | $2,022 | 0.12% |
| Outside services | 12,156 | 0.72% | | |
| Travel and entertainment | 1,319 | 0.08% | 1,319 | 0.08% |
| Education | 1,363 | 0.08% | 1,363 | 0.08% |
| Meals and entertainment | 14 | 0.00% | 14 | 0.00% |
| Repairs and maintenance - general | 61,742 | 3.67% | | |
| Subtotal | 451,209 | 26.79% | | |
| Net income | $1,232,999 | 73.21% | 1,232,999 | 73.21% |
| Net income plus fixed and continuing expenses | | | $1,237,717 | 73.49% |

(A) Revenue is based upon actual collections for the twelve months ended December 31, 2000. Refer to Schedule 2.

*Accompanying text is an integral part of this report.*



CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

Schedule 5
Page 1 of 2

**Analysis of Continuing Payroll Expense**
**As Calculated**

| Payroll period | Gross pay | Benefits FICA | Combined total |
|---|---|---|---|
| 11/13/2000 | $9,506.56 | $704.88 | $10,211.44 |
| 11/24/2000 | 9,631.33 | 714.37 | 10,345.70 |
| 12/8/2000 | 9,333.21 | 691.63 | 10,024.84 |
| 12/22/2000 | 10,244.74 | 761.35 | 11,006.09 |
| 1/3/2001 | 10,137.31 | 750.12 | 10,887.43 |
| 1/19/2001 | 9,663.23 | 713.84 | 10,377.07 |
| 2/2/2001 | 10,026.49 | 741.66 | 10,768.15 |
| 2/16/2001 | 10,290.42 | 761.81 | 11,052.23 |
| Total | $78,833.29 | $5,839.66 | $84,672.95 |
| Average | $9,854.16 | $729.96 | $10,584.12 |
| March: | | | |
| 3/16/2001 | $9,844.21 | $727.67 | $10,571.88 |
| 3/30/2001 | 8,659.76 | 626.49 | 9,286.25 |
| Total | $18,503.97 | $1,354.16 | $19,858.13 |
| April: | | | |
| 4/13/2001 | $9,366.58 | $471.92 | $9,838.50 |
| 4/27/2001 | 9,168.34 | 678.56 | 9,846.90 |
| Total | $18,534.92 | $1,150.48 | $19,685.40 |
| May: | | | |
| 5/11/2001 | $7,998.01 | $589.89 | $8,587.90 |
| 5/25/2001 | 8,165.52 | 602.77 | 8,768.29 |
| Total | $16,163.53 | $1,192.66 | $17,356.19 |
| June: | | | |
| 6/8/2001 | $8,237.17 | $608.20 | $8,845.37 |
| 6/22/2001 | 8,566.00 | 633.24 | 9,199.24 |
| Total | $16,803.17 | $1,241.44 | $18,044.61 |
| July | | | |
| 7/11/2001 | $7,810.31 | $576.40 | $8,386.71 |
| 7/25/2001 | 6,934.56 | 509.43 | 7,443.99 |
| Total | $14,744.87 | $1,085.83 | $15,830.70 |

*Accompanying text is an integral part of this report.*



BUCHANAN CLARKE SCHLADER LLP
certified public accountants

CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

Schedule 5
Page 2 of 2

**Analysis of Continuing Payroll Expense**
**As Calculated**

| Payroll period | | Gross pay | Benefits FICA | Combined total |
|---|---|---|---|---|
| August | | | | |
| | 8/3/2001 | $7,259.95 | $534.33 | $7,794.28 |
| | 8/17/2001 | 9,238.74 | 685.69 | 9,924.43 |
| | 8/31/2001 | 5,734.28 | 438.67 | 6,172.95 |
| Total | | $22,232.97 | $1,658.69 | $23,891.66 |
| September | | | | |
| | 9/17/2001 | $6,497.66 | $479.01 | $6,976.67 |
| | 9/28/2001 | 7,254.84 | 536.95 | 7,791.79 |
| Total | | $13,752.50 | $1,015.96 | $14,768.46 |
| October | | | | |
| | 10/12/2001 | $6,449.56 | $475.33 | $6,924.89 |
| | 10/26/2001 | 7,735.03 | 573.70 | $8,308.73 |
| Total | | $14,184.59 | $1,049.03 | $15,233.62 |
| November | | | | |
| | 11/9/2001 | $7,225.53 | $534.24 | $7,759.77 |
| | 11/21/2001 | 9,341.51 | 696.13 | $10,037.64 |
| Total | | $16,567.04 | $1,230.37 | $17,797.41 |
| December | | | | |
| | 12/7/2001 | $9,542.21 | $700.35 | $10,242.56 |
| | 12/21/2001 | 8,767.09 | 643.57 | $9,410.66 |
| Total | | $18,309.30 | $1,343.92 | $19,653.22 |

*Accompanying text is an integral part of this report.*



BUCHANAN CLARKE SCHLADER LLP
certified public accountants

Schedule 6

CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

**Analysis of Coinsurance Collectible Percentage**
**As Calculated**

| Description | Amount |
|---|---|
| Gross earnings value (A) | $8,667,087 |
| Times: coinsurance percentage | 80.00% |
| Value at risk | $6,933,670 |
| Policy limit | $562,000 |
| Collectible percentage | 8.11% |

(A) Refer to Schedule 7.

*Accompanying text is an integral part of this report.*



BCS
Buchanan Clarke Schlader LLP
certified public accountants

CNA Insurance Companies
Re: Valley Diagnostics Clinic
Date of Loss: March 4, 2001

Schedule 7

**Analysis of Gross Earnings Value**
**Based Upon The Twelve Months Ended January 31, 2001**
**As Calculated**

| Description | Amount | Percentage of revenue | Gross earnings |
|---|---|---|---|
| Revenue: | | | |
| Patient revenue | $9,583,237 | 95.99% | |
| Other | 400,219 | 4.01% | |
| Subtotal | 9,983,456 | 100.00% | |
| Less: operating expenses: | | | |
| Salaries - physicians | 3,399,326 | 34.05% | $3,399,326 |
| Salaries - staff | 2,557,619 | 25.62% | 2,557,619 |
| Fringe benefits | 599,708 | 6.01% | 599,708 |
| Supplies - medical | 419,050 | 4.20% | |
| Supplies - other | 359,420 | 3.60% | |
| Purchased services - referral lab | 114,570 | 1.15% | |
| Purchased services - transcriptions | 173,271 | 1.74% | |
| Repairs and maintenance | 88,126 | 0.88% | 88,126 |
| Utilities | 178,310 | 1.79% | 178,310 |
| Insurance | 229,234 | 2.30% | 229,234 |
| Legal | 83,913 | 0.84% | 83,913 |
| Recruitment/advertising | 143,609 | 1.44% | 143,609 |
| Computer/software support | 197,168 | 1.97% | 197,168 |
| Contractual services | 250,058 | 2.50% | |
| Other | 44,718 | 0.45% | 44,718 |
| Subtotal | 8,838,100 | 88.53% | |
| Operating income | 1,145,356 | 11.47% | |
| Less: capital expenses: | | | |
| Non-income taxes | 55,018 | 0.55% | 55,018 |
| Lease expense | 789,477 | 7.91% | 789,477 |
| Interest expense | 97,390 | 0.98% | 97,390 |
| Subtotal | 941,885 | 9.43% | |
| Net income | $203,471 | 2.04% | 203,471 |
| Gross earnings value | | | $8,667,087 |

*Accompanying text is an integral part of this report.*



THOMAS W. EAGAR, Sc.D., P.E.
ROOM 4-136
MASSACHUSETTS INSTITUTE OF TECHNOLOGY
CAMBRIDGE, MA 02139-4307
617-253-3229
FAX 617-252-1773

June 27, 2003

Cozen & O'Connor
2300 Bankone Center
1717 Main Street
Dallas, Texas 75201-7335

Attention: Wes Vines

RE: Valley Diagnostics

Dear Mr. Vines,

At your request, I have investigated the failure of an American Standard toilet valve, which failed at Valley Diagnostics causing extensive damage. My investigation has consisted of the following:

1. Inspection visually and with aided magnification of the failed valve.

2. Review of photographs of the valve as installed in the water closet after the failure.

3. Review of the scientific literature.

4. Review of chemical analysis of valve plastic as reported by Paul L. Carper of Verite Forensic Engineering.

Based upon this investigation, I have made the following observations and I have formed the following opinions within a reasonable degree of engineering certainty.

1. The incident valve is made of acetal plastic.

2. Acetal plastic is susceptible to degradation and environmentally assisted cracking in waters containing chlorine or other halogens at relatively low concentrations.

3. One manufacturer of acetal toilet valves indicates that chlorine concentrations greater than 30 ppm are harmful to the acetal plastic.

4. The Nalco Water Handbook notes that the Mississippi River at Vicksburg, MS contains more than 30-ppm chlorine.

5. The acetal plastic of the incident valve is severely degraded. It has changed from medium gray to white. The surface is rough and has the texture of a dried riverbed. There is an extensive crack, the fracture surfaces of which have turned white due to exposure.



6. *Chemical Resistance*, Volume 1, of the Plastics Design Library 1994, rates acetal as susceptible to cracking, oxidation of the plasticizer, softening, swelling and surface hardening when exposed to calcium hypochlorite.

7. Plastics have strength and toughness ratios which are 10 to 100 times lower than common metals, such as brass, used in plumbing fixtures. (See e.g. M.F. Ashby, *Materials Selection in Mechanical Design.*)

Based upon this investigation, it is my opinion that the toilet valve failed due to environmentally assisted cracking and deterioration of the plastic due to exposure to the warm, chlorine containing water in the water supplies of the Rio Grande Valley. Since these temperatures and salinity levels are normal and expected in a number of municipal water supplies throughout the United States, this toilet valve was defectively designed and is unreasonably dangerous for use in its intended application. There were no warnings attached or molded into the incident valve alerting the user of these foreseeable hazards.

These opinions are based upon the information available. If further information becomes available, such information will also be considered.

Sincerely yours,

Thomas W. Eagar

Thomas W. Eagar

jh

# THOMAS W. EAGAR

MIT, Room 4-136
77 Massachusetts Ave
Cambridge, MA 02139
Voice: (617) 253-3229
FAX: (617) 252-1773
tweagar@mit.edu

Home:
138 Claflin St.
Belmont, MA 02478
(617) 484-0571

## PROFESSIONAL INTERESTS:

Materials processing and manufacturing; special interests in welding and joining of metals, ceramics and electronic materials; deformation processing; alternate manufacturing processes; manufacturing management; materials systems analysis; selection of materials and failure analysis.

## EDUCATION:

S.B.   Metallurgy and Materials Science,
         Massachusetts Institute of Technology, 1972
Sc.D.  Metallurgy, Massachusetts Institute of Technology, 1975
---    Business Administration, Lehigh University, 1975-76
---    Program for Senior Executives, Sloan School of Management,
         Massachusetts Institute of Technology, 1988

## EMPLOYMENT:

Bethlehem Steel Corporation
        Homer Research Laboratories
              Research Engineer, 1974-1976
Massachusetts Institute of Technology
        Department of Materials Science and Engineering
              Assistant Professor of Materials Engineering, 1976-1980
              Associate Professor of Materials Engineering, 1980-1987
US Office of Naval Research - Tokyo
              Liaison Scientist, 1984-1985
Massachusetts Institute of Technology
              Professor of Materials Engineering, 1987-
              Professor of Engineering Systems, 2000-
              Leaders for Manufacturing Professor, 1988-1993
              Department Head, Materials Science and Engineering (Acting), March 1989
               –August, 1989




Richard P. Simmons Professor of Materials Engineering, 1990-1993
Director, Materials Processing Center, 1991-1993
POSCO Professor of Materials Engineering, 1993-1999
Co-Director, Leaders for Manufacturing Program, 1993-1995
Department Head, Materials Science & Engineering, 1995-2000
Thomas Lord Professor of Materials Engineering and Engineering Systems, 2001-

**HONORS AND AWARDS:**
International Junior Civitan of the Year, 1968
Dennison K. Bullens Scholarship, 1969-1971
Foundry Educational Foundation Scholarship, 1970-1971
Phi Lambda Upsilon, Member 1971
Tau Beta Pi, Member, 1971; Distinguished Service Award, 1980
National Science Foundation Graduate Fellowship, 1972-1974
Metallurgy and Materials Prize, Boston Section AIME, 1972
Adams Memorial Membership Award, American Welding Society, 1979-1983
Charles H. Jennings Memorial Medal, American Welding Society, 1983, 1991
Champion H. Mathewson Gold Medal, TMS-AIME, 1987
Henry Krumb Lecturer, TMS/SME-AIME, 1987
National Science Foundation Creativity Extension Award, 1988-1990
ASM International, Fellow, 1989
Houdremont Lecturer, International Institute of Welding, 1990
Richard P. Simmons Professorship, 1990-1993
Warren F. Savage Award, American Welding Society, 1990, 1996
William Spraragen Award, American Welding Society, 1990, 1993
Comfort A. Adams Lecturer, American Welding Society, 1992
Henry Marion Howe Medal, ASM International, 1992
William Irrgang Award, American Welding Society, 1993
Leaders for Manufacturing Professorship, 1988-1993
Richard P. Simmons Professorship, 1990-1993
POSCO Professorship, 1993-1999
Thomas Lord Professorship, 2001-
American Welding Society, Fellow, 1994, Honorary Member, 1999
Nelson W. Taylor Lecturer, Pennsylvania State University, 1995
National Academy of Engineering, 1997
General Electric Distinguished Lecture, Rensselaer Polytechnic Institute, 2001
Silver Quill Award, American Welding Society, 2002
American Association for the Advancement of Science, Fellow, 2003

**ACTIVITIES:**
National Academy of Engineering, Member
American Welding Society, Fellow and Honorary Member; *Welding Journal*, Principal Reviewer; Awards Committee, Professional Certification Committee
American Council of International Institute of Welding, Member
ASM International, Fellow
American Institute of Mining, Metallurgical and Petroleum Engineers, Member
Tau Beta Pi, Member, New England District Director (1977-1980), MIT

Chapter Advisor, 1977- 2001, Chief Advisor, 2002 -
American Association for the Advancement of Science, Fellow
Society of Automotive Engineers, Member
American Ceramic Society, Member
Society of Manufacturing Engineers, Member
American Society of Mechanical Engineers, Member
American Society for Testing and Materials, Member
Materials Research Society, Member
Registered Professional Engineer, Massachusetts Certificate Number 29726
Navy Joining Center, Technical Advisory Board
Editorial Board, *Science and Technology of Welding and Joining*
National Research Council, Ocean Studies Board, Committee on Future Needs in Deep Submergence Science, Member
Automatic Welding Journal (Ukraine), Member International Editorial Council, 2002
National Research Council, Board of Manufacturing and Engineering Design, Member

**TEACHING EXPERIENCE:**

| Undergraduate: | Graduate: | Professional: |
|---|---|---|
| Thermodynamics | Kinetics | Materials Selection |
| Chemical Metallurgy | Deformation Processing | Welding and Joining Processes |
| Physical Metallurgy | Welding and Joining Processes | Failure Analysis |
| Materials Processing | Materials Selection | Non-destructive Testing |
| Solid State Chemistry | Product Design | |
| Physical Chemistry | | |
| Essentials of Engineering | | |

**PUBLICATIONS:**

1. "Metallurgical Considerations for Optimizing the Superconducting Properties of $Nb_3Al$," J.G. Kohr, T.W. Eagar, and R.M. Rose, *Metall. Trans.*, *3(5)*, 1177, 1972.

2. "Preliminary Measurements of the Critical Current Density of $Nb_3Al_{0.8}Ge_{0.2}$ Ribbon", R. Loberg, T. W. Eagar, I. M. Puffer, R. M. Rose, in *Proc of Fourth Int. Conf. on Magnet Technology*, Brookhaven National Lab, 1972.

3. "Fabrication and Jc(H,T) Measurements on $Nb_3Al_{.75}Ge_{.25}$ Ribbon," R. Loberg, T.W. Eagar, I.M. Puffer and R.M. Rose, *Appl. Phys. L.*, *22(2)*, 69, 1973.

4. "Resistive Measurements on an Improved NbAlGe Superconducting Ribbon," T.W. Eagar and R.M. Rose, *IEEE Nucl. S.*, *NS-20 (3)*, 742, 1973.

5. "Improved Jc in Mechanically Fabricated $Nb_3Al$ Wires and Ribbons," T.W. Eagar and R.M. Rose, *IEEE Magnet.*, *Mag-11(2)*, 214, 1975.

6. "LNG Hull Steels with Improved High Heat Input Weldability," T.W. Eagar and J.C.

Baker, ASM-ASTM-MPC Symposium on Low Temperature Properties of Ship Plate, 1976.

7. "Sources of Weld Metal Oxygen Contamination During Submerged Arc Welding," T.W. Eagar, *Welding J., 57(3),* 76s, 1978.

8. "Electromagnetically and Thermally Driven Flow Phenomena in Electroslag Welding," A.H. Dilawari, J. Szekely and T.W. Eagar, *Metall. Trans., 9B(9),* 371, 1978.

9. "An Analysis of Heat and Fluid Flow Phenomena in Electroslag Welding," A.H. Dilawari, T.W. Eagar and J. Szekely, *Welding J., 57(1),* 24s, 1978.

10. "A Mathematical Model of Heat and Fluid Flow Phenomena in Electroslag Welding," J. Szekely and T.W. Eagar, in *Proc. of IIW Coll. on Applications of Numerical Techniques in Welding*, Dublin, Ire., 1, 1978.

11. "Oxygen and Nitrogen Contamination During Arc Welding" T.W. Eagar, in *Proc. of Welding-Physical Metallurgy and Failure Phenomena*, R.J. Cristoffel, ed., General Electric, Schenectady, NY, 31, 1979.

12. "The Analysis of Magnetohydrodynamics and Plasma Dynamics in Metals Processing Operations," C.W. Chang, J. Szekely, and T.W. Eagar, in *Proc. of the Sagamore Conf. on Recent Advances in Metals Processing*, 1, 1977.

13. "On the Micromechanics of Multifilamentary Superconducting Composites," S.F. Cogan, D.S. Holmes, I.M. Puffer, T.W. Eagar, and R.M. Rose, *IEEE Magnet., Mag-15(1),* 684, 1979.

14. "Superconducting Cu-$Nb_3Sn$ Composites Produced by Cold Extrusion of Fine Powders," R. Flukiger, S. Foner, E.J. McNiff Jr., B.B. Schwartz, J. Adams, S. Forman, T.W. Eagar, and R.M. Rose, *IEEE Magnet., Mag-15(1),* 689, 1979.

15. "The Modelling of Gas Velocity Fields in Welding Arcs," C.W. Chang, T.W. Eagar and J. Szekely, *Arc Physics and Weld Pool Behavior*, The Welding Institute, Cambridge, Eng., 381, 1980.

16. "Ductility of Stabilized Ferritic Stainless Steel Welds," G.B. Hunter and T.W. Eagar, *Metall. Trans., 11A(2),* 213, 1980.

17. "The Effect of SAW Parameters on Weld Metal Chemistry," C.S. Chai and T.W. Eagar, *Welding J., 59(3),* 93s, 1980.

18. "Heat Generation Patterns and Temperature Profiles in Electroslag Welding," T. DebRoy, J. Szekely and T.W. Eagar, *Metall. Trans., 11B(12),* 593, 1980.

19. "Temperature Profiles, the Size of the Heat Affected Zone and Dilution in Electroslag Welding," T. DebRoy, J. Szekely and T.W. Eagar, *Mat. Sci. Eng., 56(2),* 181, 1982.

20. "Oxygen and Nitrogen Contamination During Submerged Arc Welding of Titanium," T.W. Eagar, in *Proc. of the Int. Conf. on Welding Research in the 1980's*, Osaka University, Osaka, Japan, 113, 1980.

21. "Slag-metal Equilibrium During Submerged Arc Welding," C.S. Chai and T.W. Eagar, *Metall. Trans., 12B(3),* 539, 1981.

22. "Automated Welding--Research Needs," T.W. Eagar, in *Modeling of Casting and Welding Processes*, AIME, Warrendale, PA, 487, 1981.

23. "Mathematical Modeling of the Temperature Profiles and Weld Dilution in Electroslag Welding of Steel Plates," T. DebRoy, J. Szekely and T.W. Eagar, in *Modeling of Casting and Welding Processes,* AIME, Warrendale, PA, 197, 1981.

24. "Physics of Arc Welding," T.W. Eagar, in *AIP/AISI Conf. on Applications of Physics in the Steel Industry,* AIP, New York, 272, 1981.

25. "Slag-Metal Reactions in Binary CaF2-Metal Oxide Welding Fluxes," C.S. Chai and T.W. Eagar, *Welding J., 61(7),* 229s, 1982.

26. "The Effect of Electrical Resistance on Nugget Formation During Spot Welding," J.G. Kaiser, G.J. Dunn and T.W. Eagar, *Welding J., 61(6),* 167s, 1982.

27. "High Cycle Fatigue of Weld Repaired Cast Ti-6Al-4V," G.B. Hunter, F.S. Hodi and T.W. Eagar, *Metall. Trans., 13A(9),* 1589, 1982.

28. "A Parametric Study of the Electroslag Welding Process," W.S. Ricci and T.W. Eagar, *Welding J., 61(12)*, 397s, 1982.

29. "Selective Evaporation of Metals From Weld Pools," A. Block-Bolten and T.W. Eagar, *Trends in Welding Research in the United States*, S.A. David, ed., ASM International, Metals Park, OH, 53, 1982.

30. "Laser Welding of Aluminum and Aluminum Alloys," C.A. Huntington and T.W. Eagar, *Welding J., 62(4),* 105, 1983.

31. "Measurements of the Force Exerted by a Welding Arc," T.D. Burleigh and T.W. Eagar, *Metall. Trans., 14A(6),* 1223, 1983.

32. "Changes of Weld Pool Shape by Variations in the Distribution of Heat Source in Arc Welding," N.S. Tsai and T.W. Eagar, in *Modelling of Casting and Welding Processes II,* J.A. Dantzig and J.T. Berry, eds., AIME, New York, 317, 1984.

33. "Comparison of Theoretically Predicted and Experimentally Determined Submerged Arc Weld Deposit Compositions," U. Mitra, R.D. Sutton, and T.W. Eagar, *Metall. Trans., 14B(9),* 510, 1983.

34. "Slag Metal Reactions During Submerged Arc Welding of Alloy Steels," U. Mitra and T.W. Eagar, *Metall. Trans., 15A(1)*, 217, 1983.

35. "Convection in Arc Weld Pools," G.M. Oreper, T.W. Eagar, and J. Szekely, *Welding J., 62(11)*, 307, 1983.

36. "Temperature Fields Produced by Travelling Distributed Heat Sources," N.S. Tsai and T.W. Eagar, *Welding J., 62(12)*, 346s, 1983.

37. "Influence of Surface Depression and Convection on Arc Weld Pool Geometry," M.L. Lin and T.W. Eagar, in *Transport Phenomena in Material Processing*, PED, Vol. 10/HTD, 29, M.M. Chen, J. Mazumder, and C.L. Tucker III, eds., ASME, New York, 63, 1983.

38. "Metal Vaporization From Weld Pools," A. Block-Bolten and T.W. Eagar, *Metall. Trans., 15B(3)*, 461, 1984.

39. "Prediction of Weld Metal Composition During Flux Shielded Welding," C.S. Chai and T.W. Eagar, *J. Mat. Energy Sys., 5(3)*, 160, 1983.

40. "Selection of Processes for Welding Steel Rails," N.S. Tsai and T.W. Eagar, *Railroad Rail Welding*, Railway Systems and Management Assoc., Northfield, NJ, 421, 1985.

41. "Metallurgical and Process Variables Affecting The Resistance Spot Weldability of Galvanized Sheet Steels," S.A. Gedeon, D. Schrock, J. LaPointe, T.W. Eagar, SAE Technical Paper 840113, Warrendale, PA, 1984.

42. "Distribution of the Heat and Current Fluxes in Gas Tungsten Arcs," N.S. Tsai and T.W. Eagar, *Metall. Trans., 16B(4)*, 841, 1985.

43. "The Size of the Sensitization Zone in 304 Stainless Steel Welds," N.S. Tsai and T.W. Eagar, *J. Mat. Energy Sys., 6(1)*, 33, 1984.

44. "A Method of Filming Metal Transfer in Welding," C.D. Allemand, R. Schoeder, D.E. Ries and T.W. Eagar, *Welding J., 64(1)*, 45, 1985.

45. "Influence of Arc Pressure on Weld Pool Geometry," M.L. Lin and T.W. Eagar, *Welding J., 64(6)*, 163s, 1985.

46. "Slag Metal Reactions During Submerged Arc Welding of Steel," U. Mitra and T.W. Eagar, in *Proc. of Int. Conf. on Quality and Reliability in Welding*, 2, Chinese Mech. Eng. Soc., Harbin, PRC, B.24.1, 1984.

47. "An Improved Method of Multiwavelength Pyrometry," G.B. Hunter, C.D. Allemand, and T.W. Eagar, in *Thermosense VII, Proc. SPIE 520*, SPIE, Bellingham, WA, 40, 1985.



48. "Multiwavelength Pyrometry: An Improved Method," G.B. Hunter, C.D. Allemand, and T.W. Eagar, *Opt. Eng., 24(6),* 1081, 1985.

49. "Electron Beam and Laser Materials Processing in Japan," T.W. Eagar, *Welding J., 65(7),* 19, 1986.

50. "Pressures Produced by Gas Tungsten Arcs," M.L. Lin and T.W. Eagar, *Metall. Trans., 17B(9)*, 601, 1986.

51. "Resistance Spot Welding of Galvanized Steel: Part I, Materials Variations and Process Modifications," S.A. Gedeon and T.W. Eagar, *Metall. Trans., 17B(12),* 879, 1986.

52. "Resistance Spot Welding of Galvanized Steel: Part II, Mechanisms of Spot Weld Nugget Formation," S.A. Gedeon and T.W. Eagar, *Metall. Trans., 17B(12),* 887, 1986.

53. "Measurement of Dynamic Electrical and Mechanical Properties of Resistance Spot Welds," S.A. Gedeon, C.D. Sorensen, K.T. Ulrich, and T.W. Eagar, *Welding J., 66(12),* 387s, 1987.

54. "Metal Vapors in Gas Tungsten Arcs Part I: Spectroscopy and Monochromatic Photography," G.J. Dunn, C.D. Allemand, and T.W. Eagar, *Metall. Trans., 17A(10),* 1863, 1986.

55. "Metal Vapors in Gas Tungsten Arcs Part II: Theoretical Calculations of Transport Properties," G.J. Dunn and T.W. Eagar, *Metall. Trans., 17A(10),* 1871, 1986.

56. "Cinematography of Resistance Spot Welding of Galvanized Steel Sheet," C.T. Lane, C.D. Sorensen, G.B. Hunter, S.A. Gedeon, and T.W. Eagar, *Welding J., 66(9),* 260s, 1987.

57. "Prototype Device for Multiwavelength Pyrometry," G.B. Hunter, C.D. Allemand, and T.W. Eagar, *Opt. Eng., 25(11),* 1222, 1986.

58. "The Role of Transient Convection in the Melting and Solidification in Arc Weldpools," G.M. Oreper, J. Szekely and T.W. Eagar, *Metall. Trans., 17B(4),* 735, 1986.

59. "Effects of Surface Depression and Convection in GTA Welding," M.L. Lin and T.W. Eagar, *Advances in Welding Science & Technology*, S.A. David, ed., ASM International, Metals Park, OH, 47, 1986.

60. "Digital Signal Processing as a Diagnostic Tool for Gas Tungsten Arc Welding," C.D. Sorensen and T.W. Eagar, *Advances in Welding Science & Technology,* S.A. David, ed., ASM International, Metals Park, OH, 467, 1986.

61. "The Physics and Chemistry of Welding Processes," T.W. Eagar, *Advances in Welding Science & Technology*, S.A. David, ed., ASM International, Metals Park, OH, 291, 1986.



62. "Non-Uniform Current Distribution in Spot Welding," R. Bowers and T.W. Eagar, in *AWS Sheet Metal Welding Conference*, Detroit, MI, October, 1986.

63. "Visible Light Emissions During Gas Tungsten Arc Welding and its Applications to Weld Image Improvement," E. Kim, C. Allemand and T.W. Eagar, *Welding J., 66(12),* 369s, 1987.

64. "The Real Challenge in Materials Engineering," T.W. Eagar, *Technology Review, 90* (2), 24, 1987 (also published in Japanese in Berufu, 43, 1987).

65. "Materials Science and Engineering in the US - Past, Present & Future," T.W. Eagar, *Bulletin of Japan Institute of Metals, 26(2),* 119, 1987 (Japanese).

66. "The Promise of New Materials - Real or Imaginary," T.W. Eagar, *J. of Metals,* 20, 1987.

67. "Transient Thermal Behavior in Resistance Spot Welding," E.Kim and T.W. Eagar, in *AWS Detroit Section Sheet Metal Welding Conference III*, Southfield, MI, 1988.

68. "Brazing Alloy Design for Metal/Ceramic Joints," R.R. Kapoor and T.W. Eagar, *Ceramic Engineering Science Proceedings, 10 (11-12),* 1613, American Ceramic Society, Westerville, OH, 1989.

69. "Parametric Analysis of Resistance Spot Welding Lobe Curve," E.W. Kim and T. W. Eagar, *SAE 1988 Transactions, J. of Materials, 97(2),* 1989, SAE paper 880278.

70. "Ceramic-Metal Bonding Research in Japan," T.W. Eagar, *Welding J., 66(11),* 35, 1987.

71. "Slag-Metal Reactions During Welding - Part I: Evaluation and Reassessment of Existing Theories," U. Mitra and T.W. Eagar, *Metall. Trans., 22B(2),* 65, 1991.

72. "Slag-Metal Reactions During Welding - Part II: Theory," U. Mitra and T.W. Eagar, *Metall. Trans., 22B(2),* 73, 1991.

73. "Slag-Metal Reactions During Welding - Part III: Experimental Verification of the Theory," U. Mitra and T.W. Eagar, *Metall. Trans., 22B(2),* 83, 1991.

74. "Modelling of Oscillations in Partially Penetrated Weld Pools," C.D. Sorensen and T.W. Eagar, *J. Dynamic Systems and Control, 112(9),* 469, 1990.

75. "Measurement of Oscillations in Partially Penetrated Weld Pools Through Spectral Analysis," C.D. Sorensen and T.W. Eagar, *J. Dynamic Systems and Control, 112(9),* 463, 1990.

76. Electrode Geometry in Resistance Spot Welding," R.J. Bowers, C.D. Sorensen and T.W. Eagar, *Welding J., 69(2),* 45s, 1990.

77. "Assessing Hydrogen Assisted Cracking Fracture Modes in High Strength Steel

Weldments," S.A. Gedeon and T.W. Eagar, *Welding J., 69(6),* 213s, 1990.

78. "Wettability of Silver Based Reactive Metal Brazing Alloys on Alumina," R.R. Kapoor, E.S. Podszus and T.W. Eagar, *Scripta Metallurgica, 22*, 1277, August 1988.

79. "Oxidation Behavior of Silver and Copper Based Brazing Filler Metals for Silicon Nitride/Metal Joints," R.R. Kapoor and T.W. Eagar, *J. of the American Ceramic Society, 72(3),* 448, 1989.

80. "Thermochemical Analysis of Hydrogen Absorption in Welding," S.A. Gedeon and T.W. Eagar, *Welding J., 69(7),* 264-s, 1990.

81. "Analyses of Electrode Heat Transfer in Gas Metal Arc Welding," Y-S. Kim, D. McEligot, T.W. Eagar, *Welding J., 70(1),* 20s, 1991.

82. "Enhancement of the Weldability in Resistance Welding," C.M. Calva and T.W. Eagar, in *AWS Detroit Section Sheet Metal Welding Conference IV*, Southfield, MI, 1990.

83. "Modelling of Metal Transfer in Gas Metal Arc Welding," Y-S. Kim and T.W. Eagar, in *Edison Welding Institute Annual North American Welding Research Seminar*, Columbus, OH, 1988.

84. "Modeling of Welding Distortion in Complex Structures," A. Moshaiov and T.W. Eagar, *Automation in the Design and Manufacture of Large Marine Systems*, C. Chryssostomidis, ed., Hemisphere Publishing Corporation, New York, 235, 1990.

85. "Measuring the Residual Ferrite Content of Rapidly Solidified Stainless Steel Alloys," J.W. Elmer and T.W. Eagar, *Welding J., 69(4),* 141s, 1990.

86. "Measurement of Transient Temperature Response During Resistance Spot Welding," E.W. Kim and T.W. Eagar, *Welding J., 60(8),* 303s, 1989.

87. "Microstructural Development During Solidification of Stainless Steel Alloys," J.W. Elmer, S.M. Allen and T.W. Eagar, *Metall. Trans., 20A(10),* 2117, 1989.

88. "Technology Transfer and Cooperative Research in Japan," T.W. Eagar, *Welding J.*, 39, 1989.

89. "Fundamental Aspects of Electroslag Welding of Titanium Alloys," T.W. Eagar, J.H. Devletian, S.J. Chen, W.E. Wood and I.L. Caplan, *Recent Trends in Welding Science and Technology*, S.A. David and J. M. Vitek, eds., ASM International, Materials Park, OH, 419, 1990.

90. "The Influence of Cooling Rate on the Ferrite Content of Stainless Steel Alloys," J.W. Elmer, S.M. Allen and T.W. Eagar, *Recent Trends in Welding Science and Technology*, S.A. David and J. M. Vitek, eds., ASM International, Materials Park, OH, 165, 1990.



91. "Non-Contact True Temperature Measurements for Process Diagnostics," M.A. Khan, C.D. Allemand and T.W. Eagar, in *Proc. of Materials Research Society Symposium on Process Diagnostics: Materials, Combustion, Fusion, 117*, 119, 1988.

92. "Parametric Study of Heat Flow During Resistance Spot Welding," E.W. Kim and T.W. Eagar, *Modeling and Control of Casting and Welding Processes IV*, A.F. Giamei and G.J. Abbaschian, eds., TMS, Warrendale, PA, 1988.

93. "An Iconoclast's View of the Physics of Welding - Rethinking Old Ideas," T.W. Eagar, *Recent Trends in Welding Science and Technology*, S.A. David and J. M. Vitek, eds., ASM International, Materials Park, OH, 341, 1990.

94. "Temperature Distribution and Energy Balance in the Electrode During GMAW," Y-S. Kim and T.W. Eagar, *Recent Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park, OH, 13, 1990.

95. "The Transition from Shallow to Deep Penetration During Electron Beam Welding," J.Elmer, W.H. Giedt and T.W. Eagar, *Welding J., 69(5)*, 167s, 1990.

96. "Characterization of Spatter in Low Current GMAW of Titanium Plate," S.T. Eickhoff and T.W. Eagar, *Welding J., 69(10)*, 382s, 1990.

97. "Metal Transfer in Pulsed Current Gas Metal Arc Welding," Y-S. Kim and T.W. Eagar, *Welding J.,72 (7)*, 279-s, 1993.

98. "Improving the Calculation of Interdiffusion Coefficients," R.R. Kapoor and T.W. Eagar, *Metall. Trans., 21A(12)*, 3039, 1990.

99. "Effect of Second Phase Particles on Direct Brazing of Alumina Dispersion Hardened Copper," A.A. McFayden, R.R. Kapoor and T.W. Eagar, *Welding J., 69(11)*, 399s, 1990.

100. "Tin-Based Reactive Solders for Ceramic/Metal Joints," R.R. Kapoor and T.W. Eagar, *Metall. Trans., 20B(12)*, 919, 1989.

101. "Thermochemistry of Joining," T.W. Eagar, in *Elliott Symposium on Chemical Process* Metallurgy, P.J. Koros and G.R. St. Pierre, eds., Iron and Steel Society, Warrendale, PA, 197, 1991.

102. "Challenges in Joining Emerging Materials," T.W. Eagar, in *Proc. of International Conference on Advances in Joining Newer Structural Materials*, Montreal, Canada, 1990, Pergamon Press, Oxford, 3, 1990. (English and French)

103. "Physics of Arc Welding Processes," T.W. Eagar, *Advanced Joining Technologies*, T.H. North, ed., Chapman and Hall, London, U.K., 61, 1990.

104. "Thermodynamic Data from Diffusion Couples - I," R.R. Kapoor and T.W. Eagar, *Acta Metallurgica, 38(12)*, 2741, 1990.

105. "Thermodynamic Data from Diffusion Couples - II," R.R. Kapoor and T.W. Eagar, *Acta Metallurgica, 38(12)*, 2755, 1990.

106. "Non-Contact Temperature Measurement - I: Interpolation-Based Techniques," M.A. Khan, C. Allemand and T.W. Eagar, *Review of Scientific Instruments, 62(2)*, 392, 1991.

107. "Non-Contact Temperature Measurement - II: Least Squares-Based Techniques," M.A. Khan, C. Allemand and T.W. Eagar, *Review of Scientific Instruments, 62(2)*, 403, 1991.

108. "Whither Advanced Materials," T.W. Eagar, *Advanced Materials & Processes, 139(6)*, 25, 1991.

109. "The Future of Metals," T.W. Eagar, *Welding J., 70(6)*, 69, 1991.

110. "Single-Phase Solidification During Rapid-Resolidification of Stainless Steel Alloys," J.W. Elmer, T.W. Eagar and S.M. Allen, in *Proc. of the Materials Weldability Symposium*, ASM International, Materials Park, OH, 143, 1990.

111. "Analysis of Metal Transfer in Gas Metal Arc Welding," Y-S. Kim and T.W. Eagar, *Welding J. 4*, 269s-276s, 1993.

112. "Calculation of Electrical and Thermal Conductivities of Metallurgical Plasmas," G.J. Dunn and T.W. Eagar, *Welding Research Council Bulletin 357*, Welding Research Council, New York, 1, 1990.

113. "Joining of Aluminum Matrix Composites by Plasma Spraying," T. Itsukaichi, M. Umemoto, I. Okane, T.W. Eagar and K. Fukui, in *Proc. of the International Conference on New Advances in Welding and Allied Processes, Vol II*, International Academic Publishers, Beijing, China, May 1991.

114. "Plasma Spray Joining of Aluminum Matrix Composites Using Osprey Composite Powder," T. Itsukaichi, T.W. Eagar, M. Umemoto, and I. Okane, *Transactions of the Japan Welding Society, 10(2)*, 309, 1992. (Japanese)

115. "Transient Liquid Phase Bonding Processes," W.D. MacDonald and T.W. Eagar, *The Metal Science of Joining*, M.J. Cieslak, J.H. Perepezko, S. Kang, M.E. Glicksman, eds., Metallurgical Society, Warrendale, PA, 93, 1991.

116. "Infrared Radiation from an Arc Plasma and Its Application to Plasma Diagnostics," T. Ohji and T.W. Eagar, *J. of Plasma Physics and Chemistry, 12(4)*, 403, 1992.

117. "Transient Liquid Phase Bonding," W.D. MacDonald and T.W. Eagar, *Annual Review of Materials Science, 22*, 23, 1992.

118. "Materials Manufacturing," T.W. Eagar, *MRS Bulletin, 4*, 27, 1992.

119. "Problems in Engineering and Science Education: Why Do We Have a Weakness in Materials Synthesis and Processing?," T.W. Eagar, *MRS Bulletin, 9,* 36, 1992.

120. "Resistance Welding: A Fast, Inexpensive and Deceptively Simple Process," T.W. Eagar, in *International Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park,OH, 347, 1992.

121. "Low Temperature Transient Liquid Phase Bonding of Ti-6Al-4V," W.D. MacDonald and T.W. Eagar, *International Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park, OH, 1083, 1992.

122. "Investigations of Drop Detachment Control in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar, J.H. Lang, *International Trends in Welding Science and Technology*, S.A. David and J.M. Vitek, eds., ASM International, Materials Park, OH, 1009, 1992.

123. "Metal Transfer Control in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar, J.H. Lang, in *Tenth Symposium on Energy Engineering Sciences*, Argonne National Laboratory, Argonne, IL, May, 1992.

124. "Low Temperature Transient Liquid Phase (LTTLP) Bonding for Au/Cu and Cu/Cu Interconnections," M. Hou and T.W. Eagar, Trans. of ASME, *J. of Electronic Packaging, 114*, 443, 1992.

125. "Low Stress Die Attach by Low Temperature Transient Liquid Phase Bonding," J.W. Roman and T.W. Eagar, in *1992 International Symposium on Microelectronics, 52,* (sponsored by the International Society for Hybrid Microelectronics, ISHM), San Francisco, CA, 81, 1992.

126. "Characterization of Spatter in Low-Current GMAW of Titanium Alloy Plate," S.T. Eickhoff and T.W. Eagar, in *Proc. of the Technical Program from the 1990 TDA International Conference on Products and Applications*, Orlando, FL, October 1990.

127. "High Energy Electron Beam Welding & Materials Processing," V.R. Dave, D.L. Goodman, T.W. Eagar, K.C. Russell, in *Proc. of AWS High Energy Electron Beam Welding & Materials Processing*, 156, 1993.

128. "High Energy Electron Beam (HEEB) Processing of Advanced Materials," V.R. Dave, D.L. Goodman, M. Farnush, T.W. Eagar, K.C. Russell, in *Proc. of AWS-HEEB Processing of Advanced Materials*, Chicago, IL, 537, 1992.

129. "Joining of 6061 Aluminum Matrix-Ceramic Particle Reinforced Composites," R. Klehn, T.W.Eagar, *WRC Bulletin 385,* 1, 1993.

130. "In-Space Welding, Visions and Realities," D. Tamir, T. A. Siewert, K. Masubuchi, L. Flanigan, R. Su, and T.W. Eagar, in *Proc. of Thirtieth Space Congress: "Yesterday's Vision is Tomorrow's Reality", (4),* 1.9, Cocoa Beach, Florida, 1993.

131. "Evolving Manufacturing Practices: Lessons for the Quality Control Engineer," T.W. Eagar, *Materials Evaluation, 51(10)*, 1184, 1993.

132. "Joining of Advanced Materials," T.W. Eagar, W.A. Baeslack, R. Kapoor, *Encyclopedia of Advanced Materials*, D.Bloor, M. Flemings, R. Brook, S. Mahajan, eds., Pergamon Press, Oxford, 1207, 1994.

133. "Advanced Joining Processes," T.W. Eagar, W.A. Baeslack, *Encyclopedia of Advanced Materials*, D. Bloor, M. Flemings, R. Brook, S. Mahajan, eds., Pergamon Press, Oxford, 1221, 1994.

134. "Leaders for Manufacturing: Educating for the Future," T.W. Eagar, *AAAS Science and Technology Policy Yearbook*, A.H. Teich, S.D. Nelson, C. McEnaney, eds., AAAS, 229, 1994.

135. "Welding Process Decoupling for Improved Control," D.E. Hardt, T.W. Eagar, J.H. Lang and L. Jones in *Proc. of 11th Symp. on Energy Engineering Sciences*, Argonne National Laboratory, Argonne, IL, 287, 1993.

136. "Heat and Metal Transfer in Gas Metal Arc Welding using Argon and Helium," P.G. Jonsson, T.W. Eagar and J. Szekeley, *Metall. Trans., 26B(4)*, 383, 1995.

137. "The Only Constant is Change," T.W. Eagar, *Welding Journal, 74(12)*, 63, 1995.

138. "Cleaning and Reflow of Pb-Sn-C4 Solder Bumps," C. Lee, D. Crafts, T.W, Eagar, Trans. of ASME, *J. of Electronic Packaging, 117(4)*, 277, 1995.

139. "Redefining the University-Industry Relationship for Manufacturing Excellence," T.W. Eagar, W. C. Hanson, T.L. Magnanti and D.B. Rosenfield, in *Proc. of the 4th Annual Pittsburgh Manufacturing Systems Engineering Conf.*, 1993.

140. "Bringing New Materials to Market," T.W. Eagar, *Technology Review*, 42, February/March, 1995.

141. "Welding and Joining: Moving from Art to Science," *Welding Journal, 74(6)*, 49, 1995.

142. "Evaluation Method for Electrochemical Migration Susceptibility in Pure Water," (Japanese), T. Takemoto, R.M. Latanision, T.W. Eagar and A. Matsunawa, in *Proc. of 1st Symposium on Microjoining and Assembly Technology in Electronics*, Japan Welding Society Committee of Microjoining, Tokyo, 105, 1995.

143. "The Temporal Nature of Forces Acting on Metal Drops in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar, J.H. Lang, *Trends in Welding Research*, H.B. Smartt, J.A. Johnson, S.A. David, eds., ASM International, Materials Park, OH, 365, 1996.

144. "Plasma Spray Joining of Al-Matrix Particulate Reinforced Composites," T. Itsukaichi, T.W. Eagar, M. Umemoto and I. Okane, *Welding Journal, 75(9)*, 285s, 1996.

1998.

159. 'The Quiet Revolution in Materials Processing," T.W. Eagar, in *Proc. of Third Pacific Rim International Conference on Advanced Materials and Processing*, M.A. Imam, R. DeNale, S. Hanada, et al., eds.,TMS, Warrendale, PA, 1, 1998.

160. "Magnitude Scaling of Free Surface Depression During High Current Arc Welding, P.F. Mendez and T.W. Eagar, in *Trends in Welding Research*, ASM International, 13-18, June 1-5, 1998.

161. "In Search of the Perfect Weld," T.W. Eagar, *Trends in Welding Research*, J.M. Vitek, S.A. David *et al*, eds., ASM International, Materials Park, OH, 261, 1999.

162. "Study of Chromium in Gas Metal Arc Welding Fume," T.W. Eagar, P. Sreekanthan, N.T. Jenkins *et al.*,*Trends in Welding Research*, J.M. Vitek, S.A. David *et al*, eds., ASM International, Materials Park, OH, 374, 1999.

163. "Magnitude Scaling of Free Surface Depression during High Current Arc Welding," P.F. Mendez and T.W. Eagar, *Trends in Welding Research*, , J.M. Vitek, S.A. David *et al*, eds., ASM International, Materials Park, OH, 13, 1999.

164. "Liquid Infiltrated Powder Interlayer Bonding (LIPIB) - A Process for Large Gap Joining," W.D. Zhuang and T.W. Eagar, *Science and Technology of Welding and Joining*, 2000 Volume 5, Number 3, 125-134.

165. "Images of a Steel Electrode in Ar-2%O2 During Constant-Current Gas Metal Arc Welding," L.A. Jones, T.W. Eagar and J.H. Lang, *Welding Journal*, Welding Research Supplement, April 1998, 135-s-141-s.

166. "Estimation of the Characteristic Properties of the Weld Pool During High Productivity Arc Welding," P.F. Mendez and T.W. Eagar in 5th International Seminar "Numerical Analysis of Weldability," 1999. Graz-Seggau, Austria.

167. "Order of Magnitude Scaling of Complex Engineering Problems," P.F. Mendez and T.W. Eagar, *Seventeenth Symposium on Energy Engineering Sciences*, Argonne, IL, pp. 106-113, May 13-14, 1999.

168. "Humping Formation in High Current GTA Welding," P.F. Mendez, K.L. Niece and T.W. Eagar, in *Proceedings of the International Conference on Joining of Advanced and Specialty Materials II*, Cincinnati, OH, November 1999.

169. "Order of Magnitude Scaling of the Cathode Region in an Axisymmetric Transferred Electric Arc," P.F. Mendez, M.A. Ramirez, G. Trapaga, T.W. Eagar in *Metallurgical and Materials Transactions B*, June 2001, Vol. 32B, p.547-554.

170. "Modeling of Materials Processing Using Dimensional Analysis and Asymptotic Considerations," P.F. Mendez and T.W. Eagar in Proc. of THERMEC'2000, International

145. "Abrasion Resistant Active Braze Alloys for Metal Single Layer Technology," R.K. Shiue, S.T. Buljan and T.W. Eagar, *Science and Technology of Welding and Joining 2(2)*, 71, 1997.

146. "Large Gap Joining of Ti-6Al-4V with Mixed Powder Interlayers," W.D. Zhuang and T.W. Eagar, *Science and Technology of Welding and Joining 2(4)*, 139, 1997.

147. "Diffusional Breakdown of Nickel Protective Coatings on Copper Substrate in Silver-Copper Eutectic Melts," W.D. Zhuang and T.W. Eagar, *Metall. Trans., 28A(4)*, 969, 1997.

148. "Transient Liquid Phase (TLP) Bonding using Coated Metal Powders," W.D. Zhuang and T.W. Eagar, *Welding Journal, 76(4)*, 157s, 1997.

149. "High Temperature Brazing by Liquid Infiltration," W.D. Zhuang and T.W. Eagar, *Welding Journal, 76(12)*, 526s, 1997.

150. "Dynamic Behavior of Gas Metal Arc Welding," L.A. Jones, P. Mendez, D. Weiss, and T.W. Eagar, presented at the 9th Annual Conference on Iron and Steel Technology, Pohang,
Korea, August 1997.

151. "A Systematic Strategy for Optimizing Manufacturing Operations," J. Kerkhoff, T.W. Eagar, and J. Utterback, *Production and Operations Management, (7)1*, 67, 1998.

152. "Isothermal Solidification Kinetics of Diffusion Brazing," W.D. MacDonald and T.W. Eagar, *Metall. Trans., 29A(1)*, 315, 1998.

153. "Magnetic Forces Acting on Molten Drops in Gas Metal Arc Welding," L.A. Jones, T.W. Eagar and J.H. Lang, *Journal of Physics, Part D: Applied Physics, 31(1)*, 93, 1998.

154. "A Dynamic Model of Drops Detaching from a Gas Metal Arc Welding Electrode," L.A. Jones, T.W. Eagar and J.H. Lang, *Journal of Physics, Part D: Applied Physics 31(1)*, 107, 1998.

155. "Electrochemical Migration Tests of Solder Alloys in Pure Water," T. Takemoto, R.M. Latanision, T.W. Eagar and A. Matsunawa, *Corrosion Science, 39(8)*, 1415, 1997.

156. "Quiet Revolution in Materials Manufacturing and Production," T.W. Eagar, *Journal of Metals, 50(4)*, 19, 1998.

157. "The Plasma-Enabled Recovery of Titanium Metal by the Electrolysis of Titanate Slags," H.R. Larson and T.W. Eagar, *Journal of Metals, 50(9)*, 56, 1998.

158. "How Welding Fumes Affect the Welder," J.M. Antonini, G.G. Krishna Murthy, R.A. Rogers, R. Albert, T.W. Eagar, G.D. Ulrich, and J.D. Brain, *Welding Journal, 77(10)*, 55,

Conference on Processing and Manufacturing of Advanced Materials, Las Vegas, NV, December 4-8, 2000.

171. "Scaling of the Cathode Region of a Long GTA Welding Arc," P.F. Mendez, M.A. Ramirez, G. Trapaga and T.W. Eagar, *Advances in Computational Engineering & Sciences*, Volume I, Tech Science Press, Palmdale, CA, 689-694, 2000.

172. "Effect of Electrode Droplet Size on Evaporation and Fume Generation in GMAW," P.F. Mendez, N.T. Jenkins, T.W. Eagar, Gas Metal Arc Welding for the 21st Century, Orlando, FL, American Welding Society, December 6-8, 2000.

173. "Strain Energy Distribution in Ceramic/Metal Joints," J.-W. Park, P.F. Mendez and T.W. Eagar, *Acta Materialia*, Volume 50, issue 5, pp.883-899, March 2002.

174. "Modeling of Welding Processes through Order of Magnitude Scaling," P.F. Mendez and T.W. Eagar, Metal Technologies, MMT-2000, Ariel, Israel, November 13-15, 2000.

175. "Modeling of Materials Processing Using Dimensional Analysis and Asymptotic Considerations," P.F. Mendez and T.W. Eagar, accepted by *Journal of Materials Processing Technology*, 2001.

176. "Welding Processes for Aeronautics," P.F. Mendez and T.W. Eagar, *Advanced Materials & Processes*, 159 (5), pp. 39-43, 2001.

177. "Why Did the World Trade Center Collapse? Science, Engineering and Speculation," C. Musso and T.W. Eagar, *Journal of Materials*, pp. 8-11, December 2001.

178. "Strain Energy Release in Ceramic-to-Metal Joints with Patterned Interlayers," J.-W. Park, J.J. Kim, T.W. Eagar, *Journal of the American Ceramic Society*, submitted September 2001.

179. "Strain Energy in the Filler Metal and the Shear Strength of the Concentric Ceramic-to-Metal Brazed Joints," J.L. Wiese, J.-W. Park, T.W. Eagar, *Scripta Materialia*, submitted 2001.

180. "Thermodynamic Model of the Zr-O System," R. Arroyave and T.W. Eagar, *Calphad*, submitted 2001.

181. "Scaling Laws in the Welding Arc," P.F. Mendez, M.A. Ramirez, G. Trapaga and T.W. Eagar, *Mathematical Modelling of Weld Phenomena 6*, Institute of Materials, London, UK, 2002.

182. "Residual Stress Release in Ceramic-to-Metal Joints by Ductile Metal Interlayers," J.W. Park, P.F. Mendez and T.W. Eagar, *Scripta Metallurgica et Materialia*, submitted 2002.

183. "Carbide Formation in Alloy 718 During Electron Beam Solid Freeform Fabrication," J.E. Matz and T.W. Eagar, accepted by *Metall. Trans.*, 2002.

184. "Application of the Transient Liquid Phase Bonding to Microelectronics and MEMS Packaging," J.W. Park and T.W. Eagar, IEEE Conference Proceedings on Advanced Packaging Materials and Processes, 2002.

185. "Interfacial Microstructure of Partial Transient Liquid Phase Bonded $Si_3N_4$-to-INCONEL 718 Joints," J.J. Kim, J.-W. Park and T.W. Eagar, accepted *Materials Science and Engineering A* (2001).

186. "Elastoplastic Behavior of Dissimilar Material Joints, Part 1 Theory and Numerical Analysis," M. Tateno and T.W. Eagar, submitted to Transactions of the ASME, *Journal of Applied Mechanics*, 2002.

187. "Experimental Characterization of Temperature Profiles in One Dimensionally Simulated Resistance Spot Welding of Bare and Zinc Coated Steel," E. Kim and T.W. Eagar, *Welding Journal*, submitted July 2002.

188. "Manganese in Welding Fume and Worker Health," M.C. Balmforth, N.T. Jenkins, T.W. Eagar, *Welding Journal*, submitted 2002.

189. "Freshly generated stainless steel welding fume induces greater lung inflammation in rats as compared to aged fume," J.M. Antonini, R.W. Clarke, G.G. Krishna Murthy, P. Sreekanthan, N. Jenkins, T.W. Eagar, J.D. Brain, Elsevier Science *Toxicology Letters* 98 (1998), 77-86.

190. "New Trends in Welding in the Aeronautic Industry," P.F. Mendez and T.W. Eagar, 2nd Conference of New Manufacturing Trends, Bilboa, Spain, November 19 – 20, 2002.

191. "Metal Substrate Effects on the Thermochemistry of Active Brazing Interfaces," R. Arroyave and T.W. Eagar, Acta Materialia, accepted June, 2003.

192. "Feasibility of Using Earth-bounded NDT Techniques for the Space Environment," V. Nikou, P.F. Mendez, K. Masubuchi, T.W. Eagar, Conference on Emerging Technologies in Non-Destructive Testing, Thessaloniki, Greece, May 26-28, 2003.

193. "Joining $LaMO_3$ Perovskite Ceramics to Nickel-based Super Alloys Using Brazing/TLPB Techniques," R. Arroyave, T.W. Eagar, H.R. Larson, Abstracts of Papers, 225th ACS National Meeting, New Orleans, LA, United States, March 23-27, 2003, FUEL-111 (CODEN: 69DSA4 AN 2003:182444 CAPLUS)

194. "Hollow-Cored, Long-Fiber Metal Matrix Composites for Thermal Packaging Applications," Christopher Musso and Thomas Eagar, *Proceedings of ICCE/9*, July 2002, p.549-550.

195. "Submicron Particle Chemistry: Vapor Condensation Analogous to Liquid Solidication," Neil T. Jenkins and Thomas W. Eagar, *Journal of Materials*, June 2003, Volume 55, No. 6, p.44-47.

**PATENTS:**

1. "Method of Resistance Welding," T.W. Eagar, J.G. Kaiser, and G.J. Dunn, Patent No. 4,365,134, Dec. 21, 1982.

2. "Non-hygroscopic Welding Flux Binders," E.A. Barringer and T.W. Eagar, Patent No. 4,512,822, April 23, 1985.

3. "Large Diameter Stud and Method and Apparatus for Welding Same," T.E. Shoup, D.J. Maykut, and T.W. Eagar, Patent No. 4,531,042, July 23, 1985.

4. "Non-Hygroscopic Welding Flux Binders," E.A. Barringer and T.W. Eagar, Patent No. 4,557,768; December 10, 1985.

5. "Laser Instrument," R.J. Cabrera, T.W. Eagar and J. Santangelo, Patent No. 4,580,558, April 8, 1986.

6. "Laser Instrument," R.J. Cabrera and T.W. Eagar, Patent No. 4,646,734, March 3, 1987.

7. "Non-Hygroscopic Welding Flux Binders," E.A. Barringer and T.W. Eagar, Patent No. 4,662,952, May 5, 1987.

8. "Age-Hardenable Sterling Silver," T.W. Eagar, D.P. Agarwal, L.L. Bourguignon and R.E. Marcotte, Patent No. 4,810,308, March 7, 1989.

9. "Emissivity Independent Multiwavelength Pyrometry," M.A. Khan, C.D. Allemand and T.W. Eagar, Patent No. 5,132,922, July 21, 1992.

10. "Silver Alloys of Exceptional and Reversible Hardness," T.W. Eagar, D.P. Agarwal, L.L. Bourguignon and R.E. Marcotte, Patent No. 4,869,757, September 26, 1989.

11. "Wear Resistant Bond for an Abrasive Tool," R.K. Shiue, R. Andrews, T.W. Eagar, B. Miller and S-T. Buljan, Patent No. 5,846,269, December 8, 1998.

12. "Abrasive Tool Containing Coated Abrasive Grain,"R.K. Shiue, B. Miller, S.T. Buljan, E. Schulz and T.W. Eagar, Patent No. 5,855,314, January 5, 1999.

13. "Removable Bond for an Abrasive Tool," R.K. Shiue, T.W. Eagar, B. Miller and S-T. Buljan, Patent No. 6,245,443, June 12, 2001.

**PATENTS PENDING:**

"Filtration Element for Severe Service Applications," M. Mutsakis, J.P. Puglia, G.M. Freedland, T.W. Eagar and H.R. Larson, Patent Application No. 09/809,818, filed March 16, 2001.

**PATENT APPLICATION:**

"Methods for Forming Articles Having Very Small Channels Therethrough, and Such Articles, and Method of Using Such Articles," C.S. Musso and T.W. Eagar, filed March 12, 2002.

**Thomas W. Eagar**
**Litigation Identification**
**June 17, 2003**

1.  Welding Asbestos Litigation – deposition in Cambridge, MA on May 24, 1995 re: Asbestos Litigation, New Castle County Delaware, and telephonic deposition in Boston, MA on July 7, 1999 re: Shipe et al. v Lincoln Electric, Company et al.; Ralph Davies, Davies McFarland and Carroll, defendant's attorney.

2.  Bicycle Failure – deposition in Boston, MA on December 18, 1997, re: Jeffrey Crawn v. Benteler; trial in Easton, PA, May 21, 1999; James Dodd-O; Thomas, Thomas, and Hafer, Harrisburg, PA, plaintiff's attorney.

3.  Failure of Machinery – deposition in Raynham, MA on May 29, 1998 and trial in Boston, MA on May 14, 1999 re: Hartford Steam Boiler v. Sentinel Products, Rosemary Connolly, Robins, Kaplan, Miller and Ciresi, plaintiff's attorney.

4.  Helicopter Mishap – deposition in Boston, MA on May 3, 1999 and trial testimony in Bisbee, AZ on October 5 and 6, 1999 re: Jenkins v. Bell Helicopter; Steve Yost, Goodwin Raup, defendant's attorney.

5.  Fall From Ladder – deposition in New York City, NY on June 29, 1999 re: Borchers' v. Werner; Dan McNamara, DeCicco, Gibbons and McNamara, defendant's attorney.

6.  Steel Bearings – deposition in Boston, MA on June 30, 1999 and trial in Los Angeles, January 22, 2001 re: United States v. NMB Corporation; John McKay, Shaw Pittman, defendant's attorney.

7.  Truck Accident – trial in Somerville, MA on July 28, 1999 re: Commonwealth of Massachusetts v. Dana Smith; Ed Mahoney Law Offices of Richard W. McLeod, defendant's attorney.  Trial in Cambridge, MA on October 31 and November 5, 2002, John Nelson, Law Offices of Brian Cullen, defendant's attorney.

8.  Failure of Hydraulic Cylinder – deposition in Boston, MA on July 28, 1999, and November 5, 1999 re: Marcantonio v. Sterling Industrial; Richard Edwards, Campbell, Campbell, and Edwards, defendant's attorney.

9. Screw Failure – trial in Rochester, NY on October 8, 1999 re: Torchia v. Van Dorn DeMag; Beryl Nussbaum, Woods Oviatt, Gilman, defendant's attorney.

10. Aerial Bucket Truck – deposition in Boston, MA, on October 26, 1999 re: Christopher Finney v. Asplundh Tree Expert Company; Darrell Warta, Foulston & Siefkin, defendant's attorney.

11. Pipe Failure – arbitration in New York City on October 27, 1999, re: Winter Club v. Burley Construction; Richard Flanagan, Flanagan and Cooke, plaintiff's attorney.

12. Ladder Accident – trial in New Brunswick, NJ on December 10, 1999 re: Norcross v. Werner, Don Crowley, Methfessel and Werbel, defense attorney.

13. Ladder Collapse – deposition in Cambridge, MA, December 13, 1999, re: Landou v. Werner, J. Scott Donington, Champi and Donington, defense attorney.

14. Welding Fume – deposition in San Francisco, CA, January 17, 2000, re: Thornsby v. Lincoln Electric Company et al., Al Norris, Crosby, Heafey, Roach & May, defense attorney.

15. Copper Wire – Dispute Resolution Board, January 25-27, 2000 and March 5, 2000, Westbrooke, CT, BBC/MEC v. Amtrak, Nancy Feinrider, Kalkines, Arky, Zall and Bernstein, defense attorney.

16. Failed Hose Coupling – deposition in Weslaco, TX, March 3, 2000, re: Rivera v. Van Dorn DeMag, Mark Ferris, Jones, Galligan, Key and Lozano, defense attorney.

17. Copper Elbow Failure – deposition in New York City, March 16, 2000, Turner Construction v. Elkhart Products, Mark Mullen, Cozen & O'Connor, plaintiff's attorney.

18. Ladder Collapse – trial in Brooklyn, NY, April 14-17, 2000, Santata v. Seagrave et al, Herb Waichman, Parker & Waichman, plaintiff's attorney.

19. Patent Infringement – trial in Madison, WI, May 24 and 25, 2000, Rayovac v. Duracell, Ed DeFranco, Fish & Neave, defendant's attorney.

20. Metal Bellows – deposition in Cambridge, MA, June 8, 2000, Apache Oil v. Titeflex Corporation, Michael Quinn, Bonenberger & Quinn, plaintiff's attorney.

21. Building Fire – trial in Rochester, NY, June 16, 2000, Sodoma Farms Inc. v. Niagara Mohawk, Chris Fallon, Cozen & O'Connor, plaintiff's attorney.

22. Pipe Failure – trial in Brooklyn, NY, June 27, 2000, Flight Safety International v. The Port Authority of New York and New Jersey, Jack Brown, Cozen & O'Connor, plaintiff's attorney.

23. Cable Failure – deposition in Houston, TX, November 10, 2000, Salazar v. Morse Industries, Mark Farris, Jones, Galligan Key and Lozano, plaintiff's attorney. Trial in Edinburgh, TX, September 18 – 19, 2002, Roger Braugh, Sico White & Braugh, plaintiff's attorney.

24. Broken Weld – trial in Dedham, MA, November 15, 2000, Anderson v. Braintree Hospital, John Bruce, Foster & Eldridge, defendant's attorney.

25. Helicopter Accident – deposition in Cambridge, MA, November 21, 2000, Kennedy v. Bell Helicopter, Dan Laurence, Mills Meyer & Swartling, defendant's attorney.

26. Electrical Contacts – deposition in Cambridge, MA, December 7, 2000, Campbell v. GE, William Clark, Cozen & O'Connor, plaintiff's attorney.

27. Medical Instrument – telephonic deposition in Cambridge, MA, December 28, 2000, Jerome v. Codman, Thomas Lucas, Cassiday Schade and Gloor, defendant's attorney.

28. Aircraft Mishap – deposition in Kansas City, MO, January 10 and 11, 2001, Snyder et al. v. Teledyne Continental Motors, John Turner, Turner & Sweeney, plaintiff's attorney.

29. Steel Cutting – trial in New York City, February 5 and 6, 2001, Liberty Mutual v. Design Build, E. Rinaldi, Cozen & O'Connor, plaintiff's attorney.

30. Helicopter Engine Failure – deposition in New Orleans, LA, February 15, 2001 and trial in Lafayette, LA, April 25-26, 2001, Bertrand v. Air Logistics, Robert Kerrigan, Deutsch, Kerrigan & Stiles, defendant's attorney.

31. Brazed Joints – deposition in Montpelier, VT, March 2, 2001, Northeast Granite v. Pyramid Supply, William Clark, Cozen & O'Connor, plaintiff's attorney.

32. Broken Screw – deposition in Boston, MA, March 9, 2001, Krueger v. Codman. Robert Houghton, Shuttleworth & Ingersoll, defendant's attorney.

33. Automobile Accident – deposition in Beaumont, Texas, April 6, 2001, Thornton v. Ford, Ken Lewis, Bush Lewis & Roebuck, plaintiff's attorney.

34. Automobile Accident – deposition in Norwood, MA, April 27, 2001, Pierce v. GM, Ralph Monaco, Conway and Londregan, plaintiff's attorney. Trial in New London, CT, July 18, 2001, Pierce v. GM, Ralph Monaco, plaintiff's attorney.

35. Fan Motor Failure – deposition in Hartford, CT, June 5, 2001, Colorpix v. Broan, Stuart Blackburn, Law Offices of Stuart Blackburn, plaintiff's attorney.

36. Helicopter Mishap – deposition in San Antonio, TX, June 18, 2001, Stutzman v. Torrington, Ernest Cannon, plaintiff's attorney.

37. Electrical Arc – deposition in Cambridge, MA, July 17, 2001, Chryczyk v. The Prime Group, Kathy McCabe, Cassiday Schade & Gloor, defendant's attorney.

38. Brake Spring Failure – deposition in Chicago, IL, July 20, 2001 and January 31, 2002. Trial in Chicago, IL, March 19, 2002, Dexter Axle v. Omiotek, Pat Gloor, Cassiday Schade & Gloor, plaintiff's attorney.

39. Helicopter Mishap – deposition in Seattle, WA, August 3, 2001, Wehling v. Bell, Dan Laurence, Mills Meyers & Swartling, defendant's attorneys. Trial in Seattle, WA, October 3 and 4, 2001.

40. Aluminum Casting Failure – trial in Brockton, MA, October 10, 2001, Davidson v. Polaris, Tim Mattson, Bowman & Brooke, defendant's attorney.

41. Gas Heater Corrosion – deposition in Cambridge, MA, October 16 and 29, 2001, Copco Steel and Atlas Steel v. Document Services, John Schleiter, Daar, Fisher, Kanaris & Vanek, plaintiff's attorney.

42. Weld Failures – deposition in Cambridge, MA, October 19, 2001, JWR Resources v. Long Airdox, Shawn George, George & Lorenson, defendant's attorney.

43. Helicopter Mishap – deposition in Cambridge, MA, October 24, 2001, Harvey v. Bell Helicopter, Jim Doran, Waller Lansden Dortsch & Davis, defendant's attorney.

44. Patent Infringement – trial in Washington, D.C., October 25 and 30, 2001, 3M v. Kinik, Anthony Roth, Morgan Lewis & Bochius, defendant's attorney.

45. Offshore Oil Rig - hearing in Houston, TX, October 26, 2001, Ed Murphy, Beirne Maynard & Parsons, defendant's attorney.

46. Steel Shaft Fracture – deposition in Cambridge, MA, November 9, 2001, Epsilon Products v. Krupp Mannesmann, Brian Lincicome, Cozen & O'Connor, plaintiff's attorney.

47. Oil Tank Failure – deposition in Cambridge, MA, January 25, 2002, Farlee v. L.K. Walton, Scott Donington, Donington and Sena, plaintiff's attorney.

48. Fire – deposition in Boston, MA, February 12, 2002, Rotando v. Atlantic Heating and Air Conditioning, David Groth, Cozen & O'Connor, plaintiff's attorney.

49. Fire – deposition taken in Philadelphia, PA, February 22, 2002. Trial in Newark, NJ, May 9, 2002, O'Brien v. GEC Alstohm, Thomas McKay, Cozen & O'Connor, plaintiff's attorney.

50. Broken Steel Stud – deposition in Los Angeles, CA, March 27, 2002, Souza v. Van Dorn DeMag, Craig Sears; Harrington, Foxx, Dubrow and Canter, defense attorney.

51. Electrical Fire – deposition in Baltimore, MD, March 28, 2002, Hoon v. Lightolier, Peter Rossi, Cozen & O'Connor, plaintiff's attorney.

52. Fatigue Failure – deposition in Philadelphia, PA, April 12, 2002. Trial in Philadelphia, PA, May 21, 2002, TCM v. Standard Steel, Bruce McKissock, McKissock & Hoffman, defendant's attorney.

53. Hydrogen Cracking – trial in Clearfield, PA, April 23, 2002, Equimeter v. Charkan, James DeVittorio, Law Offices of James DeVittorio, defendant's attorney.

54. Metal Pan – deposition in Cambridge, MA, May 3, 2002, Good v. Alcan. Paul Casteleiro, Law Offices of Paul Casteleiro, defendant's attorney.

55. Electrical Contacts – hearing in Brownsville, TX, May 16, 2002, Manuel Cruz v. BRK Brands, Inc., James Heller, Cozen & O'Connor, defendant's attorney. Deposition in Philadelphia, PA on June 20, 2002.

56. Automobile Accident – deposition in Cambridge, MA, June 11, 2002, Stone v. Subaru, Shawn George, George and Lorsenson, plaintiff's attorney.

57. Fire – trial in Whitehorse, Yukon, Canada, July 9 and 10, 2002, Trans North Turbo v. North 60 Petro, Rick Davison, Parlee McLaws, defendant's attorney.

58. Paint Adhesion – deposition in Chicago, IL, September 11, 2002, Holden v. Wismarq, Kathy McCabe, Cassiday Schade & Gloor, defendant's attorney.

59. Fan Motor Failure – deposition in Charlotte, NC, October 10, 2002, Automotive Parts Express v. Broan Nu-Tone, Tracey Eggleston, Cozen & O'Connor, plaintiff's attorney.

60. Electrical Arc – deposition in Cambridge, MA, October 21, 2002, Great Northern Insurance v. Magnetek, Inc., Richard Bailey, Cozen & O'Connor, plaintiff's attorney.

61. Weld Failure – deposition in Cambridge, MA, November 8, 2002, Brown v. Homes of Merit, Ren Werrenrath, Fisher Rushmer & Werrenrath, defense attorney.

62. Copper Corrosion – trial in Cambridge, MA, November 18, 2002, Smith v. Gill Services, David Volkin, Fitzhugh, Parker & Alvaro, defendant's attorney.

63. Bolt Failure – deposition in Cambridge, MA, December 11, 2002, Boettge v. Karis Family Enterprises, Kathy McCabe, Cassiday Schade & Gloor, defendant's attorney.

64. Aircraft Engine Failure – trial in Cambridge, MA, January 30, 2003, Snyder v. Superior Air Parts, David Cook, Kreindler and Kreindler, plaintiff's attorney.

65. Compressed Gas Tank Failure – deposition in Milwaukee, WI, February 11, 2003, Choates v. Western Industries, Mark Foley, Foley & Lardner, defense attorney.

66. Explosion – deposition in Dallas, TX, March 5, 2003, Cain Foods v. Whirlwind, Duane Hermes, Hermes Sargent Bates, defendant's attorney.

67. Electrical Contacts – deposition in Philadelphia, PA, March 7, 2003, Morales v. BRK, Jim Heller, Cozen & O'Connor, defendant's attorney.

68. Helicopter Mishap – deposition in Cambridge, MA, April 2, 2003, Auerbach v. Cav-Air, Greg Palmer, Wicker Smith O'Hara, McCoy Graham & Ford, defense attorney.

69. Ladder Mishap – deposition in Boston, MA, April 3, 2003; hearing on April 14, 2003 in Boston, MA, Erickson v. Werner, Brian Voke, Campbell Campbell Edwards & Conroy, defense attorney.

70. Grinding Wheel Mishap – telephonic deposition in Cambridge, MA, April 14, 2003, Zach Wamsley v. CSC Holding Corporation, John Turner, Turner & Sweeney, plaintiff's attorney.

71. Electric Motor Failure – deposition in Philadelphia, PA, on April 16, 2003, Lapp v. Emerson Electric, Marty Duffey, Cozen & O'Connor, plaintiff's attorney.

72. Electrical Fire – deposition in Boston, MA, April 29, 2003 and May 20, 2003, Freidlander v. Bunker Electric, Jim Cullen, Cozen & O'Connor, plaintiff's attorney.

73. Electrical Cable Failure – deposition in Newark, NJ, May 13, 2003 and deposition in Cambridge, MA, May 19, 2003, PSE&G v. Co-Steel, Andrew Gibbs, Cozen & O'Connor, defendant's attorney.

74. Hose Coupling Failure – deposition in Albany, NY, May 14, 2003, Citicorp v. Dustbusters, David Groth, Cozen & O'Connor, plaintiff's attorney.

75. Gas Explosion – deposition in New York City, NY, May 23, 2003, Shalit v. Apple Tree Construction, Michael Sommi, Cozen & O'Connor, plaintiff's attorney.

76. Welding Fume – trial in New York City, June 17, 2003, Gomez v. Lincoln Electric Company, Jay Maylish, Kaye Scholer, defendant's attorney.



STYLE OF CASE: TRANSCONTINENTAL INSURANCE COMPANY
vs.
AMERICAN STANDARD, INC.

CASE NO.: 02-205

PERTAIN TO: Valley Diagnostic

FROM: GAB Robins, NA., Inc.
Insurance

DELIVER TO: DALE M. HOLIDY
Germer, Bernsen & Gertz, L.L.P.
333 Clay, Suite 4105
Houston, TX 77002

IN THE DISTRICT COURT OF
COUNTY,
JUDICIAL DISTRICT

The taxable cost of $ 70.00 was charged to Attorney for Defendant, TBA # 00792937

Order No. 01-7342-001

16821 Buccaneer Lane, Suite 103 • Houston, Texas 77058
Phone (281) 990-9854 • Fax (281) 990-6189

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**TEXAS, HOUSTON DIVISION**

| | | |
|---|---|---|
| **TRANSCONTINENTAL INSURANCE COMPANY** | : | |
| vs. | : | CIVIL ACTION NO. **02-205** |
| **AMERICAN STANDARD, INC.** | : | |

**NOTICE OF INTENTION**
**TO TAKE DEPOSITION BY WRITTEN QUESTIONS**

To Plaintiff by and through their attorney(s) of record: **C. Wesley Vines**
To other party/parties by and through their attorney(s) of record: **Gordon D. Laws**

You will please take notice that fourteen (14) days from the service of a copy hereof with attached questions, a deposition by written questions will be taken of Custodian of Records for:

**GAB Robins, NA., Inc. (Insurance)**
**632 Ed Carey Drive, Suite 700 Harlingen, TX 78550-7965**

before a Notary Public for **TEXAS OUTSOURCE GROUP (281) 990-9854 Fax (281) 990-6189**
**16821 BUCCANEER LANE, SUITE 103 , HOUSTON, TX 77058**

or its designated agent, which deposition with attached questions may be used in evidence upon the trial of the above-styled and numbered cause pending in the above named court. Notice is further given that request is hereby made as authorized under Rule 45, Federal Rules of Civil Procedure, to the officer taking this deposition to issue a subpoena duces tecum and cause it to be served on the witness to produce any and all records as described on the attached questions and/or Exhibit(s) and any other such record in the possession, custody or control of the said witness, and every such record to which the witness may have access, pertaining to:

**Valley Diagnostic**

and to turn all such records over to the officer authorized to take this deposition so that photographic reproductions of the same may be made and attached to said deposition.

s/Dale Holidy
**DALE M. HOLIDY**
**Germer, Bernsen & Gertz, L.L.P.**
**333 Clay, Suite 4105**
**Houston, TX 77002**
**(713) 650-1313 Fax (713) 739-7420**
Attorney for Defendant
SBA # 00792937

I hereby certify that a true and correct copy of the foregoing instrument has been forwarded to all Counsel of Record by hand delivery, FAX, and/or certified mail, return receipt requested, on this day.

Dated: May 19, 2003 by____________________

Order No. **01-7342-001**

AO 88 (Rev. 11/91) Subpoena in a Civil Case

# United States District Court

## FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

TRANSCONTINENTAL INSURANCE COMPANY

vs.

AMERICAN STANDARD, INC.

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: 02-205

TO: Custodian of Records for: **GAB Robins, NA., Inc.**
**632 Ed Carey Drive, Suite 700**
**Harlingen, TX 78550-7965 (956) 423-0770**

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| The office of the custodian: **632 Ed Carey Drive, Suite 700 Harlingen, TX 78550-7965** | **Instanter** |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
**Any and all records pertaining to Valley Diagnostic, DOL: 3-4-01, GAB File # 34718-43410, including but not limited to, any and all claim files, investigation files, documents, photographs, evaluations, accident reports, injury reports, diagrams, statements, witness statements, letters from attorneys, reports, notes and any correspondence.**

| PLACE | DATE AND TIME |
|---|---|
| The office of the custodian: **632 Ed Carey Drive, Suite 700 Harlingen, TX 78550-7965** | **Instanter** |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b) (6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| S/Dale Holidy **Attorney for Defendant** | 5-19-03 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**DALE M. HOLIDY**
**Germer, Bernsen & Gertz, L.L.P.**
**333 Clay, Suite 4105, Houston, TX 77002 (713) 650-1313**

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

**TRANSCONTINENTAL INSURANCE COMPANY** :

vs. : CIVIL ACTION NO. **02-205**

**AMERICAN STANDARD, INC.** :

## DIRECT QUESTIONS TO BE PROPOUNDED TO THE WITNESS

Custodian of Records for: **GAB Robins, NA., Inc.**
Records Pertaining To: **Valley Diagnostic**
Type of Records: **Any and all records pertaining to Valley Diagnostic , DOL: 3-4-01, GAB File # 34718-43410, including but not limited to, any and all claim files, investigation files, documents, photographs, evaluations, accident reports, injury reports, diagrams, statements, witness statements, letters from attorneys, reports, notes and any correspondence.**

1. Please state your full name.

   Answer: DENNIS NICKOLOFF

2. Please state by whom you are employed and the business address.

   Answer: GAB ROBINS N. A. INC., 632 Ed Carey Dr, S700, HARLINGEN, TX 78550

3. What is the title of your position or job?

   Answer: Supervising Adjuster

4. Are these memoranda, reports, claim records, or data compilations, outlined in the subpoena duces tecum, pertaining to the above-named person, in your custody or subject to your control, supervision or direction?

   Answer: Yes

5. Are you able to identify these aforementioned records as the originals or true and correct copies of the originals?

   Answer: Yes

6. Please hand to the Officer taking this deposition copies of the memoranda, reports, claim records, or data compilations, mentioned in Question No. 4. Have you complied? If not, why?

   Answer: Yes

7. Are the copies which you have handed to the Officer taking this deposition true and correct copies of such memoranda, reports, claim records, or data compilations?

Answer: Yes

8. Were such memoranda, reports, claim records, or data compilations kept in the regular course of business of this facility?

Answer: Yes

9. Was it in the regular course of business of this facility for a person with knowledge of the acts, events, conditions, opinion, or diagnoses, recorded to make the record or to transmit information thereof to be included in such record?

Answer: Yes

10. Were the entries on these records made at or shortly after the time of the transaction recorded?

Answer: Yes

11. Was the method of preparation of these records trustworthy?

Answer: Yes

WITNESS (Custodian of Records)

Before me, the undersigned authority, on this day personally appeared ________________, known to me to be the person whose name is subscribed to the foregoing instrument in the capacity therein stated, who being first duly sworn, stated upon his/her oath that the answers to the foregoing questions are true and correct. I further certify that the records attached hereto are exact duplicates of the original records.

SWORN TO AND SUBSCRIBED before me this 10th day of June, 2003.

LISA MARTINEZ
Notary Public, State of Texas
My Commission Expires
OCTOBER 23, 2005

NOTARY PUBLIC

My Commission Expires: 10-23-05

Order No. 01-7342-001

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

**TRANSCONTINENTAL INSURANCE COMPANY** :

**vs.** : CIVIL ACTION NO. **02-205**

**AMERICAN STANDARD, INC.** :

## AFFIDAVIT

Records Pertaining To: **Valley Diagnostic**

Type of Records: **Any and all records pertaining to Valley Diagnostic , DOL: 3-4-01, GAB File # 34718-43410, including but not limited to, any and all claim files, investigation files, documents, photographs, evaluations, accident reports, injury reports, diagrams, statements, witness statements, letters from attorneys, reports, notes and any correspondence.**

Before me, the undersigned authority, personally appeared Dennis Nickoloff, (Custodian of Records) who, being by me duly sworn, deposed as follows:

My name is Dennis Nickoloff, I am over eighteen (18) years of age, of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

- I am the Custodian of Records for:
**GAB Robins, NA., Inc.**

Attached hereto are 84 pages of records from this facility. These records are kept in the regular course of business, and it was the regular course of business for an employee or representative of this facility, with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

[signature]
AFFIANT (Custodian of Records)

Sworn to and subscribed before me on the 10th day of June, 2003.

LISA MARTINEZ
Notary Public, State of Texas
My Commission Expires
OCTOBER 23, 2005

[signature]
NOTARY PUBLIC

My Commission Expires: 10-23-05

Order No. **01-7342-001**

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION

**TRANSCONTINENTAL INSURANCE COMPANY** :

vs. : CIVIL ACTION NO. **02-205**

**AMERICAN STANDARD, INC.** :

## NOTICE OF DELIVERY

RE: **GAB Robins, NA., Inc. (Insurance)**

I, Randall Haynes, Notary Public in and for the State of Texas, hereby certify pursuant to the Rule 206, Texas Rules of Civil Procedure,

1. That this Deposition by Written Questions of , the Custodian of Records for the above named is a true and exact duplicate of the records pertaining to **Valley Diagnostic**, given by the witness named herein, after said witness was duly sworn by ;

2. That the transcript is a true record of the testimony given by the witness;

3. That **$ 70.00** is the charge for the preparation of the completed Deposition by Written Questions and any copies of exhibits, charged to Attorney for **Defendant, DALE M. HOLIDY, TBA # 00792937**;

4. That the deposition transcript was submitted on the day of , , to the witness for examination, signature and return to the officer by a specified date;

5. That changes, if any made by the witness, in the transcript and otherwise are attached thereto or incorporated therein;

6. That the witness returned the transcript;

7. That the original deposition by Written Questions and a copy thereof, together with copies of all exhibits was delivered to the attorney or party who Noticed the first questions for safekeeping and use at trial;

8. That pursuant to information made a part of the records at the time said testimony was taken, the following includes all parties of record:

   **Gordon D. Laws**
   **C. Wesley Vines, Attorney For Plaintiff**

and

9. A copy of this Notice of Delivery was served on all parties shown herein.

GIVEN UNDER MY HAND AND SEAL OF OFFICE ON THIS THE 17 day of June, 20 03

Notary Public in and for the State of Texas

**TEXAS OUTSOURCE GROUP**
**16821 BUCCANEER LANE, SUITE 103**
**HOUSTON, TX 77058**
**(281) 990-9854 Fax (281) 990-6189**

Order No. **01-7342-001**

NOTARY PUBLIC
STATE OF TEXAS
RANDALL L. HAYNES
NOTARY PUBLIC
STATE OF TEXAS
MY COMM. EXP. 7-19-2004





GAB Robins
GAB Robins North America, Inc.

# ACTIVITY REPORT

| FILE NO. | EMPLOYEE NAME | EMPLOYEE NO. | ADJUSTERS HOURLY BILLING RATE |
|---|---|---|---|
| 34718-43410 | D. Nickoloff | 4205-3 | $ |

| DATE | ACTIVITY | TIME Hours | EXPENSES CODE | EXPENSES AMOUNT | EXPENSES MILEAGE |
|---|---|---|---|---|---|
| | FILE SET-UP; MAINTENANCE FEE | 1.0 | | | |
| 3/6 | Eva called Evelyn Fisk + advised we rec | | | | |
| | loss + DN assigned - will see this pm | .2 | | | |
| 3/6 | Kevin Jones called - Belfour - 817-291-4165 [illegible] | .1 | | | |
| 3/6 | At Risk - met w/ Rod Miller - exdirector, maint | | | | |
| 3:40 | supervisor, Ruben Flores, Adam Garcia + Kevin Jones | | | | |
| | Reviewed bldg damage + contents. Mtg to disc | | | | |
| | procedures on cleaning + drying - 24,000 xdays - | 2.5 | PG | ~~40~~ | |
| | | | .50 ~~80~~ 16 | $28.00 | |
| 3/7 | Called Kevin Jones - disc damage + cost - | | | | |
| | he has spoken w/ Evelyn - will have Adam | | | | |
| | drop new early files in place + pull rest of | | | | |
| | vinyl base | .2 | TT | 200 | |
| 3/7 | Called Evelyn + left mess | .2 | | | |
| 3/7 | Evelyn called - will go to her GA | | | | |
| | as soon as he arrives her - reserves | | | | |
| | disc - will fax to her | .2 | | | |
| 3/7 | 1st Report faxed to Co | 1.5 | fax | 300 | |
| 3/9 | Ret call to Evias from CNA - status disc - | | | | |
| | will be down on Tuesday - | .3 | | | |
| 3/9 | Called Adam Garcia - left mess | .1 | | | |
| | TOTAL | 6.3 | | ~~$45.80~~ $33.30 | |

MISCELLANEOUS EXPENSE CODES
(check if incurred)

| | | |
|---|---|---|
| ☐ CA Cassette # ______ | ☐ AM Excess Auto Mileage $ ______ | ☐ ME Meals $ ______ |
| ☐ CT Cassette-Transcribed # ______ | ☐ AT Auto Parking/Tolls $ ______ | ☐ PR Public Records $ ______ |
| ☐ PC Photocopy(s) # ______ | ☐ EM Express Mail Cost $ ______ | ☐ TR Transportation $ ______ |
| ☐ PG Photograph(s) # ______ | ☐ FS Fee Schedule Review $ ______ | ☐ TT FAX/Telephone Tolls $ ______ |
| ☐ AC Admin. - Cost Cont. $ ______ | ☐ HM Hotel/Motel $ ______ | ☐ OS Other Services $ ______ |

(Fee / Out of Pocket Exp.)

1

Form 155 (Rev. 8/97)

GAB Robins North America, Inc.

# ACTIVITY REPORT

| FILE NO. | EMPLOYEE NAME | EMPLOYEE NO. | ADJUSTERS HOURLY BILLING RATE |
|---|---|---|---|
| 34718 4340 | Nickoloff, D | 4205-3 | $ |

| DATE | ACTIVITY | TIME Hours | EXPENSES CODE | AMOUNT | MILEAGE |
|---|---|---|---|---|---|
| 3/12 | Called Adam - Cell 453-5597 - Arch | | | | |
| | went thru bldg Fri - abt Money As | | | | |
| | Anticipated - he will check w/ him & meet | | | | |
| | us tomorrow at 9:00 am | .2 | | | |
| | | | | | |
| 3/13 | Met w/ Ivans, Adam, Ross, etc at | | | | |
| | Risk | 4.0 | | | |
| | | | | | |
| 3/20 | Ret call to Ivans - left VM mess | .1 | TT | 1.00 | |
| 3/20 | Ivans called - do Measurements + Breckh for | | | | |
| | Valley Drug Bldg | .1 | | | |
| | | | | | |
| 3/21 | Measure Bldg - couple photos of side + back | 1.0 | PG | incl | |
| | | | | | |
| 3/21 | Diagram to det | .5 | | | |
| | | | | | |
| 3/22 | Boeckh evaluation | .5 | | | |
| 3/22 | Marshall " | 1.0 | | | |
| | | | | | |
| 3/23 | Two Reports + fax to Co | 1.0 | fax | 3.00 | |
| | | | | | |
| 3/26 | Ivans called - we're done - he will call in couple | | | | |
| | days for papers - will give him his fax # then | .1 | | | |
| | | | | | |
| 3/26 | Ivans called - can't no basement - will do | .1 | | | |
| 3/26 | Called Keith - left mess | .1 | | | |
| 3/26 | [illegible] | .1 | | | |
| | TOTAL | 8.8 | | | |

MISCELLANEOUS EXPENSE CODES (check if incurred)

| | | | | | |
|---|---|---|---|---|---|
| ☐ CA Cassette | # 2 ea/Reports | ☐ AM Excess Auto Mileage | $ | ☐ ME Meals | $ |
| ☐ CT Cassette-Transcribed | # | ☐ AT Auto Parking/Tolls | $ | ☐ PR Public Records | $ |
| ☐ PC Photocopy(s) | # | ☐ EM Express Mail Cost | $ | ☐ TR Transportation | $ |
| ☐ PG Photograph(s) | # | ☐ FS Fee Schedule Review | $ | ☐ TT FAX/Telephone Tolls | $ |
| ☐ AC Admin. - Cost Cont. (Fee / Out of Pocket Exp.) | $ | ☐ HM Hotel/Motel | $ | ☐ OS Other Services | $ |

4 002



GAB Robins

GAB Robins North America, Inc.

# ACTIVITY REPORT

| FILE NO. 34718 43410 | EMPLOYEE NAME Nickoloff, D | EMPLOYEE NO. 4205-3 | ADJUSTERS HOURLY BILLING RATE $ |
|---|---|---|---|

| DATE | ACTIVITY | TIME Hours | EXPENSES CODE | AMOUNT | MILEAGE |
|---|---|---|---|---|---|
| 2/29 | Ret call to Ivans - Req we revise $ on bldg valuation - to include added cost of doubled walls - will correct + fax to him | .2 | TT | $2.00 | |
| 3/29 | At Ivans Req - amended 2 valuations to add in double stack wall cost + faxed to him | .5 | fax | $5.00 | |
| 4/2 | 3rd Report | .5 | | | |
| 4/13 | 4th Report | .5 | | | |
| 4/30 | 5th Report | .5 | | | |
| 5/14 | 6th Report | .5 | | | |
| 6/1 | 7th Report | .5 | | | |
| 7/2 | Ret call to Steven Bruce - CNA [illegible] - (left msg) | .1 | TT | $1.00 | |
| 7/2 | Steven called - gave him Evelyn's # to reach Bob | .1 | | | |
| 7/3 | 8th Report | .3 | | | |
| 8/2 | Mt photo | .7 | | | |
| 8/2 | 9th Report | .3 | | | |
| 8/8 | Evelyn called Close + bill w/ 10th + final Report | TOTAL .3 | | $8.00 | |

MISCELLANEOUS EXPENSE CODES (check if incurred)

| | | | |
|---|---|---|---|
| ☐ CA Cassette # ____ | ☐ AM Excess Auto Mileage $ ____ | ☐ ME Meals | |
| ☐ CT Cassette-Transcribed # ____ | ☐ AT Auto Parking/Tolls $ ____ | ☐ PR Public Records | |
| ☐ PC Photocopy(s) # ____ | ☐ EM Express Mail Cost $ ____ | ☐ TR Transportation | |
| ☐ PG Photograph(s) # ____ | ☐ FS Fee Schedule Review $ ____ | ☑ TT FAX/Telephone Tolls | |
| ☐ AC Admin. - Cost Cont. $ ____ (Fee / Out of Pocket Exp.) | ☐ HM Hotel/Motel $ ____ | ☐ OS Other Services | 28 photo 3 |

GAB

For use with the Calculator Cost Method

# CALCULATOR COST FORM Form 121 (12/90)

MARSHALL VALUATION SERVICE SQUARE FOOT COS

| | | | |
|---|---|---|---|
| 1. | SUBSCRIBER MAKING SURVEY GAB Robins | DATE OF SURVEY 3/22/01 | |
| 2. | NAME OF BUILDING Valley Diagnostic | OWNER | |
| 3. | LOCATED AT 2200 Haine Dr, Harlingen, TX 78550 | | |

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 4. | OCCUPANCY | Medical Office Bldg | | | |
| 5. | BUILDING CLASS AND QUALITY | Cls C Qual Average | Cls Qual | Cls Qual | Cls Qual |
| 6. | EXTERIOR WALL | Brick | | | |
| 7. | NO. OF STORIES & HEIGHT PER STORY | No. 2 Ht 12 | No. Ht | No. Ht | No. Ht |
| 8. | AVERAGE FLOOR AREA | 21,540)2= | | | |
| 9. | AVERAGE PERIMETER | 626 | | | |
| 10. | AGE AND CONDITION | Age 19 Cond. V Good | Age Cond. | Age Cond. | Age Cond. |

11. REGION

Western ☐ Central ☑ Eastern ☐

12. CLIMATE

Mild ☐ Moderate ☑ Extreme ☐

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 13. | BASE SQUARE FOOT COST | 71.06 | | | |
| | **SQUARE FOOT REFINEMENTS** | | | | |
| 14. | HEATING, COOLING, VENTILATION | + 3.75 | | | |
| 15. | ELEVATOR DEDUCTION | Included | | | |
| 16. | MISCELLANEOUS | N/A | | | |
| 17. | **TOTAL LINES 13 THROUGH 16 ▷** | 74.81 | | | |
| | **HEIGHT AND SIZE REFINEMENTS** | | | | |
| 18. | NUMBER OF STORIES - MULTIPLIER | 2.0 | | | |
| 19. | HEIGHT PER STORY - MULTIPLIER (See Line 7) | 1.0 | | | |
| 20. | FLOOR AREA-PERIMETER MULTIPLIER (Lines 8 & 9) | .923 | | | |
| 21. | COMBINED HEIGHT AND SIZE MULTIPLIER (Lines 18x19x20) | 1.846 | | | |

| | **FINAL CALCULATIONS** | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 22. | REFINED SQUARE FOOT COST (Line 17 x 21) | 138.10 | | | |
| 23. | CURRENT COST MULTIPLIER (Sect. 99 p. 3) | 1.06 | | | |
| 24. | LOCAL MULTIPLIER (Sect. 99 p. 5 thru 10) | .82 | | | |
| 25. | FINAL SQ. FT. COST (Line 22 x LINE 23 x LINE 24) | 120.04 | | | |
| 26. | AREA (BACK OF THIS FROM) | 21,540 | | | |
| 27. | LINE 25 x LINE 26 | 2,585,662 | | | |
| 28. | LUMP SUMS (LINE 34) | + 159,622 | | | |
| 29. | **REPLACEMENT COST** (LINE 27 + LINE 28) | 2,745,284 | | | |
| 30. | DEPRECIATION % (Sect. 97) | 28% | | | |
| 31. | DEPRECIATION AMOUNT (LINE 29 x LINE 30) | 768,680 | | | |
| 32. | **DEPRECIATED COST** (LINE 29 - LINE 31) | 1,976,605 | | | |

## TOTAL OF ALL SECTIONS

| 33. REPLACEMENT COST | DEPRECIATED COST | INSURABLE VALUE |
|---|---|---|
| 2,745,284 | 1,976,605 | |

00 4

See back of this form for drawings area and insurable value calculations.

Calculations:

Lump sum (Sprinklers, elevators, etc.) Double shark walls + special treatment walls (Lead) | + $159,622

34. TOTAL ▷ $159,622

| INSURANCE EXCLUSIONS (Section 96) | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|
| 35. BASEMENT EXCAVATION | | | | |
| 36. FOUNDATION BELOW GROUND | | | | |
| 37. PIPING BELOW GROUND | | | | |
| 38. ARCHITECT'S PLANS AND SPECIFICATIONS | | | | |
| 39. TOTAL % OF EXCLUSIONS (LINES 35 THRU 38) | | | | |
| 40. REPLACEMENT OR DEPRECIATED COST (LINE 29 OR 32) | | | | |
| 41. EXCLUDING AMOUNT (LINE 39 x LINE 40) | | | | |
| 42. INSURABLE VALUE (LINE 40 - LINE 41) | | | | |

NOTES:

00 5

Boeckh costs include labor and material, normal profit and overhead as of date of report. Costs represent general estimates which are not to be considered a detailed quantity survey. These costs include generalities and assumptions that are common to the types of structures represented in the software.

(C) 1999 E. H. Boeckh, a Division of Thomson Publishing Corporation. All Rights Reserved.

Commercial Building Valuation System

Standard

03/29/2001

Policy:
Exp. Date:
(none)
Cost as of: 03/1999
Property Owner:
Valley Diagnostic

Texas Ins. Managers

SUMMARY OF COSTS:

| | Replacement Cost | $/sq.ft. Cost | Depreciated Cost | $/sq.ft. Cost |
|---|---|---|---|---|
| Section: 1 | $2,658,669 | $61.72 | $2,108,879 | $48.95 |
| 100% 501 Medical Clinic | | | | |
| TOTAL: | $2,658,669 | $61.72 | $2,108,879 | $48.95 |

Boeckh costs include labor and material, normal profit and overhead as of date of report. Costs represent general estimates which are not to be considered a detailed quantity survey. These costs include generalities and assumptions that are common to the types of structures represented in the software.

(C) 1999 E. H. Boeckh, a Division of Thomson Publishing Corporation. All Rights Reserved.

System

Commercial Building Valuation

Standard

03/29/2001

---

Property Owner: Valley Diagnostic
Cost as of: 03/1999
Property Address: 2200 Haine
Harlingen, TX 78550

---

Building Description Section 1
Occupancy:
100% 501 Medical Clinic

Construction Type: 100% Masonry Non-Combustible
Number of Stories: 2
Gross Floor Area: 43,078 sq.ft.
Total Perimeter: 626 ft.
Construction Quality: 2.5
Year Built: 1982
Climatic Region: Warm
Seismic Zone: 0
High Wind Region: 2
Hillside
Construction: Degree of Slope: Level
Site Position: Unknown
Site Accessibililty: Excellent
Soil Condition: Excellent

---

Architect Fees: 7% is included.
Profit and Overhead: 20% is included.

---

Depreciation:
Condition: Average Effective Age: 19 years
Depreciation: 22 %

---

SUMMARY OF COSTS:
Replacement

Cost

Site Preparation
2,913
Foundation Wall
12,322
Interior Foundations
8,491
Slab On Ground
63,668

Framing
150,776
Exterior Wall — 2 % Wall Openings
159,533
100 % Brick, on masonry

Structural Floor
186,663
Roof
163,391
Material — 100 % Built-up, tar and gravel or rock
Pitch — 100 % Flat
Floor Finish
120,783
25 % Carpeting
75 % Tile, vinyl composite

Ceiling Finish
140,237
100 % Suspended acoustical
Partitions — 5,000 ft.
159,622
Structure — 100 % Studs, girts, etc.
Finish — 100 % Drywall
Plumbing — 80 Total Fixtures
222,850
Heating
100,405
100 % Forced warm air

Cooling
169,782
100 % Forced cool air

Electrical
362,452
100 % Average

Built-ins
270,487
Elevators
136,843
2 Passenger
Manual Fire Alarm — 100 %
67,830

---

SUBTOTAL
$2,499,047

---

Depreciated Cost (78%)
$1,949,257

---

Misc. Additional Features:
Double shrk wall adjustment
159,622
Total Additions
159,622

---

TOTAL SECTION 1
$2,108,879



GAB Robins North America, Inc.

632 ED CAREY DRIVE
SUITE 700
HARLINGEN, TX, 78550-7965
T : 956-423-0770
F :956-423-2407

# ACKNOWLEDGEMENT

March 6, 2001

CNA COMMERCIAL INSURANCE
P O BOX 219011
DALLAS, TX 75221 9011

Attn: Evelyn V. Fisk

| | |
|---|---|
| Policy Number | :UNKNOWN |
| Claim Number | :64673311 |
| Customer Code | :084145 |
| GAB File No. | :34718-43410 |
| Insured | :VALLEY DIAGNOSTIC |
| Claimant | : VALLEY DIAGNOSTIC |
| Type of Claim | :PR |
| Date of Claim | :03/04/2001 |
| Date Assigned | :03/06/2001 |
| Adjuster | :DENNIS NICKOLOFF |

We acknowledge receipt of your assignment. The adjuster indicated above, is responsible for responding to your needs.

Handling of your assignment will be in accordance with GAB Robins standard diaries or customer specific instructions.

Should you need additional information, please contact our office at 956-423-0770.

Thank you for this assignment.

cc:

0 9

(Copyright (c) 2000 GAB Robins North America, Inc., All Rights Reserved)



GAB Robins North America, Inc.

632 Ed Carey Drive
Suite 700
Harlingen, TX.
78550-7965
T: 956-423-0770
F: 956-423-2407

March 6, 2001

Valley Diagnostic
2200 Haine Dr.
Harlingen, TX. 78550

| RE: | | |
|---|---|---|
| | GAB File No. | : 34718-43410 |
| | Insured | : VALLEY DIAGNOSTIC |
| | Policy # | : |
| | Claim # | : 64-673311 |
| | Date of Loss | : 03-04-01 |

Valley Diagnostic:

We wish to acknowledge receipt of your claim for damage under your insurance policy.

Investigation of this claim has been referred to this office. The adjuster/appraiser assigned to your claim is Dennis Nickoloff, at 956-423-0770.

He/she can be reached at the above telephone number in the event you have not heard from him/her by the time you receive this letter.

The adjuster/appraiser will advise you of any items, statements or documents you will need to provide in order for your claim to be processed. Until that time you are to protect your property from any further damage. Please contact your adjuster/appraiser immediately if you require assistance in this regard.

You will also need to arrange a mutually agreeable time for the adjuster/appraiser to personally inspect your damage, if required. Thank you for your assistance and cooperation.

Yours very truly,

Dennis Nickoloff
Adjuster

DN/es

cc: CNA Commercial Insurnace
P O Box 219011
Dallas, TX. 75221-9011

00 10

GAB N167I(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc., All Rights Reserved)

GAB

*For use with the Calculator Cost Method*

# CALCULATOR COST FORM Form 121 (12/90)

MARSHALL VALUATION SERVICE SQUARE FOOT COSTS

| | | | |
|---|---|---|---|
| 1. | SUBSCRIBER MAKING SURVEY SAO Rubins | DATE OF SURVEY 3/22/01 | |
| 2. | NAME OF BUILDING Valley Diagnostic | OWNER | |
| 3. | LOCATED AT 2200 [illegible] Dr, Harlingen TX 78550 | | |

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 4. | OCCUPANCY | Medical Office Bldg | | | |
| 5. | BUILDING CLASS AND QUALITY | Cls C Qual Average | Cls Qual | Cls Qual | Cls Qual |
| 6. | EXTERIOR WALL | Brick | | | |
| 7. | NO. OF STORIES & HEIGHT PER STORY | No. 2 Ht 12 | No. Ht | No. Ht | No. Ht |
| 8. | AVERAGE FLOOR AREA | 21,540 sf | | | |
| 9. | AVERAGE PERIMETER | 631 | | | |
| 10. | AGE AND CONDITION | Age 19 Cond. V Good | Age Cond. | Age Cond. | Age Cond. |

11. REGION — Western ☐ Central ☑ Eastern ☐

12. CLIMATE — Mild ☐ Moderate ☑ Extreme ☐

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 13. | BASE SQUARE FOOT COST | 71.06 | | | |
| | **SQUARE FOOT REFINEMENTS** | | | | |
| 14. | HEATING, COOLING, VENTILATION | + 3.75 | | | |
| 15. | ELEVATOR DEDUCTION | Included | | | |
| 16. | MISCELLANEOUS | N/A | | | |
| 17. | **TOTAL LINES 13 THROUGH 16** ▷ | 74.81 | | | |
| | **HEIGHT AND SIZE REFINEMENTS** | | | | |
| 18. | NUMBER OF STORIES - MULTIPLIER | 2.0 | | | |
| 19. | HEIGHT PER STORY - MULTIPLIER (See Line 7) | 1.0 | | | |
| 20. | FLOOR AREA-PERIMETER MULTIPLIER (Lines 8 & 9) | .923 | | | |
| 21. | COMBINED HEIGHT AND SIZE MULTIPLIER (Lines 18x19x20) | 1.846 | | | |

| | **FINAL CALCULATIONS** | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 22. | REFINED SQUARE FOOT COST (Line 17 x 21) | 138.10 | | | |
| 23. | CURRENT COST MULTIPLIER (Sect. 99 p. 3) | 1.06 | | | |
| 24. | LOCAL MULTIPLIER (Sect. 99 p. 5 thru 10) | .82 | | | |
| 25. | FINAL SQ. FT. COST (Line 22 x LINE 23 x LINE 24) | 120.04 | | | |
| 26. | AREA (BACK OF THIS FROM) | 21,540 | | | |
| 27. | LINE 25 x LINE 26 | 2,585,662 | | | |
| 28. | LUMP SUMS (LINE 34) | + 159,622 | | | |
| 29. | **REPLACEMENT COST** (LINE 27 + LINE 28) | 2,745,284 | | | |
| 30. | DEPRECIATION % (Sect. 97) | 28% | | | |
| 31. | DEPRECIATION AMOUNT (LINE 29 x LINE 30) | 768,680 | | | |
| 32. | **DEPRECIATED COST** (LINE 29 - LINE 31) | 1,976605 | | | |

## TOTAL OF ALL SECTIONS

CO 11

| 33. REPLACEMENT COST | DEPRECIATED COST | INSURABLE VALUE |
|---|---|---|
| 2,745,284 | 1,976,605 | |

See back of this form for drawings area and insurable value calculations.

GAB

GAB-28

# Diagram Sheet

| Name (Property Owner) | Location | Identification No. |
| --- | --- | --- |
| Valley Diagnostic | Front | 31718-43 |

00 12

| Prepared By | Date | Scale |
| --- | --- | --- |
| D. Nickoloff | 3/21/01 | Not To Scale |

TRANSACTION REPORT

MAR-23-01 FRI 10:28 AM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| MAR-23 | 10:27 AM | GAB HOUSTON | 1'15" | 3 | SEND | OK |

2nd Report to Bill Kaam

 GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : First Report*

March 7, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

## SOURCE AND DATE OF ASSIGNMENT AND DATE INSPECTED

We received this assignment by facsimile on 03-01-01. The risk and damage were inspected on 03-01-01.

## SUGGESTED RESERVES

| | RCV |
|---|---|
| Building | $ 125,000.00 |
| Contents | $ 100,000.00 |
| BI | $ 50,000.00 |

** Reserves are based on preliminary inspection only.

00 14

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 ABSTRACT OF COVERAGE

At the time of assignment, no coverage information was provided.

CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

This occurred during the early morning hours of Sunday, 3/4/01. The water was discovered by a maintenance employee who was in the building for another purpose. He shut off the water as soon as the source was discovered and contacted management. More employees were called as was All Valley Restoration, who assisted greatly in the water extraction, drying and de-humidification of the building.

SUBROGATION

Based on current information, we believe no subrogation will be involved.

RISK

The risk is a two story brick medical building of approximately 42,000 square feet.

DETERMINATION OF VALUE

A valuation report will be generated and included with our next report

SCOPE OF DAMAGE

The water flooded an area of approximately 75'x 75' on the second floor. This is an area mostly consisting of offices. After penetrating the floor and first floor ceiling, the water ran down into the first floor, which houses the radiology department. As it did so, approximately 24,000 x-rays and their folders were wet. Additionally small office machinery and equipment was covered with water.

The building carpet has been dried but, may need replacement due to discoloration and staining. The office furnishing will need to be reviewed for damage as well. Our recent inspection did not disclose any large or widespread damage to furnishing but, the Insured is concerned about what may occur in days to come. We will re-inspect these items on our next visit.

ADJUSTMENT

All Valley Construction is preparing a detailed estimate, which we will review on Monday 3/12/01 with them and the building architects.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 ## EXPERTS

Belfor USA was contacted by your office directly and met us at the risk location. They will be doing restoration work on the wet x-rays. They also inspected the specialty equipment and spoke with the Insured's service vendors who were on site inspecting and repairing radiology equipment. At this point, we do not believe that any of that equipment was damaged severely.

## SALVAGE

To be determined, following review of the damaged contents.

## FUTURE HANDLING

We will secure an agreed repair figure with the Insured's contractor and advise you accordingly on this figure.

The Insured will be checking and sorting small office equipment and setting aside those items that will need to be replaced.

Belfor will handle the restoration work on the x-rays and any other documents that were affected.

We understand that one of your General Adjusters will be assigned this loss to work to conclusion. If this occurs, please have that person call or contact me so that we can transition the handling of the file over to him or her.

Next report on or before 04-06-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

# FAX COVER

To: Helen —

Company:

Phone:

Fax:

From: Dennis

Title:

Extension:

Date: 3/16/01

Pages including this cover page:

Notes:

Helen —
This was done on the 7th
So, according to TAS Next
Report is due 21 days from
then or 3/28/01 28th. I have it
on my calendar to do on the
23rd — Let me know if this
is not correct.
Dennis

P. 01

TRANSACTION REPORT

MAR-16-01 FRI 8:36 AM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| MAR-16 | 8:35 AM | GAB HOUSTON | 1'27" | 4 | SEND | OK |

Dennis

a

# Assignment Form – Property Appraisals or Liability Investigations

**CNA Commercial Insurance**
**PO Box 219011**
**Dallas, TX 75221-9011**
**Phone: 214-220-5500**
**Fax: 214-220-1688**
**ALC – 64**
**GAB Customer Code # CNA 104013**
**Crawford Program # 14262**

**March 6, 2001**

| Claim No | Desk Code | Date of Loss | Loss Type: 1st P Property Appraisals |
|---|---|---|---|
| 64-673311 | P6 | 03-04-01 | (Drop-Down Box) |

| Claim Specialist | Phone Number | E-Mail Address |
|---|---|---|
| Evelyn V. Fisk | 800-262-1113 Ext. 5524 | evelyn.fisk@cna.com |

| Insured | Address | Phone |
|---|---|---|
| Valley Diagnostic | 2200 Haine Dr Harlingen TX 78553 | 956 421 5198 |
| Claimant | Address | Phone |
| Contact: Rod Miller or Ruben Flores | Address: same | Phone: same |

421-5063 MAINT. #

**Description of Loss:** Large water damage to building and contents: Radiology suite.

**Location of Property to be Inspected:** same

**Description of Property:** radiology files, machinery, building wet when toilet on 2nd floor overflowed Saturday evening and was not discovered until about Noon Sunday.

**Reported Damage:** Ceilings down, machinery wet, film and files wet, building damage. Insd has hired Valley Wide Restoration to remove water and attempt to dry the film files.

| ☒ Property Agreed Appraisal | Task Assignment/ Investigations | Task Assignment/ Investigations Scene Diagram |
|---|---|---|
| ☒ Contents | ☐ Police Report | ☐ Interview Investigating Officer |
| ☒ Structure | ☐ Death Certificate | ☐ Canvas Scene for Witness |
| ☐ Type of Construction | ☐ Coroner's Report | ☐ Statement of Insured |
| ☐ Other (Specify in Special Instructions) | ☐ Autopsy Report | ☐ Statement of Claimant |
| | ☐ Contract/Lease | ☐ Statement of Witness |
| | | ☐ Other (Specify in Special Instructions) |

**WHILE YOU WERE OUT**

TO: Dennis DATE: 3/6/01 TIME: 1:38
M: Adam Garcia OF:
PHONE: 453-5587 FAX:

☐ CALLED TO SEE YOU
☑ TELEPHONED
☐ WILL CALL AGAIN
☑ PLEASE PHONE

REMARKS:

SIGNED:

Adams 8803

**ATTN: CLAIMS SPECIALIST**
**GAB ICS: HOUSTON, TX**
**TEL# 713-988-6700**
**FAX# 713-270-3800**

| Special Instructions: RUSH-Insured business (Radiology dept) is shut down. All Valley Restoration Adam Garcia 956 453 5587, office 956 412 1039 has a water clean up crew in there. I have asked Belfor Kevin Jones 817 291 4165 mobile to go see what they can do to help save the films and files and get the ambient moisture out of there. They can also ck the machinery which is wet. I asked Belfour to coordinate with everyone. |
|---|
| **SPECIAL DELIVERY INSTRUCTIONS** (Complete only if you want the report faxed or mailed to an address other than captioned in the above heading) |
| nsure |

P. 01

TRANSACTION REPORT

MAR- 7-01 WED 4:39 PM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| MAR- 7 | 4:38 PM | 12142201688 | 1'21" | 3 | SEND | OK |

Attn: John Hinz

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

***Report : Second Report***

March 23, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

---

On March 13, 2001 we met at with CNA General Adjuster Ivars A. Rudzitis at the Risk. The Insured's General Contractor, All Valley Construction attended as well as Valley Diagnostic Radiology Manager Ruben Flores, Executive director Rod Miller, Valley Diagnostic's supervisor of maintenance and local agent Larry Schoenemann.

Mr. Rudzitis will assume control of this file. He has asked that we maintain an open file to assist with coordinating local affairs. A request was made for a building valuation using both the Boeckh software system and the Marshall Valuation System. Attached are copies of the results of our analysis. The originals will be provided to Mr. Rudzitis during his next visit to the area. Original photographs will be turned over to Mr. Rudzitis as well.

**ENCLOSURES**

1. Diagram
2. Boeckh Valuation
3. Marshall Valuation

**SUGGESTED RESERVES**

Adjusted reserves have been established by CNA General Adjuster Ivars A. Rudzitis

**ABSTRACT OF COVERAGE**

Copies of the Insured policy were secured from the local agent's office by Mr. Rudzitis.

00 22

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 ## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## RISK

The risk is a two story, brick, medical office building of approximately 43,078 square feet. A diagram has been prepared and, a copy is attached.

## DETERMINATION OF VALUE

Our valuation results are attached. The Boeckh software produced an RCV of $2,499,047 and an ACV of $1,949,257. The Marshall Valuation resulted in an RCV of $2,585,662 and an ACV of $1,861,677. We believe that the slight difference may be due the fact that our Marshall Valuation local and cost multipliers are approximately 18 months old. These factors generally do not change significantly so, the difference between the two systems may be simply be just that.

## ADJUSTMENT

All Valley Construction prepared a detailed estimate, which was reviewed on Tuesday 3/13/01 by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

00 23

To be determined, following review of the damaged contents and equipment.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



**FUTURE HANDLING**

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 04-23-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

System

Commercial Building Valuation

Standard

03/26/2001

Property Owner: Valley Diagnostic
Cost as of: 03/1999
Property Address: 2200 Haine
Harlingen, TX 78550

Building Description Section 1

Occupancy:
100% 501 Medical Clinic

Construction Type: 100% Masonry Non-Combustible
Number of Stories: 2
Gross Floor Area: 43,078 sq.ft.
Total Perimeter: 626 ft.
Construction Quality: 2.5
Year Built: 1982
Climatic Region: Warm
Seismic Zone: 0
High Wind Region: 2
Hillside
Construction: Degree of Slope: Level
Site Position: Unknown
Site Accessibililty: Excellent
Soil Condition: Excellent

Architect Fees: 7% is included.
Profit and Overhead: 20% is included.

Depreciation:
Condition: Average Effective Age: 19 years
Depreciation: 22 %

SUMMARY OF COSTS:
Replacement

Cost

Site Preparation
2,913
Foundation Wall
12,322
Interior Foundations
8,491
Slab On Ground
63,668

Framing
150,776
Exterior Wall — 2 % Wall Openings
159,533
100 % Brick, on masonry

Structural Floor
186,663
Roof
163,391
Material — 100 % Built-up, tar and gravel or rock
Pitch — 100 % Flat
Floor Finish
120,783
25 % Carpeting
75 % Tile, vinyl composite

Ceiling Finish
140,237
100 % Suspended acoustical

Partitions — 5,000 ft.
159,622
Structure — 100 % Studs, girts, etc.
Finish — 100 % Drywall
Plumbing — 80 Total Fixtures
222,850
Heating
100,405
100 % Forced warm air

Cooling
169,782
100 % Forced cool air

Electrical
362,452
100 % Average

Built-ins
270,487
Elevators
136,843
2 Passenger
Manual Fire Alarm — 100 %
67,830

---

SUBTOTAL
$2,499,047

---

Depreciated Cost (78%)
$1,949,257

---

TOTAL SECTION 1
$1,949,257

---

Boeckh costs include labor and material, normal profit and overhead as of date of report. Costs represent general estimates which are not to be considered a detailed quantity survey. These costs include generalities and assumptions that are common to the types of

structures represented in the software.

(C) 1999 E. H. Boeckh, a Division of Thomson Publishing Corporation. All Rights Reserved.

---

☐ System

Commercial Building Valuation

Standard

03/26/2001

---

Policy:
Exp. Date:
{none}
Cost as of: 03/1999
Property Owner:
Valley Diagnostic

Texas Ins. Managers

---

| SUMMARY OF COSTS: | | | Replacement |
|---|---|---|---|
| $/sq.ft. | Depreciated | $/sq.ft. | |
| Cost | Cost | Cost | Cost |
| Section: 1 | | | $2,499,047 |
| $58.01 | $1,949,257 | $45.25 | |
| 100% 501 | Medical Clinic | | |
| TOTAL: | | | $2,499,047 |
| $58.01 | $1,949,257 | $45.25 | |

---

Boeckh costs include labor and material, normal profit and overhead as of date of report. Costs represent general estimates which are not to be considered a detailed quantity survey. These costs include generalities and assumptions that are common to the types of structures represented in the software.

(C) 1999 E. H. Boeckh, a Division of Thomson Publishing Corporation. All Rights Reserved.

---

GAB

GAB-28

# Diagram Sheet

| Name (Property Owner) | Location | Identification No. |
|---|---|---|
| Valley Diagnostic | Front | 34712-4354 |






| Prepared By | Date | Scale |
|---|---|---|
| D. Nickoloff | 3/21/01 | Not To Scale |

**GAB**

CALCULATOR COST FORM Form 121 (12/90)

*For use with the Calculator Cost Method*

MARSHALL VALUATION SERVICE SQUARE FOOT COST

| | | | | | |
|---|---|---|---|---|---|
| 1. | SUBSCRIBER MAKING SURVEY GAB Robins | | | DATE OF SURVEY 3/22/01 | |
| 2. | NAME OF BUILDING Valley Diagnostic | | | OWNER | |
| 3. | LOCATED AT 2200 Haine Dr, Harlingen TX 78550 | | | | |
| | | SECTION I | SECTION II | SECTION III | SECTION IV |
| 4. | OCCUPANCY | Medical Office Bldg | | | |
| 5. | BUILDING CLASS AND QUALITY | Cls C Qual Average | Cls ___ Qual ___ | Cls ___ Qual ___ | Cls ___ Qual ___ |
| 6. | EXTERIOR WALL | Brick | | | |
| 7. | NO. OF STORIES & HEIGHT PER STORY | No. 2 Ht 12 | No. ___ Ht ___ | No. ___ Ht ___ | No. ___ Ht ___ |
| 8. | AVERAGE FLOOR AREA | 21,540 ± | | | |
| 9. | AVERAGE PERIMETER | 626 | | | |
| 10. | AGE AND CONDITION | Age 19 Cond. V Good | Age ___ Cond. ___ | Age ___ Cond. ___ | Age ___ Cond. ___ |

11. REGION: Western ☐ Central ☑ Eastern ☐

12. CLIMATE: Mild ☐ Moderate ☑ Extreme ☐

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 13. | BASE SQUARE FOOT COST | 71.06 | | | |
| | **SQUARE FOOT REFINEMENTS** | | | | |
| 14. | HEATING, COOLING, VENTILATION | + 3.75 | | | |
| 15. | ELEVATOR DEDUCTION | Included | | | |
| 16. | MISCELLANEOUS | N/A | | | |
| 17. | **TOTAL LINES 13 THROUGH 16 ▷** | 74.81 | | | |
| | **HEIGHT AND SIZE REFINEMENTS** | | | | |
| 18. | NUMBER OF STORIES - MULTIPLIER | 2.0 | | | |
| 19. | HEIGHT PER STORY - MULTIPLIER (See Line 7) | 1.0 | | | |
| 20. | FLOOR AREA-PERIMETER MULTIPLIER (Lines 8 & 9) | .923 | | | |
| 21. | COMBINED HEIGHT AND SIZE MULTIPLIER (Lines 18x19x20) | 1.846 | | | |

| | **FINAL CALCULATIONS** | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 22. | REFINED SQUARE FOOT COST (Line 17 x 21) | 138.10 | | | |
| 23. | CURRENT COST MULTIPLIER (Sect. 99 p. 3) | 1.06 | | | |
| 24. | LOCAL MULTIPLIER (Sect. 99 p. 5 thru 10) | .82 | | | |
| 25. | FINAL SQ. FT. COST (Line 22 x LINE 23 x LINE 24) | 120.04 | | | |
| 26. | AREA (BACK OF THIS FROM) | 21,540 | | | |
| 27. | LINE 25 x LINE 26 | 2,585,662 | | | |
| 28. | LUMP SUMS (LINE 34) | — | | | |
| 29. | **REPLACEMENT COST** (LINE 27 + LINE 28) | 2,585,662 | | | |
| 30. | **DEPRECIATION %** (Sect. 97) | 28% | | | |
| 31. | **DEPRECIATION AMOUNT** (LINE 29 x LINE 30) | 723,985 | | | |
| 32. | **DEPRECIATED COST** (LINE 29 - LINE 31) | 1,861,677 | | | |

03 29

TOTAL OF ALL SECTIONS

| 33. REPLACEMENT COST | DEPRECIATED COST | INSURABLE VALUE |
|---|---|---|
| 2,585,662 | 1,861,677 | |

See back of this form for drawings area and insurable value calculations.

This showed up on my Report list for 4/3 — we did this Report will place on 21 day diary in future (backed up 5 days). Dennis

GAB

FYI

GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Third Report*

April 3, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

## ENCLOSURES

1. Boeckh Valuation (revised)
2. Marshall Valuation (revised)

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## RISK

## DETERMINATION OF VALUE

Following a discussion with Mr. Rudzitis, we revised our valuations to reflect the unusual double sheetrock wall treatment in the Risk. The Boeckh software produced a revised RCV of $2,658,669 and an ACV of $2,108,879. The Marshall Valuation resulted in a revised RCV of $2,745,284 and an ACV of $1,976,605.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 **ADJUSTMENT**

As noted in our previous report, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

**EXPERTS**

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

**SALVAGE**

To be determined, following review of the damaged contents and equipment.

**FUTURE HANDLING**

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 04-19-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

P. 01

TRANSACTION REPORT

APR- 3-01 TUE 10:05 AM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| APR- 3 | 10:04 AM | GAB HOUSTON | 1'26" | 3 | SEND | OK |

GAB

GAB-28

# Diagram Sheet

| Name (Property Owner) | Location | Identification No. |
|---|---|---|
| Valley Diagnostic | Front | 3[illegible] |

00 33

(S)

| Prepared By | Date | Scale |
|---|---|---|
| D. N[illegible] | 3/21/01 | Not To Scale |

P. 01

TRANSACTION REPORT

APR- 2-01 MON 8:45 AM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| APR- 2 | 8:44 AM | GAB HOUSTON | 1'16" | 3 | SEND | OK |

P. 01

TRANSACTION REPORT

MAR-29-01 THU 1:48 PM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| MAR-29 | 1:45 PM | 19419247470 | 2' 19" | 6 | SEND | OK |



GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Tenth and Final Report*

August 8, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

---

**We acknowledge your telephone call of 08-08-01 instructing us to close our file.**

**ENCLOSURES**

1. Photographs of Risk and damage

**CAUSE OF LOSS**

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

**SUBROGATION**

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves. Mr. Steven Burke is the attorney at that firm (214-462-3054).

**ADJUSTMENT**

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



EXPERTS

Belfor USA took possession of the X-ray files for drying, cleaning and restoration.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

SALVAGE

To be determined, following review of the damaged contents and equipment.

FUTURE HANDLING

Our file is now closed.

Dennis Nickoloff
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

TAILORED SERVICE
PREPARED BY GAB Robins FOR

PROPERTY
CNA NATIONAL VENDOR PROGRAM

GAB Robins
GAB Robins North America, Inc. TAS [ ]
*revision date* (9/00)
*template revision date (07/2000)*
Customer Code
**CNA 084145 / RSKCo 379100 under group 799 Use these code numbers on all files received on 9-25-2000 and after.**

*Company Name, Address, Tele. & Fax*
CNA INSURANCE COMPANY. CNA PLAZA. CHICAGO, IL 60685, TELEPHONE 312-822-5000
PROGRAM INCLUDES CNA COMMERCIAL. RSKCo AND CNA HEALTHPRO

TAS Inception – 9/2000
TAS Expiration – 9/2003
Type of TAS - PROPERTY
Applicable Standard -

Territory - USA

1. Assignments – All assignments must be received from CNA or the GAB Robins reception center in Tennessee. If received from any other source. you must contact the CNA claim office for approval to handle. The call center will be in operation from 8am Eastern time to 5pm Pacific time.

2. Acknowledgement – The GABR call center will fax an acknowledgement to CNA listing the office and the phone number where the assignment is made within an hour of receipt. The GABR office receiving the assignment will fax to the CNA claim specialist/adjuster the name and the phone number of the GAB appraiser handling the assignment within 6 hours of the assignment.

3. Reporting Requirements – Appraisals – final report within 4 business days following the date of assignment. In the rare instances when not completed. first status report within 4 business days following the date of assignment and subsequent status reports every 21 days or the estimated completion date, which ever is earlier.

4. Settlement Authority – No authority, **agreed appraisal** only. **Agreed appraisal is defined as the cost of the repairs agreed with the property owner, the property owner's contractor or a reputable contractor in the local area that will do the work based on your estimate.**

5. Checks – Issued by CNA.

6. Reports – Appraisal – must confirm cause of loss and damage on standard short form reports. First report should close the file; however, if first report is a status report appraiser must give estimated completion date. Fax completed assignment to CNA claim specialist/adjuster and mail original hardcopy reports and all enclosures to the CNA claim office.

7. Billing – use - pricing attached for the CNA program. All billing documents are sent to the CNA claim specialist/adjuster. Itemize the additional charges such as mileage and photos. Any additional charges require the prior approval of CNA claim specialist/adjuster. All T&E files must have an itemized listing of services, claim number, amount paid, name of appraiser, name of insured, invoice number and charges. Interim billing of files with the permission of claim specialist/adjuster only.

8. Subrogation - Immediate notification of subrogation potential should be given to the CNA claim specialist/adjuster.

9. Photographs – Appraisal – no more than 5 photographs per appraisal without the permission of the CNA claim specialist/adjuster. All photos should be mounted on photo sheets and a description of the photos. All photos mounted on photo sheets with dates and description. One photo must be taken of the risk on all losses. Expert photos with the permission of the CNA. One photo should show front elevation of risk.

10. Value – Appraisal – determine the pre-loss replacement value and actual cash value of the structure and/or business personal property and put this figure on top of the 420 or within the Boeckh automated estimate

00 38

11. Estimate (Repair-Replace) – In the rare instance that estimate in not prepared, all losses will have a complete scope of loss created and submitted with the first report. An itemized estimate will be completed within 48 hours after inspection and will suggest depreciation by trade/line item. Content items on appraisals will have a list of the damaged contents and the suggested

depreciation by trade item.

12. Salvage – Appraisal – advise the CNA claim specialist/adjuster of salvage and protect if possible.

13. Branch Assists – Advise the claim specialist/adjuster that additional help is needed and obtain permission to use a branch assist.

14. Proofs of Loss/Releases – Not involved, unless requested by CNA.

15. Index Bureau - PILR Reports, Etc., - File as appropriate.

16. Special Instructions –

1. Inspection of losses must be done within 48 hours from the day of the assignment. Contact must be made with the property owner or with the appropriate representative on same day of assignment if the assignment is received by 2pm local time. If after 2pm then contact must be made by noon of the next business day. If unable to make contact a contact letter must be sent within 24 hours.

2. CNA claim specialist/adjuster must be contacted immediately, under usual circumstances from the scene, in the following instances 1) extent of damages varies substantially from the assignment report, 2) the gross loss is over app. $25,000, 3) extent of damage varies substantially from the assignment sheet, 4) coverage appears to be questionable. 5) fraud or arson involved, 6) need for outside expert, 7) subrogation and salvage involved in losses over $25,000, 8) when a lawsuit is filed, or 9) complaints received from insured, agent, claimants and state insurance department.

3. If the claim warrants the use of a GA, permission must be obtained from CNA examiner by phone prior to the use of the GA.

4. If there are any questions on the claim, call the CNA assigning adjuster to discuss questions you may have.

5. Excess mileage is defined as over 75 miles one way from the office. Any claim whereyou will need to travel more than 75 miles one way; the CNA adjuster must approve travel by phone before making the trip. Pro rated travel must also be considered when billing CNA.

6. If a local GAB Robins adjuster does not have the needed expertise to handle a specific file and it is necessary to bring in another GAB Robin's adjuster, you are required to call the CNA adjuster to obtain permission. It is important to discuss any deviations with the CNA so they have the opportunity to approve our activity.

7. General Adjusters may not be used without the permission of the CNA representative.

**Pricing on second page**

TAILORED SERVICE
PREPARED BY GAB Robins FOR CNA Insurance Company

**PAGE 2 PROPERTY TAS**
***Company Name, Address, Tele. & Fax***
CNA INSURANCE COMPANY, CNA PLAZA,
CHICAGO, IL 60685, TELEPHONE 312-822-5000
PROGRAM INCLUDES CNA COMMERCIAL,
RSKCo AND CNA HEALTHPRO

**Pricing:**

| Severity Band | Price |
|---|---|
| 1. Loss between $0 - $ 500 | $105 |
| 1. Loss between $501 - $ 2,500 | $160 |
| 2. Loss between $2501 - $ 5,000 | $220 |
| 3. Loss between $5,001 - $ 10,000 | $290 |
| 4. Loss between $10,001 - $ 15,000 | $375 |
| 5. Loss between $15,001 - $ 20,000 | $485 |
| 6. Loss between $20,001 - $ 25,000 | $580 |
| 7. Loss over $25,000 | $60/hr |

**Services Included in the Price:**

- 80 Free Miles
- 5 Photos
- Itemized estimate to include ACV
- 1st Party ITV (replacement value) Estimates
- Supplements

CUSTOMER TAS INSTRUCTIONS SUPERSEDE ...

- Long Distance calls
- Fax Charges
- Copying Charges
- Miscellaneous expenses incurred in the normal handling of a loss/claim

**Extra Charges:**
- Additional Photos @ $1.75 per photo (First 5 photos are free)
- Additional Mileage @ $1.25 per mile (First 80 miles are free)
- Expert Fees (requires CNA's prior approval before using)
- Out of town expenses such as airfare, lodging, food etc. (requires CNA's prior approval before using)

8. Pricing is for all field adjusters but does not include General Adjusters. Use of GA's is with the permission of the CNA or RSKCo only at the standard published rates.

9. Additional tasks requested as part of the appraisal will be billed based on the time of completing the task only, at the $60.00 per hour inclusive rate. No additional drive time will be charged unless the specific task requires driving time to get to the task site.

10. Any file assigned as a full adjustment will be handled at the $60.00 per hour inclusive rate for all activity in addition to the property appraisal flat charge if the gross amount of the appraisal is below $25,000.00. If the gross amount of the appraisal is over the $25,000.00 limit, the entire full adjustment is billed at the $60.00 rate for the time involved.

- Long Distance calls
- Fax Charges
- Copying Charges
- Miscellaneous expenses incurred in the normal handling of a loss/claim

**Extra Charges:**
- Additional Photos @ $1.75 per photo (First 5 photos are free)
- Additional Mileage @ $1.25 per mile (First 80 miles are free)
- Expert Fees (requires CNA's prior approval before using)
- Out of town expenses such as airfare, lodging, food etc. (requires CNA's prior approval before using)

8.  Pricing is for all field adjusters but does not include General Adjusters. Use of GA's is with the permission of the CNA or RSKCo only at the standard published rates.

9.  Additional tasks requested as part of the appraisal will be billed based on the time of completing the task only, at the $60.00 per hour inclusive rate. No additional drive time will be charged unless the specific task requires driving time to get to the task site.

10. Any file assigned as a full adjustment will be handled at the $60.00 per hour inclusive rate for all activity in addition to the property appraisal flat charge if the gross amount of the appraisal is below $25,000.00. If the gross amount of the appraisal is over the $25,000.00 limit, the entire full adjustment is billed at the $60.00 rate for the time involved.

## REMODEL NOTES & LEGEND

1. REMODEL OF ERDMAN BUILDING, STEEL FRAME, BRICK VENEER AND BUILT-UP ROOF.
2. "HARVEST" VINYL IN NEW CARL[illegible] (FORMER [illegible]). FAV - FIELD APPLIED VINYL FOR ACCENT AND FOR COMPATIBILITY W/ EXISTING "BUFF" VINYL [illegible] CT - CERAMIC TILE AT NEW TOILETS.
3. CARPET UN[illegible] [illegible] VT - VINYL [illegible] TILE OR CT - CERAMIC TILE (CT AT TOILETS)
4. SEE ORIGINAL JOB NOTES FOR TYPICAL SYMBOLS
5. EXISTING WALL & DOOR, TO REMAIN

   30° NEW WALL & DOOR (IF REL. - RELOCATE)
6. VERIFY [illegible] OF EXISTING HARDWARE
7. THIS CONTRACT INCLUDE[illegible] [illegible] AREA, [illegible]
8. FIELD VERIFY DIM[illegible] OF EXISTING CONDITIONS PRIOR TO BEGINNING OF WORK

| SHEET NUMBER | JOB NUMBER | UPPER LEVEL PLAN |
|---|---|---|
| 3 | D9719 | DRAWN [illegible] DATE [illegible] SCALE 1/8" = 1'-0" |

| | |
|---|---|
| 7 DEC '89 | [illegible] REV FOR PRICING |
| 11 DEC '89 | REV. TO PRICING |
| 21 DEC '89 | CONTRACT! |

PULMONARY

CARDIOLOGY

HOSPITAL BILLING

EXAM

EXAM

EXAM

CONS

CONS

EXAM

EXAM

EXAM

EXAM

TYPICAL EXAM

EXAM

EXAM

EXAM

STRESS

STRESS

SPECIAL HVAC REQ'D.

EKG

ECHO

MIN. SURG.

CONS.

CONS.

CONS.

P.A.'S

CONS.

STOR.

CONS

CONS.

EXIST'G ELEC.

PULMONARY

CARDIOLOGY
HOSPITAL BILLING
EXAM
CONS
STRESS
EKG
ECHO
MIN. SURG.
TYPICAL EXAM
SPECIAL HVAC REQ'D.
STOR.
P.A.'S
EXIST'G ELEC

PULMONARY

EXAM

CONS.

CONS.

CLO.

CLO.

CONS.

CONS.

P.A.'S

EXIST'G ELEC.

EXAM

TYPICAL EXAM

EXAM

MIN. SURG.

CONS.

EXAM

EXAM

EXAM

EXAM

ECHO

CONS

EXAM

CARDIOLOGY

HEADER @ 6'-10"

HEADER @ 6'-10"

STOR.

SPECIAL HVAC REQ'D.

HOSPITAL BILLING

EXAM

STRESS

STRESS

EKG

CONS.

NEW CABINETRY TO MATCH TYP.

RELOC. FEC.

NEW FEC

45



GAB

GAB Robins North America, Inc.

## PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] | NEGATIVE [X] | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 1
DESCRIPTION: Front of Risk (North)

PICTURE NUMBER: 2
DESCRIPTION: Rear (S. Side)

00 46

GAB
GAB Robins North America, Inc.

# PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 3
DESCRIPTION: Closer View of front of Risk

PICTURE NUMBER: 4
DESCRIPTION: Rear (SE Corner)



GAB Robins North America, Inc.

## PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 5

DESCRIPTION: X-Ray file room sustained water damage

PICTURE NUMBER: 6

DESCRIPTION: 1s-floor wall- water ran down from above.



GAB Robins North America, Inc.

# PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 7

DESCRIPTION: Toilet on 2nd level that overflowed

PICTURE NUMBER: 8

DESCRIPTION: 2nd floor Hall - Lav at left

Water extracted from carpet

00 49



GAB Robins North America, Inc.

# PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] | NEGATIVE [X] | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 9

DESCRIPTION: office on 2nd level — water extracted from carpet

PICTURE NUMBER: 10

DESCRIPTION: 2nd floor hall

50



GAB Robins North America, Inc.

## PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [ X ] | | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 11

DESCRIPTION: 2nd floor Hall - work area

PICTURE NUMBER:

DESCRIPTION: Neg



GAB

GAB Robins North America, Inc.

# PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] | NEGATIVE [X] | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 12

DESCRIPTION:

Photos 12-21 Are of various equipment that was water damaged/or wet. All on 1st floor - in or near X-Ray dept.

PICTURE NUMBER: 13

DESCRIPTION:

0 52



GAB Robins North America, Inc.

# PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 14

DESCRIPTION:

PICTURE NUMBER: 15

DESCRIPTION:

00 53



GAB Robins North America, Inc.

# PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] | NEGATIVE [X] | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 16

DESCRIPTION:

PICTURE NUMBER: 17

DESCRIPTION:



GAB

GAB Robins North America, Inc.

PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 18

DESCRIPTION:

PICTURE NUMBER: 19

DESCRIPTION:



GAB Robins North America, Inc.

# PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |

PICTURE NUMBER: 20

DESCRIPTION:

PICTURE NUMBER: 21

DESCRIPTION:

P.01

TRANSACTION REPORT

APR-18-2003 FRI 01:36 PM

FOR: GAB ROBINS 713 270 3800

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE | M# | DP |
|---|---|---|---|---|---|---|---|---|
| APR-18 | 01:35 PM | 919739933221 | 1'11" | 7 | SEND | OK | 166 | |

TOTAL : 1M 11S PAGES: 7

GAB Robins North America, Inc.

8700 Commerce Park
Suite 235
Houston, TX 77036
T: 713-988-6700
F: 713-270-3800

## FAX COVER SHEET

Date: 4-18-03

To: Nancy Krantz

From: Traci x222

Number of pages (including cover sheet): 7

RE: Valley Diagnostic



GAB Robins North America, Inc.

8700 Commerce Park
Suite 235
Houston, TX 77036
T: 713-988-6700
F: 713-270-3800

# FAX COVER SHEET

Date: 4-18-03

To: Nancy Krantz

From: fraz x222

Number of pages (including cover sheet): 7

RE: Valley Diagnostic

Fax number: 973-993-3221

Faxed by: fraz x222

00 58

GAB N1671(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc., All Rights Reserved)

## REMODEL NOTES & LEGEND

1. REMODEL OF ERDMAN BUILDING, STEEL FRAME, BRICK VENEER AND BUILT-UP ROOF.
2. "HARVEST" VINYL IN NEW CARPET [illegible] (FORMER [illegible]). FAY - FIELD APPLIED VINYL [illegible] AND FOR COMPATIBILITY W/ EXISTING "BUFF" VINYL [illegible] CT - CERAMIC TILE AT NEW TOILETS.
3. CARPET [illegible] VT - VINYL [illegible] CT - CERAMIC TILE (CT AT TOILETS)
4. SEE ORIGINAL JOB NOTES FOR TYPICAL SYMBOLS
5. EXISTING WALL & DOOR, TO REMAIN

   NEW WALL & DOOR (IF REL. - RELOCATE)
6. VERIFY [illegible] EXISTING HARDWARE
7. THIS CONTRACT INCLUDES ONLY AREAS [illegible]
8. FIELD VERIFY DIMENSIONS OF EXISTING CONDITIONS PRIOR TO BEGINNING OF WORK

| SHEET NUMBER | JOB NUMBER | UPPER LEVEL PLAN |
|---|---|---|
| 3 | D9719 | DRAWN [illegible] DATE 6 [illegible] 91 SCALE 1/8" = 1'-0" |

| Date | Revision |
|---|---|
| 7 DEC '89 | [illegible] REV FOR PRICING |
| 11 DEC '89 | REV. TO PRICING |
| 21 DEC '89 | CONTRACT |


GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Third Report*

April 3, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

## ENCLOSURES

1. Boeckh Valuation (revised)
2. Marshall Valuation (revised)

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## RISK

## DETERMINATION OF VALUE

Following a discussion with Mr. Rudzitis, we revised our valuations to reflect the unusual double sheetrock wall treatment in the Risk. The Boeckh software produced a revised RCV of $2,658,669 and an ACV of $2,108,879. The Marshall Valuation resulted in a revised RCV of $2,745,284 and an ACV of $1,976,605.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 ADJUSTMENT

As noted in our previous report, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

SALVAGE

To be determined, following review of the damaged contents and equipment.

FUTURE HANDLING

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 04-19-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

TRANSACTION REPORT

APR-13-01 FRI 11:02 AM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| APR-13 | 11:01 AM | GAB HOUSTON | 1'05" | 3 | SEND | OK |

# FAX COVER

To: John Hinz
Company: DeB Robins N.A., Inc.
Phone: (713) 988-6700
Fax:

From: Dennis Nickoloff
Title:
Extension:

Date: 4-13-01

Pages including this cover page: 3 pages

Notes:
Re: #34718-43410
CNA 4th Report

Thanks

 GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Fourth Report*

April 13, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

SALVAGE

To be determined, following review of the damaged contents and equipment.

FUTURE HANDLING

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 05-04-01.

Dennis Nickoloff
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Fifth Report*

April 30, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

---

**CAUSE OF LOSS**

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

**SUBROGATION**

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

**ADJUSTMENT**

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

**EXPERTS**

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

**SALVAGE**

To be determined, following review of the damaged contents and equipment.

**FUTURE HANDLING**

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 05-21-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

**CNA REPORT DUE**

Adjuster: Dennis Nickoloff

File #: 34718-43410

Insured: Valley Diagnostic

Claimant:

Report due date: 5/16/01

Fax copy to John Hine

P. 01

# TRANSACTION REPORT

MAY-16-01 WED 9:03 AM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| MAY-16 | 9:02 AM | GAB HOUSTON | 51" | 2 | SEND | OK |



Attn: John Hinz

GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Sixth Report*

May 16, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjusters as their needs dictate.

Next report on or before 06-06-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Seventh Report*

June 1, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

---

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

SALVAGE

To be determined, following review of the damaged contents and equipment.

FUTURE HANDLING

We will continue to assist your General Adjusters as their needs dictate.

Next report on or before 07-06-01.

Dennis Nickoloff
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Ninth Report*

August 2, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| **Policy No.** | Unknown |
| **Policy Period** | Unknown |
| **Claim No.** | 64-673311 |
| **GAB File No.** | 34718-43410 |
| **Insured** | Valley Diagnostic |
| **Claimant** | |
| **Agency** | |
| **Agency Location** | |
| **Type of Claim** | Property |
| **Date of Claim** | 03-04-01 |

---

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves. Mr. Steven Burke is the attorney at that firm (214-462-3054).

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA took possession of the X-ray files for drying, cleaning and restoration.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

**SALVAGE**

To be determined, following review of the damaged contents and equipment.

**FUTURE HANDLING**

We will continue to assist your General Adjusters as their needs dictate.

**Please advise if you wish us to maintain an open file.**

Next report on or before 09-06-01.

*Dennis Nickoloff*

e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services. Inc. All Rights Reserved)

 GAB ROBINS N.A., INC.
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Eighth Report*

July 3, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves. Mr. Steven Burke is the attorney at that firm (214-462-3054).

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA took possession of the X-ray files for drying, cleaning and restoration.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

**SALVAGE**

To be determined, following review of the damaged contents and equipment.

**FUTURE HANDLING**

We will continue to assist your General Adjusters as their needs dictate.

**Please advise if you wish us to maintain an open file.**

Next report on or before 08-06-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



GAB Robins North America, Inc.

CNA
PO Box 219011
Dalllas, TX 75221-9011

Attn: Evelyn Fisk

632 Ed Carey Dr.
Suite 700
Harlingen, Tx. 78550
T: 956-423-0770
F: 956-423-2407

**BILLING SUMMARY** 08/08/2001

Final x
Supplemental
Interim

GAB Robins File: 34718-43410
Insured : Valley Diagnostic
Claim Number : 64-673311
Policy Number :
Adjuster : D. Nickoloff #4205-3

| | | | | Cust. Charge |
|---|---|---|---|---|
| PROPERTY: | Damage Appraisal | Flat Rate: | | |
| | No Frills: | Flat Rate: | | |
| | Automobile Appraisal | Flat Rate: | | |
| Estimated Loss: | $0.00 | | | |
| OR: | Time & Expense | | | |
| | Hours | 20.1 | | |
| | At Rate of | $ 60.00 | | $ 1,206.00 |
| CASUALTY : | Time & Expense Hours | | | |
| | At Rate of | | | $ - |
| | Flat Rate Assignment | | | $ - |
| | Recorded Statement | | | $ - |
| | Scene Investigation | | | $ - |
| | Other | | | $ - |
| EXTRAS | Mileage | 25 | | |
| | less included | -25 | | |
| | Chargeable miles at $1.55/mile | 0 | $ 1.55 | $ - |
| | *[ Office use only # of miles ]* | *0* | | |
| | *[ Adjuster Credit ]* | *$ 1.10* | $ - | |
| | Photos Total | 21 | | |
| | Less Included | -5 | | |
| | Billable Photos Times Rate | 16 | $ 1.75 | $28.00 |
| | Telephone/ Fax charges | | | $ - |
| | Public Records | | | $ - |
| | Police or Fire reports cost | | | $ - |
| | Support Staff @ $35.00 per hour | | | $ - |
| | Parking | | | $ - |
| | Other | | | $ - |
| | SubTotal | | | $ 1,234.00 |
| | Sales Tax 8 1/4% | | | $ 101.81 |
| | Total Billing: | | | $ 1,335.81 |

Mgr Approval_____

78

Held back because amounts were not matching: Diff

Thank you for using GAB Robins.

# FAX COVER

To: Evelyn Fisk
Company: CNA
Phone:
Fax: (214) 220-1688

From:
Title:
Extension:

Dennis Nickoloff
General Adjuster
Supervising Adjuster

T: 956.423.0770
T: 956.383.7541
F: 956.423.2407
nickolod@gabrobins.com

GAB Robins
GAB Robins North America, Inc.

632 Ed Carey Drive
Suite 700
Harlingen, TX 78550-7965

Date: 8/9/01

Pages including this cover page: 3 pages

Notes:
Re: Clm. # 64-673311
Ind. Valley Diagnostic
10th + Final Report

Thank you!

P. 01

TRANSACTION REPORT

AUG- 9-01 THU 4:10 PM

FOR: GAB ROBINS N. A. INC. 9564232407

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|---|---|---|---|---|---|---|
| AUG- 9 | 4:08 PM | 12142201688 | 1'56" | 3 | SEND | OK |



GAB
Robins

GAB Robins North America, Inc.

9000 SW Freeway
Suite 400
Houston, TX 77074
T: 713-988-6700
F: 713-270-3800

March 11, 2002

Evelyn Fisk
C N A Insurance Company
P.O. Box 219011
Dallas, TX 75221-9011

**RE : Unpaid Invoice(s)**

Attached you will find a copy of invoice(s) listed below. Our records indicate that the following invoice(s) has/have not been paid:

| YOUR CLAIM NUMBER | INVOICE NUMBER | INVOICE AMOUNT | INVOICE DATE | GAB FILE NUMBER | NOTICE |
|---|---|---|---|---|---|
| 64673311 | 7311404074 | 1307.81 | 08-09-01 | 34718-43410 | 1st |
| 64814522 | 7311404360 | 327.76 | 11-26-01 | 34718-43843 | 1st |

**Please review the attached invoice(s) and place in line for payment.** If payment has already been issued, please forward a copy of canceled check(s) to my attention at the above address.

We appreciate your business and thank you for your attention to this matter.

Tracy Todd
713-988-6700 x222

attachment(s)

GAB N1671(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc., All Rights Reserved)



GAB Robins North America, Inc.

8700 Commerce Park
Suite 235
Houston, TX 77036
T: 713-988-6700
F: 713-270-3800

May 19, 2003

Accounts Payable
C N A Insurance Company
P.O. Box 219011
Dallas, TX 75221

**RE : Unpaid Invoice(s)**

Attached you will find a copy of invoice(s) listed below. Our records indicate that the following invoice(s) has/have not been paid:

| YOUR CLAIM NUMBER | INVOICE NUMBER | INVOICE AMOUNT | INVOICE DATE | GAB FILE NUMBER | NOTICE |
|---|---|---|---|---|---|
| 64676880 | 7311103002 | 113.66 | 08-15-01 | 34705-21874 | 2nd |
| 64813631 | 7311103235 | 811.88 | 11-27-01 | 34705-21956 | 1st |
| 64817596 | 7311301944 | 454.65 | 04-11-02 | 34716-35131 | 1st |
| 64673311 | 7311404074 | 1307.81 | 08-09-01 | 34718-43410 | 2nd |
| 64688572 | 7310722391 | 113.66 | 09-18-02 | 34724-86309 | 1st |
| 64821205 | 7310722371 | 627.85 | 09-18-02 | 34724-86905 | 1st |
| 64689689 | 7310723127 | 405.94 | 10-23-02 | 34724-87111 | 1st |
| 64689866 | 7310722969 | 409.73 | 10-14-02 | 34724-87279 | 1st |
| 64821046 | 7310724688 | 850.86 | 03-13-03 | 34724-88578 | 1st |
| 64821046<br>64692046<br>64821066 | 7310724689 | 720.95 | 03-13-03 | 34724-88580 | 1st |
| 64668208 | 7311605115 | 522.59 | 01-25-01 | 34737-66266 | 1st |
| 64681648 | 7311605723 | 113.14 | 01-16-02 | 34737-66768 | 1st |

**Please review the attached invoice(s) and place in line for payment.** If payment has already been issued, please forward a copy of canceled check(s) to my attention at the above address.

We appreciate your business and thank you for your attention to this matter.

John Hinz
General Manager
713-988-6700 x214

JH/tt

attachment(s)

GC 82

GAB N167K(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc. All Rights Reserved)



GAB Robins
GAB Robins North America, Inc.

632 ED CAREY DRIVE
SUITE 700
HARLINGEN, TX, 78550-7965
T: 956-423-0770
F 956-423-2407

# SERVICE INVOICE

084145
CNA INSURANCE COMPANY
P O BOX 219011
ATTN: EVELYN FISK
DALLAS, TX 75221 9011

**FINAL BILLING**

**Mail Remittance To :**
**GAB Robins North America, Inc.**
**P.O. Box 7247-7162**
**Philadelphia, PA 19170-7162**
**IRS - 13-2747054**

---

**Invoice Number : 7311404074**
CUSTOMER SPECIFIC PRICING

**GAB File Number**
34718-43410A

**TAS No.**

**Invoice Date**
08/09/01

**Catastrophe No.**

**Insured**
VALLEY DIAGNOSTIC

**Policy Number**
UNKNOWN

**Policy Term**
01/01/2001-12/31/2001

**Claim Number**
64673311

**Claimant**
VALLEY DIAGNOSTIC

**Agency & Location**

**Cust. Producer Code**

**Acc/Loss/Occur Location**
HARLINGEN,TX

**Loss Zip**
78550

**Type of Loss/Claim**
PR

**Acc/Loss/Occur Date**
03/04/2001

**Assign Date**
03/06/2001

**Product Code**
1CP

---

**Expenses**

| | |
|---|---|
| **Service** | 1,206.00 |
| **Miscellaneous** | .00 |
| **Sub Total** | 1,206.00 |
| **Taxes/Overhead** | 101.81 |
| **Total Invoice** | $1,307.81 |

**FILE COPY**

83

GAB A991

(Copyright (c) 2000 GAB Robins North America, Inc., All Rights Reserved)

Version 2.0.1.1



GAB Robins North America, Inc.

CNA
PO Box 219011
Dallas, TX 75221-9011

Attn: Evelyn Fisk

632 Ed Carey Dr.
Suite 700
Harlingen, Tx. 78550
T: 956-423-0770
F: 956-423-2407

**BILLING SUMMARY** 08/08/2001

Final x
Supplemental ___
Interim ___

GAB Robins File: 34718-43410
Insured : Valley Diagnostic
Claim Number : 64-673311
Policy Number :
Adjuster : D. Nickoloff #4205-3

| | | | | | Cust. Charge |
|---|---|---|---|---|---|
| PROPERTY: | Damage Appraisal | Flat Rate: | | | |
| | No Frills: | Flat Rate: | | | |
| | Automobile Appraisal | Flat Rate: | | | |
| Estimated Loss: | | $0.00 | | | |
| OR: | Time & Expense | | | | |
| | Hours | 20.1 | | | |
| | At Rate of | $ 60.00 | | | $ 1,206.00 |
| CASUALTY : | Time & Expense Hours | | | | |
| | At Rate of | | | | $ - |
| | Flat Rate Assignment | | | | $ - |
| | Recorded Statement | | | | $ - |
| | Scene Investigation | | | | $ - |
| | Other | | | | $ - |
| EXTRAS | Mileage | 25 | | | |
| | less included | -25 | | | |
| | Chargeable miles at $1.55/mile | 0 | $ | 1.55 | $ - |
| | *[ Office use only # of miles ]* | *0* | | | |
| | *[ Adjuster Credit ]* | *$ 1.10* | *$* | *-* | |
| | Photos Total | 21 | | | |
| | Less Included | -5 | | | |
| | Billable Photos Times Rate | 16 | $ | 1.75 | $28.00 |
| | Telephone/ Fax charges | | | | $ - |
| | Public Records | | | | $ - |
| | Police or Fire reports cost | | | | $ - |
| | Support Staff @ $35.00 per hour | | | | $ - |
| | Parking | | | | $ - |
| | Other | | | | $ - |
| | SubTotal | | | | $ 1,234.00 |
| | Sales Tax 8 1/4% | | | | $ 101.81 |
| | Total Billing: | | | | $ 1,335.81 |

Mgr Approval_____

Contact 3/6
Insp 3/6
1st Rpt 3/7

84

Thank you for using GAB Robins.

# ORAL DEPOSITION OF DENNIS NICKOLOFF

## August 26, 2003

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**Sunbelt Reporting & Litigation Services**
**(713) 667-0763 Houston**
**(214) 747-0763 Dallas**



RECEIVED
SEP 10 2003

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

TRANSCONTINENTAL INSURANCE COMPANY \
Plaintiff, \
\
VS. \CIVIL ACTION NO.B-02-205
\
AMERICAN STANDARD, INC., \
Defendant. \

***************************************

THE VIDEOTAPED AND ORAL DEPOSITION OF
DENNIS NICKOLOFF
AUGUST 26, 2003

****************************************

Reported By: Susan A. Swantner
Job No. 42357

Page 2

INDEX

| | PAGE |
|---|---|
| APPEARANCES | 3 |
| PRELIMINARY PROCEEDINGS | 4 |
| EXAMINATION BY MR. DALE M. "RETT" HOLIDY | 4 |
| EXAMINATION BY MR. C. WESLEY VINES | 50 |
| FURTHER EXAMINATION BY MR. HOLIDY | 54 |
| FURTHER EXAMINATION BY MR. VINES | 56 |
| REPORTER'S CERTIFICATE | 57 |

* * * * * *

EXHIBIT INDEX

| NUMBER | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | MR. NICKOLOFF'S ACTIVITY REPORT AND COMPLETE FILE | 5 |
| 2 | PHOTOGRAPH OF COMMODE | 25 |

Page 3

THE VIDEOTAPED AND ORAL DEPOSITION OF DENNIS NICKOLOFF, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 26th of August, 2003, from 10:33 a.m. to 11:26 a.m., before Susan A. Swantner, CSR in and for the State of Texas, reported at the offices of GAB Robins, 632 Ed Carey, Suite 700, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated in the record or attached hereto.

A P P E A R A N C E S

FOR THE PLAINTIFF:
C. WESLEY VINES
Cozen & O'Connor
1717 Main Street, Suite 2300
Dallas, Texas 75201-7335

FOR THE DEFENDANT:
MR. DALE M. "RETT" HOLIDY
Germer Gertz, L.L.P.
333 Clay Street, Suite 4105
Houston, Texas 77002

VIDEOGRAPHER:
MR. ARMANDO GOMEZ
Sunbelt Reporting & Litigation Services

Page 4

PRELIMINARY PROCEEDINGS

COURT REPORTER: Per the Federal Rules?
MR. HOLIDY: Yes.
MR. VINES: Yes.
COURT REPORTER: Signature?
(Discussion off the record.)
THE WITNESS: No, I don't need to sign it.
VIDEOGRAPHER: We're on record. Time is 10:33.
COURT REPORTER: Would you raise your right hand? Do you honestly swear or affirm the testimony you're about to give today will be the truth, the whole truth and nothing but the truth?
THE WITNESS: I do.

EXAMINATION

QUESTIONS BY MR. DALE M. "RETT" HOLIDY:
Q Mr. Nickoloff, my name is Rett Holidy, and I represent American Standard in this lawsuit. Could you please state your full name for the record?
A My name is Dennis Nickoloff.
Q Mr. Nickoloff, how are you employed?
A I am employed by GAB Robins N.A., Inc., as an insurance adjuster.
Q N.A. meaning North America?
A Yes, sir, correct.

Page 5

Q How long have you been employed by GAB Robins?
A 27 years.
Q For purposes of today, when I say GAB Robins, will you agree with me that that means GAB Robins North America, Inc.?
A That's correct.
Q That's a mouthful that I probably can't get out throughout the day.
(Nickoloff Exhibit No. 1 was marked.)
Q I'm going to hand you what has been marked as Exhibit No. 1 to your deposition. That is a copy of your file, consisting of 83 pages, that was subpoenaed by my office for purposes of this litigation, and throughout the deposition we will be referring to it -- excuse me, it's 84 pages -- we will be referring to it. But before we begin talking about your investigation, I would like to get some more background information. Where is your office located?
A 632 Ed Carey Drive, Suite 700, Harlingen, Texas, 78550.
Q Is that where we are today?
A Correct.
Q And how long has your office been in this location?
A Approximately 14 or 15 years.

Page 6

Q What is your educational background?
A I have a Bachelor's Degree and Master's work done, about 30 hours of post-graduate work done.
Q Where did you obtain your Bachelor's Degree?
A At the University of Brockport in New York State.
Q Are you originally from New York?
A Yes, sir.
Q When did you move to the South Texas area?
A 1983.
Q Lived here ever since?
A Yes, sir
Q Came down here with GAB Robins?
A Yes, sir.
Q What type of program did you obtain your graduate hours in?
A The graduate hours? I'm sorry.
Q Yes, sir.
A Foreign Education, English is my major and education was my minor.
Q How did you get into the adjusting business?
A Enrollment was dropping in the school system I was working in. I was teaching for four or five years, and as the enrollment was dropping, it looked like they were cutting out more and more teachers, and I was at

Page 7

the low end of the seniority. So I thought I better find some other way to make a living. A friend of mine had just gotten out of the service and started working for GAB and introduced me to them, and that's basically how I got started doing this.
Q Did you serve in the military as well?
A No, sir, I did not.
Q Can you tell the ladies and gentlemen of the jury what it is that you do as an adjuster?
A Sure. Basically we receive assignments from a variety of insurance companies or self-insured interests. They ask us to handle their claims in one fashion or another. Sometimes it consists of going out and meeting with the insureds, appraising damages, preparing estimates, taking photographs, gathering evidence of whatever might be available. Sometimes we take it to conclusion, where we secure a Proof of Loss, which is a form signed by the insured, stating the amount of their claim to the insurance company. Other times we're asked to do partial investigations, where we're asked to meet with the insureds, and secure photos, write an estimate, and then our relationship is broken off and the insurance company concludes the claims. Other times a representative of the insurance company will step in on a large loss, such as this,

Page 8

where that person will then take over the handling of the claim and we basically just do the preliminary work for them, turn our material over to them, and they become the primary adjuster.
Q Does part of your job as an adjuster include investigating what was the cause of the loss?
A Yes, it is.
Q How do you normally go about investigating what was the cause of the loss?
A Generally we meet with the insured. Of course, basically ask what happened, how the incident or event occurred. If it is a fire we may call an expertise from a cause and origin expert. If it is a water loss we may talk to a plumber, to determine whether it's a pipe break or what has happened in the plumbing system. And that's basically what we do.
Q In this instance did you talk to a plumber to assist you in determining the cause of the loss?
A No, we did not.
Q Now you were contacted by Transcontinental Insurance Company or CNA --
A Correct.
Q -- to investigate a water loss at Valley Diagnostic Clinic here in Harlingen.
A That's correct.

**Page 9**

Q And this clinic is located just a mile or two up the road from where you are; is that right?
A That's correct.
Q Were you already familiar with the facility?
A I knew of its whereabouts, yes, sir.
Q You've never done any work there?
A No, sir.
Q Never adjusted a claim for them in the past, had you?
A No, sir.
Q Okay. What was the specific assignment that you were given?
A I will have to look back at the Loss Notice, if you don't mind.
Q Okay.
A It's --
Q That's fine. And if -- if possible, I would prefer that you refer to what has been marked as Exhibit No. 1.
A Oh, certainly.
Q And it's my understanding that is a complete copy --
A It is.
Q -- of your file. I noticed earlier that you were thumbing through it and I didn't see you frown,

**Page 10**

so --
A No, it will take me a second to locate it.
Q That's fine. If you could tell us what page number --
A Will do.
Q -- that you are referring to as we go through, that would be helpful.
A It is listed as page 19 and 20.
Q Okay.
A And this is the Assignment Form as we received it by facsimile from CNA.
Q What did CNA ask you to go out and do?
A The instructions read, "Rush. Insured business (Radiology department) is shut down. All Valley Restoration, Adam Garcia, 956-453-5587, office 956-412 -- I'm sorry -- 1039, has a water clean up crew in there. I have asked Belfor, Kevin Jones, 817-291-4165 mobile, to go see what they can do to help save the films and files and get the ambient moisture out of there. They can also check the machinery which is wet. I asked Belfor to coordinate with everyone."
So basically the assignment was to go and meet with the insured and find out what had happened here and report back to them.
Q Okay. And this was sent to you as a rush,

**Page 11**

which means go out as quickly as possible?
A Correct.
Q Who is All Valley Restoration?
A They are a restoration service, was, I don't know if they still are, located here in Harlingen or in the surrounding area.
Q Did you have any connection with the retention of All Valley Restoration?
A No, sir, I did not.
Q It looks like they were already on the job before you were contacted.
A Correct.
Q Who is Belfor?
A Belfor is a restoration company also.
Q Do you have an understanding as to what Belfor was supposed to do?
A I just read you what my understanding was. They were supposed to inspect the x-ray films and the machinery to determine if it could be saved, cleaned, restored, and to assist apparently the restoration company in eliminating moisture, if they needed that help.
Q Okay. Did you have anything to do with the retention of Belfor?
A No, sir.

**Page 12**

Q One of the things that you were talking about that you do as an adjuster is help to adjust the claim. Did you help to adjust the claim for this loss in any way whatsoever?
A No, sir, I did not.
Q Okay. Was your role limited to going out and investigating the cause of the incident?
A My role was limited basically to meeting with the insured and finding out how serious the incident was. Once that report was made back to the insurance company, other decisions were made as to who was going to handle the claim.
Q Now by how serious it was, what do you mean by that?
A In terms of the amount of damage to the building, in terms of the amount of interruption to the insured's business and so on.
Q Okay. In doing this investigation that you did to determine the seriousness of the loss and how the loss occurred, did you prepare a series of reports?
A Yes, I did.
Q Do you know how many reports you prepared in all?
A Let me check and we will find out the number totally.

**Page 13**

Q To help you out a little bit --
MR. VINES: Excuse me. Since I don't have a copy, maybe if I could look at your file --
THE WITNESS: File, sure.
MR. VINES: -- you have the exhibit there.
Q (By Mr. Holidy) On page 36 --
A Yeah.
Q -- there's a Tenth and Final Report.
A That would be the Final Report, August 8th, 2001, correct.
Q What date did this loss occur?
A This loss occurred on 3/4/01.
Q What date were you retained?
A I was retained on 3/6.
Q So two days after the loss?
A Correct.
Q Is it your understanding that the loss occurred on a weekend?
A Correct. I believe my file notes, I have written some dates in on my copy, I believe it shows on Monday.
Q That would be the 6th?
A I believe that's the 6th.
Q Okay. Your first report was dated March 7th.
A Correct.

**Page 14**

Q And that's on page 14 of Exhibit 1.
A Okay. That's correct.
Q And what was the first day that you went out to look at the damage at the clinic?
A That would have been March 6th also, the same day we received the loss.
Q How many days total did you spend at the clinic investigating this loss?
A I was there on that occasion meeting with a large group of people, and I believe I went back one time thereafter at the request of CNA's executive GA or general adjuster. We went back I believe and met with a group again. So I believe there was two meetings at the building. And then I went back one time in between there to do some measurements of the building, that was requested by CNA's adjuster. They needed a footprint of the building drawn and a valuation of the risk.
Q And can you tell me what pages are reflected -- or reflect the footprint?
A Uh-huh. Page 1 shows the first visit at 3/6.
Q Okay. And what pages of Exhibit No. 1, is it 43, 44 and 45, show the footprint of the building?
A That's not my drawing.
Q Okay.
A That was a drawing that was provided by the

**Page 15**

insured.
Q How about page 33?
A Page 33. Yes.
Q That's your drawing?
A That's the drawing I made, yes, sir.
Q And by footprint, what do you mean?
A Just the perimeter walls of the building.
Q And you did another diagram on page 28 it appears.
A It's the same diagram, sir. It's just duplicated twice.
Q And that diagram is dated March 21st, 2001?
A Correct.
Q Would that be the date that you created the diagram?
A Yes.
Q So in just trying to create a time line of when you went out there, we know you went out there on March 6th, 2001, which is the date that you were retained, we know that you did the footprint of the building on March 21st, 2001.
A Correct.
Q You mentioned a third time that you went there. What date would that have been?
A Actually it would have been the second visit.

**Page 16**

The first visit was on March 6th. The second visit was on March 13th, and that was with the CNA general adjuster. And then the last visit I believe was 3/21 and that was the date the building was diagramed and that diagram was prepared.
Q Well, let's -- let's go back to March 6th, 2001. You said that you met with a group of people there.
A Correct.
Q Who was in that group of people, if you recall?
A There was a large room with a large table and a lot of people, and I made a note of some of the names. Rod Miller was the executive director. He was the principal contact for the insured at that time or at least introduced himself as such. The maintenance supervisor was Ruben Flores. Adam Garcia was there, he was the owner of Valley Rest -- All Valley Restoration. Excuse me. And Kevin Jones was there from Belfor's. There may have been others sitting around the table. I -- some people did not introduce themselves and that happens in a large meeting.
Q Sure. Ruben Flores said he was the maintenance supervisor?
A Uh-huh. That's how he was introduced to me, correct.

Page 17

Q Did you meet anyone else from the maintenance department?
A Not that I recall.
Q Did you ever meet a man by the name of Keith Holm?
A The name sounds familiar and I may have met him on -- I don't believe I met him on the first meeting, but I think when -- when I went back and met with CNA's adjuster he may have been there and walked us through the building. That name does sound familiar.
Q Did you happen to write down or make note of what was Keith Holm's position?
A No, I did not, because at that moment I was more or less not handling the claim. CNA had taken over handling the claim by that point.
Q Okay.
A So I think Mr. Rudzitis, is his name, was the general adjuster. I believe he was trading business cards and -- and doing the formal communication with the insured at that point. I was more or less along just to assist him in finding the building, walking him through the building and pointing out the things that we had seen on the initial walk through.
Q It was your understanding that Ruben Flores was the maintenance supervisor at the time that this loss

Page 18

occurred?
A Yes, sir, that's correct.
Q So you met with these four, whose names you wrote down, plus some additional people?
A Correct.
Q Can you tell me what occurred in that general meeting that you had when you initially went to the clinic?
A This is awhile back, but to the best of my recollection, I believe that the insured was advising me on how they had proceeded since discovering the loss. They had contacted All Valley Restoration and put them to work in extracting water in the building and doing emergency repairs, in terms of removing wet ceiling tiles that were about to collapse on their machinery or other things.
Q You brought up an important point, and I didn't mean to cut you off --
A That's all right.
Q -- but you brought up an important point. This did occur awhile back.
A Yes, sir.
Q We're sitting here today on August --
A 26th.
Q -- 26th, 2003, some two and a half years after

Page 19

this loss occurred and --
A Yes.
Q -- you've probably investigated many losses since that time.
A Just a few. Yes, I have, quite a few.
Q Is part of the purpose in your creating the log and in creating the reports to help you know what goes on while you're out there doing the work?
A Correct.
Q And is it also fair to say that your memory with respect to your investigation of this claim is based on your refreshing your recollection and reviewing your file and your reports?
A Correct.
Q Your reports are your best recollection and reporting of what it was that you found when you went there?
A Also correct, yes.
Q Okay. So you had a general meeting with them. They told you that they had done some things to try to eliminate further damage, by ceiling tiles falling on equipment, things such as that.
A Correct.
Q What then happened?
A They were making arrangements to remove the

Page 20

wet -- their primary concern at that moment was their x-rays. You know, their films were wet and damp from water running down into that room. The ones that were not directly wet were in a moisture ladened area and they were concerned about removing them from that area. I sat and listened to the insured make plans with All Valley Restoration, physically, how they were going to physically box and remove the x-rays, and their concern was for security while they did this, of course. These things had to be safely moved in vans that All Valley, I believe, was going to rent and drive to wherever Belfor's was. I don't -- I can't remember their -- their location.
Q Fort Worth?
A Possibly, yeah. Belfor's wanted their -- the films to be taken to their location, so that they could do whatever they do to --
Q Okay.
A -- try to recover them, and I don't know what process is used, but that's their expertise. So that's something they would -- they would know.
Q Certainly.
A Other things were also discussed, as to a plan to further do repairs. It was agreed that All Valley Restoration was going to prepare a remediation repair

Page 21

bid to remove wet and damaged items from the building. Belfor's was going to look over the equipment and machinery, as that is their area of expertise, and they were going to present a report in terms of what was damaged, what machinery could be cleaned and so on.

Q Now was Belfor supposed to look at the radiologic equipment and determine if it was salvageable?

A That was my understanding, yes.

Q Did you have any involvement with any other entity, other than Belfor, who was going to come and look at the equipment to determine if it could be salvaged --

A No, sir.

Q -- or if it was a loss?

A No, sir, I did not. That may have occurred after I left the loss basically.

Q Sure. But it was your initial impression that Belfor was the one that was going to do all of this?

A Yes, sir.

Q So after you had the discussions on what the clinic had done, what All Valley was going to do with respect to their preliminary report, evaluation, and then helping to send the films to Belfor, what then occurred with respect to your investigation?

Page 22

A As you saw from the report, I came back to the office I think on the following day and immediately did a report to CNA, advising them of what had happened on that day, and it was a brief report, but I believe it made the point. I think they knew the seriousness of it, because I received a call from CNA shortly after that, saying they were going to -- or one of their executive GAs was in route and making plans to be here and take over the file.

Q Okay. So it was your impression that you were to gather the initial information and that CNA was then going to come down and begin a further investigation?

A Correct.

Q Did you at any time assist with CNA in their more detailed, further investigation?

A Not at all.

Q Okay. I would like for you to turn to page 14 of Exhibit No. 1, and could you tell the ladies and gentlemen of the jury what is the title of that document?

A First Report.

Q Okay. And it's dated March 7th, 2001?

A That's correct.

Q This would be the first report that you prepared the day after your investigation?

Page 23

A That's correct.

Q You did a thing which was called Abstract of Coverage; what -- what does that mean? That's on page 2 of the report, or page 15 of Exhibit No. 1.

A That is a discussion that we put in our reports revolving around the coverage issues, in terms of what coverage is applicable to the building, the contents of the building, if they have business interruption coverage. This is where we would make those notes. If we are asked to do a complete analysis by an insurance company, we look over their coverage documents, analyze whether the coverage applies to the loss, and give them our recommendations in that regard. In this case there was no coverage information supplied, and therefore no analysis could be done.

Q Okay.

A That's all that says.

Q And it appears that that was outside of the scope of what you were asked to do.

A Correct.

Q In looking at page 1 of the First Report, or page 14 of Exhibit 1, there is some Suggested Reserves that total $275,000. Was that just a nominal number that you threw out based on what you had seen?

A Yes, that's correct. As you see, the little

Page 24

stipulation below it, Reserves are based on preliminary inspection only, basic walk through.

Q The second item on page 15 of the Exhibit No. 1, or page 2 of your First Report, is Cause of Loss, and following your inspection what did you determine was the cause of loss?

A Information provided by the insured is what you read in the first paragraph.

Q Okay. When you say insured, can you explain to me --

A That would be --

Q -- what you mean by that?

A Yes, sir. That would be either the insured, being the person that we met with, either the Rod Miller's discussion, more likely, and I cannot recall exactly, more likely though it would have been with Ruben Flores.

Q All right.

A As we walked through the building we passed the commode that was supposedly the cause of the loss, and someone pointed in that room and indicated that this was the primary location of the water overflow, and at that time someone -- I asked what had happened, which I am supposed to do --

Q Right.

Page 25

A -- and someone said that the hinge pin of the second floor toilet fill valve worked itself loose, causing the tank to overflow, and that's why that reads just the way it does.
Q Okay. Now looking at page 49 of Exhibit No. 1.
A Okay.
Q These are photographs that were taken by you?
A Yes, that's correct.
Q And were these taken on March 6th, during the time of your initial investigation?
A Yes.
Q And are you able to, in looking at that picture, determine what was the hinge pin that worked itself loose?
A Do you want my best guess or -- I'm not a plumber, but I'm assuming that it's the pin on top of the fill valve that they were talking about. If you would like me to point it out, I will be glad to do that.
(Nickoloff Exhibit No. 2 was marked.)
Q Well, I am going to give you what we will mark as Exhibit No. 2 to your deposition, and hopefully it will help us, and you're pointing that out because it's a color photograph --
A Okay.

Page 26

Q -- and a little more clear. If you could hold that up for the ladies and gentlemen of the jury to see on the camera, and could you point to us what you believe is the hinge pin?
A As I said, I believe this to be the hinge pin that we're talking about.
Q All right. Thank you, sir. You can keep that. We will refer back to it.
Going back to your report, your First Report, on page 15, it was your understanding, based on the information that was given to you by Valley Diagnostic Clinic representatives, whether it was Rod Miller or Ruben Flores, that that hinge pin working itself loose was the cause of the loss?
A That was my understanding, yes.
Q That's what they told you?
A Correct.
Q Other than your looking at the toilet and taking that photograph, as reflected on page 49 of Exhibit No. 1, did you do any further investigation as to determine what was the cause of the loss?
A No, I did not.
Q Okay. So you relied solely upon their representations made to you two days after the loss and your visual inspection of the toilet?

Page 27

A Correct.
Q Did you talk to Mr. Flores, Keith Holm, or anyone else at Valley Diagnostic about their maintenance program?
A No, I did not. There was a stip -- I think there's a note in here that they did their own building maintenance, and I believe that was the only comment that was made. I may have asked them who worked on the toilets or who maintains their toilets. Oftentimes a subcontractor is utilized for those purposes, to maintain plumbing and so on. They indicated that their maintenance department maintained the toilets and that was why I put that in my report.
Q Okay. And you're referring to the third sentence of the first paragraph under Cause of Loss, your First Report, page 2 of that?
A Correct.
Q Were you given any other information concerning the loss and how it occurred?
A No, sir.
Q You were told that it was discovered on Sunday, in the early morning hours of March 4th, 2001?
A Correct, by an employee who came into the building.
Q Did that employee, do you know if that was

Page 28

Keith Holm or Ruben Flores? Do you know who that was?
A I don't -- I don't honestly recall.
Q Is it your understanding that he discovered the source of the water, turned it off, and then they went about their business of trying to mop things up?
A Exactly.
Q Okay. In looking, going further down your report, the next section on page 15 of Exhibit No. 1 is Subrogation. It looks like that was outside the scope of your work.
A Yes, sir, it was. At that moment, based on the information that the insured had maintained its own plumbing equipment and so on, it was my understanding, as you see, based on current information, I stipulated that we don't believe subrogation will be involved. That, of course, changed later, when they determined that the cause of the loss was -- had something to do with the toilet itself, and I tried to -- I think I amended that later on in my reports, but initially it was my understanding that -- that this maintenance work was done by the insured and that's why I made that comment.
Q Now what does the Risk section mean?
A It's just a description of the building itself that the loss occurs in. Usually it's the building

Page 29

that's insured primarily.

Q Determination of Value, Scope of Damage, and Adjustment, that all has to do with the seriousness of the loss?

A Exactly, a brief description of what occurred.

Q And it was preliminary information at that point?

A Yes, sir.

Q Experts, you said Belfor was working on the films?

A Uh-huh.

Q And no other experts had been retained up to that point in time?

A Not to my knowledge.

Q Okay. Salvage had not yet been determined?

A Correct.

Q What did you recommend to CNA or Transcontinental that they should do following your First Report?

A As you see in my future handling outline, I was at that point waiting for a repair estimate to be prepared by the insurance contractor, which we were going to review as soon as he had it completed. At that moment I think I knew that there was going to be a GA involved, but we still needed to do the same procedures,

Page 30

whether it was myself or with the executive GA from CNA, someone still needed to meet with the insured -- insurance contractors, excuse me, and then review the estimate he prepared for repairs to the building, and that was the plan that I was laying out here.

Q Okay. Your next report was generated on March 23rd, 2001. That's on page 22 of Exhibit No. 1. Now this would have been after you went with the executive general adjuster from CNA out to Valley Diagnostic Clinic; is that correct?

A That's correct. Excuse me.

Q And this report -- the general adjuster that you were talking about was Mr. -- how do you say his name?

A Ivars Rudzitis.

Q Rudzitis?

A Yes.

Q I appreciate your saying that, so I would not butcher it. You went through the building on March 13th, 2001 with Mr. Rudzitis to do another investigation; is that right?

A Right. That's correct.

Q Do you recall if the toilet was still in place at that time?

A I don't recall.

Page 31

Q Okay. You prepared another report very similar to the one that you prepared previously; is that right?

A Yes.

Q Updating what had happened during the interim, between March 7th and March 23th; is that fair?

A Yes, that's correct.

Q Okay. Looking at page 2 of that report, on page 23 of Exhibit No. 1, you have the Cause of Loss.

A That's correct.

Q And would you read that for the ladies and gentlemen of the jury?

A It's basically a repetition of the First Report. It says, "The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets."

Q Okay. And it looks like some information has changed with respect to Subrogation, indicating that CNA or Transcontinental has hired a lawsuit to handle a potential subrogation claim.

A Correct. They -- Mr. Rudzitis said they had hired an expert or an attorney, a law firm in Dallas, to handle potential subrogation at that time.

Q Okay. And there's some changes in the report

Page 32

regarding value, adjustment and experts; is that right?

A Right.

Q And for future handling, it looks like CNA is now doing the adjusting and you're just simply making yourself available?

A Correct.

Q Your next report was dated April 3rd, 2001, and that is on page 30 of Exhibit No. 1. Is the Cause of Loss the same as reflected in that report?

A Yes.

Q That a hinge pin worked itself loose?

A Correct.

Q There's a note at the top that you have written in there. Could you read that for the ladies and gentlemen of the jury? Did it not come out on your copy?

A Oh, okay. This is internal reporting requirements by my company.

Q Okay.

A It just says that -- it's saying that the report showed up on my list for 4/3, and we did this report, and we'll place it on a 21 day diary, based on the company's request. It's internal reporting requirements that we have.

Q That brings up a good question. Why, if CNA

Page 33

had taken over the adjusting, are you continuing to generate reports?

A Basically until they tell us to close our file --

Q Okay.

A -- we maintain an open file until they ask us or tell us that they're finished with us, have no further need of our services. It's something that's rather simple, but when you're working with an out of town adjuster, like Mr. Rudzitis was, it's possible he needed some very basic leg work done here, pick up something from the agent, or the insured may have something he wants to present to the insurance company, yet they don't want to mail it or -- and they will send it through our company, where I will pick it up and Fed Ex it to someone or -- so those things would be done and we would keep a file open in the event that they have some additional requests.

Q Okay. Do you have any specific recollection of what you and Mr. Rudzitis talked about when you went through the clinic on March 13th, 2001?

A Our primary concern I think was he was working with mostly addressing his questions to Adam Garcia. If I recall the -- we walked through the building and looked at the damages, and there was another person, it

Page 34

might have been that person that you mentioned, but I think there were four of us primarily walking through the building.

Q Okay. Adam Garcia is with All Valley Restoration?

A Correct, and the other name that you mentioned.

Q Keith Holm.

A It may have been Keith Holm that was with us, because I do remember that I think there were four of us walking through the building.

Q Okay.

A Someone from the building was pointing out different areas and Adam Garcia was explaining how he was going about doing -- go about doing the repairs and so on. Mr. Rudzitis was making some notes. And basically I was walking along behind. That's pretty much was my role there. I just was pretty much a follower in that group.

Q Okay. Other than that, can you remember any discussions that they were making about the cause of loss?

A No, sir, I don't believe that was part of the discussion that -- that I recall.

Q Okay. Now the third time that you went out to the clinic was just to do your footprint drawing.

Page 35

A Yes.

Q Is that right?

A That's correct.

Q And that would have been before the date of your Third Report on April 3rd, 2001?

A I believe so.

Q Okay. Your next report, Report No. Four, which is on page 64, is dated April 13th, 2001. It appears again that the Cause of Loss is stated that the hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow; is that correct?

A Correct.

Q Is there anything else that -- or is there anything that has changed between the Third and Fourth Report?

A Probably Adjustment caption, where it notes that All Valley Construction had prepared a detailed estimate, which was reviewed, seen by Mr. Rudzitis. It was our understanding that a re-inspection was going to occur from someone of their other field personnel, was going to come by and take a look at the estimate. I really don't know what that was about. I just understand that Mr. Rudzitis got the estimate, had been presented to CNA, and that CNA wanted to have one of their tech people take a look at it and possibly walk

Page 36

the building. I have no knowledge of whether that occurred or not, but that was my understanding, and that little stipulation was put in there because of that.

Q And it appears under the section Experts on page 2 of the report, which is page 65 of Exhibit 1, that you had had some contact with the Valley Diagnostic representatives to know that they were retaining their own experts to evaluate the damage done to the equipment.

A Yes. I don't know -- I can't recall without looking back at my notes, but I would --

Q Sure.

A -- assume that we had probably a conversation, it may have been either -- even through the CNA GA, in a phone conversation, where he may have said that Valley -- Valley Diagnostic is having some of their own people look at it, and I just chose to repeat that, just so it was memorialized at least in the report there.

Q So you were having continuing dialogue with at least CNA, if not also Valley Diagnostic, about what was going on with this claim?

A Very much around the peripheral -- peripheral edge of this though. It wasn't to the nuts and bolts of the adjustment, but more as to what the general direction was going in the -- in the -- in terms of the

Page 37

claim.
Q And in all fairness, what you mean by nuts and bolts of the adjustment is the scope of loss and valuation of the loss?
A Correct, the actual damages that were incurred, both by property and building.
Q And the next report that you did, the Fifth Report, is dated April 30th, 2001, it's on page 66 of Exhibit No. 1, exact same language for Cause of Loss; is that right?
A Yes. Correct.
Q Has anything changed on -- between Exhibit 4 -- excuse me, Report Four and Report Five?
A Not that I see.
Q Report No. Six, which is on page 70 of Exhibit No. 1, is dated May 16th, 2001.
A Correct.
Q It looks like there CNA has told you that there is going to be a change in who's handling the file.
A Yes.
Q Who is now handling the file?
A A Mr. Bob Dudek. It was my understanding that Mr. Rudzitis had become ill, seriously ill, and would probably not be back working the claim again, and that Mr. -- Mr. Dudek would be taking over the file.

Page 38

Q The Cause of Loss is the exact same as before?
A I had no information to change it. So I just duplicated it from the prior report.
Q Okay. Anything else changed on Exhibit -- or, excuse me, your Sixth Report?
A Not at all.
Q Okay. Your Seventh Report is found on page 72 of Exhibit No. 1, it's dated June 1st, 2001.
A Uh-huh.
Q It appears to be exactly the same as the Sixth Report?
A It is.
Q Okay. Cause of Loss is exactly the same?
A Correct.
Q Your Eighth Report is on page 76 of Exhibit No. 1.
A It's out of sequence. Okay.
Q And it's dated July 3rd, 2001; is that right?
A Correct.
Q It appears to be exactly the same as the Sixth and Seventh Reports?
A That's correct.
Q Were you generating these reports as part of your internal mechanisms?
A Yes. They come up on what we call a diary

Page 39

system, every 30 days, or whatever the company may request. They come up on our internal diary list and we have to do a report, and that's the insured's -- insurance company's opportunity to say, "Gee, we don't need anymore of these reports. We don't need your assistance anymore. You may close your file," but until I get that telephone call or it becomes blatantly obvious to me that no further work is required.
Q Okay. Cause of Loss on the Eighth Report is the same as it was on the previous seven reports?
A That is correct.
Q All right. Now your Ninth Report is on page 74 of Exhibit No. 1, and it's dated August 2nd, 2001.
A Yes.
Q Is that correct?
A Yes.
Q It's exactly the same as Six, Seven and Eight?
A That's correct.
Q Cause of Loss is exactly the same --
A Correct.
Q -- is that right? Your Tenth Report is on page 36 of Exhibit No. 1.
A Okay.
Q A few of these are out of order.
A Okay. No problem.

Page 40

Q All righty. And this says Tenth and Final Report; is that right?
A Correct.
Q It's dated August 8th, 2001.
A That's correct.
Q Does this mean you are closing your file?
A Yes. We received a telephone call from someone at the CNA office. Evelyn Fisk, who had assigned the loss to us, called and said that I could close my file, there was no longer any need for us to maintain an open file.
Q Okay.
A At which time I generated this closing report.
Q It says, "CC: Mr. Bill Knarr." Who is Mr. Bill Knarr?
A He is our property supervisor in the Houston branch.
Q Of GAB Robins?
A Of GAB Robins, that's correct.
Q Now differences between this and the previous reports, is it has an enclosures at the beginning, photographs of risks -- or excuse me, risk and damage.
A Correct.
Q Would there be -- those be the photographs that you took on March 6th, 2001?

Page 41

A They were. They were looked at by Mr. Rudzitis. He was going to take them with him when he left. For some reason they were left in my file and they were in the back of the file, and I thought while I was closing the report, since those are the possession of the insurance company, I better forward them at that time.
Q Okay. And that would have been on March 13th, 2001 when he looked at those?
A That's correct.
Q Okay. Did you ever see Mr. Rudzitis or Mr. Dudek after March 13th, 2001?
A No. I never met Mr. Dudek at all.
Q Okay. Cause of Loss on Tenth and Final Report is again, "The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow"?
A Correct.
Q Any other changes or any changes to the report, other than the exhibits, enclosures and then future handling, saying our file is now closed?
A No. There was, I think, an addition here of Steven Burke is the attorney at a law firm that was handling the subrogation possibility. I don't know where that jumped in there. That may have been during a

Page 42

previous report also, but --
Q. You are correct. It shows up on No. Nine, it shows up on No. Eight. No. Eight was the first time that it shows up and Report No. Eight was dated July 3rd, 2001.
A That was based on a telephone call on July 2nd from Steven Burke, who identified himself as a CNA subrogation attorney.
Q So the lawyer from CNA contacted you about the loss?
A Correct. He left a message for me. I returned his call the same day and gave him Evelyn Fisk's telephone to reach Bob Dudek, since I was not handling the claim and he wanted to talk about it in depth. I had no knowledge of what he wanted to talk about, and I referred him to the CNA GA who was working the file.
Q Did he ask you about your initial investigation?
A No, sir.
Q Did he do anything other than to identify who he was and to ask you some general questions?
A No, that's all he did actually.
Q Do you know if he had in his possession copies of your reports that you had sent to CNA?
A I have no way of knowing that.

Page 43

Q Did he discuss those with you?
A No.
Q Did he ask you what you saw and what you found when you first went out there on March 6th, 2001?
A No, he did not.
Q He just said, "Hey, I'm a lawyer," and you referred him to someone else?
A Correct.
Q You probably do that often when lawyers call you.
A As often as I can.
Q I don't think anyone would blame you for doing that whatsoever.
Let's talk for a moment about this hinge pin that worked itself loose. You determined that that was the cause of the loss based on the information you were given by Valley Diagnostic?
A Yes.
Q If you look at Exhibit No. 2, which is the photograph, do you see a small tab on the top of the arm next to the pin? If you need to --
A Are you talking about this little outcropping of plastic?
Q Yes.
A Yes, I do see it.

Page 44

Q And can you show that to the ladies and gentlemen of the jury?
A You are talking about little outcropping of plastic right here?
Q No, I'm not.
A Okay.
Q I'm talking about this little outcropping of plastic --
A Oh, I'm sorry.
Q -- right there.
A Sorry. In the wrong place. Yes, right there. It's hard to see it upside down.
Q And do you know what the purpose of that little outcropping of plastic is?
A No, I do not.
Q If I were to tell you that that little outcropping of plastic normally has another little piece of plastic that comes down to keep that pin in place, would you have any reason to disagree with me?
A No.
Q Would you agree with me that if the maintenance personnel at Valley Diagnostic were regularly maintaining that toilet, they would have been able to see that little pin working itself loose?
A I don't know. I would think so.

**Page 45**

Q Would you agree with me that if maintenance personnel at Valley Diagnostic had broken off that little keeper tab that keeps that pin in place, they should have known that there was the potential for that pin to work itself loose?
A Are you saying if they had done that --
Q If they had done that.
A -- that this may have happened? Yes, I would agree that it's possible.
Q Would you agree that if they had done that, that they should have just replaced the little 4 or $5 plastic part that allowed the water to flow up into the toilet?
A If they have more knowledge than I do of flush valves, obviously they -- they should have.
Q And you would assume that someone who is maintaining flush valves would have more knowledge than you do of flush valves?
A I would hope so.
Q Yes. Certainly they should, at a minimum; you would agree with that, would you not?
A Yes.
Q At any point in time during the five months that you were generating reports and having periodic contact with the clinic and with CNA or Transcontinental

**Page 46**

Insurance did anyone say anything to you about a crack in the tube?
A No, sir.
Q Do you know how long that toilet had been installed?
A No, sir.
Q Did anyone tell you about when the toilet was installed?
A No, sir.
Q Did anyone tell you when the toilet was manufactured?
A No, sir.
Q The evidence has shown that this toilet was manufactured in 1983 and then it was installed in the clinic when that portion of the clinic was built out in 1990 or 1991.
A Okay.
Q Did anyone from the clinic or anyone else you talked to from the insurance company ever tell you where was the toilet during the seven or eight years between the time it was manufactured and the time it was installed?
A No, sir.
Q Do you have any knowledge regarding the history of this toilet, other than the fact that it was sitting

**Page 47**

in the clinic and a pin worked itself loose?
A No, sir, that's all I know about it.
Q Would you agree with me that it's important for a commercial institution to have a regular maintenance program for all mechanical pieces of equipment that it has?
A I think that's a safe assumption.
Q Is it a safe assumption to say that that should include toilets?
A Yes.
Q Would you agree with me that products over time, especially products that are 15, 16, 17, 18 years old, due to normal use can wear out?
A Yes.
Q As part of a good and reasonable maintenance program, do you think that a maintenance department, with people skilled in the areas of plumbing, should be looking at products to see if they're deteriorating through normal wear and tear?
A Yes.
Q Do you think a product that deteriorates through normal wear and tear is necessarily defective?
A No.
Q It's something that should be expected, shouldn't it?

**Page 48**

A Yes.
Q So you would agree that maintenance is very important and that a preventative approach to maintenance rather than a reactive approach is much better?
A Yes.
Q Do you think in determining what may have caused a loss it's important to determine all of the stresses that this particular product may have undergone?
A Certainly.
Q And in order to know what caused a failure or a break or a loss, do you think it's important to know the complete history of that product?
A Certainly.
Q Did CNA ask you to do any type of research to determine any of those things, a complete history, stresses, anything of those nature?
A No, sir.
Q Do you believe that it's reasonable for a manufacturer to rely upon the information provided to it regarding a particular material by the manufacturer of that material?
A Yes.
Q It's just one of those common sense, normal

Page 49

things, don't you think?
A Yes.
Q Have you investigated water loss claims before this one?
A Yes.
Q Involving toilets?
A Yes.
Q Okay. Tell me about those.
A Generally they're in homeowner situations and some of them are in commercial situations. A lot of times they involve a sticking of the valve, this particular flush type valve or some other similar type valve. Many times it's a worn out part. Many times it's an improperly installed part. The homeowner has taken it upon themselves to put a valve in and it's not installed correctly or it's not installed properly at the base and it's leaking from the bottom, the supply lines are not hooked up correctly. We have for a large variety of things. Or the toilet itself is backing up because of a sewage problem, unrelated to the toilet function itself, but it still stems from the toilet. So we have a variety of these things.
Q So your inspection of this toilet and this loss was not your first rodeo, so to speak?
A No, sir, it was not.

Page 50

Q And when you went in there, you went in with that background of having investigated previous losses to look to see what was the cause of this loss?
A Uh-huh.
Q Is that right?
A That's correct.
Q And when you went there you listened to what the people from Valley Diagnostic had to say, and then based on that, plus your visual inspection of the toilet, you determined the cause of the loss was that pin working itself loose?
A That's correct.
MR. HOLIDY: Well, sir, I believe those are the questions I have for you at this time.
THE WITNESS: Okay.
MR. HOLIDY: And I appreciate your time.
EXAMINATION
BY MR. C. WESLEY VINES:
Q Sir, I have just a couple of questions. First of all, by the second visit you were no longer the, quote, "main adjuster" on this file?
A That's correct.
Q Okay. And you weren't at any time out there truly trying to investigate the cause of this loss, were you?

Page 51

MR. HOLIDY: Objection, leading.
A I was out there to meet with the insured and initially help them in direction to get them started with their repairs and see if I could assist them in any way in the selection of people to help them with those repairs.
Q (By Mr. Vines) I believe you testified that you were out there to check on the seriousness of this loss.
A Correct.
MR. HOLIDY: Objection, leading.
Q (By Mr. Vines) Did you understand your role was to investigate the cause of the loss?
A Not necessarily, no.
Q Are you an expert plumber?
A No, I am not.
Q In fact, until you were told by counsel that there was supposedly some piece missing from that valve, you didn't even know such a piece existed, did you?
A No, sir, I did not.
MR. HOLIDY: Objection, leading.
Q (By Mr. Vines) Okay. You're being asked a whole bunch of questions about your attitudes and opinions about things. You were asked whether or not you believe that one should expect that things wear out

Page 52

over time, and you said that you hold that opinion, correct?
A That's correct.
Q Okay. Tires wear out over time, don't they?
A Yes, sir.
Q What if -- what if you bought a brand new set of tires and they wore out in the first month and you were told that because when they get wet they wear out, would you accept that as reasonable?
A No, sir.
Q What if you were told that you have a plumbing product and its internal parts, the parts that keep the water contained, wear out when they're exposed to water?
MR. HOLIDY: Objection.
A That would be beyond my expectation also.
Q (By Mr. Vines) Yeah.
MR. HOLIDY: Misstates facts in evidence.
Q (By Mr. Vines) What if you are told that, you know, if there's chlorine or other things that are commonly in the water supply here in Harlingen, that they just plum wear out?
A That's also unexpected.
MR. HOLIDY: Objection, misstates facts in evidence.
Q (By Mr. Vines) If you bought a car and --

**Page 53**

from, let's say, any -- any automobile, let's say Ford, if you buy a Ford and one of its parts breaks down and you think it -- the part is defective, would you accept it if Ford told you, "Well, hey, you know, we just relied on the component maker. You got to go talk to them. It's not our fault."

A No, I wouldn't accept that.

MR. HOLIDY: Objection, assumes facts not in evidence.

Q (By Mr. Vines) Okay. Do you -- because I was listening pretty closely, and I know that you met with a number of people out there, but do you have an actual recollection of who specifically first mentioned to you this hinge pin?

A No. No. As I said, I was reading from my file notes or activities notes at the time. And I even noticed that Ruben Flores was later identified in my reports as the head of radiology, not head of maintenance. So it's been two years plus and the name was familiar only because of my file note. So whether he was the director of maintenance or the head of radiology, I really couldn't tell you. I would suspect that he's probably the head of radiology. But at the moment, when you walk in, you have a variety of people talking at you at the same time, usually everybody

**Page 54**

wanted to get their opinion as to what's the most important thing you should be doing while you're walking through the water. So names do get confused. Unless I get business cards from people and can then put faces with the business cards, it's difficult to keep the names straight.

MR. HOLIDY: Objection, nonresponsive.

Q (By Mr. Vines) As we sit here today, you don't know that it was Ruben Flores who mentioned the hinge pin to you?

A Not necessarily, sir. That was the name I wrote down, but I assumed that that was the person I heard it from, but it's not necessarily a fact.

Q And if you don't know who told it to you, would you have any way of knowing the source of the information of the person who mentioned this hinge pin to you?

A Where he got his information from, no, sir, I don't.

MR. VINES: That's all I have.

FURTHER EXAMINATION

BY MR. HOLIDY:

Q Mr. Nickoloff, that first meeting where -- that you attended at the clinic, you said that the persons present were from Valley Diagnostic Clinic, All Valley

**Page 55**

Restoration and Belfor; is that right?

A Correct. And as I said, there were other people sitting at the table. I don't -- there was maybe 14 people in the room, so...

Q Is was your understanding that the people who told you about the hinge pin working itself loose were from the clinic; is that right?

A My assumption was, yes, they were.

Q And then you also had an opportunity to look at the toilet yourself; is that right?

A Let me just explain. The inspection of the toilet was I stepped into the bathroom, I took the picture that you saw, stepped out of the bathroom, because I was being escorted through the building at a rapid rate. So my inspection of the building -- of the toilet itself was about 30 seconds.

MR. HOLIDY: Objection, nonresponsive.

Q You were in there long enough to take a picture and to look to see what was the cause of the leak, right?

A That's correct.

Q And based on what representatives from the clinic had told you and from what you saw, you determined the cause of the leak was the hinge pin working itself loose?

**Page 56**

A Reporting as they had told me, yes, that's correct.

MR. HOLIDY: Thank you, sir.

FURTHER EXAMINATION

BY MR. VINES:

Q Well, a couple of follow-ups. You accepted the causation as understood and as given to you from someone else; is that correct?

A That's correct.

Q You didn't independently come to a determination as to the cause of this loss, did you?

A That's correct.

MR. HOLIDY: Object to the form.

Q (By Mr. Vines) You spent 30 seconds looking at this toilet?

A Approximately.

MR. VINES: Okay. That's all I have.

VIDEOGRAPHER: Off record. 11:26.

*****************

Signature waived

*****************

Page 57

COUNTY OF HARRIS )
STATE OF TEXAS )

REPORTER'S CERTIFICATE

I, SUSAN A. SWANTNER, Certified Shorthand Reporter in and for the State of Texas, hereby certify that this transcript is a true record of the testimony given.

I further certify that I am neither attorney nor counsel for, related to, nor employed by any of the parties to the action in which this testimony was taken. Further, I am not a relative or employee of any attorney of record in this cause, nor do I have a financial interest in the action.

Subscribed and sworn to on this the 8th day of September, 2003.

SUSAN A. SWANTNER
Certified Shorthand Reporter
In and for the State of Texas

Certification No. 2150
Expiration Date: 12-31-2004