## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

OCT 2 9 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY | § § § | |
| Plaintiff, | § § | |
| AND | § § | |
| VALLEY DIAGNOSTIC CLINIC, P.A. | § § | CIVIL ACTION NO. B-02-205 |
| Intervenor, | § § | |
| v. | § § | |
| AMERICAN STANDARD, INC. | § § | |
| Defendant. | § | |

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE

NOW COMES:

TRANSCONTINENTAL INSURANCE COMPANY ("Transcontinental") and submits this Memorandum in Support of its Motion in Limine seeking an order to exclude Defendant AMERICAN STANDARD, INC. ("ASI"), Defendant's counsel and any witness appearing on behalf of Defendant from making during *voir dire*, trial, opening statement and closing argument any statements, references, comments, questions or interrogation, directly or indirectly, regarding any of the matters enumerated herein without first approaching the bench and obtaining a ruling from the Court on the admissibility of such matters, outside the presence of all prospective jurors or jurors ultimately selected in this case. Each of the matters enumerated below would be inadmissible for any purpose upon proper and timely objection. To allow interrogation of a witness, a comment, inference or statement to the prospective jurors or jurors, or an offer of evidence concerning these matters would prejudice or confuse the jury, and sustaining objections

to such questions, comments, inferences or offers of evidence would not cure such prejudice or confusion, but would instead reinforce the impact and effect upon the jurors of having hear or been presented with such prejudicial or confusing matters.

## I.    LAW AND ARGUMENT

Relevant evidence is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Implicit in that definition are two distinct requirements: (1) the evidence must be probative of the proposition it is offered to prove; and (2) the proposition to be proved must be one that is of consequence to the action. *United States v. Hall*, 653 F.2d 1002, 1005 (5th Cir. 1981) (quoting McCormick on Evidence § 185 (2d ed. 1973); 1 Weinstein's Evidence P 401(3) (1980); 22 Wright & Graham, Federal Practice and Procedure: Evidence § 5162 (1978)).

While relevant evidence is admissible, irrelevant evidence is inadmissible. Fed. R. Evid. 402. Further, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Fed. R. Evid. 403. *See also Magnivision, Inc. v. Bonneau Co.*, 115 F.3d 956, 961 (Fed. Cir. 1997) ("The purpose of the [FRE's] include assuring that irrelevant evidence does not unfairly prejudice the jury."); *U.S. v. Blackstone*, 56 F.3d 1143, 1146 (9th Cir. 1995) (unfair prejudice means the tendency to suggest a decision on an improper basis, such as emotion or instinct).

Transcontinental submits the following matters are irrelevant, hearsay, unduly prejudicial and would cause confusion for the jury, and thus, are not admissible for any purposes in trial of this case:

1.

After the water leak, various disputes arose between Transcontinental and its insured, VDC including: (1) coverage questions, (2) selection of outside vendors for repair and (3) the length of the adjustment process.   VDC sued Transcontinental challenging certain coverage positions taken by Transcontinental, which suit is still pending.   In the first place, evidence of these disputes is not relevant (particularly in light of the fact that the parties have stipulated as to damages).  FRE 401.  In the second place, even if relevant, the probative value of such evidence is substantially outweighed by the danger of unfair prejudice and confusion.  FRE 403.

2.

In the aftermath of the water leak, Transcontinental retained an outside adjuster, Dennis Nicholoff, to perform certain limited functions.  Mr. Nickoloff is an employee of GAB Robins North America, Inc. ("GAB") an outside adjusting firm.[1]  A copy of Mr. Nicholoff's deposition and exhibits is attached hereto.

Nicholoff was sent over on a rush basis essentially to determine the scope of the problems being experienced by VDC.  Nicholoff depo., pp. 10-12.  In his own words:

> My role was limited basically to meeting with the insured and finding out how serious the incident was.  Once that report was made back to the insurance company, other decisions were made as to who was going to handle the claim. Nicholoff depo., p. 12, l. 8-12.

Nicholoff went on to explain that by serious he meant the amount of damage and the amount of interruption to the insured's business.  *Id.* at lines 15-17.  Exhibit 1 to Nickoloff's deposition is a copy of his file.  Pages 19 and 20 represent the assignment form.  The assignment form indicates

---

[1]  Prior to the damage stipulation, Transcontinental had designated Nickoloff as a damage expert.  The expert designation clearly does not list Mr. Nickoloff as a causation expert.

that Nickoloff was sent on a rush basis. The form contains a number of boxes permitting the person assigning the work to check those tasks which the adjuster is to undertake. The form includes a number of boxes having to do with investigation such as interviewing witnesses. Notably, none of those boxes are checked. The loss occurred on March 4, 2001. Mr. Nickoloff received his assignment and first visited the site on March 6, 2001, two days after the loss. Nickoloff depo., p. 13, l. 13-14. On March 7, Mr. Nickoloff prepared his first in a series of reports to Transcontinental (Transcontinental is an issuing company owned by CNA and references in the deposition to CNA should be understood as references to Transcontinental). Mr. Nickoloff testified that, due to the seriousness of the loss, shortly after his initial report he received notice from Transcontinental that an executive general adjuster of Transcontinental would be taking over the file. Nickoloff depo., p. 22. Nickoloff did not meet with anyone from the maintenance department. Nickoloff depo., p. 17. Mr. Nickoloff made a second visit to the site in the company of the Transcontinental (CNA) general adjuster, Ivars Rudzitis on March 13, 2001 (Nickoloff depo., p. 16). When asked by defense counsel if he took notes of any conversations with maintenance individuals on that second visit, Nickoloff testified that he did not for the reason that "at that time I was more or less not handling the claim. CNA had taken over handling the claim by that point." Nickoloff depo., p. 17, l. 1-15. With regard to the depth of his understanding, Mr. Nickoloff incorrectly identified Reuben Flores as the individual that he thought was involved with maintenance. Nickoloff depo., pp. 16-17 (when in fact Mr. Flores was a member of the radiology department). Nickoloff depo., pp. 16-17. During his first visit Mr. Nickoloff testifies that someone mentioned to him that a pin in the subject water valve may have come loose. This remark is included in his reports. Mr. Nickoloff could not recall at the time of his deposition who allegedly made the comment about a loose pin to him nor anything

about the source of the commenter's knowledge. Nickoloff depo., p. 53, l. 10-25 through p. 54, l. 1-19.

With regard to the "inspection" Nickoloff's own characterization of what transpired is telling:

> Let me just explain. The inspection of the toilet was I stepped into the bathroom, I took the picture that you saw, stepped out of the bathroom, because I was being escorted through the building at a rapid rate. So my inspection of the building-of the toilet itself was about 30 seconds. Nickoloff depo., p. 55, l. 11-16.

Nickoloff testified he did not attempt to make any independent determination as to the cause of loss. Nickoloff depo., p. 56, l. 10-12. Rather, he simply accepted the comment about a "loose pin" as a given even though he does recall who said it or the source of that person's information. Nickoloff depo., p. 55, l. 22-25 through p. 56, l. 1-17. Nickoloff conceded that it was not his role to investigate the loss. Nickoloff depo., p. 50, l. 23-25 through p. 51, l. 1-14. He admitted that he was not an expert in plumbing. Nickoloff depo., p. 51, l. 15-16. Nickoloff testified that he did not talk to a plumber in this case. He did say that when he is assigned to a fire he will call an expert cause and origin investigator. If it is a water loss "we may talk to a plumber." Nickoloff depo., p. 8, l. 8-19.

Nickoloff's first report is found within Exhibit 1 to his deposition, beginning on page 14 (the page numbers appear stamped in the lower right hand corner of Exhibit 1). On page 2 of the three page report Nickoloff states, under the heading Cause of Loss, "the hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow." On that same page, under the heading Subrogation, the report states "Based on current information, we believe no subrogation will be involved." Subsequent reports suggest that "subrogation possibilities are being explored by Mr. Rudzitis (the adjuster who quickly took over for Nickoloff), using a law firm in Dallas, Texas that handles lawsuits arising from malfunctioning toilet flush valves." See

for example, Exhibit 1 to Nickoloff deposition beginning at page 36 (Nickoloff's tenth and final report).

Based on the above and foregoing, it is clear that Nickoloff was not hired to investigate cause, has no expertise as a plumber and based on a 30 second look at the toilet and a comment from an unknown person wrote in his reports that the cause of the loss was a loose hinge pin. In the first place, the reports themselves are inadmissible hearsay. FRE 802. Moreover, because Nickoloff states that the cause of loss was simply derived from a comment made to him from an unknown person we have hearsay within hearsay and the cause should not be admitted nor should Nickoloff be permitted to testify at trial concerning his opinion (or that of others) as to the cause of this loss. There is no reliable scientific basis for his proposed testimony and correct scientific procedures were not used in this case. His testimony is thus inadmissible under FRE 702 and 703 as interpreted by the Supreme Court in *Daubert v. Merrell Dell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Similarly, any references in Mr. Nickoloff's reports or any testimony from Mr. Nickoloff concerning "subrogation possibilities" constitutes an inadmissible opinion as to the ultimate merits of the case and should not be admitted. FRE 403.

3.

One of Defendant's retained experts is Fred Delgado, Jr., a plumber. Mr. Delgado made a visual inspection of VDC's clinic on July 31, 2003. In ASI's expert disclosures, Mr. Delgado makes this statement:

> **Even after the incident in question, no preventative measures were taken to prevent a similar situation in the future.** After my inspection of several rooms, which contained 24 toilets, I witnessed a broken toilet tank, leaking plastic ballcocks, and the improper installation of a floor drain directed towards the toilet in question. In my opinion, it is not an issue of faulty or defective parts, but a question of improper maintenance on Valley Diagnostic's part. At this point there is no "real" person named to perform the maintenance on the toilet in question, which is also

> specious. In my opinion, the spoliation of evidence has transpired.
> In the first instance, Transcontinental objects to this testimony on
> the grounds that it has no relevance to the events or circumstances
> in existence at the time of the leak (March of 2001). FRE 401.

The only question which is relevant in this case is anything which VDC did or failed to do which led to the loss in March of 2001. Findings in July of 2003 do not advance that cause. Arguing that VDC had some duty to undertake "future preventative measures" is specious, unfounded by law and prejudicial. FRE 403. Clearly it is improper for Mr. Delgado to assert his "opinion" on the alleged spoliation of evidence.

4.

Any mention or reference, made in any manner, as to the issue of "Tort Reform", "lawsuit abuse", or the like. This instruction should preclude Defendant from making any mention of Tort Reform, including but not limited to references to frivolous lawsuits, nuisance suits, caps on punitive damages, joint and several liability and limitations on contingent fees. Any testimony or comments by Defendant's counsel and/or witnesses on the subject of Tort Reform is not relevant to liability or damages resulting from the sudden and catastrophic failure of the subject toilet at issue in this lawsuit and such comments could result in undue prejudice to Transcontinental. Fed. R. Evid. 403.

5.

Any testimony from any witness that Defendant has not identified as a person with knowledge of relevant facts in pretrial disclosures and/or response to Transcontinental's Interrogatories. A party cannot call a witness not identified by that party but who was identified by the other party. The court must automatically exclude a witness from testifying if the witness was not listed in response to interrogatories requesting witnesses. Fed. R. Civ. P. 33.

6.

Any expert testimony from any witness that Defendant has not identified as an expert witness in response to Transcontinental's Interrogatories. When a party is asked for information about expert witnesses who will testify at trial (names and substance of testimony), the information must be disclosed. *See, Thompson v. Barnett*, 734 F. Supp. 751, 753 (S.D. Miss. 1989) (party failed to show good cause for untimely designation of expert witnesses and thus could not use the testimony of that expert witness at trial).

7.

Any statement, reference, or mention by Defendants or its attorney, to any document that was not produced in response to Transcontinental's Request for Production of Documents and which may be contained in Defendant's or its counsel's files, for the reason that the time for conducting discovery has ended and any statement, reference, or argument made by Defendant during trial regarding matters which could have been obtained through discovery but which were not obtained would be unfairly prejudicial to Transcontinental and would prejudice the jury.

8.

That counsel for Defendant be instructed not to tender, read from, or refer to any *ex parte* statement or report of any person who is not then and there present in Court and available to testify and be cross examined by Transcontinental's counsel, and that Defendant's counsel further be instructed not to suggest to the jury or any prospective juror by argument or otherwise what would have been the testimony of any witness who is not actually called to testify.

9.

Any statement by Defendant or Defendant's counsel regarding the probable testimony of any person who is absent, unavailable, or not called as a witness to testify in this case.

10.

Any mention, reference, inference or offer of evidence of conduct or statements made in the course of settlement or compromise negotiations.  Fed. R. Evid. 408; *Affiliated Mfrs. v. Aluminum Co.*, 56 F.3d 521, 526 (3d. Cir. 1995).

11.

Any mention, reference or inference that Transcontinental filed this Motion in Limine or that the Court has ruled in response.  Such references or statements are inherently prejudicial in that they suggest or infer that Transcontinental has sought to prohibit proof or that the Court has excluded proof of matters which the jury may interpret to be damaging to Transcontinental's interests in this case.

## II.    CONCLUSION

For the foregoing reasons, Transcontinental submits that its motion in limine should be granted as to each and every issue and matter asserted herein.

Respectfully submitted,

C. WESLEY VINES
Texas Bar No. 20586050
RICHARD M. MUNOZ
Texas Bar No. 24013212
**COZEN AND O'CONNOR**
2300 BankOne Center
1717 Main Street
Dallas, Texas 75201-7335
214-462-3000 - telephone
214-462-3299 - facsimile

**ATTORNEYS FOR PLAINTIFF**

DALLAS1\120918\1 112639.000

# ORAL DEPOSITION OF DENNIS NICKOLOFF

## August 26, 2003



CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**Sunbelt Reporting & Litigation Services**
**(713) 667-0763 Houston**
**(214) 747-0763 Dallas**

## Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF TEXAS
 3                  BROWNSVILLE DIVISION
 4  TRANSCONTINENTAL INSURANCE     \
 5  COMPANY                        \
 6            Plaintiff,           \
 7                                 \
 8  VS.                   \CIVIL ACTION NO.B-02-205
 9                                 \
10  AMERICAN STANDARD, INC.,       \
11            Defendant.           \
12  *********************************
13     THE VIDEOTAPED AND ORAL DEPOSITION OF
14               DENNIS NICKOLOFF
15               AUGUST 26, 2003
16  *********************************
17             Reported By:  Susan A. Swantner
18                           Job No. 42357
19
20
21
22
23
24
25
```

## Page 2

```
 1                      INDEX
 2                                        PAGE
 3  APPEARANCES                             3
 4  PRELIMINARY PROCEEDINGS                 4
 5  EXAMINATION BY MR. DALE M. "RETT" HOLIDY  4
 6  EXAMINATION BY MR. C. WESLEY VINES      50
 7  FURTHER EXAMINATION BY MR. HOLIDY       54
 8  FURTHER EXAMINATION BY MR. VINES        56
 9  REPORTER'S CERTIFICATE                  57
10                 * * * * * *
11               EXHIBIT INDEX
12  NUMBER       DESCRIPTION     PAGE MARKED
13   1       MR. NICKOLOFF'S ACTIVITY REPORT    5
            AND COMPLETE FILE
14
     2       PHOTOGRAPH OF COMMODE             25
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1      THE VIDEOTAPED AND ORAL DEPOSITION OF DENNIS
 2  NICKOLOFF, produced as a witness at the instance of the
 3  DEFENDANT, and duly sworn, was taken in the above-styled
 4  and numbered cause on the 26th of August, 2003, from
 5  10:33 a.m. to 11:26 a.m., before Susan A. Swantner, CSR
 6  in and for the State of Texas, reported at the offices
 7  of GAB Robins, 632 Ed Carey, Suite 700, Harlingen,
 8  Texas, pursuant to the Federal Rules of Civil Procedure
 9  and the provisions stated in the record or attached
10  hereto.
11
12              A P P E A R A N C E S
13
14  FOR THE PLAINTIFF:
15              C. WESLEY VINES
                Cozen & O'Connor
16              1717 Main Street, Suite 2300
                Dallas, Texas  75201-7335
17
    FOR THE DEFENDANT:
18
                MR. DALE M. "RETT" HOLIDY
19              Germer Gertz, L.L.P.
                333 Clay Street, Suite 4105
20              Houston, Texas  77002
21  VIDEOGRAPHER:
22              MR. ARMANDO GOMEZ
                Sunbelt Reporting & Litigation Services
23
24
25
```

## Page 4

```
 1           PRELIMINARY PROCEEDINGS
 2       COURT REPORTER:    Per the Federal Rules?
 3       MR. HOLIDY:    Yes.
 4       MR. VINES:    Yes.
 5       COURT REPORTER:    Signature?
 6       (Discussion off the record.)
 7       THE WITNESS:    No, I don't need to sign it.
 8       VIDEOGRAPHER:    We're on record.  Time is
 9  10:33.
10       COURT REPORTER:    Would you raise your
11  right hand?  Do you honestly swear or affirm the
12  testimony you're about to give today will be the truth,
13  the whole truth and nothing but the truth?
14       THE WITNESS:    I do.
15           EXAMINATION
16  QUESTIONS BY MR. DALE M. "RETT" HOLIDY:
17   Q   Mr. Nickoloff, my name is Rett Holidy, and I
18  represent American Standard in this lawsuit.  Could you
19  please state your full name for the record?
20   A   My name is Dennis Nickoloff
21   Q   Mr. Nickoloff, how are you employed?
22   A   I am employed by GAB Robins N.A., Inc., as an
23  insurance adjuster.
24   Q   N.A. meaning North America?
25   A   Yes, sir, correct.
```

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

### Page 5

1   Q    How long have you been employed by GAB Robins?
2   A    27 years.
3   Q    For purposes of today, when I say GAB Robins,
4   will you agree with me that that means GAB Robins North
5   America, Inc.?
6   A    That's correct.
7   Q    That's a mouthful that I probably can't get out
8   throughout the day.
9        (Nickoloff Exhibit No. 1 was marked.)
10  Q    I'm going to hand you what has been marked as
11  Exhibit No. 1 to your deposition.  That is a copy of
12  your file, consisting of 83 pages, that was subpoenaed
13  by my office for purposes of this litigation, and
14  throughout the deposition we will be referring to it --
15  excuse me, it's 84 pages -- we will be referring to it.
16  But before we begin talking about your investigation, I
17  would like to get some more background information.
18  Where is your office located?
19  A    632 Ed Carey Drive, Suite 700, Harlingen,
20  Texas, 78550.
21  Q    Is that where we are today?
22  A    Correct.
23  Q    And how long has your office been in this
24  location?
25  A    Approximately 14 or 15 years.

### Page 6

1   Q    What is your educational background?
2   A    I have a Bachelor's Degree and Master's work
3   done, about 30 hours of post-graduate work done.
4   Q    Where did you obtain your Bachelor's Degree?
5   A    At the University of Brockport in New York
6   State.
7   Q    Are you originally from New York?
8   A    Yes, sir.
9   Q    When did you move to the South Texas area?
10  A    1983.
11  Q    Lived here ever since?
12  A    Yes, sir
13  Q    Came down here with GAB Robins?
14  A    Yes, sir.
15  Q    What type of program did you obtain your
16  graduate hours in?
17  A    The graduate hours?  I'm sorry.
18  Q    Yes, sir.
19  A    Foreign Education, English is my major and
20  education was my minor.
21  Q    How did you get into the adjusting business?
22  A    Enrollment was dropping in the school system I
23  was working in   I was teaching for four or five years,
24  and as the enrollment was dropping, it looked like they
25  were cutting out more and more teachers, and I was at

### Page 7

1   the low end of the seniority.  So I thought I better
2   find some other way to make a living.  A friend of mine
3   had just gotten out of the service and started working
4   for GAB and introduced me to them, and that's basically
5   how I got started doing this.
6   Q    Did you serve in the military as well?
7   A    No, sir, I did not.
8   Q    Can you tell the ladies and gentlemen of the
9   jury what it is that you do as an adjuster?
10  A    Sure.  Basically we receive assignments from a
11  variety of insurance companies or self-insured
12  interests.  They ask us to handle their claims in one
13  fashion or another.  Sometimes it consists of going out
14  and meeting with the insureds, appraising damages,
15  preparing estimates, taking photographs, gathering
16  evidence of whatever might be available.  Sometimes we
17  take it to conclusion, where we secure a Proof of Loss,
18  which is a form signed by the insured, stating the
19  amount of their claim to the insurance company.  Other
20  times we're asked to do partial investigations, where
21  we're asked to meet with the insureds, and secure
22  photos, write an estimate, and then our relationship is
23  broken off and the insurance company concludes the
24  claims.  Other times a representative of the insurance
25  company will step in on a large loss, such as this,

### Page 8

1   where that person will then take over the handling of
2   the claim and we basically just do the preliminary work
3   for them, turn our material over to them, and they
4   become the primary adjuster.
5   Q    Does part of your job as an adjuster include
6   investigating what was the cause of the loss?
7   A    Yes, it is.
8   Q    How do you normally go about investigating what
9   was the cause of the loss?
10  A    Generally we meet with the insured.  Of course,
11  basically ask what happened, how the incident or event
12  occurred.  If it is a fire we may call an expertise from
13  a cause and origin expert.  If it is a water loss we may
14  talk to a plumber, to determine whether it's a pipe
15  break or what has happened in the plumbing system.  And
16  that's basically what we do.
17  Q    In this instance did you talk to a plumber to
18  assist you in determining the cause of the loss?
19  A    No, we did not.
20  Q    Now you were contacted by Transcontinental
21  Insurance Company or CNA --
22  A    Correct.
23  Q    -- to investigate a water loss at Valley
24  Diagnostic Clinic here in Harlingen.
25  A    That's correct.

**Page 9**

1  Q   And this clinic is located just a mile or two
2  up the road from where you are; is that right?
3  A   That's correct.
4  Q   Were you already familiar with the facility?
5  A   I knew of its whereabouts, yes, sir.
6  Q   You've never done any work there?
7  A   No, sir.
8  Q   Never adjusted a claim for them in the past,
9  had you?
10  A   No, sir.
11  Q   Okay.  What was the specific assignment that
12  you were given?
13  A   I will have to look back at the Loss Notice, if
14  you don't mind.
15  Q   Okay.
16  A   It's --
17  Q   That's fine.  And if -- if possible, I would
18  prefer that you refer to what has been marked as Exhibit
19  No. 1.
20  A   Oh, certainly.
21  Q   And it's my understanding that is a complete
22  copy --
23  A   It is.
24  Q   -- of your file.  I noticed earlier that you
25  were thumbing through it and I didn't see you frown,

**Page 10**

1  so --
2  A   No, it will take me a second to locate it.
3  Q   That's fine.  If you could tell us what page
4  number --
5  A   Will do.
6  Q   -- that you are referring to as we go through,
7  that would be helpful.
8  A   It is listed as page 19 and 20.
9  Q   Okay.
10  A   And this is the Assignment Form as we received
11  it by facsimile from CNA.
12  Q   What did CNA ask you to go out and do?
13  A   The instructions read, "Rush.  Insured business
14  (Radiology department) is shut down.  All Valley
15  Restoration, Adam Garcia, 956-453-5587, office
16  956-412 -- I'm sorry -- 1039, has a water clean up crew
17  in there.  I have asked Belfor, Kevin Jones,
18  817-291-4165 mobile, to go see what they can do to help
19  save the films and files and get the ambient moisture
20  out of there.  They can also check the machinery which
21  is wet.  I asked Belfor to coordinate with everyone."
22      So basically the assignment was to go and
23  meet with the insured and find out what had happened
24  here and report back to them.
25  Q   Okay.  And this was sent to you as a rush,

**Page 11**

1  which means go out as quickly as possible?
2  A   Correct.
3  Q   Who is All Valley Restoration?
4  A   They are a restoration service, was, I don't
5  know if they still are, located here in Harlingen or in
6  the surrounding area.
7  Q   Did you have any connection with the retention
8  of All Valley Restoration?
9  A   No, sir, I did not.
10  Q   It looks like they were already on the job
11  before you were contacted.
12  A   Correct.
13  Q   Who is Belfor?
14  A   Belfor is a restoration company also.
15  Q   Do you have an understanding as to what Belfor
16  was supposed to do?
17  A   I just read you what my understanding was.
18  They were supposed to inspect the x-ray films and the
19  machinery to determine if it could be saved, cleaned,
20  restored, and to assist apparently the restoration
21  company in eliminating moisture, if they needed that
22  help.
23  Q   Okay.  Did you have anything to do with the
24  retention of Belfor?
25  A   No, sir.

**Page 12**

1  Q   One of the things that you were talking about
2  that you do as an adjuster is help to adjust the claim.
3  Did you help to adjust the claim for this loss in any
4  way whatsoever?
5  A   No, sir, I did not.
6  Q   Okay.  Was your role limited to going out and
7  investigating the cause of the incident?
8  A   My role was limited basically to meeting with
9  the insured and finding out how serious the incident
10  was.  Once that report was made back to the insurance
11  company, other decisions were made as to who was going
12  to handle the claim.
13  Q   Now by how serious it was, what do you mean by
14  that?
15  A   In terms of the amount of damage to the
16  building, in terms of the amount of interruption to the
17  insured's business and so on.
18  Q   Okay.  In doing this investigation that you did
19  to determine the seriousness of the loss and how the
20  loss occurred, did you prepare a series of reports?
21  A   Yes, I did.
22  Q   Do you know how many reports you prepared in
23  all?
24  A   Let me check and we will find out the number
25  totally.

ORAL DEPOSITION OF DENNIS NICKOLOFF

**August 26, 2003**

## Page 13

1  Q   To help you out a little bit --
2      MR. VINES:   Excuse me. Since I don't have
3  a copy, maybe if I could look at your file --
4      THE WITNESS:   File, sure.
5      MR. VINES:   -- you have the exhibit there.
6  Q   (By Mr. Holidy) On page 36 --
7  A   Yeah.
8  Q   -- there's a Tenth and Final Report.
9  A   That would be the Final Report, August 8th,
10 2001, correct.
11 Q   What date did this loss occur?
12 A   This loss occurred on 3/4/01.
13 Q   What date were you retained?
14 A   I was retained on 3/6.
15 Q   So two days after the loss?
16 A   Correct.
17 Q   Is it your understanding that the loss occurred
18 on a weekend?
19 A   Correct. I believe my file notes, I have
20 written some dates in on my copy, I believe it shows on
21 Monday.
22 Q   That would be the 6th?
23 A   I believe that's the 6th.
24 Q   Okay. Your first report was dated March 7th.
25 A   Correct.

## Page 14

1  Q   And that's on page 14 of Exhibit 1.
2  A   Okay. That's correct.
3  Q   And what was the first day that you went out to
4  look at the damage at the clinic?
5  A   That would have been March 6th also, the same
6  day we received the loss.
7  Q   How many days total did you spend at the clinic
8  investigating this loss?
9  A   I was there on that occasion meeting with a
10 large group of people, and I believe I went back one
11 time thereafter at the request of CNA's executive GA or
12 general adjuster. We went back I believe and met with a
13 group again. So I believe there was two meetings at the
14 building. And then I went back one time in between
15 there to do some measurements of the building, that was
16 requested by CNA's adjuster. They needed a footprint of
17 the building drawn and a valuation of the risk.
18 Q   And can you tell me what pages are reflected --
19 or reflect the footprint?
20 A   Uh-huh. Page 1 shows the first visit at 3/6.
21 Q   Okay. And what pages of Exhibit No. 1, is it
22 43, 44 and 45, show the footprint of the building?
23 A   That's not my drawing.
24 Q   Okay.
25 A   That was a drawing that was provided by the

## Page 15

1  insured.
2  Q   How about page 33?
3  A   Page 33. Yes.
4  Q   That's your drawing?
5  A   That's the drawing I made, yes, sir.
6  Q   And by footprint, what do you mean?
7  A   Just the perimeter walls of the building.
8  Q   And you did another diagram on page 28 it
9  appears.
10 A   It's the same diagram, sir. It's just
11 duplicated twice.
12 Q   And that diagram is dated March 21st, 2001?
13 A   Correct.
14 Q   Would that be the date that you created the
15 diagram?
16 A   Yes.
17 Q   So in just trying to create a time line of when
18 you went out there, we know you went out there on March
19 6th, 2001, which is the date that you were retained, we
20 know that you did the footprint of the building on March
21 21st, 2001.
22 A   Correct.
23 Q   You mentioned a third time that you went there.
24 What date would that have been?
25 A   Actually it would have been the second visit.

## Page 16

1  The first visit was on March 6th. The second visit was
2  on March 13th, and that was with the CNA general
3  adjuster. And then the last visit I believe was 3/21
4  and that was the date the building was diagramed and
5  that diagram was prepared.
6  Q   Well, let's -- let's go back to March 6th,
7  2001. You said that you met with a group of people
8  there.
9  A   Correct.
10 Q   Who was in that group of people, if you recall?
11 A   There was a large room with a large table and a
12 lot of people, and I made a note of some of the names.
13 Rod Miller was the executive director. He was the
14 principal contact for the insured at that time or at
15 least introduced himself as such. The maintenance
16 supervisor was Ruben Flores. Adam Garcia was there, he
17 was the owner of Valley Rest -- All Valley Restoration.
18 Excuse me. And Kevin Jones was there from Belfor's.
19 There may have been others sitting around the table.
20 I -- some people did not introduce themselves and that
21 happens in a large meeting.
22 Q   Sure. Ruben Flores said he was the maintenance
23 supervisor?
24 A   Uh-huh. That's how he was introduced to me,
25 correct

## Page 17

1  Q   Did you meet anyone else from the maintenance
2  department?
3  A   Not that I recall.
4  Q   Did you ever meet a man by the name of Keith
5  Holm?
6  A   The name sounds familiar and I may have met him
7  on -- I don't believe I met him on the first meeting,
8  but I think when -- when I went back and met with CNA's
9  adjuster he may have been there and walked us through
10 the building.  That name does sound familiar.
11 Q   Did you happen to write down or make note of
12 what was Keith Holm's position?
13 A   No, I did not, because at that moment I was
14 more or less not handling the claim.  CNA had taken over
15 handling the claim by that point.
16 Q   Okay.
17 A   So I think Mr. Rudzitis, is his name, was the
18 general adjuster.  I believe he was trading business
19 cards and -- and doing the formal communication with the
20 insured at that point.  I was more or less along just to
21 assist him in finding the building, walking him through
22 the building and pointing out the things that we had
23 seen on the initial walk through.
24 Q   It was your understanding that Ruben Flores was
25 the maintenance supervisor at the time that this loss

## Page 18

1  occurred?
2  A   Yes, sir, that's correct.
3  Q   So you met with these four, whose names you
4  wrote down, plus some additional people?
5  A   Correct.
6  Q   Can you tell me what occurred in that general
7  meeting that you had when you initially went to the
8  clinic?
9  A   This is awhile back, but to the best of my
10 recollection, I believe that the insured was advising me
11 on how they had proceeded since discovering the loss.
12 They had contacted All Valley Restoration and put them
13 to work in extracting water in the building and doing
14 emergency repairs, in terms of removing wet ceiling
15 tiles that were about to collapse on their machinery or
16 other things.
17 Q   You brought up an important point, and I didn't
18 mean to cut you off --
19 A   That's all right.
20 Q   -- but you brought up an important point.  This
21 did occur awhile back.
22 A   Yes, sir.
23 Q   We're sitting here today on August --
24 A   26th.
25 Q   -- 26th, 2003, some two and a half years after

## Page 19

1  this loss occurred and --
2  A   Yes.
3  Q   -- you've probably investigated many losses
4  since that time.
5  A   Just a few.  Yes, I have, quite a few.
6  Q   Is part of the purpose in your creating the log
7  and in creating the reports to help you know what goes
8  on while you're out there doing the work?
9  A   Correct.
10 Q   And is it also fair to say that your memory
11 with respect to your investigation of this claim is
12 based on your refreshing your recollection and reviewing
13 your file and your reports?
14 A   Correct.
15 Q   Your reports are your best recollection and
16 reporting of what it was that you found when you went
17 there?
18 A   Also correct, yes.
19 Q   Okay.  So you had a general meeting with them.
20 They told you that they had done some things to try to
21 eliminate further damage, by ceiling tiles falling on
22 equipment, things such as that.
23 A   Correct.
24 Q   What then happened?
25 A   They were making arrangements to remove the

## Page 20

1  wet -- their primary concern at that moment was their
2  x-rays.  You know, their films were wet and damp from
3  water running down into that room.  The ones that were
4  not directly wet were in a moisture ladened area and
5  they were concerned about removing them from that area.
6  I sat and listened to the insured make plans with All
7  Valley Restoration, physically, how they were going to
8  physically box and remove the x-rays, and their concern
9  was for security while they did this, of course.  These
10 things had to be safely moved in vans that All Valley, I
11 believe, was going to rent and drive to wherever
12 Belfor's was.  I don't -- I can't remember their --
13 their location.
14 Q   Fort Worth?
15 A   Possibly, yeah.  Belfor's wanted their -- the
16 films to be taken to their location, so that they could
17 do whatever they do to --
18 Q   Okay.
19 A   -- try to recover them, and I don't know what
20 process is used, but that's their expertise  So that's
21 something they would -- they would know.
22 Q   Certainly.
23 A   Other things were also discussed, as to a plan
24 to further do repairs.  It was agreed that All Valley
25 Restoration was going to prepare a remediation repair

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

BSA                                                                                    XMAX(6/6)

## Page 21

1  bid to remove wet and damaged items from the building.
2  Belfor's was going to look over the equipment and
3  machinery, as that is their area of expertise, and they
4  were going to present a report in terms of what was
5  damaged, what machinery could be cleaned and so on.
6      Q    Now was Belfor supposed to look at the
7  radiologic equipment and determine if it was
8  salvageable?
9      A    That was my understanding, yes.
10     Q    Did you have any involvement with any other
11 entity, other than Belfor, who was going to come and
12 look at the equipment to determine if it could be
13 salvaged --
14     A    No, sir.
15     Q    -- or if it was a loss?
16     A    No, sir, I did not. That may have occurred
17 after I left the loss basically.
18     Q    Sure. But it was your initial impression that
19 Belfor was the one that was going to do all of this?
20     A    Yes, sir.
21     Q    So after you had the discussions on what the
22 clinic had done, what All Valley was going to do with
23 respect to their preliminary report, evaluation, and
24 then helping to send the films to Belfor, what then
25 occurred with respect to your investigation?

## Page 22

1      A    As you saw from the report, I came back to the
2  office I think on the following day and immediately did
3  a report to CNA, advising them of what had happened on
4  that day, and it was a brief report, but I believe it
5  made the point. I think they knew the seriousness of
6  it, because I received a call from CNA shortly after
7  that, saying they were going to -- or one of their
8  executive GAs was in route and making plans to be here
9  and take over the file.
10     Q    Okay. So it was your impression that you were
11 to gather the initial information and that CNA was then
12 going to come down and begin a further investigation?
13     A    Correct.
14     Q    Did you at any time assist with CNA in their
15 more detailed, further investigation?
16     A    Not at all.
17     Q    Okay. I would like for you to turn to page 14
18 of Exhibit No. 1, and could you tell the ladies and
19 gentlemen of the jury what is the title of that
20 document?
21     A    First Report.
22     Q    Okay. And it's dated March 7th, 2001?
23     A    That's correct.
24     Q    This would be the first report that you
25 prepared the day after your investigation?

## Page 23

1      A    That's correct.
2      Q    You did a thing which was called Abstract of
3  Coverage; what -- what does that mean? That's on page 2
4  of the report, or page 15 of Exhibit No. 1.
5      A    That is a discussion that we put in our reports
6  revolving around the coverage issues, in terms of what
7  coverage is applicable to the building, the contents of
8  the building, if they have business interruption
9  coverage. This is where we would make those notes. If
10 we are asked to do a complete analysis by an insurance
11 company, we look over their coverage documents, analyze
12 whether the coverage applies to the loss, and give them
13 our recommendations in that regard. In this case there
14 was no coverage information supplied, and therefore no
15 analysis could be done.
16     Q    Okay.
17     A    That's all that says.
18     Q    And it appears that that was outside of the
19 scope of what you were asked to do.
20     A    Correct.
21     Q    In looking at page 1 of the First Report, or
22 page 14 of Exhibit 1, there is some Suggested Reserves
23 that total $275,000. Was that just a nominal number
24 that you threw out based on what you had seen?
25     A    Yes, that's correct. As you see, the little

## Page 24

1  stipulation below it, Reserves are based on preliminary
2  inspection only, basic walk through.
3      Q    The second item on page 15 of the Exhibit No.
4  1, or page 2 of your First Report, is Cause of Loss, and
5  following your inspection what did you determine was the
6  cause of loss?
7      A    Information provided by the insured is what you
8  read in the first paragraph.
9      Q    Okay. When you say insured, can you explain to
10 me --
11     A    That would be --
12     Q    -- what you mean by that?
13     A    Yes, sir. That would be either the insured,
14 being the person that we met with, either the Rod
15 Miller's discussion, more likely, and I cannot recall
16 exactly, more likely though it would have been with
17 Ruben Flores.
18     Q    All right.
19     A    As we walked through the building we passed the
20 commode that was supposedly the cause of the loss, and
21 someone pointed in that room and indicated that this was
22 the primary location of the water overflow, and at that
23 time someone -- I asked what had happened, which I am
24 supposed to do --
25     Q    Right.

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

**Page 25**

1  A   -- and someone said that the hinge pin of the
2  second floor toilet fill valve worked itself loose,
3  causing the tank to overflow, and that's why that reads
4  just the way it does.
5  Q   Okay. Now looking at page 49 of Exhibit No. 1.
6  A   Okay.
7  Q   These are photographs that were taken by you?
8  A   Yes, that's correct.
9  Q   And were these taken on March 6th, during the
10  time of your initial investigation?
11  A   Yes.
12  Q   And are you able to, in looking at that
13  picture, determine what was the hinge pin that worked
14  itself loose?
15  A   Do you want my best guess or -- I'm not a
16  plumber, but I'm assuming that it's the pin on top of
17  the fill valve that they were talking about. If you
18  would like me to point it out, I will be glad to do
19  that.
20      (Nickoloff Exhibit No. 2 was marked.)
21  Q   Well, I am going to give you what we will mark
22  as Exhibit No. 2 to your deposition, and hopefully it
23  will help us, and you're pointing that out because it's
24  a color photograph --
25  A   Okay.

**Page 26**

1  Q   -- and a little more clear. If you could hold
2  that up for the ladies and gentlemen of the jury to see
3  on the camera, and could you point to us what you
4  believe is the hinge pin?
5  A   As I said, I believe this to be the hinge pin
6  that we're talking about.
7  Q   All right. Thank you, sir. You can keep that.
8  We will refer back to it.
9      Going back to your report, your First
10  Report, on page 15, it was your understanding, based on
11  the information that was given to you by Valley
12  Diagnostic Clinic representatives, whether it was Rod
13  Miller or Ruben Flores, that that hinge pin working
14  itself loose was the cause of the loss?
15  A   That was my understanding, yes.
16  Q   That's what they told you?
17  A   Correct.
18  Q   Other than your looking at the toilet and
19  taking that photograph, as reflected on page 49 of
20  Exhibit No. 1, did you do any further investigation as
21  to determine what was the cause of the loss?
22  A   No, I did not.
23  Q   Okay. So you relied solely upon their
24  representations made to you two days after the loss and
25  your visual inspection of the toilet?

**Page 27**

1  A   Correct.
2  Q   Did you talk to Mr. Flores, Keith Holm, or
3  anyone else at Valley Diagnostic about their maintenance
4  program?
5  A   No, I did not. There was a stip -- I think
6  there's a note in here that they did their own building
7  maintenance, and I believe that was the only comment
8  that was made. I may have asked them who worked on the
9  toilets or who maintains their toilets. Oftentimes a
10  subcontractor is utilized for those purposes, to
11  maintain plumbing and so on. They indicated that their
12  maintenance department maintained the toilets and that
13  was why I put that in my report.
14  Q   Okay. And you're referring to the third
15  sentence of the first paragraph under Cause of Loss,
16  your First Report, page 2 of that?
17  A   Correct.
18  Q   Were you given any other information concerning
19  the loss and how it occurred?
20  A   No, sir.
21  Q   You were told that it was discovered on Sunday,
22  in the early morning hours of March 4th, 2001?
23  A   Correct, by an employee who came into the
24  building.
25  Q   Did that employee, do you know if that was

**Page 28**

1  Keith Holm or Ruben Flores? Do you know who that was?
2  A   I don't -- I don't honestly recall.
3  Q   Is it your understanding that he discovered the
4  source of the water, turned it off, and then they went
5  about their business of trying to mop things up?
6  A   Exactly.
7  Q   Okay. In looking, going further down your
8  report, the next section on page 15 of Exhibit No. 1 is
9  Subrogation. It looks like that was outside the scope
10  of your work.
11  A   Yes, sir, it was. At that moment, based on the
12  information that the insured had maintained its own
13  plumbing equipment and so on, it was my understanding,
14  as you see, based on current information, I stipulated
15  that we don't believe subrogation will be involved.
16  That, of course, changed later, when they determined
17  that the cause of the loss was -- had something to do
18  with the toilet itself, and I tried to -- I think I
19  amended that later on in my reports, but initially it
20  was my understanding that -- that this maintenance work
21  was done by the insured and that's why I made that
22  comment.
23  Q   Now what does the Risk section mean?
24  A   It's just a description of the building itself
25  that the loss occurs in. Usually it's the building

## Page 29

1 that's insured primarily.
2     Q     Determination of Value, Scope of Damage, and
3 Adjustment, that all has to do with the seriousness of
4 the loss?
5     A     Exactly, a brief description of what occurred.
6     Q     And it was preliminary information at that
7 point?
8     A     Yes, sir.
9     Q     Experts, you said Belfor was working on the
10 films?
11    A     Uh-huh.
12    Q     And no other experts had been retained up to
13 that point in time?
14    A     Not to my knowledge.
15    Q     Okay. Salvage had not yet been determined?
16    A     Correct.
17    Q     What did you recommend to CNA or
18 Transcontinental that they should do following your
19 First Report?
20    A     As you see in my future handling outline, I was
21 at that point waiting for a repair estimate to be
22 prepared by the insurance contractor, which we were
23 going to review as soon as he had it completed. At that
24 moment I think I knew that there was going to be a GA
25 involved, but we still needed to do the same procedures,

## Page 30

1 whether it was myself or with the executive GA from CNA,
2 someone still needed to meet with the insured --
3 insurance contractors, excuse me, and then review the
4 estimate he prepared for repairs to the building, and
5 that was the plan that I was laying out here.
6     Q     Okay  Your next report was generated on March
7 23rd, 2001. That's on page 22 of Exhibit No. 1. Now
8 this would have been after you went with the executive
9 general adjuster from CNA out to Valley Diagnostic
10 Clinic; is that correct?
11    A     That's correct. Excuse me.
12    Q     And this report -- the general adjuster that
13 you were talking about was Mr. -- how do you say his
14 name?
15    A     Ivars Rudzitis.
16    Q     Rudzitis?
17    A     Yes.
18    Q     I appreciate your saying that, so I would not
19 butcher it. You went through the building on March
20 13th, 2001 with Mr. Rudzitis to do another
21 investigation; is that right?
22    A     Right. That's correct.
23    Q     Do you recall if the toilet was still in place
24 at that time?
25    A     I don't recall.

## Page 31

1     Q     Okay. You prepared another report very similar
2 to the one that you prepared previously; is that right?
3     A     Yes.
4     Q     Updating what had happened during the interim,
5 between March 7th and March 23th; is that fair?
6     A     Yes, that's correct.
7     Q     Okay. Looking at page 2 of that report, on
8 page 23 of Exhibit No. 1, you have the Cause of Loss.
9     A     That's correct.
10    Q     And would you read that for the ladies and
11 gentlemen of the jury?
12    A     It's basically a repetition of the First
13 Report. It says, "The hinge pin of a second floor
14 toilet fill valve worked itself loose, causing the tank
15 to overflow. Water flooded approximately 4,400 square
16 feet on each of the two floors. The Insured's
17 maintenance department maintains the toilets."
18    Q     Okay. And it looks like some information has
19 changed with respect to Subrogation, indicating that CNA
20 or Transcontinental has hired a lawsuit to handle a
21 potential subrogation claim.
22    A     Correct. They -- Mr. Rudzitis said they had
23 hired an expert or an attorney, a law firm in Dallas, to
24 handle potential subrogation at that time.
25    Q     Okay. And there's some changes in the report

## Page 32

1 regarding value, adjustment and experts; is that right?
2     A     Right.
3     Q     And for future handling, it looks like CNA is
4 now doing the adjusting and you're just simply making
5 yourself available?
6     A     Correct.
7     Q     Your next report was dated April 3rd, 2001, and
8 that is on page 30 of Exhibit No. 1. Is the Cause of
9 Loss the same as reflected in that report?
10    A     Yes.
11    Q     That a hinge pin worked itself loose?
12    A     Correct.
13    Q     There's a note at the top that you have written
14 in there. Could you read that for the ladies and
15 gentlemen of the jury? Did it not come out on your
16 copy?
17    A     Oh, okay. This is internal reporting
18 requirements by my company.
19    Q     Okay.
20    A     It just says that -- it's saying that the
21 report showed up on my list for 4/3, and we did this
22 report, and we'll place it on a 21 day diary, based on
23 the company's request. It's internal reporting
24 requirements that we have.
25    Q     That brings up a good question. Why, if CNA

**ORAL DEPOSITION OF DENNIS NICKOLOFF**
**August 26, 2003**

BSA                                                                                    XMAX(9/9)

## Page 33

1 had taken over the adjusting, are you continuing to
2 generate reports?
3    A    Basically until they tell us to close our
4 file --
5    Q    Okay.
6    A    -- we maintain an open file until they ask us
7 or tell us that they're finished with us, have no
8 further need of our services. It's something that's
9 rather simple, but when you're working with an out of
10 town adjuster, like Mr. Rudzitis was, it's possible he
11 needed some very basic leg work done here, pick up
12 something from the agent, or the insured may have
13 something he wants to present to the insurance company,
14 yet they don't want to mail it or -- and they will send
15 it through our company, where I will pick it up and Fed
16 Ex it to someone or -- so those things would be done and
17 we would keep a file open in the event that they have
18 some additional requests.
19    Q    Okay. Do you have any specific recollection of
20 what you and Mr. Rudzitis talked about when you went
21 through the clinic on March 13th, 2001?
22    A    Our primary concern I think was he was working
23 with mostly addressing his questions to Adam Garcia. If
24 I recall the -- we walked through the building and
25 looked at the damages, and there was another person, it

## Page 34

1 might have been that person that you mentioned, but I
2 think there were four of us primarily walking through
3 the building.
4    Q    Okay. Adam Garcia is with All Valley
5 Restoration?
6    A    Correct, and the other name that you mentioned.
7    Q    Keith Holm.
8    A    It may have been Keith Holm that was with us,
9 because I do remember that I think there were four of us
10 walking through the building.
11    Q    Okay.
12    A    Someone from the building was pointing out
13 different areas and Adam Garcia was explaining how he
14 was going about doing -- go about doing the repairs and
15 so on. Mr. Rudzitis was making some notes. And
16 basically I was walking along behind. That's pretty
17 much was my role there. I just was pretty much a
18 follower in that group.
19    Q    Okay. Other than that, can you remember any
20 discussions that they were making about the cause of
21 loss?
22    A    No, sir, I don't believe that was part of the
23 discussion that -- that I recall.
24    Q    Okay. Now the third time that you went out to
25 the clinic was just to do your footprint drawing.

## Page 35

1    A    Yes.
2    Q    Is that right?
3    A    That's correct.
4    Q    And that would have been before the date of
5 your Third Report on April 3rd, 2001?
6    A    I believe so.
7    Q    Okay. Your next report, Report No. Four, which
8 is on page 64, is dated April 13th, 2001. It appears
9 again that the Cause of Loss is stated that the hinge
10 pin of a second floor toilet fill valve worked itself
11 loose, causing the tank to overflow; is that correct?
12    A    Correct.
13    Q    Is there anything else that -- or is there
14 anything that has changed between the Third and Fourth
15 Report?
16    A    Probably Adjustment caption, where it notes
17 that All Valley Construction had prepared a detailed
18 estimate, which was reviewed, seen by Mr. Rudzitis. It
19 was our understanding that a re-inspection was going to
20 occur from someone of their other field personnel, was
21 going to come by and take a look at the estimate. I
22 really don't know what that was about. I just
23 understand that Mr. Rudzitis got the estimate, had been
24 presented to CNA, and that CNA wanted to have one of
25 their tech people take a look at it and possibly walk

## Page 36

1 the building. I have no knowledge of whether that
2 occurred or not, but that was my understanding, and that
3 little stipulation was put in there because of that.
4    Q    And it appears under the section Experts on
5 page 2 of the report, which is page 65 of Exhibit 1,
6 that you had had some contact with the Valley Diagnostic
7 representatives to know that they were retaining their
8 own experts to evaluate the damage done to the
9 equipment.
10    A    Yes. I don't know -- I can't recall without
11 looking back at my notes, but I would --
12    Q    Sure.
13    A    -- assume that we had probably a conversation,
14 it may have been either -- even through the CNA GA, in a
15 phone conversation, where he may have said that
16 Valley -- Valley Diagnostic is having some of their own
17 people look at it, and I just chose to repeat that, just
18 so it was memorialized at least in the report there.
19    Q    So you were having continuing dialogue with at
20 least CNA, if not also Valley Diagnostic, about what was
21 going on with this claim?
22    A    Very much around the peripheral -- peripheral
23 edge of this though. It wasn't to the nuts and bolts of
24 the adjustment, but more as to what the general
25 direction was going in the -- in the -- in terms of the

ORAL DEPOSITION OF DENNIS NICKOLOFF

BSA                                   **August 26, 2003**                          XMAX(10/10)

---

### Page 37

1  claim.
2  Q    And in all fairness, what you mean by nuts and
3  bolts of the adjustment is the scope of loss and
4  valuation of the loss?
5  A    Correct, the actual damages that were incurred,
6  both by property and building.
7  Q    And the next report that you did, the Fifth
8  Report, is dated April 30th, 2001, it's on page 66 of
9  Exhibit No. 1, exact same language for Cause of Loss; is
10 that right?
11 A    Yes. Correct.
12 Q    Has anything changed on -- between Exhibit 4 --
13 excuse me, Report Four and Report Five?
14 A    Not that I see.
15 Q    Report No. Six, which is on page 70 of Exhibit
16 No. 1, is dated May 16th, 2001.
17 A    Correct.
18 Q    It looks like there CNA has told you that there
19 is going to be a change in who's handling the file.
20 A    Yes.
21 Q    Who is now handling the file?
22 A    A Mr. Bob Dudek. It was my understanding that
23 Mr. Rudzitis had become ill, seriously ill, and would
24 probably not be back working the claim again, and that
25 Mr. -- Mr. Dudek would be taking over the file.

---

### Page 38

1  Q    The Cause of Loss is the exact same as before?
2  A    I had no information to change it. So I just
3  duplicated it from the prior report.
4  Q    Okay. Anything else changed on Exhibit -- or,
5  excuse me, your Sixth Report?
6  A    Not at all.
7  Q    Okay. Your Seventh Report is found on page 72
8  of Exhibit No. 1, it's dated June 1st, 2001.
9  A    Uh-huh.
10 Q    It appears to be exactly the same as the Sixth
11 Report?
12 A    It is.
13 Q    Okay. Cause of Loss is exactly the same?
14 A    Correct.
15 Q    Your Eighth Report is on page 76 of Exhibit No.
16 1.
17 A    It's out of sequence. Okay.
18 Q    And it's dated July 3rd, 2001; is that right?
19 A    Correct.
20 Q    It appears to be exactly the same as the Sixth
21 and Seventh Reports?
22 A    That's correct.
23 Q    Were you generating these reports as part of
24 your internal mechanisms?
25 A    Yes. They come up on what we call a diary

---

### Page 39

1  system, every 30 days, or whatever the company may
2  request. They come up on our internal diary list and we
3  have to do a report, and that's the insured's --
4  insurance company's opportunity to say, "Gee, we don't
5  need anymore of these reports. We don't need your
6  assistance anymore. You may close your file," but until
7  I get that telephone call or it becomes blatantly
8  obvious to me that no further work is required.
9  Q    Okay. Cause of Loss on the Eighth Report is
10 the same as it was on the previous seven reports?
11 A    That is correct.
12 Q    All right. Now your Ninth Report is on page 74
13 of Exhibit No. 1, and it's dated August 2nd, 2001.
14 A    Yes.
15 Q    Is that correct?
16 A    Yes.
17 Q    It's exactly the same as Six, Seven and Eight?
18 A    That's correct.
19 Q    Cause of Loss is exactly the same --
20 A    Correct.
21 Q    -- is that right? Your Tenth Report is on page
22 36 of Exhibit No. 1.
23 A    Okay.
24 Q    A few of these are out of order.
25 A    Okay. No problem.

---

### Page 40

1  Q    All righty. And this says Tenth and Final
2  Report; is that right?
3  A    Correct.
4  Q    It's dated August 8th, 2001.
5  A    That's correct.
6  Q    Does this mean you are closing your file?
7  A    Yes. We received a telephone call from someone
8  at the CNA office. Evelyn Fisk, who had assigned the
9  loss to us, called and said that I could close my file,
10 there was no longer any need for us to maintain an open
11 file.
12 Q    Okay.
13 A    At which time I generated this closing report.
14 Q    It says, "CC: Mr. Bill Knarr." Who is Mr.
15 Bill Knarr?
16 A    He is our property supervisor in the Houston
17 branch.
18 Q    Of GAB Robins?
19 A    Of GAB Robins, that's correct.
20 Q    Now differences between this and the previous
21 reports, is it has an enclosures at the beginning,
22 photographs of risks -- or excuse me, risk and damage.
23 A    Correct.
24 Q    Would there be -- those be the photographs that
25 you took on March 6th, 2001?

---

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

### Page 41

1  A   They were. They were looked at by Mr.
2  Rudzitis. He was going to take them with him when he
3  left. For some reason they were left in my file and
4  they were in the back of the file, and I thought while I
5  was closing the report, since those are the possession
6  of the insurance company, I better forward them at that
7  time.
8  Q   Okay. And that would have been on March 13th,
9  2001 when he looked at those?
10  A   That's correct.
11  Q   Okay. Did you ever see Mr. Rudzitis or Mr.
12  Dudek after March 13th, 2001?
13  A   No. I never met Mr. Dudek at all.
14  Q   Okay. Cause of Loss on Tenth and Final Report
15  is again, "The hinge pin of a second floor toilet fill
16  valve worked itself loose, causing the tank to
17  overflow"?
18  A   Correct.
19  Q   Any other changes or any changes to the report,
20  other than the exhibits, enclosures and then future
21  handling, saying our file is now closed?
22  A   No. There was, I think, an addition here of
23  Steven Burke is the attorney at a law firm that was
24  handling the subrogation possibility. I don't know
25  where that jumped in there. That may have been during a

### Page 42

1  previous report also, but --
2  Q   You are correct. It shows up on No. Nine, it
3  shows up on No. Eight. No. Eight was the first time
4  that it shows up and Report No. Eight was dated July
5  3rd, 2001.
6  A   That was based on a telephone call on July 2nd
7  from Steven Burke, who identified himself as a CNA
8  subrogation attorney.
9  Q   So the lawyer from CNA contacted you about the
10  loss?
11  A   Correct. He left a message for me. I returned
12  his call the same day and gave him Evelyn Fisk's
13  telephone to reach Bob Dudek, since I was not handling
14  the claim and he wanted to talk about it in depth. I
15  had no knowledge of what he wanted to talk about, and I
16  referred him to the CNA GA who was working the file.
17  Q   Did he ask you about your initial
18  investigation?
19  A   No, sir.
20  Q   Did he do anything other than to identify who
21  he was and to ask you some general questions?
22  A   No, that's all he did actually.
23  Q   Do you know if he had in his possession copies
24  of your reports that you had sent to CNA?
25  A   I have no way of knowing that.

### Page 43

1  Q   Did he discuss those with you?
2  A   No.
3  Q   Did he ask you what you saw and what you found
4  when you first went out there on March 6th, 2001?
5  A   No, he did not.
6  Q   He just said, "Hey, I'm a lawyer," and you
7  referred him to someone else?
8  A   Correct.
9  Q   You probably do that often when lawyers call
10  you.
11  A   As often as I can.
12  Q   I don't think anyone would blame you for doing
13  that whatsoever.
14        Let's talk for a moment about this hinge
15  pin that worked itself loose. You determined that that
16  was the cause of the loss based on the information you
17  were given by Valley Diagnostic?
18  A   Yes.
19  Q   If you look at Exhibit No. 2, which is the
20  photograph, do you see a small tab on the top of the arm
21  next to the pin? If you need to --
22  A   Are you talking about this little outcropping
23  of plastic?
24  Q   Yes.
25  A   Yes, I do see it.

### Page 44

1  Q   And can you show that to the ladies and
2  gentlemen of the jury?
3  A   You are talking about little outcropping of
4  plastic right here?
5  Q   No, I'm not.
6  A   Okay.
7  Q   I'm talking about this little outcropping of
8  plastic --
9  A   Oh, I'm sorry.
10  Q   -- right there.
11  A   Sorry. In the wrong place. Yes, right there.
12  It's hard to see it upside down.
13  Q   And do you know what the purpose of that little
14  outcropping of plastic is?
15  A   No, I do not.
16  Q   If I were to tell you that that little
17  outcropping of plastic normally has another little piece
18  of plastic that comes down to keep that pin in place,
19  would you have any reason to disagree with me?
20  A   No.
21  Q   Would you agree with me that if the maintenance
22  personnel at Valley Diagnostic were regularly
23  maintaining that toilet, they would have been able to
24  see that little pin working itself loose?
25  A   I don't know. I would think so.

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

## Page 45

1    Q    Would you agree with me that if maintenance
2  personnel at Valley Diagnostic had broken off that
3  little keeper tab that keeps that pin in place, they
4  should have known that there was the potential for that
5  pin to work itself loose?
6    A    Are you saying if they had done that --
7    Q    If they had done that.
8    A    -- that this may have happened?  Yes, I would
9  agree that it's possible.
10    Q    Would you agree that if they had done that,
11  that they should have just replaced the little 4 or $5
12  plastic part that allowed the water to flow up into the
13  toilet?
14    A    If they have more knowledge than I do of flush
15  valves, obviously they -- they should have.
16    Q    And you would assume that someone who is
17  maintaining flush valves would have more knowledge than
18  you do of flush valves?
19    A    I would hope so.
20    Q    Yes.  Certainly they should, at a minimum; you
21  would agree with that, would you not?
22    A    Yes.
23    Q    At any point in time during the five months
24  that you were generating reports and having periodic
25  contact with the clinic and with CNA or Transcontinental

## Page 46

1  Insurance did anyone say anything to you about a crack
2  in the tube?
3    A    No, sir.
4    Q    Do you know how long that toilet had been
5  installed?
6    A    No, sir.
7    Q    Did anyone tell you about when the toilet was
8  installed?
9    A    No, sir.
10    Q    Did anyone tell you when the toilet was
11  manufactured?
12    A    No, sir.
13    Q    The evidence has shown that this toilet was
14  manufactured in 1983 and then it was installed in the
15  clinic when that portion of the clinic was built out in
16  1990 or 1991.
17    A    Okay.
18    Q    Did anyone from the clinic or anyone else you
19  talked to from the insurance company ever tell you where
20  was the toilet during the seven or eight years between
21  the time it was manufactured and the time it was
22  installed?
23    A    No, sir.
24    Q    Do you have any knowledge regarding the history
25  of this toilet, other than the fact that it was sitting

## Page 47

1  in the clinic and a pin worked itself loose?
2    A    No, sir, that's all I know about it.
3    Q    Would you agree with me that it's important for
4  a commercial institution to have a regular maintenance
5  program for all mechanical pieces of equipment that it
6  has?
7    A    I think that's a safe assumption.
8    Q    Is it a safe assumption to say that that should
9  include toilets?
10    A    Yes.
11    Q    Would you agree with me that products over
12  time, especially products that are 15, 16, 17, 18 years
13  old, due to normal use can wear out?
14    A    Yes.
15    Q    As part of a good and reasonable maintenance
16  program, do you think that a maintenance department,
17  with people skilled in the areas of plumbing, should be
18  looking at products to see if they're deteriorating
19  through normal wear and tear?
20    A    Yes.
21    Q    Do you think a product that deteriorates
22  through normal wear and tear is necessarily defective?
23    A    No.
24    Q    It's something that should be expected,
25  shouldn't it?

## Page 48

1    A    Yes.
2    Q    So you would agree that maintenance is very
3  important and that a preventative approach to
4  maintenance rather than a reactive approach is much
5  better?
6    A    Yes.
7    Q    Do you think in determining what may have
8  caused a loss it's important to determine all of the
9  stresses that this particular product may have
10  undergone?
11    A    Certainly.
12    Q    And in order to know what caused a failure or a
13  break or a loss, do you think it's important to know the
14  complete history of that product?
15    A    Certainly.
16    Q    Did CNA ask you to do any type of research to
17  determine any of those things, a complete history,
18  stresses, anything of those nature?
19    A    No, sir.
20    Q    Do you believe that it's reasonable for a
21  manufacturer to rely upon the information provided to it
22  regarding a particular material by the manufacturer of
23  that material?
24    A    Yes.
25    Q    It's just one of those common sense, normal

## Page 49

1 things, don't you think?
2    A   Yes.
3    Q   Have you investigated water loss claims before
4 this one?
5    A   Yes.
6    Q   Involving toilets?
7    A   Yes.
8    Q   Okay. Tell me about those.
9    A   Generally they're in homeowner situations and
10 some of them are in commercial situations. A lot of
11 times they involve a sticking of the valve, this
12 particular flush type valve or some other similar type
13 valve. Many times it's a worn out part. Many times
14 it's an improperly installed part. The homeowner has
15 taken it upon themselves to put a valve in and it's not
16 installed correctly or it's not installed properly at
17 the base and it's leaking from the bottom, the supply
18 lines are not hooked up correctly. We have for a large
19 variety of things. Or the toilet itself is backing up
20 because of a sewage problem, unrelated to the toilet
21 function itself, but it still stems from the toilet. So
22 we have a variety of these things.
23    Q   So your inspection of this toilet and this loss
24 was not your first rodeo, so to speak?
25    A   No, sir, it was not.

## Page 50

1    Q   And when you went in there, you went in with
2 that background of having investigated previous losses
3 to look to see what was the cause of this loss?
4    A   Uh-huh.
5    Q   Is that right?
6    A   That's correct.
7    Q   And when you went there you listened to what
8 the people from Valley Diagnostic had to say, and then
9 based on that, plus your visual inspection of the
10 toilet, you determined the cause of the loss was that
11 pin working itself loose?
12    A   That's correct.
13       MR. HOLIDY:   Well, sir, I believe those
14 are the questions I have for you at this time.
15       THE WITNESS:   Okay.
16       MR. HOLIDY:   And I appreciate your time.
17              EXAMINATION
18 BY MR. C. WESLEY VINES:
19    Q   Sir, I have just a couple of questions. First
20 of all, by the second visit you were no longer the,
21 quote, "main adjuster" on this file?
22    A   That's correct.
23    Q   Okay. And you weren't at any time out there
24 truly trying to investigate the cause of this loss, were
25 you?

## Page 51

1       MR. HOLIDY:   Objection, leading.
2    A   I was out there to meet with the insured and
3 initially help them in direction to get them started
4 with their repairs and see if I could assist them in any
5 way in the selection of people to help them with those
6 repairs.
7    Q   (By Mr. Vines) I believe you testified that
8 you were out there to check on the seriousness of this
9 loss.
10    A   Correct.
11       MR. HOLIDY:   Objection, leading.
12    Q   (By Mr. Vines) Did you understand your role
13 was to investigate the cause of the loss?
14    A   Not necessarily, no
15    Q   Are you an expert plumber?
16    A   No, I am not.
17    Q   In fact, until you were told by counsel that
18 there was supposedly some piece missing from that valve,
19 you didn't even know such a piece existed, did you?
20    A   No, sir, I did not.
21       MR. HOLIDY:   Objection, leading.
22    Q   (By Mr. Vines) Okay. You're being asked a
23 whole bunch of questions about your attitudes and
24 opinions about things. You were asked whether or not
25 you believe that one should expect that things wear out

## Page 52

1 over time, and you said that you hold that opinion,
2 correct?
3    A   That's correct.
4    Q   Okay. Tires wear out over time, don't they?
5    A   Yes, sir.
6    Q   What if -- what if you bought a brand new set
7 of tires and they wore out in the first month and you
8 were told that because when they get wet they wear out,
9 would you accept that as reasonable?
10    A   No, sir.
11    Q   What if you were told that you have a plumbing
12 product and its internal parts, the parts that keep the
13 water contained, wear out when they're exposed to water?
14       MR. HOLIDY:   Objection.
15    A   That would be beyond my expectation also.
16    Q   (By Mr. Vines) Yeah.
17       MR. HOLIDY:   Misstates facts in evidence.
18    Q   (By Mr. Vines) What if you are told that, you
19 know, if there's chlorine or other things that are
20 commonly in the water supply here in Harlingen, that
21 they just plum wear out?
22    A   That's also unexpected.
23       MR. HOLIDY:   Objection, misstates facts in
24 evidence.
25    Q   (By Mr. Vines) If you bought a car and --

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

## Page 53

1 from, let's say, any -- any automobile, let's say Ford,
2 if you buy a Ford and one of its parts breaks down and
3 you think it -- the part is defective, would you accept
4 it if Ford told you, "Well, hey, you know, we just
5 relied on the component maker. You got to go talk to
6 them. It's not our fault."
7    A    No, I wouldn't accept that.
8        MR. HOLIDY:    Objection, assumes facts not
9 in evidence.
10    Q    (By Mr. Vines) Okay. Do you -- because I was
11 listening pretty closely, and I know that you met with a
12 number of people out there, but do you have an actual
13 recollection of who specifically first mentioned to you
14 this hinge pin?
15    A    No. No. As I said, I was reading from my file
16 notes or activities notes at the time. And I even
17 noticed that Ruben Flores was later identified in my
18 reports as the head of radiology, not head of
19 maintenance. So it's been two years plus and the name
20 was familiar only because of my file note. So whether
21 he was the director of maintenance or the head of
22 radiology, I really couldn't tell you. I would suspect
23 that he's probably the head of radiology. But at the
24 moment, when you walk in, you have a variety of people
25 talking at you at the same time, usually everybody

## Page 54

1 wanted to get their opinion as to what's the most
2 important thing you should be doing while you're walking
3 through the water. So names do get confused. Unless I
4 get business cards from people and can then put faces
5 with the business cards, it's difficult to keep the
6 names straight.
7        MR. HOLIDY:    Objection, nonresponsive.
8    Q    (By Mr. Vines) As we sit here today, you don't
9 know that it was Ruben Flores who mentioned the hinge
10 pin to you?
11    A    Not necessarily, sir. That was the name I
12 wrote down, but I assumed that that was the person I
13 heard it from, but it's not necessarily a fact.
14    Q    And if you don't know who told it to you, would
15 you have any way of knowing the source of the
16 information of the person who mentioned this hinge pin
17 to you?
18    A    Where he got his information from, no, sir, I
19 don't.
20        MR. VINES:    That's all I have.
21        FURTHER EXAMINATION
22 BY MR. HOLIDY:
23    Q    Mr. Nickoloff, that first meeting where -- that
24 you attended at the clinic, you said that the persons
25 present were from Valley Diagnostic Clinic, All Valley

## Page 55

1 Restoration and Belfor; is that right?
2    A    Correct. And as I said, there were other
3 people sitting at the table. I don't -- there was maybe
4 14 people in the room, so...
5    Q    Is was your understanding that the people who
6 told you about the hinge pin working itself loose were
7 from the clinic; is that right?
8    A    My assumption was, yes, they were.
9    Q    And then you also had an opportunity to look at
10 the toilet yourself; is that right?
11    A    Let me just explain. The inspection of the
12 toilet was I stepped into the bathroom, I took the
13 picture that you saw, stepped out of the bathroom,
14 because I was being escorted through the building at a
15 rapid rate. So my inspection of the building -- of the
16 toilet itself was about 30 seconds.
17        MR. HOLIDY:    Objection, nonresponsive.
18    Q    You were in there long enough to take a picture
19 and to look to see what was the cause of the leak,
20 right?
21    A    That's correct.
22    Q    And based on what representatives from the
23 clinic had told you and from what you saw, you
24 determined the cause of the leak was the hinge pin
25 working itself loose?

## Page 56

1    A    Reporting as they had told me, yes, that's
2 correct.
3        MR. HOLIDY:    Thank you, sir.
4        FURTHER EXAMINATION
5 BY MR. VINES:
6    Q    Well, a couple of follow-ups. You accepted the
7 causation as understood and as given to you from someone
8 else; is that correct?
9    A    That's correct.
10    Q    You didn't independently come to a
11 determination as to the cause of this loss, did you?
12    A    That's correct.
13        MR. HOLIDY:    Object to the form.
14    Q    (By Mr. Vines) You spent 30 seconds looking at
15 this toilet?
16    A    Approximately.
17        MR. VINES:    Okay. That's all I have.
18        VIDEOGRAPHER·    Off record. 11:26.
19
20        ******************
21        Signature waived
22        ******************
23
24
25

## Page 57

```
 1   COUNTY OF HARRIS )
 2   STATE  OF  TEXAS )
 3                   REPORTER'S CERTIFICATE
 4          I, SUSAN A. SWANTNER, Certified Shorthand
 5   Reporter in and for the State of Texas, hereby certify
 6   that this transcript is a true record of the testimony
 7   given.
 8          I further certify that I am neither attorney
 9   nor counsel for, related to, nor employed by any of the
10   parties to the action in which this testimony was taken.
11   Further, I am not a relative or employee of any attorney
12   of record in this cause, nor do I have a financial
13   interest in the action.
14          Subscribed and sworn to on this the 8th day of
15   September, 2003.
16                   _____
17                   SUSAN A. SWANTNER
18                   Certified Shorthand Reporter
19                   In and for the State of Texas
20   Certification No. 2150
21   Expiration Date:  12-31-2004
22
23
24
25
```

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

TRANSCONTINENTAL INSURANCE        \
COMPANY                           \
              Plaintiff,        \
                      \
VS.                               \CIVIL ACTION NO.B-02-205
                      \
AMERICAN STANDARD, INC.,          \
              Defendant.        \

**********************************
EXHIBIT VOLUME TO
THE VIDEOTAPED AND ORAL DEPOSITION OF
DENNIS NICKOLOFF
AUGUST 26, 2003
**********************************
(Exhibit Nos. 1 - 2)

Reported By:  Susan A. Swantner
Job No. 42357

# COPY

Sunbelt Reporting & Litigation Services
4545 Bissonnet, Suite 100      15150 Preston, Suite 300
Bellaire, Texas 77401          Dallas, Texas 75248
713 • 667 • 0763               214 • 747 • 0763
713 • 661 • 3838 (Fax)         972 • 401 • 9733 (Fax)
www.sunbeltreporting.com

ORAL DEPOSITION OF DENNIS NICKOLOFF

1                           INDEX

2                                              PAGE

3  APPEARANCES                                  3

4  PRELIMINARY PROCEEDINGS                       4

5  EXAMINATION BY MR. DALE M. "RETT" HOLIDY     4

6  EXAMINATION BY MR. C. WESLEY VINES           50

7  FURTHER EXAMINATION BY MR. HOLIDY            54

8  FURTHER EXAMINATION BY MR. VINES             56

9  REPORTER'S CERTIFICATE                       57

10                    *  *  *  *  *  *

11                       EXHIBIT INDEX

12  NUMBER               DESCRIPTION        PAGE MARKED

13  1            MR. NICKOLOFF'S ACTIVITY REPORT      5
               AND COMPLETE FILE
14
    2            PHOTOGRAPH OF COMMODE                25
15

16

17

18

19

20

21

22

23

24

25

**ORAL DEPOSITION OF DENNIS NICKOLOFF**
**August 26, 2003**

BSA                                                                                                      XMAX(1/16)

**Concordance Report**
Unique Words: **1,189**
Total Occurrences: **4,200**
Total Words In File:
**10,013**

Single File Concordance

Case Insensitive

Cover Pages = **3**

Includes **ALL** Text
Occurrences

Dates **ON**

Includes Pure Numbers

Possessive Forms **ON**

**\* \* DATES \* \***

**3/4/01** [1]
13:12
**12-31-2004** [1]
57:21

**\* \* $ \* \***

**$275,000** [1]
23:23
**$5** [1]
45:11

**\* \* 1 \* \***

**1** [24]
5:9, 11; 9:19; 14:1, 20, 21;
22:18; 23:4, 21, 22; 24:4;
25:5; 26:20; 28:8; 30:7;
31:8; 32:8; 36:5; 37:9, 16;
38:8, 16; 39:13, 22
**1039** [1]
10:16
**10:33** [1]
4:9
**11:26** [1]
56:18
**12-31-2004** [1]
57 21
**13th** [6]
16:2; 30:20; 33:21; 35:8;
41:8, 12
**14** [5]
5:25; 14:1; 22:17; 23:22;
55:4
**15** [6]
5:25; 23:4; 24:3; 26:10;
28:8; 47:12
**16** [1]
47:12
**16th** [1]
37:16
**17** [1]
47:12
**18** [1]
47:12

**19** [1]
10:8
**1983** [2]
6:10; 46:14
**1990** [1]
46:16
**1991** [1]
46:16
**1st** [1]
38:8

**\* \* 2 \* \***

**2** [8]
23:3; 24:4; 25:20, 22;
27:16; 31:7; 36:5; 43:19
**20** [1]
10:8
**2001** [24]
13:10; 15:12, 19, 21; 16:7;
22:22; 27:22; 30:7, 20;
32:7; 33:21; 35:5, 8; 37:8,
16; 38:8, 18; 39:13; 40:4,
25; 41:9, 12; 42:5; 43:4
**2003** [2]
18:25; 57:15
**21** [1]
32:22
**2150** [1]
57:20
**21st** [2]
15:12, 21
**22** [1]
30:7
**23** [1]
31:8
**23rd** [1]
30:7
**23th** [1]
31:5
**26th** [2]
18:24, 25
**27** [1]
5:2
**28** [1]
15:8
**2nd** [2]
39:13; 42:6

**\* \* 3 \* \***

**3/21** [1]
16:3
**3/4/01** [1]
13:12
**3/6** [2]
13:14; 14:20
**30** [5]
6:3; 32:8; 39:1; 55:16;
56:14
**30th** [1]
37:8

**33** [2]
15:2, 3
**36** [2]
13:6; 39:22
**3rd** [4]
32:7; 35:5; 38:18; 42:5

**\* \* 4 \* \***

**4** [2]
37:12; 45:11
**4,400** [1]
31:15
**4/3** [1]
32:21
**43** [1]
14:22
**44** [1]
14:22
**45** [1]
14:22
**49** [2]
25:5; 26:19
**4th** [1]
27:22

**\* \* 6 \* \***

**632** [1]
5:19
**64** [1]
35:8
**65** [1]
36:5
**66** [1]
37:8
**6th** [9]
13:22, 23; 14:5; 15:19;
16:1, 6; 25:9; 40:25; 43:4

**\* \* 7 \* \***

**70** [1]
37:15
**700** [1]
5:19
**72** [1]
38:7
**74** [1]
39:12
**76** [1]
38:15
**78550** [1]
5:20
**7th** [3]
13:24; 22:22; 31:5

**\* \* 8 \* \***

**817-291-4165** [1]
10:18
**83** [1]
5:12
**84** [1]

**5:15**
**8th** [3]
13:9; 40:4; 57:14

**\* \* 9 \* \***

**956-412** [1]
10:16
**956-453-5587** [1]
10:15

**\* \* A \* \***

**able** [2]
25:12; 44:23
**abstract** [1]
23:2
**accept** [3]
52:9; 53:3, 7
**accepted** [1]
56:6
**action** [2]
57:10, 13
**activities** [1]
53:16
**actual** [2]
37:5; 53:12
**actually** [2]
15:25; 42:22
**adam** [5]
10:15; 16:16; 33:23; 34:4,
13
**addition** [1]
41:22
**additional** [2]
18:4; 33:18
**addressing** [1]
33:23
**adjust** [2]
12:2, 3
**adjusted** [1]
9:8
**adjuster** [14]
4:23; 7:9; 8:4, 5; 12:2;
14:12, 16; 16:3; 17:9, 18;
30:9, 12; 33:10; 50:21
**adjusting** [3]
6:21; 32:4; 33:1
**adjustment** [5]
29:3; 32:1; 35:16; 36:24;
37:3
**advising** [2]
18:10; 22:3
**affirm** [1]
4:11
**after** [9]
13:15; 18:25; 21:17, 21;
22:6, 25; 26:24; 30:8; 41:12
**again** [4]
14:13; 35:9; 37:24; 41:15
**agent** [1]
33:12
**agree** [9]

**5:4; 44:21; 45:1, 9, 10, 21;**
47:3, 11; 48:2
**agreed** [1]
20:24
**allowed** [1]
45:12
**along** [2]
17:20; 34:16
**already** [2]
9:4; 11:10
**ambient** [1]
10:19
**amended** [1]
28:19
**america** [2]
4:24; 5:5
**american** [1]
4:18
**amount** [3]
7:19; 12:15, 16
**analysis** [2]
23:10, 15
**analyze** [1]
23:11
**another** [5]
7:13; 15:8; 30:20; 31:1;
33:25; 44:17
**anymore** [2]
39:5, 6
**anyone** [8]
17:1; 27:3; 43:12; 46:1, 7,
10, 18
**anything** [8]
11:23; 35:13, 14; 37:12;
38:4; 42:20; 46:1; 48:18
**apparently** [1]
11:20
**appears** [6]
15:9; 23:18; 35:8; 36:4;
38:10, 20
**applicable** [1]
23:7
**applies** [1]
23:12
**appraising** [1]
7:14
**appreciate** [2]
30:18; 50:16
**approach** [2]
48:3, 4
**approximately** [3]
5:25; 31:15; 56:16
**april** [4]
32:7; 35:5, 8; 37:8
**area** [5]
6:9; 11:6; 20:4, 5; 21:3
**areas** [2]
34:13; 47:17
**arm** [1]
43:20
**around** [3]
16:19; 23:6; 36:22
**arrangements** [1]

ORAL DEPOSITION OF DENNIS NICKOLOFF
**August 26, 2003**

BSA                                                                XMAX(2/17)

19:25
asked [10]
7:20, 21; 10:17, 21; 23:10, 19; 24:23; 27:8; 51:22, 24
assigned [1]
40:8
assignment [2]
9:11; 10:10, 22
assignments [1]
7:10
assist [5]
8:18; 11:20; 17:21; 22:14; 51:4
assistance [1]
39:6
assume [2]
36:13; 45:16
assumed [1]
54:12
assumes [1]
53:8
assuming [1]
25:16
assumption [3]
47:7, 8; 55:8
attended [1]
54:24
attitudes [1]
51:23
attorney [5]
31:23; 41:23; 42:8; 57:8, 11
august [4]
13:9; 18:23; 39:13; 40:4
automobile [1]
53:1
available [2]
7:16; 32:5
awhile [2]
18:9, 21

* * B * *

bachelor's [2]
6:2, 4
back [16]
9:13; 10:24; 12:10; 14:10, 12, 14; 16:6; 17:8; 18:9, 21; 22:1; 26:8, 9; 36:11; 37:24; 41:4
background [3]
5:17; 6:1; 50.2
backing [1]
49:19
base [1]
49:17
based [11]
19:12; 23:24; 24:1; 26:10, 28:11, 14; 32:22; 42:6; 43:16; 50:9; 55:22
basic [2]
24:2, 33:16
basically [11]
7:4, 10; 8:2, 11, 16; 10:22;

12:8; 21:17; 31:12; 33:3; 34:16
bathroom [2]
55:12, 13
become [2]
8:4; 37:23
becomes [1]
39:7
before [5]
5:16; 11:11; 35:4; 38:1; 49:3
begin [2]
5:16; 22:12
beginning [1]
40:21
behind [1]
34:16
being [3]
24:14; 51:22; 55:14
belfor [12]
10:17, 21; 11:13, 14, 15, 24; 21:6, 11, 19, 24; 29:9; 55:1
belfor's [4]
16:18; 20:12, 15; 21:2
believe [22]
13:19, 20, 23; 14:10, 12, 13; 16:3; 17:7, 18; 18:10; 20:11; 22:4; 26:4, 5; 27:7; 28:15; 34:22; 35:6; 48:20; 50:13; 51:7, 25
below [1]
24:1
best [3]
18:9; 19:15; 25:15
better [3]
7:1; 41:6; 48:5
between [6]
14:14; 31:5; 35:14; 37:12; 40:20; 46:20
beyond [1]
52:15
bid [1]
21:1
bill [2]
40:14, 15
bit [1]
13:1
blame [1]
43:12
blatantly [1]
39:7
bob [2]
37:22; 42:13
bolts [2]
36:23; 37:3
both [1]
37:6
bottom [1]
49:17
bought [2]
52:6, 25
box [1]

20:8
branch [1]
40:17
brand [1]
52:6
break [2]
8:15; 48:13
breaks [1]
53:2
brief [2]
22:4; 29:5
brings [1]
32:25
brockport [1]
6:5
broken [2]
7:23; 45:2
brought [2]
18:17, 20
building [30]
12:16; 14:14, 15, 17, 22; 15:7, 20; 16:4; 17:10, 21, 22; 18:13; 21:1; 23:7, 8; 24:19; 27:6, 24; 28:24, 25; 30:4, 19; 33:24; 34:3, 10, 12; 36:1; 37:6; 55:14, 15
built [1]
46:15
bunch [1]
51:23
burke [2]
41:23; 42:7
business [8]
6:21; 10:13; 12:17; 17:18; 23:8; 28:5; 54:4, 5
butcher [1]
30:19
buy [1]
53:2

* * C * *

call [8]
8:12; 22:6; 38:25; 39:7; 40:7; 42:6, 12; 43:9
called [2]
23:2; 40:9
came [3]
6:13; 22:1; 27:23
camera [1]
26:3
caption [1]
35:16
car [1]
52:25
cards [3]
17:19; 54:4, 5
carey [1]
5:19
case [1]
23:13
causation [1]
56:7

cause [31]
8:6, 9, 13, 18; 12:7; 24:4, 6, 20; 26:14, 21; 27:15; 28:17; 31:8; 32:8; 34:20; 35:9; 37:9; 38:1, 13; 39:9, 19; 41:14; 43:16; 50:3, 10, 24; 51:13; 55:19, 24; 56:11; 57:12
caused [2]
48:8, 12
causing [4]
25:3; 31:14; 35:11; 41:16
cc [1]
40:14
ceiling [2]
18:14; 19:21
certainly [5]
9:20; 20:22; 45:20; 48:11, 15
certificate [1]
57:3
certification [1]
57:20
certified [2]
57:4, 18
certify [2]
57:5, 8
change [2]
37:19; 38:2
changed [5]
28:16; 31:19; 35:14; 37:12; 38:4
changes [3]
31:25; 41:19
check [3]
10:20; 12:24; 51:8
chlorine [1]
52:19
chose [1]
36:17
claim [14]
7:19; 8:2; 9:8; 12:2, 3, 12; 17:14, 15; 19:11; 31:21; 36:21; 37:1, 24; 42:14
claims [2]
7:12, 24; 49:3
clean [1]
10:16
cleaned [2]
11:19; 21:5
clear [1]
26:1
clinic [19]
8:24; 9:1; 14:4, 7; 18:8; 21:22; 26:12; 30:10; 33:21; 34:25; 45:25; 46:15, 18; 47:1; 54:24, 25; 55:7, 23
close [3]
33:3; 39:6; 40:9
closed [1]
41:21
closely [1]
53.11

closing [3]
40:6, 13; 41:5
cna [27]
8:21; 10:11, 12; 16:2; 17:14; 22:3, 6, 11, 14; 29:17; 30:1, 9; 31:19; 32:3, 25; 35:24; 36:14, 20; 37:18; 40:8; 42:7, 9, 16, 24; 45:25; 48:16
cna's [3]
14:11, 16; 17:8
collapse [1]
18:15
color [1]
25:24
come [7]
21:11; 22:12; 32:15; 35:21; 38:25; 39:2; 56:10
comes [1]
44:18
comment [2]
27:7; 28:22
commercial [2]
47:4; 49:10
commode [1]
24:20
common [1]
48:25
commonly [1]
52:20
communication [1]
17:19
companies [1]
7:11
company [14]
7:19, 23, 25; 8:21; 11:14, 21; 12:11; 23:11; 32:18; 33:13, 15; 39:1; 41:6; 46:19
company's [2]
32:23; 39:4
complete [4]
9:21; 23:10; 48:14, 17
completed [1]
29:23
component [1]
53:5
concern [3]
20:1, 8; 33:22
concerned [1]
20:5
concerning [1]
27:18
concludes [1]
7:23
conclusion [1]
7:17
confused [1]
54:3
connection [1]
11:7
consisting [1]
5:12
consists [1]

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

BSA    XMAX(3/18)

7:13
construction [1]
35:17
contact [3]
16:14; 36:6; 45:25
contacted [4]
8:20; 11:11; 18:12; 42:9
contained [1]
52:13
contents [1]
23:7
continuing [2]
33:1; 36:19
contractor [1]
29:22
contractors [1]
30:3
conversation [2]
36:13, 15
coordinate [1]
10:21
copies [1]
42:23
copy [5]
5:11; 9:22; 13:3, 20; 32:16
correct [77]
4:25; 5:6, 22; 8:22, 25; 9:3;
11:2, 12; 13:10, 16, 19, 25;
14:2; 15:13, 22; 16:9, 25;
18:2, 5; 19:9, 14, 18, 23;
22:13, 23; 23:1, 20, 25;
25:8; 26:17; 27:1, 17, 23;
29:16; 30:10, 11, 22; 31:6,
9, 22; 32:6, 12; 34:6; 35:3,
11, 12; 37:5, 11, 17; 38:14,
19, 22; 39:11, 15, 18, 20;
40:3, 5, 19, 23; 41:10, 18;
42:2, 11; 43:8; 50:6, 12, 22;
51:10; 52:2, 3; 55:2, 21;
56:2, 8, 9, 12
correctly [2]
49:16, 18
counsel [2]
51:17; 57:9
county [1]
57:1
couple [2]
50:19; 56:6
course [3]
8:10; 20:9; 28:16
court [3]
4:2; 5, 10
coverage [7]
23:3, 6, 7, 9, 11, 12, 14
crack [1]
46:1
create [1]
15:17
created [1]
15:14
creating [2]
19:6, 7
crew [1]

10:16
current [1]
28:14
cut [1]
18:18
cutting [1]
6:25

* * D * *

dale [1]
4:16
dallas [1]
31:23
damage [6]
12:15; 14:4; 19:21; 29:2;
36:8; 40:22
damaged [1]
21:1, 5
damages [3]
7:14; 33:25; 37:5
damp [1]
20:2
date [8]
13:11, 13; 15:14, 19, 24;
16:4; 35:4; 57:21
dated [12]
13:24; 15:12; 22:22; 32:7;
35:8; 37:8, 16; 38:8, 18;
39:13; 40:4; 42:4
dates [1]
13:20
day [9]
5:8; 14:3, 6; 22:2, 4, 25;
32:22; 42:12; 57:14
days [4]
13:15; 14:7; 26:24; 39:1
decisions [1]
12:11
defective [2]
47:22; 53:3
degree [2]
6:2, 4
dennis [1]
4:20
department [5]
10:14; 17:2; 27:12; 31:17;
47:16
deposition [3]
5:11, 14; 25:22
depth [1]
42:14
description [2]
28:24; 29:5
detailed [2]
22:15; 35:17
deteriorates [1]
47:21
deteriorating [1]
47:18
determination [2]
29:2; 56:11
determine [10]

8:14; 11:19; 12:19; 21:7,
12; 24:5; 25:13; 26:21;
48:8, 17
determined [5]
28:16; 29:15; 43:15; 50:10;
55:24
determining [2]
8:18; 48:7
diagnostic [12]
8:24; 26:12; 27:3; 30:9;
36:6, 16, 20; 43:17; 44:22;
45:2; 50:8; 54:25
diagram [5]
15:8, 10, 12, 15; 16:5
diagramed [1]
16:4
dialogue [1]
36:19
diary [3]
32:22; 38:25; 39:2
differences [1]
40:20
different [1]
34:13
difficult [1]
54:5
direction [2]
36:25; 51:3
directly [1]
20:4
director [2]
16:13; 53:21
disagree [1]
44:19
discovered [2]
27:21; 28:3
discovering [1]
18:11
discuss [1]
43:1
discussed [1]
20:23
discussion [4]
4:6; 23:5; 24:15; 34:23
discussions [2]
21:21; 34:20
document [1]
22:20
documents [1]
23:11
doing [10]
7:5; 12:18; 17:19; 18:13;
19:8; 32:4; 34:14; 43:12;
54:2
done [13]
6:3; 9:6; 19:20; 21:22;
23:15; 28:21; 33:11, 16;
36:8; 45:6, 7, 10
down [11]
6:13; 14:17; 17:11; 18:4;
20:3; 22:12; 28:7; 44:12,
18; 53 2; 54:12
drawing [5]

14:23, 25; 15:4, 5; 34:25
drawn [2]
14:17
drive [2]
5:19; 20:11
dropping [2]
6:22, 24
dudek [5]
37:22, 25; 41:12, 13; 42:13
due [1]
47:13
duplicated [2]
15:11; 38:3
during [5]
25:9; 31:4; 41:25; 45:23;
46:20

* * E * *

each [1]
31:16
earlier [1]
9:24
early [1]
27:22
ed [1]
5:19
edge [1]
36:23
education [2]
6:19, 20
educational [1]
6:1
eight [5]
39:17; 42:3, 4; 46:20
eighth [2]
38:15; 39:9
either [3]
24:13, 14; 36:14
eliminate [1]
19:21
eliminating [1]
11:21
emergency [1]
18:14
employed [4]
4:21, 22; 5:1; 57:9
employee [3]
27:23, 25; 57:11
enclosures [2]
40:21; 41:20
end [1]
7:1
english [1]
6:19
enough [1]
55:18
enrollment [2]
6:22, 24
entity [1]
21:11
equipment [7]
19:22; 21 2, 7, 12; 28:13;

36:9; 47:5
escorted [1]
55:14
especially [1]
47:12
estimate [6]
7:22; 29:21; 30:4; 35:18,
21, 23
estimates [1]
7:15
evaluate [1]
36:8
evaluation [1]
21:23
evelyn [2]
40:8; 42:12
even [3]
36:14; 51:19; 53:16
event [2]
8:11; 33:17
ever [4]
6:11; 17:4; 41:11; 46 19
every [1]
39:1
everybody [1]
53:25
everyone [1]
10:21
evidence [5]
7:16; 46:13; 52:17, 24; 53:9
ex [1]
33:16
exact [2]
37:9; 38:1
exactly [1]
24:16; 28:6; 29:5; 38:10,
13, 20; 39:17, 19
examination [4]
4:15; 50:17; 54:21; 56:4
excuse [8]
5:15; 13:2; 16:18; 30:3, 11,
37:13; 38:5; 40:22
executive [5]
14:11; 16:13; 22:8; 30:1, 8
exhibit [28]
5:9, 11, 9:18; 13:5; 14:1,
21; 22:18; 23:4, 22; 24:3;
25:5, 20, 22; 26:20; 28:8;
30:7; 31:8; 32:8; 36:5; 37:9,
12, 15; 38:4, 8, 15; 39:13,
22; 43:19
exhibits [1]
41:20
existed [1]
51:19
expect [1]
51:25
expectation [1]
52:15
expected [1]
47:24
expert [3]
8:13; 31:23; 51:15

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

BSA                                                                                    XMAX(4/19)

**expertise [3]**
8:12; 20:20; 21:3
**experts [5]**
29:9, 12; 32:1; 36:4, 8
**expiration [1]**
57:21
**explain [2]**
24:9; 55:11
**explaining [1]**
34:13
**exposed [1]**
52:13
**extracting [1]**
18:13

---

**＊ ＊ F ＊ ＊**

---

**faces [1]**
54:4
**facility [1]**
9:4
**facsimile [1]**
10:11
**fact [3]**
46:25; 51:17; 54:13
**facts [3]**
52:17, 23; 53:8
**failure [1]**
48:12
**fair [2]**
19:10; 31:5
**fairness [1]**
37:2
**falling [1]**
19:21
**familiar [4]**
9:4; 17:6, 10; 53:20
**fashion [1]**
7:13
**fault [1]**
53:6
**fed [1]**
33:15
**federal [1]**
4:2
**feet [1]**
31:16
**few [3]**
19:5; 39:24
**field [1]**
35:20
**fifth [1]**
37:7
**file [24]**
5:12; 9:24; 13:3, 4, 19;
19:13; 22:9, 33:4, 6, 17;
37:19, 21, 25; 39:6; 40:6, 9,
11; 41:3, 4, 21; 42:16;
50:21; 53:15, 20
**files [1]**
10:19
**fill [5]**
25:2, 17; 31:14; 35:10;

**41:15**
**films [6]**
10:19; 11:18; 20:2, 16;
21:24; 29:10
**final [4]**
13:8, 9; 40:1; 41:14
**financial [1]**
57:12
**find [3]**
7:2; 10:23; 12:24
**finding [2]**
12:9; 17:21
**fine [2]**
9:17; 10:3
**finished [1]**
33:7
**fire [1]**
8:12
**firm [2]**
31:23; 41:23
**first [22]**
13:24; 14:3, 20; 16:1; 17:7;
22:21, 24; 23:21; 24:4, 8;
26:9; 27:15, 16; 29:19;
31:12; 42:3, 43:4; 49:24;
50:19; 52:7; 53:13; 54:23
**fisk [1]**
40:8
**fisk's [1]**
42:12
**five [3]**
6:23; 37:13; 45:23
**flooded [1]**
31:15
**floor [4]**
25:2; 31:13; 35:10; 41:15
**floors [1]**
31:16
**flores [9]**
16:16, 22; 17:24; 24:17;
26:13; 27:2; 28:1; 53:17;
54:9
**flow [1]**
45:12
**flush [4]**
45:14, 17, 18; 49:12
**follow-ups [1]**
56:6
**follower [1]**
34:18
**following [3]**
22:2; 24:5; 29:18
**footprint [6]**
14:16, 19, 22; 15:6, 20;
34:25
**ford [3]**
53:1, 2, 4
**foreign [1]**
6:19
**form [3]**
7:18; 10:10; 56:13
**formal [1]**
17:19

**fort [1]**
20:14
**forward [1]**
41:6
**found [3]**
19:16; 38:7; 43:3
**four [6]**
6:23; 18:3; 34:2, 9; 35:7;
37:13
**fourth [1]**
35:14
**friend [1]**
7:2
**from [37]**
6:7; 7:10; 8:12; 9:2; 10:11;
16:18; 17:1; 20:2, 5; 21:1;
22:1, 6; 30:1, 9; 33:12;
34:12; 35:20; 38:3; 40:7;
42:7, 9; 46:18, 19; 49:17,
21; 50:8; 51:18; 53:1, 15;
54:4, 13, 18, 25; 55:7, 22,
23; 56:7
**frown [1]**
9:25
**full [1]**
4:19
**function [1]**
49:21
**further [12]**
19:21; 20:24; 22:12, 15;
26:20; 28:7; 33:8; 39:8;
54:21; 56:4; 57:8, 11
**future [3]**
29:20; 32:3; 41:20

---

**＊ ＊ G ＊ ＊**

---

**ga [5]**
14:11; 29:24; 30:1; 36:14;
42:16
**gab [8]**
4:22; 5:1, 3, 4; 6:13; 7:4;
40:18, 19
**garcia [5]**
10:15; 16:16; 33:23; 34:4,
13
**gas [1]**
22:8
**gather [1]**
22:11
**gathering [1]**
7:15
**gave [1]**
42:12
**gee [1]**
39:4
**general [9]**
14:12; 16:2; 17:18; 18:6;
19:19; 30:9, 12; 36:24;
42:21
**generally [2]**
8:10; 49:9
**generate [1]**

**33:2**
**generated [2]**
30:6; 40:13
**generating [2]**
38:23; 45:24
**gentlemen [6]**
7:8; 22:19; 26:2; 31:11;
32:15; 44:2
**give [3]**
4:12; 23:12; 25:21
**given [6]**
9:12; 26:11; 27:18; 43:17;
56:7; 57:7
**glad [1]**
25:18
**go [9]**
8:8; 10:6, 12, 18, 22; 11:1;
16:6; 34:14; 53:5
**goes [1]**
19:7
**going [26]**
5:10; 7:13; 12:6, 11; 20:7,
11, 25; 21:2, 4, 11, 19, 22;
22:7, 12; 25:21; 26:9; 28:7;
29:23, 24; 34:14; 35:19, 21;
36:21, 25; 37:19; 41:2
**good [2]**
32:25; 47:15
**gotten [1]**
7:3
**graduate [2]**
6:16, 17
**group [5]**
14:10, 13; 16:7, 10; 34:18
**guess [1]**
25:15

---

**＊ ＊ H ＊ ＊**

---

**half [1]**
18:25
**hand [2]**
4:11; 5:10
**handle [4]**
7:12; 12:12; 31:20, 24
**handling [10]**
8:1; 17:14, 15; 29:20; 32:3;
37:19, 21; 41:21, 24; 42:13
**happen [1]**
17:11
**happened [8]**
8:11, 15; 10:23; 19:24;
22:3; 24:23; 31:4; 45:8
**happens [1]**
16:21
**hard [1]**
44:12
**harlingen [4]**
5:19; 8:24; 11:5; 52:20
**harris [1]**
57:1
**having [4]**
36:16, 19; 45:24; 50:2

**he's [1]**
53:23
**head [4]**
53:18, 21, 23
**heard [1]**
54:13
**help [9]**
10:18; 11:22; 12:2, 3; 13:1;
19:7; 25:23; 51:3, 5
**helpful [1]**
10:7
**helping [1]**
21:24
**hereby [1]**
57:5
**hey [2]**
43:6; 53:4
**him [8]**
17:6, 7, 21; 41:2; 42:12, 16;
43:7
**himself [2]**
16:15; 42:7
**hinge [15]**
25:1, 13; 26:4, 5, 13; 31:13;
32:11; 35:9; 41:15; 43:14;
53:14; 54:9, 16; 55:6, 24
**hired [2]**
31:20, 23
**history [3]**
46:24; 48:14, 17
**hold [2]**
26:1; 52:1
**holdy [18]**
4:3, 16, 17; 13:6; 50:13, 16;
51:1, 11, 21; 52:14, 17, 23;
53:8; 54:7, 22; 55:17; 56:3,
13
**holm [5]**
17:5; 27:2; 28:1; 34:7, 8
**holm's [1]**
17:12
**homeowner [2]**
49:9, 14
**honestly [2]**
4:11; 28:2
**hooked [1]**
49:18
**hope [1]**
45:19
**hopefully [1]**
25:22
**hours [2]**
6:3, 16, 17; 27:22
**houston [1]**
40:16

---

**＊ ＊ I ＊ ＊**

---

**identified [2]**
42:7; 53:17
**identify [1]**
42:20
**ill [2]**

*From expertise to ill*

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

37:23
**immediately** [1]
22:2
**important** [7]
18:17, 20; 47:3; 48:3, 8, 13;
54:2
**impression** [2]
21:18; 22:10
**improperly** [1]
49:14
**inc** [2]
4:22; 5:5
**incident** [3]
8:11; 12:7, 9
**include** [2]
8:5; 47:9
**incurred** [1]
37:5
**independently** [1]
56:10
**indicated** [2]
24:21; 27:11
**indicating** [1]
31:19
**information** [15]
5:17; 22:11; 23:14; 24:7;
26:11; 27:18; 28:12, 14;
29:6; 31:18; 38:2; 43:16;
48:21; 54:16, 18
**initial** [5]
17:23; 21:18; 22:11; 25:10;
42:17
**initially** [3]
18:7; 28:19; 51:3
**inspect** [1]
11:18
**inspection** [7]
24:2, 5; 26:25; 49:23; 50:9;
55:11, 15
**installed** [7]
46:5, 8, 14, 22; 49:14, 16
**instance** [1]
8:17
**institution** [1]
47:4
**instructions** [1]
10:13
**insurance** [15]
4:23; 7:11, 19, 23, 24; 8:21;
12:10; 23:10; 29:22; 30:3;
33:13; 39:4; 41:6; 46:1, 19
**insured** [19]
7:18; 8:10; 10:13, 23; 12:9;
15:1; 16:14; 17:20; 18:10;
20:6; 24:7, 9, 13; 28:12, 21;
29:1; 30:2; 33:12; 51:2
**insured's** [3]
12:17; 31:16; 39:3
**insureds** [2]
7:14, 21
**interest** [1]
57:13
**interests** [1]

7:12
**interim** [1]
31:4
**internal** [5]
32:17, 23; 38:24; 39:2;
52:12
**interruption** [2]
12:16; 23:8
**introduce** [1]
16:20
**introduced** [3]
7:4; 16:15, 24
**investigate** [1]
8:23; 50:24; 51:13
**investigated** [3]
19:3; 49:3; 50:2
**investigating** [4]
8:6, 8; 12:7; 14:8
**investigation** [11]
5:16; 12:18; 19:11; 21:25;
22:12, 15, 25; 25:10; 26:20;
30:21; 42:18
**investigations** [1]
7:20
**involve** [1]
49:11
**involved** [2]
28:15; 29:25
**involvement** [1]
21:10
**involving** [1]
49:6
**issues** [1]
23:6
**item** [1]
24:3
**items** [1]
21:1
**ivars** [1]
30:15

* * J * *

**job** [2]
8:5; 11:10
**jones** [2]
10:17; 16:18
**july** [3]
38:18; 42:4, 6
**jumped** [1]
41:25
**june** [1]
38:8
**jury** [6]
7:9; 22:19; 26:2; 31:11;
32:15; 44:2
**just** [27]
7:3; 8:2; 9:1; 11:17; 15:7,
10, 17; 17:20; 19:5; 23:23;
25:4; 28:24; 32:4, 20;
34:17, 25; 35:22; 36:17,
38:2; 43:6; 45:11; 48:25;
50:19; 52:21; 53:4; 55:11

* * K * *

**keep** [5]
26:7; 33:17; 44:18; 52:12;
54:5
**keeper** [1]
45:3
**keeps** [1]
45:3
**keith** [6]
17:4, 12; 27:2; 28:1; 34:7, 8
**kevin** [2]
10:17; 16:18
**knarr** [2]
40:14, 15
**knew** [3]
9:5; 22:5; 29:24
**know** [27]
11:5; 12:22; 15:18, 20;
19:7; 20:2, 19, 21; 27:25;
28:1; 35:22; 36:7, 10;
41:24; 42:23; 44:13, 25;
46:4; 47:2; 48:12, 13;
51:19; 52:19; 53:4, 11;
54:9, 14
**knowing** [2]
42:25; 54:15
**knowledge** [6]
29:14; 36:1; 42:15; 45:14,
17; 46:24
**known** [1]
45:4

* * L * *

**ladened** [1]
20:4
**ladies** [6]
7:8; 22:18; 26:2; 31:10;
32:14; 44:1
**language** [1]
37:9
**large** [6]
7:25; 14:10; 16:11, 21;
49:18
**last** [1]
16:3
**later** [3]
28:16, 19; 53:17
**law** [2]
31:23; 41:23
**lawsuit** [1]
4:18; 31:20
**lawyer** [2]
42:9; 43:6
**lawyers** [1]
43:9
**laying** [1]
30.5
**leading** [3]
51:1, 11, 21
**leak** [2]

55:19, 24
**leaking** [1]
49:17
**least** [3]
16:15; 36:18, 20
**left** [4]
21:17; 41:3; 42:11
**leg** [1]
33:11
**less** [2]
17:14, 20
**let** [2]
12:24; 55:11
**let's** [5]
16:6; 43:14; 53:1
**like** [10]
5:17; 6:24; 11:10; 22:17;
25:18; 28:9; 31:18; 32:3;
33:10; 37:18
**likely** [2]
24:15, 16
**limited** [2]
12:6, 8
**line** [1]
15:17
**lines** [1]
49:18
**list** [2]
32:21; 39:2
**listed** [1]
10:8
**listened** [2]
20:6; 50:7
**listening** [1]
53:11
**litigation** [1]
5:13
**little** [13]
13:1; 23:25; 26:1; 36:3;
43:22; 44:3, 7, 13, 16, 17,
24; 45:3, 11
**lived** [1]
6:11
**living** [1]
7:2
**locate** [1]
10:2
**located** [3]
5:18; 9:1; 11:5
**location** [4]
5:24; 20:13, 16; 24:22
**log** [1]
19:6
**long** [4]
5:1, 23; 46:4; 55:18
**longer** [2]
40:10; 50:20
**look** [14]
9:13; 13:3; 14:4; 21:2, 6,
12; 23:11; 35:21, 25; 36:17;
43:19; 50:3; 55:9, 19
**looked** [4]
6:24; 33:25; 41:1, 9

**looking** [9]
23:21; 25:5, 12; 26:18;
28:7; 31:7; 36:11; 47:18;
56:14
**looks** [5]
11:10; 28:9; 31:18; 32:3;
37:18
**loose** [14]
25:2, 14; 26:14; 31:14;
32:11; 35:11; 41:16; 43:15;
44:24; 45:5; 47:1; 50:11;
55:6, 25
**loss** [59]
7:17, 25; 8:6, 9, 13, 18, 23;
9:13; 12:3, 19, 20; 13:11,
12, 15, 17; 14:6, 8; 17:25;
18:11; 19:1; 21:15, 17;
23:12; 24:4, 6, 20; 26:14,
21, 24; 27:15, 19; 28:17,
25; 29:4; 31:8; 32:9; 34:21;
35:9; 37:3, 4, 9; 38:1, 13;
39:9, 19; 40:9; 41:14;
42:10; 43:16; 48:8, 13;
49:3, 23; 50:3, 10, 24; 51:9,
13; 56:11
**losses** [2]
19:3; 50:2
**lot** [2]
16:12; 49:10
**low** [1]
7:1

* * M * *

**machinery** [5]
10:20; 11:19; 18:15; 21:3, 5
**made** [8]
12:10, 11; 15:5; 16:12;
22:5; 26:24; 27:8; 28:21
**mail** [1]
33:14
**main** [1]
50:21
**maintain** [3]
27:11; 33:6; 40:10
**maintained** [2]
27:12; 28:12
**maintaining** [2]
44:23; 45:17
**maintains** [2]
27:9; 31:17
**maintenance** [18]
16:15, 22, 17:1, 25; 27:3, 7,
12; 28:20; 31:17; 44:21;
45:1; 47:4, 15, 16; 48:2, 4;
53:19, 21
**major** [1]
6:19
**make** [4]
7:2; 17:11; 20:6; 23:9
**maker** [1]
53:5
**making** [5]

ORAL DEPOSITION OF DENNIS NICKOLOFF
**August 26, 2003**

19:25; 22:8; 32:4; 34:15, 20
**man** [1]
17:4
**manufactured** [3]
46:11, 14, 21
**manufacturer** [2]
48:21, 22
**many** [5]
12:22; 14:7; 19:3; 49:13
**march** [20]
13:24; 14:5; 15:12, 18, 20;
16:1, 2, 6; 22:22; 25:9;
27:22; 30:6, 19; 31:5;
33:21; 40:25; 41:8, 12; 43:4
**mark** [1]
25:21
**marked** [4]
5:9, 10; 9:18; 25:20
**master's** [1]
6:2
**material** [3]
8:3; 48:22, 23
**may** [18]
8:12, 13; 16:19; 17:6, 9;
21:16; 27:8; 33:12; 34:8;
36:14, 15; 37:16; 39:1, 6;
41:25; 45:8; 48:7, 9
**maybe** [2]
13:3; 55:3
**mean** [8]
12:13; 15:6; 18:18; 23:3;
24:12; 28:23; 37:2; 40:6
**meaning** [1]
4:24
**means** [2]
5:4; 11:1
**measurements** [1]
14:15
**mechanical** [1]
47:5
**mechanisms** [1]
38:24
**meet** [7]
7:21; 8:10; 10:23; 17:1, 4;
30:2; 51:2
**meeting** [8]
7:14; 12:8; 14:9; 16:21;
17:7; 18:7; 19:19, 54:23
**meetings** [1]
14:13
**memorialized** [1]
36:18
**memory** [1]
19:10
**mentioned** [6]
15:23; 34:1, 6; 53:13; 54:9,
16
**message** [1]
42:11
**met** [9]
14:12, 16:7; 17:6, 7, 8;
18:3; 24:14; 41:13; 53:11
**might** [2]

7:16; 34:1
**mile** [1]
9:1
**military** [1]
7:6
**miller** [2]
16:13; 26:13
**miller's** [1]
24:15
**mind** [1]
9:14
**mine** [1]
7:2
**minimum** [1]
45:20
**minor** [1]
6:20
**missing** [1]
51:18
**misstates** [2]
52:17, 23
**mobile** [1]
10:18
**moisture** [3]
10:19; 11:21; 20:4
**moment** [1]
17:13; 20:1; 28:11; 29:24;
43:14; 53:24
**monday** [1]
13:21
**month** [1]
52:7
**months** [1]
45:23
**mop** [1]
28:5
**more** [12]
5:17; 6:25; 17:14, 20;
22:15; 24:15, 16; 26:1;
36:24; 45:14, 17
**morning** [1]
27:22
**most** [1]
54:1
**mostly** [1]
33:23
**mouthful** [1]
5:7
**move** [1]
6:9
**moved** [1]
20:10
**mr** [56]
4:3, 4, 16, 17, 21; 13:2, 5,
6; 17:17; 27:2; 30:13, 20;
31:22; 33:10, 20; 34:15;
35:18, 23; 37:22, 23, 25;
40:14; 41:1, 11, 13; 50:13,
16, 18; 51:1, 7, 11, 12, 21,
22; 52:14, 16, 17, 18, 23,
25; 53:8, 10; 54:7, 8, 20,
22, 23; 55:17; 56:3, 5, 13,
14, 17

**much** [4]
34:17; 36:22; 48:4
**myself** [1]
30:1

* * N * *

**n.a.** [2]
4:22, 24
**name** [11]
4:17, 19, 20; 17:4, 6, 10,
17; 30:14; 34:6; 53:19;
54:11
**names** [4]
16:12; 18:3; 54:3, 6
**nature** [1]
48:18
**necessarily** [4]
47:22; 51:14; 54:11, 13
**need** [6]
4:7; 33:8; 39:5; 40:10;
43:21
**needed** [5]
11:21; 14:16; 29:25; 30:2;
33:11
**neither** [1]
57:8
**never** [3]
9:6, 8; 41:13
**new** [3]
6:5, 7; 52:6
**next** [6]
28:8; 30:6; 32:7; 35:7; 37:7;
43:21
**nickoloff** [6]
4:17, 20, 21; 5:9; 25:20;
54:23
**nine** [1]
42:2
**ninth** [1]
39:12
**nominal** [1]
23:23
**nonresponsive** [2]
54:7; 55:17
**normal** [4]
47:13, 19, 22; 48:25
**normally** [2]
8:8; 44:17
**north** [2]
4:24; 5:4
**note** [5]
16:12; 17:11; 27:6; 32:13;
53:20
**notes** [7]
13:19; 23:9; 34:15; 35:16;
36:11; 53:16
**nothing** [1]
4:13
**notice** [1]
9:13
**noticed** [2]
9:24; 53:17

**number** [4]
10:4; 12:24; 23:23; 53:12
**nuts** [2]
36:23; 37:2

* * O * *

**object** [1]
56:13
**objection** [8]
51:1, 11, 21; 52:14, 23;
53:8; 54:7; 55:17
**obtain** [2]
6:4, 15
**obvious** [1]
39:8
**obviously** [1]
45:15
**occasion** [1]
14:9
**occur** [3]
13:11; 18:21; 35:20
**occurred** [12]
8:12; 12:20; 13:12, 17;
18:1, 6; 19:1; 21:16, 25;
27:19; 29:5; 36:2
**occurs** [1]
28:25
**off** [6]
4:6; 7:23; 18:18; 28:4; 45:2;
56:18
**office** [6]
5:13, 18, 23; 10:15; 22:2;
40:8
**often** [2]
43:9, 11
**oftentimes** [1]
27:9
**oh** [1]
9:20; 32:17; 44:9
**old** [1]
47:13
**once** [1]
12:10
**one** [12]
7:12; 12:1; 14:10, 14;
21:19; 22:7; 31:2; 35:24;
48:25; 49:4; 51:25; 53:2
**ones** [1]
20:3
**only** [3]
24:2; 27:7; 53:20
**open** [3]
33:6, 17; 40:10
**opinion** [2]
52:1; 54:1
**opinions** [1]
51:24
**opportunity** [2]
39:4; 55:9
**order** [1]
39:24; 48:12
**origin** [1]

8:13
**originally** [1]
6:7
**other** [21]
7:2, 19, 24; 12:11; 18:16;
20:23; 21:10, 11; 26:18;
27:18; 29:12; 34:6, 19;
35:20; 41:19, 20; 42:20;
46:25; 49:12; 52:19; 55:2
**others** [1]
16:19
**out** [43]
5:7; 6:25; 7:3, 13; 10:12,
20, 23; 11:1; 12:6, 9, 24;
13:1; 14:3; 15:18; 17:22;
19:8; 23:24; 25:18, 23;
30:5, 9; 32:15; 33:9; 34:12,
24; 38:17; 39:24; 43:4;
46:15; 47:13; 49:13; 50:23;
51:2, 8, 25; 52:4, 7, 8, 13,
21; 53:12; 55:13
**outcropping** [5]
43:22; 44:3, 7, 14, 17
**outline** [1]
29:20
**outside** [2]
23:18; 28:9
**over** [11]
8:1, 3; 17:14; 21:2; 22:9;
23:11; 33:1; 37:25; 47:11;
52:1, 4
**overflow** [5]
24:22; 25:3; 31:15; 35:11;
41:17
**own** [1]
27:6; 28:12; 36:8, 16
**owner** [1]
16:17

* * P * *

**page** [33]
10:3, 8; 13:6; 14:1, 20;
15:2, 3, 8; 22:17; 23:3, 4,
21, 22; 24:3, 4; 25:5; 26:10,
19; 27:16; 28:8; 30:7; 31:7,
8; 32:8; 35:8; 36:5; 37:8,
15; 38:7, 15; 39:12, 21
**pages** [4]
5:12, 15; 14:18, 21
**paragraph** [2]
24:8; 27:15
**part** [9]
8:5; 19:6; 34:22; 38:23;
45:12; 47:15; 49:13, 14;
53:3
**partial** [1]
7:20
**particular** [3]
48:9, 22; 49:12
**parties** [1]
57:10
**parts** [3]

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

52:12; 53:2
**passed** [1]
24:19
**past** [1]
9:8
**people** [17]
14:10; 16:7, 10, 12, 20;
18:4; 35:25; 36:17; 47:17;
50:8; 51:5; 53:12, 24; 54:4;
55:3, 4, 5
**per** [1]
4:2
**perimeter** [1]
15:7
**periodic** [1]
45:24
**peripheral** [2]
36:22
**person** [6]
8:1; 24:14; 33:25; 34:1;
54:12, 16
**personnel** [3]
35:20; 44:22; 45:2
**persons** [1]
54:24
**phone** [1]
36:15
**photograph** [3]
25:24; 26:19; 43:20
**photographs** [4]
7:15; 25:7; 40:22, 24
**photos** [1]
7:22
**physically** [2]
20:7, 8
**pick** [2]
33:11, 15
**picture** [3]
25:13; 55:13, 18
**piece** [3]
44:17; 51:18, 19
**pieces** [1]
47:5
**pin** [23]
25:1, 13, 16; 26:4, 5, 13;
31:13; 32:11; 35:10; 41:15;
43:15, 21; 44:18, 24; 45:3,
5; 47:1; 50:11; 53:14;
54:10, 16; 55:6, 24
**pipe** [1]
8:14
**place** [5]
30:23; 32:22; 44:11, 18;
45:3
**plan** [2]
20:23; 30.5
**plans** [2]
20:6; 22.8
**plastic** [7]
43:23; 44:4, 8, 14, 17, 18;
45:12
**please** [1]
4:19

**plum** [1]
52:21
**plumber** [4]
8:14, 17; 25:16; 51:15
**plumbing** [5]
8:15; 27:11; 28:13; 47:17;
52:11
**plus** [3]
18:4; 50:9; 53:19
**point** [11]
17:15, 20; 18:17, 20; 22:5;
25:18; 26:3; 29:7, 13, 21;
45:23
**pointed** [1]
24:21
**pointing** [3]
17:22; 25:23; 34:12
**portion** [1]
46:15
**position** [1]
17:12
**possession** [2]
41:5; 42:23
**possibility** [1]
41:24
**possible** [4]
9:17; 11:1; 33:10; 45:9
**possibly** [2]
20:15; 35:25
**post-graduate** [1]
6:3
**potential** [3]
31:21, 24; 45:4
**prefer** [1]
9:18
**preliminary** [5]
4:1; 8:2; 21:23; 24:1; 29:6
**prepare** [2]
12:20; 20:25
**prepared** [8]
12:22; 16:5; 22:25; 29:22;
30:4; 31:1, 2; 35:17
**preparing** [1]
7:15
**present** [3]
21:4; 33:13; 54:25
**presented** [1]
35:24
**pretty** [3]
34:16, 17; 53:11
**preventative** [1]
48:3
**previous** [4]
39:10; 40:20; 42:1; 50:2
**previously** [1]
31:2
**primarily** [2]
29:1; 34:2
**primary** [4]
8:4; 20:1; 24:22; 33:22
**principal** [1]
16:14
**prior** [1]

38:3
**probably** [7]
5:7; 19:3; 35:16; 36:13;
37:24; 43:9; 53:23
**problem** [2]
39:25; 49:20
**procedures** [1]
29:25
**proceeded** [1]
18:11
**proceedings** [1]
4:1
**process** [1]
20:20
**product** [4]
47:21; 48:9, 14; 52:12
**products** [3]
47:11, 12, 18
**program** [4]
6:15; 27:4; 47:5, 16
**proof** [1]
7:17
**properly** [1]
49:16
**property** [2]
37:6; 40:16
**provided** [3]
14:25; 24:7; 48:21
**purpose** [2]
19:6; 44:13
**purposes** [3]
5:3, 13; 27:10
**put** [6]
18:12; 23:5; 27:13; 36:3;
49:15; 54:4

* * **Q** * *

**question** [1]
32:25
**questions** [6]
4:16; 33:23; 42:21; 50:14,
19; 51:23
**quickly** [1]
11:1
**quite** [1]
19:5
**quote** [1]
50:21

* * **R** * *

**radiologic** [1]
21:7
**radiology** [4]
10 14; 53:18, 22, 23
**raise** [1]
4 10
**rapid** [1]
55:15
**rate** [1]
55:15
**rather** [2]

33:9; 48:4
**re-inspection** [1]
35:19
**reach** [1]
42:13
**reactive** [1]
48:4
**read** [5]
10:13; 11:17; 24:8; 31:10;
32:14
**reading** [1]
53:15
**reads** [1]
25:3
**really** [2]
35:22; 53:22
**reason** [2]
41:3; 44:19
**reasonable** [3]
47:15; 48:20; 52:9
**recall** [9]
16:10; 17:3; 24:15; 28:2;
30:23, 25; 33:24; 34:23;
36:10
**receive** [1]
7:10
**received** [4]
10:10; 14:6; 22:6; 40:7
**recollection** [5]
18:10; 19:12, 15; 33:19;
53:13
**recommend** [1]
29:17
**recommendations** [1]
23:13
**record** [6]
4:6, 8, 19; 56:18; 57:6, 12
**recover** [1]
20:19
**refer** [2]
9:18; 26:8
**referred** [2]
42:16; 43:7
**referring** [4]
5:14, 15; 10:6; 27:14
**reflect** [1]
14:19
**reflected** [3]
14:18; 26:19; 32:9
**refreshing** [1]
19:12
**regard** [1]
23:13
**regarding** [3]
32:1; 46:24; 48:22
**regular** [1]
47:4
**regularly** [1]
44:22
**related** [1]
57:9
**relationship** [1]
7:22

**relative** [1]
57:11
**relied** [2]
26:23; 53:5
**rely** [1]
48:21
**remediation** [1]
20:25
**remember** [3]
20:12; 34:9, 19
**remove** [1]
19:25; 20:8; 21:1
**removing** [2]
18:14; 20:5
**rent** [1]
20:11
**repair** [2]
20:25; 29:21
**repairs** [6]
18:14; 20:24; 30:4; 34:14;
54:4, 6
**repeat** [1]
36:17
**repetition** [1]
31:12
**replaced** [1]
45:11
**report** [58]
10:24; 12:10; 13:8, 9, 24;
21:4, 23, 22:1, 3, 4, 21, 24;
23:4, 21; 24:4; 26:9, 10;
27:13, 16; 28:8; 29:19;
30:6, 12; 31:1, 7, 13, 25;
32:7, 9, 21, 22; 35:5, 7, 15;
36:5, 18; 37:7, 8, 13, 15;
38:3, 5, 7, 11, 15; 39:3, 9,
12, 21; 40:2, 13; 41:5, 14,
19; 42:1, 4
**reporter** [5]
4:2, 5, 10; 57:5, 18
**reporter's** [1]
57:3
**reporting** [4]
19:16; 32:17, 23; 56:1
**reports** [16]
12:20, 22; 19:7, 13, 15;
23:5; 28:19; 33:2; 38:21,
23; 39:5, 10; 40:21; 42:24;
45:24; 53:18
**represent** [1]
4:18
**representations** [1]
26:24
**representative** [1]
7:24
**representatives** [3]
26:12; 36:7; 55:22
**request** [3]
14:11; 32:23; 39:2
**requested** [1]
14:16
**requests** [1]
33:18

*From* **passed** *to* **requests**

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

BSA                                                                                          XMAX(8/23)

**required** [1]
39:8
**requirements** [2]
32:18, 24
**research** [1]
48:16
**reserves** [2]
23:22; 24:1
**respect** [4]
19:11; 21:23, 25; 31:19
**rest** [1]
16:17
**restoration** [12]
10:15; 11:3, 4, 8, 14, 20;
16:17; 18:12; 20:7, 25;
34:5; 55:1
**restored** [1]
11:20
**retained** [4]
13:13, 14; 15:19; 29:12
**retaining** [1]
36:7
**retention** [2]
11:7, 24
**rett** [2]
4:16, 17
**returned** [1]
42:11
**review** [2]
29:23; 30:3
**reviewed** [1]
35:18
**reviewing** [1]
19:12
**revolving** [1]
23:6
**right** [25]
4:11; 9:2; 18:19; 24:18, 25;
26:7; 30:21, 22; 31:2; 32:1,
2; 35:2; 37:10; 38:18;
39:12, 21; 40:2; 44:4, 10,
11; 50:5; 55:1, 7, 10, 20
**righty** [1]
40:1
**risk** [3]
14:17; 28:23; 40:22
**risks** [1]
40:22
**road** [1]
9:2
**robins** [7]
4:22; 5:1, 3, 4; 6:13; 40:18,
19
**rod** [3]
16:13; 24:14; 26:12
**rodeo** [1]
49:24
**role** [4]
12:6, 8; 34:17; 51:12
**room** [4]
16:11; 20:3; 24:21; 55:4
**route** [1]
22:8

**ruben** [8]
16:16, 22; 17:24; 24:17;
26:13; 28:1; 53:17; 54:9
**rudzitis** [13]
17:17; 30:15, 16, 20; 31:22;
33:10, 20; 34:15; 35:18, 23;
37:23; 41:2, 11
**rules** [1]
4:2
**running** [1]
20:3
**rush** [2]
10:13, 25

**  *  *  S  *  *  **

**safe** [2]
47:7, 8
**safely** [1]
20:10
**salvage** [1]
29:15
**salvageable** [1]
21:8
**salvaged** [1]
21:13
**same** [14]
14:5; 15:10; 29:25; 32:9;
37:9; 38:1, 10, 13, 20;
39:10, 17, 19; 42:12; 53:25
**sat** [1]
20:6
**save** [1]
10:19
**saved** [1]
11:19
**saw** [4]
22:1; 43:3; 55:13, 23
**saying** [5]
22:7; 30:18; 32:20; 41:21;
45:6
**says** [5]
23:17; 31:13; 32:20; 40:1,
14
**school** [1]
6:22
**scope** [4]
23:19; 28:9; 29:2; 37:3
**second** [9]
10:2; 15:25; 16:1; 24:3;
25:2; 31:13; 35:10; 41:15;
50:20
**seconds** [2]
55:16; 56:14
**section** [3]
28:8, 23; 36:4
**secure** [2]
7:17, 21
**security** [1]
20:9
**see** [16]
9:25; 10:18; 23:25; 26:2;
28:14; 29:20; 37:14; 41:11;

43:20, 25; 44:12, 24; 47:18;
50:3; 51:4; 55:19
**seen** [3]
17:23; 23:24; 35:18
**selection** [1]
51:5
**self-insured** [1]
7:11
**send** [2]
21:24; 39:14
**seniority** [1]
7:1
**sense** [1]
48:25
**sent** [2]
10:25; 42:24
**sentence** [1]
27:15
**september** [1]
57:15
**sequence** [1]
38:17
**series** [1]
12:20
**serious** [2]
12:9, 13
**seriously** [1]
37:23
**seriousness** [4]
12:19; 22:5; 29:3; 51:8
**serve** [1]
7:6
**service** [2]
7:3; 11:4
**services** [1]
33:8
**set** [1]
52:6
**seven** [3]
39:10, 17; 46:20
**seventh** [2]
38:7, 21
**sewage** [1]
49:20
**shorthand** [2]
57:4, 18
**shortly** [1]
22:6
**show** [2]
14:22; 44:1
**showed** [1]
32:21
**shown** [1]
46:13
**shows** [5]
13:20; 14:20; 42:2, 3, 4
**shut** [1]
10:14
**sign** [1]
4:7
**signature** [2]
4:5; 56:20
**signed** [1]

**7**:18
**similar** [2]
31:1; 49:12
**simple** [1]
33:9
**simply** [1]
32:4
**since** [6]
6:11; 13:2; 18:11; 19:4;
41:5; 42:13
**sir** [42]
4:25; 6:8, 12, 14, 18; 7:7;
9:5, 7, 10, 11; 9, 25; 12:5;
15:5, 10; 18:2, 22; 21:14,
16, 20; 24:13; 26:7; 27:20;
28:11; 29:8; 34:22; 42:19;
46:3, 6, 9, 12, 23; 47:2;
48:19; 49:25; 50:13, 19;
51:20; 52:5, 10; 54:11, 18;
56:3
**sit** [1]
54:8
**sitting** [4]
16:19; 18:23; 46:25; 55:3
**situations** [2]
49:9, 10
**six** [2]
37:15; 39:17
**sixth** [3]
38:5, 10, 20
**skilled** [1]
47:17
**small** [1]
43:20
**solely** [1]
26:23
**some** [22]
5:17; 7:2; 13:20; 14:15;
16:12, 20; 18:4, 25; 19:20;
23:22; 31:18, 25; 33:11, 18;
34:15; 36:6, 16; 41:3;
42:21; 49:10, 12; 51:18
**someone** [11]
24:21, 23; 25:1; 30:2;
33:16; 34:12; 35:20; 40:7;
43:7; 45:16; 56:7
**something** [6]
20:21; 28:17; 33:8, 12, 13;
47:24
**sometimes** [2]
7:13, 16
**soon** [1]
29:23
**sorry** [4]
6:17; 10:16; 44:9, 11
**sound** [1]
17:10
**sounds** [1]
17:6
**source** [2]
28:4; 54:15
**south** [1]
6:9

**speak** [1]
49:24
**specific** [2]
9:11; 33:19
**specifically** [1]
53:13
**spend** [1]
14:7
**spent** [1]
56:14
**square** [1]
31:15
**standard** [1]
4:18
**started** [3]
7:3, 5; 51:3
**state** [5]
4:19; 6:6; 57:2, 5, 19
**stated** [1]
35:9
**stating** [1]
7:18
**stems** [1]
49:21
**step** [1]
7:25
**stepped** [2]
55:12, 13
**steven** [2]
41:23; 42:7
**sticking** [1]
49:11
**still** [5]
11:5; 29:25; 30:2, 23; 49:21
**stip** [1]
27:5
**stipulated** [1]
28:14
**stipulation** [2]
24:1; 36:3
**straight** [1]
54:6
**stresses** [2]
48:9, 18
**subcontractor** [2]
27:10
**subpoenaed** [1]
5:12
**subrogation** [7]
28:9; 31:19, 21, 24;
41:24; 42:8
**subscribed** [1]
57:14
**suggested** [1]
23:22
**suite** [1]
5:19
**sunday** [1]
27:21
**supervisor** [4]
16:16, 23; 17:25; 40:16
**supplied** [1]
23:14

**ORAL DEPOSITION OF DENNIS NICKOLOFF**
**August 26, 2003**

supply [2]
49:17; 52:20
supposed [4]
11:16, 18; 21:6; 24:24
supposedly [2]
24:20; 51:18
sure [5]
7:10; 13:4; 16:22; 21:18;
36:12
surrounding [1]
11:6
susan [2]
57:4, 17
suspect [1]
53:22
swantner [2]
57:4, 17
swear [1]
4:11
sworn [1]
57:14
system [3]
6:22; 8:15; 39:1

** T **

tab [2]
43:20; 45:3
table [3]
16:11, 19; 55:3
take [8]
7:17; 8:1; 10:2; 22:9; 35:21,
25; 41:2; 55:18
taken [7]
17:14; 20:16; 25:7, 9; 33:1;
49:15; 57:10
taking [3]
7:15; 26:19; 37:25
talk [7]
8:14, 17; 27:2; 42:14, 15;
43:14; 53:5
talked [4]
33:20; 46:19
talking [9]
5:16; 12:1; 25:17; 26:6;
30:13; 43:22; 44:3, 7; 53:25
tank [4]
25:3; 31:14; 35:11; 41:16
teachers [1]
6:25
teaching [1]
6:23
tear [2]
47:19, 22
tech [1]
35:25
telephone [4]
39:7; 40:7; 42:6, 13
tell [13]
7:8; 10:3; 14:18; 18:6;
22:18; 33:3, 7; 44:16; 46:7,
10, 19; 49:8; 53:22
tenth [4]

13:8; 39:21; 40:1; 41:14
terms [6]
12:15, 16; 18:14; 21:4;
23:6; 36:25
testified [1]
51:7
testimony [3]
4:12; 57:6, 10
texas [5]
5:20; 6:9; 57:2, 5, 19
thank [2]
26:7; 56:3
their [29]
7:12, 19; 18:15; 20:1, 2, 8,
12, 13, 15, 16, 20; 21:3, 23;
22:7, 14; 23:11; 26:23;
27:3, 6, 9, 11; 28:5; 35:20,
25; 36:7, 16; 51:4; 54:1
themselves [1]
16:20; 49:15
there's [5]
13:8; 27:6; 31:25; 32:13;
52:19
thereafter [1]
14:11
they're [4]
33:7; 47:18; 49:9; 52:13
thing [2]
23:2; 54:2
things [16]
12:1; 17:22; 18:16; 19:20,
22; 20:10, 23; 28:5; 33:16;
48:17; 49:1, 19, 22; 51:24,
25; 52:19
think [20]
17:8, 17; 22:2, 5; 27:5;
28:18; 29:24; 33:22; 34:2,
9; 41:22; 43:12; 44:25;
47:7, 16, 21; 48:7, 13; 49:1;
53:13
third [5]
15:23; 27:14; 34:24; 35:5,
14
though [2]
24:16; 36:23
thought [2]
7:1; 41:4
threw [1]
23:24
through [18]
9:25; 10:6; 17:9, 21, 23;
24:2, 19; 30:19; 33:15, 21,
24; 34:2, 10; 36:14; 47:19,
22; 54:3; 55:14
throughout [2]
5:8, 14
thumbing [1]
9:25
tiles [2]
18:15; 19:21
time [29]
4:8; 14:11, 14; 15:17, 23;
16:14; 17:25; 19:4; 22:14;

24:23; 25:10; 29:13; 30:24;
31:24; 34:24; 40:13; 41:7;
42:3; 45:23; 46:21; 47:12;
50:14, 16, 23; 52:1, 4;
53:16, 25
times [5]
7:20, 24; 49:11, 13
tires [2]
52:4, 7
title [1]
22:19
today [5]
4:12; 5:3, 21; 18:23; 54:8
toilet [25]
25:2; 26:18, 25; 28:18;
30:23; 31:14; 35:10; 41:15;
44:23; 45:13; 46:4, 7, 10,
13, 20, 25; 49:9; 50:10, 15;
23; 50:10; 55:10, 12, 16;
56:15
toilets [6]
27:9, 12; 31:17; 47:9; 49:6
told [13]
19:20; 26:16; 27:21; 37:18;
51:17; 52:8, 11, 18; 53:4;
54:14; 55:6, 23; 56:1
took [2]
40:25; 55:12
top [3]
25:16; 32:13; 43:20
total [2]
14:7; 23:23
totally [1]
12:25
town [1]
33:10
trading [1]
17:18
transcontinental [4]
8:20; 29:18; 31:20; 45:25
transcript [1]
57:6
tried [1]
28:18
true [1]
57:6
truly [1]
50:24
truth [3]
4:12, 13
try [2]
19:20; 20:19
trying [3]
15:17, 28:5; 50:24
tube [1]
46:2
turn [2]
8:3; 22:17
turned [1]
28:4
twice [1]
15:11
two [7]

9:1; 13:15; 14:13; 18:25;
26:24; 31:16; 53:19
type [2]
6:15; 48:16; 49:12

** U **

uh-huh [5]
14:20; 16:24; 29:11; 38:9;
50:4
under [2]
27:15; 36:4
undergone [1]
48:10
understand [2]
35:23; 51:12
understanding [15]
9:21; 11:15, 17; 13:17;
17:24; 21:9; 26:10, 15;
28:3, 13, 20; 35:19; 36:2;
37:22; 55:5
understood [1]
56:7
unexpected [1]
52:22
university [1]
6:5
unless [1]
54:3
unrelated [1]
49:20
until [4]
33:3, 6; 39:6; 51:17
updating [1]
31:4
upside [1]
44:12
use [1]
47:13
used [1]
20:20
usually [2]
28:25; 53:25
utilized [1]
27:10

** V **

valley [26]
8:23; 10:14, 11:3, 8; 16:17;
18:12; 20:7, 10, 24; 21:22;
26:11; 27:3; 30:9; 34:4;
35:17; 36:6, 16, 20; 43:17;
44:22; 45:2; 50:8; 54:25
valuation [1]
14:17; 37:4
value [1]
29:2; 32:1
valve [10]
25:2, 17; 31:14; 35:10;
41:16; 49:11, 12, 13, 15;
51:18
valves [3]

45:15, 17, 18
vans [1]
20:10
variety [4]
7:11; 49:19, 22; 53:24
very [4]
31:1; 33:11; 36:22; 48:2
videographer [2]
4:8; 56:18
vines [5]
4:4; 13:2, 5; 50:18; 51:7,
12, 22; 52:16, 18, 25;
53:10; 54:8, 20; 56:5, 14,
17
visit [6]
14:20; 15:25; 16:1, 3; 50:20
visual [2]
26:25; 50:9

** W **

waiting [1]
29:21
waived [1]
56:20
walk [4]
17:23; 24:2; 35:25; 53:24
walked [3]
17:9; 24:19; 33:24
walking [5]
17:21; 34:2, 10, 16; 54:2
walls [1]
15:7
want [2]
25:15; 33:14
wanted [5]
20:15; 35:24; 42:14, 15;
54:1
wants [1]
33:13
wasn't [1]
36:23
water [14]
8:13, 23; 10:16; 18:13;
20:3; 24:22; 28:4; 31:15;
45:12; 49:3; 52:13, 20; 54:3
way [6]
7:2; 12:4; 25:4; 42:25; 51:5;
54:15
we'll [1]
32:22
we're [5]
4:8; 7:20, 21; 18:23; 26:6
wear [8]
47:13, 19, 22; 51:25; 52:4,
8, 13, 21
weekend [1]
13:18
well [6]
7:6; 16:6; 25:21; 50:13;
53:4; 56:6
went [19]
14:3, 10, 12, 14; 15:18, 23;

ORAL DEPOSITION OF DENNIS NICKOLOFF
August 26, 2003

BSA                                                                          XMAX(10/25)

17:8; 18:7; 19:16; 28:4;
30:8, 19; 33:20; 34:24;
43:4; 50:1, 7
**weren't** [1]  50:23
**wesley** [1]
50:18
**wet** [7]
10:21; 18:14; 20:1, 2, 4;
21:1; 52:8
**what's** [1]
54:1
**whatsoever** [2]
12:4; 43:13
**whereabouts** [1]
9:5
**wherever** [1]
20:11
**while** [4]
19:8; 20:9; 41:4; 54:2
**who's** [1]
37:19
**whole** [2]
4:13; 51:23
**witness** [4]
4:7, 14; 13:4; 50:15
**wore** [1]
52:7
**work** [11]
6:2, 3; 8:2; 9:6; 18:13; 19:8;
28:10, 20; 33:11; 39:8; 45:5
**worked** [9]
25:2, 13; 27:8; 31:14;
32:11; 35:10; 41:16; 43:15;
47:1
**working** [12]
6:23; 7:3; 26:13; 29:9; 33:9,
22; 37:24; 42:16; 44:24;
50:11; 55:6, 25
**worn** [1]
49:13
**worth** [1]
20:14
**wouldn't** [1]
53:7
**write** [2]
7:22; 17:11
**written** [2]
13:20; 32:13
**wrong** [1]
44:11
**wrote** [2]
18:4; 54:12

——————————
**\* \* X \* \***
——————————

**x-ray** [1]
11:18
**x-rays** [2]
20:2, 8

——————————
**\* \* Y \* \***
——————————

**yeah** [3]

13:7; 20:15; 52:16
**years** [7]
5:2, 25; 6:23; 18:25; 46:20;
47:12; 53:19
**york** [2]
6:5, 7
**you've** [2]
9:6; 19:3
**yourself** [2]
32:5; 55:10

EXHIBIT 1



**GAB Robins**

GAB Robins North America, Inc.

SRS 0001

**ACTIVITY REPORT**

| FILE NO. | EMPLOYEE NAME | | EMPLOYEE NO. | ADJUSTERS HOURLY BILLING RATE |
|---|---|---|---|---|
| 34718-43410 | N. Yuckaloff | | 4005-3 | $ |

| DATE | ACTIVITY | TIME Hours | EXPENSES CODE | AMOUNT | MILEAGE |
|---|---|---|---|---|---|
| | FILE SET-UP; MAINTENANCE FEE | 1.0 | | | |
| 3/6 | Eva called Evelyn Fisk + advised we rec | | | | |
| | loss + BN assigned - will see this PM | .2 | | | |
| 3/6 | Kenn Jones called - Belfors - 817-291-4465 | .1 | | | |
| 3/10 | At Risk - met w/ Ros Miller - coordinator, maint | | | | |
| 3:40 | supervisor, Ruan Fines, Adam Garcia + Kenn Jones | | | | |
| | Reviewed bldg damage + contents, Mtg to disc | | | | |
| | Procedures on cleaning + drying - 24,000 XX days - | 2.5 | PG | $28.00 | |
| 3/7 | Called Kenn Jones - disc damage + cost - | | | | |
| | he has spoken w/ Evelyn - will have Adam | | | | |
| | drop new ceiling tiles in Place + pull rest of | | | | |
| | Vinyl Base | .2 | TT | 200 | |
| 3/1 | Called Evelyn + left mess | .2 | | | |
| 3/7 | Evelyn called - will go to Kenn GA | | | | |
| | as soon as he answers her - Reserves | | | | |
| | disc - will fax to her | .2 | | | |
| 3/7 | 1st Report + faxed to Co | 1.5 | fax | 300 | |
| 3/9 | Ret call to Evans from CNA - status disc - | | | | |
| | will be down on Tuesday - | .3 | | | |
| 3/9 | Called Adam Garcia - left mess | .1 | | | |
| | TOTAL | | | | |

MISCELLANEOUS EXPENSE CODES
(check if incurred)

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| ☐ CA Cassette | # ___ | ☐ AM Excess Auto Mileage | $ ___ | ☐ ME Meals | $ ___ |
| ☐ CT Cassette-Transcribed | # ___ | ☐ AT Auto Parking/Tolls | $ ___ | ☐ PR Public Records | $ ___ |
| ☐ PC Photocopy(s) | # ___ | ☐ EM Express Mail Cost | $ ___ | ☐ TR Transportation | $ ___ |
| ☐ PG Photograph(s) | # ___ | ☐ FS Fee Schedule Review | $ ___ | ☐ TT FAX/Telephone Tolls | $ ___ |
| ☐ AC Admit. - Cost Cont. | $ ___ | ☐ HM Hotel/Motel | $ ___ | ☐ OS Other Services | $ ___ |
| (Fee / Out of Pocket Exp.) | | | | | |

Nickaloff

EXHIBIT NO. 1

S. SWANTNER

Form 155 (Rev. 8/97)

**GAB Robins**
GAB Robins North America, Inc.

SRS 0002

## ACTIVITY REPORT

| FILE NO. 34718 | 3410 | EMPLOYEE NAME Nickoloff, D | | EMPLOYEE NO. 4205-3 | | ADJUSTERS HOURLY BILLING RATE $ | | |

| DATE | ACTIVITY | TIME Hours | EXPENSES CODE | AMOUNT | MILEAGE |
|------|----------|------------|------|--------|---------|
| 3/12 | Called Adm- Cell 453-5537 — Anch | | | | |
| | Went thru bld; fair — abt Mwary As | | | | |
| | Anticipated — to WU Clerk w/Hm & meet | | | | |
| | us tomorrow at 9:00 am | .2 | | | |
| | | | | | |
| 3/13 | Mtw/Ivans, Adam, Ruses, Ron, et at @ | | | | |
| | Rovr | 2.0 | | | |
| | | | | | |
| 3/20 | Ret call to Ivans — left Vm mess | .1 | TT | 1.00 | |
| 3/20 | Ivans called - do Monsou, Smith + Doeckh for | | | | |
| | Valley Day Bldg | .1 | | | |
| | | | | | |
| 3/21 | Measure bldg - Couple photos of side + back | 1.0 | PG | (incl) | |
| | | | | | |
| 3/21 | Diagram to Jet d | .5 | | | |
| | | | | | |
| 3/22 | Doeckh evaluation | .5 | | | |
| 3/22 | Marshall " | 1.0 | | | |
| | | | | | |
| 3/23 | Iwo Rpw + frwto Co | 1.0 | fw | 3.00 | |
| | | | | | |
| 3/26 | Ivans called - rovm done - he will call in Couple | | | | |
| | days for Ropes - will give back his Ans & then | .1 | | | |
| | | | | | |
| 3/26 | Ivans called - cant no brsemm —will do | .1 | | | |
| 3/26 | Called Keith — left mess | .1 | | | |
| | | TOTAL | | | |

MISCELLANEOUS EXPENSE CODES
(check if incurred)

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| ☐ CA Cassette | $ 2 ele/Post | ☐ AM Excess Auto Mileage | $ | ☐ ME Meals | $ | | | |
| ☐ CT Cassette-Transcribed | $ | ☐ AT Auto Parking/Tolls | $ | ☐ PR Public Records | $ | | | |
| ☐ PC Photocopy(s) | $ | ☐ EM Express Mail Cost | $ | ☐ TR Transocation | $ | | | |
| ☐ PG Photograph(s) | $ | ☐ FS Fee Schedule Review | $ | ☐ TT FAX/Telephone Tolls | $ | | | |
| ☐ AC Admin - Cost Cont. (Fee / Out of Pocket Exp.) | $ | ☐ HM Hotel/Motel | $ | ☐ OS Other Services | $ | | | |

2

**GAB Robins**
GAB Robins North America, Inc.

SRS  0003

# ACTIVITY REPORT

| FILE NO. 34718 - 43410 | EMPLOYEE NAME Nickoloff, D | | EMPLOYEE NO. 4205-3 | ADJUSTERS HOURLY BILLING RATE $ | | |
|---|---|---|---|---|---|---|
| DATE | ACTIVITY | | TIME Hours | EXPENSES | | |
| | | | | CODE | AMOUNT | MILEAGE |
| 3/29 | Ret call to Turis — Theo we revise & all bldg Unknown — to includes added cost of doveled walls — will Correct + fax to him | | .2 | TT | $20 | |
| 3/29 | At Turn Rpt — Announces 2 Unknowns to add on double Shtrk wall cost & faxes to him | | .5 | Ax | $5.00 | |
| 4/3 | 3rd Rpm | | .5 | | | |
| 4/13 | 4th Rpm | | .5 | | | |
| 4/30 | 5th Rpm | | .5 | | | |
| 5/16 | 6th Rpm | | .5 | | | |
| 6/1 | 7th Rpm | | .5 | | | |
| 7/2 | Ret call to Steven Burke — CNA Supvr any — (left mess) | | .1 | TT | $1.00 | |
| 7/2 | Steves called — gave him Evelyns # to reach Boss | | .1 | | | |
| 7/3 | | | .3 | | | |
| 8/2 | M# photo | | .7 | | | |
| 8/2 | | | .3 | | | |
| 8/1 | Evely worked Close + bill w/ Wthr + Fire Rpm | TOTAL | .3 | | | |

MISCELLANEOUS EXPENSE CODES
(check if incurred)

| | | | |
|---|---|---|---|
| ☐ CA Cassette | $ | ☐ AM Express Auto Mileage | $ |
| ☐ CT Cassette-Transcribed | $ | ☐ AT Auto Parking/Tolls | $ |
| ☐ PC Photocopy(s) | $ | ☐ EM Express Mail Cost | $ |
| ☐ PG Photograph(s) | $ | ☐ FS Fee Schedule Review | $ |
| ☐ AC Admin. - Case Cont. (Fee / Out of Pocket Exp.) | $ | ☐ HM Hotel/Motel | $ |

| | |
|---|---|
| ☐ ME Meals | |
| ☐ PR Public Records | |
| ☐ TR Transportation | |
| ☐ TT FAX/Telephone Tolls | |
| ☐ OS Other Services | |

# GAB

## CALCULATOR COST FORM Form 121 (12/90)

*For use with the Calculator Cost Method*

**MARSHALL VALUATION SERVICE SQUARE FOOT COST**

| | | | | | |
|---|---|---|---|---|---|
| 1. | SUBSCRIBER MAKING SURVEY | GAB Racine | | DATE OF SURVEY | 3/22/01 |
| 2. | NAME OF BUILDING | Valley Diagnostic | | OWNER | SRS 0004 |
| 3. | LOCATED AT | 2200 Haine Dr. Harlingen, TX 78550 | | | |

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 4. | OCCUPANCY | Medical Office Bldg | | | |
| 5. | BUILDING CLASS AND QUALITY | Cls C Qual Average | Cls ___ Qual ___ | Cls ___ Qual ___ | Cls ___ Qual ___ |
| 6. | EXTERIOR WALL | Brick | | | |
| 7. | NO. OF STORIES & HEIGHT PER STORY | No. 2 Ht 2 | No. ___ Ht ___ | No. ___ Ht ___ | No. ___ Ht ___ |
| 8. | AVERAGE FLOOR AREA | 21,540 = | | | |
| 9. | AVERAGE PERIMETER | 626 | | | |
| 10. | AGE AND CONDITION | Age 19 Cond. V Good | Age ___ Cond. ___ | Age ___ Cond. ___ | Age ___ Cond. ___ |
| 11. | REGION | | 12. CLIMATE | | |

11. REGION    Western ☐    Central ☑    Eastern ☐

12. CLIMATE    Mild ☐    Moderate ☑    Extreme ☐

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 13. | BASE SQUARE FOOT COST | 71.06 | | | |

**SQUARE FOOT REFINEMENTS**

| | | | | | |
|---|---|---|---|---|---|
| 14. | HEATING, COOLING, VENTILATION | + 3.75 | | | |
| 15. | ELEVATOR DEDUCTION | Included | | | |
| 16. | MISCELLANEOUS | N/A | | | |
| 17. | TOTAL LINES 13 THROUGH 16 ▷ | 74.81 | | | |

**HEIGHT AND SIZE REFINEMENTS**

| | | | | | |
|---|---|---|---|---|---|
| 18. | NUMBER OF STORIES – MULTIPLIER | 2.0 | | | |
| 19. | HEIGHT PER STORY – MULTIPLIER (See Line 7) | 1.0 | | | |
| 20. | FLOOR AREA-PERIMETER MULTIPLIER (Lines 8 & 9) | .923 | | | |
| 21. | COMBINED HEIGHT AND SIZE MULTIPLIER (Lines 18x19x20) | 1.846 | | | |

| | FINAL CALCULATIONS | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 22. | REFINED SQUARE FOOT COST (Line 17 x 21) | 138.10 | | | |
| 23. | CURRENT COST MULTIPLIER (Sect. 99 p. 3) | 1.06 | | | |
| 24. | LOCAL MULTIPLIER (Sect. 99 p. 5 thru 10) | .82 | | | |
| 25. | FINAL SQ. FT. COST (Line 22 x LINE 23 x LINE 24) | 120.04 | | | |
| 26. | AREA (BACK OF THIS FROM) | 21,540 | | | |
| 27. | LINE 25 x LINE 26 | 2,585,662 | | | |
| 28. | LUMP SUMS (LINE 34) | + 159,632 | | | |
| 29. | REPLACEMENT COST (Line 27 + Line 28) | 2,745,294 | | | |
| 30. | DEPRECIATION % (Sect. 97) | 28% | | | |
| 31. | DEPRECIATION AMOUNT (LINE 29 x LINE 30) | 768,680 | | | |
| 32. | DEPRECIATED COST (LINE 29 – LINE 31) | 1,976,605 | | | |

## TOTAL OF ALL SECTIONS

| | REPLACEMENT COST | DEPRECIATED COST | INSURABLE VALUE | |
|---|---|---|---|---|
| 33. | 2,745,284 | 1,976,605 | 00 | 4 |

See back of this form for drawings area and insurable value calculations.

SRS_0005

Calculations:

| Lump sum (Sprinklers, elevators, etc.) | Double shek walls + special treatment walls (Lens) | ± $159,622 |

| 34. | | TOTAL ▷ | $159,622 |

| | INSURANCE EXCLUSIONS (Section 96) | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 35. | BASEMENT EXCAVATION | | | | |
| 36. | FOUNDATION BELOW GROUND | | | | |
| 37. | PIPING BELOW GROUND | | | | |
| 38. | ARCHITECT'S PLANS AND SPECIFICATIONS | | | | |
| 39. | TOTAL % OF EXCLUSIONS (LINES 35 THRU 38) | | | | |
| 40. | REPLACEMENT OR DEPRECIATED COST (LINE 29 OR 32) | | | | |
| 41. | EXCLUDING AMOUNT (LINE 39 x LINE 40) | | | | |
| 42. | INSURABLE VALUE (LINE 40 – LINE 41) | | | | |

NOTES:

00    5

Form 121   Back

SRS 0006

Boeckh costs include labor and material, normal profit and overhead as of date of report.  Costs represent
          general estimates which are not to be considered a detailed quantity survey.  These costs include.
          generalities and assumptions that are common to the types of structures represented in the software.

          (C) 1999 E. H. Boeckh, a Division of Thomson Publishing Corporation. All Rights Reserved.

☐                                         Commercial Building Valuation
System
                                              Standard

03/29/2001

Policy:
Exp. Date:
  {none}
Cost as of:    03/1999
Property Owner:
  Valley Diagnostic

Texas Ins. Managers

| SUMMARY OF COSTS: | | | Replacement |
| $/sq.ft. | Depreciated | $/sq.ft. | |
| | | | Cost |
| Cost | Cost | Cost | |
| Section: 1 | | | $2,658,669 |
| $61.72 | $2,108,879 | $48.95 | |
| 100%   501 | Medical Clinic | | |

| TOTAL: | | | $2,658,669 |
| $61.72 | $2,108,879 | $48.95 | |

Boeckh costs include labor and material, normal profit and overhead as of date of report.  Costs represent
          general estimates which are not to be considered a detailed quantity survey.  These costs include
          generalities and assumptions that are common to the types of structures represented in the software.

          (C) 1999 E. H. Boeckh, a Division of Thomson Publishing Corporation. All Rights Reserved.

6

SRS 0007

☐ Commercial Building Valuation
System

Standard

03/29/2001

---

| | |
|---|---|
| Property Owner: | Valley Diagnostic |
| Cost as of: 03/1999 | |
| Property Address: | 2200 Haine |
| | Harlingen, TX 78550 |

---

Building Description          Section 1
  Occupancy:
        100%    501      Medical Clinic

    Construction Type:      100% Masonry Non-Combustible
    Number of Stories:      2
    Gross Floor Area:       43,078 sq.ft.
    Total Perimeter:        626 ft.
    Construction Quality:   2.5
    Year Built:             1982
    Climatic Region:        Warm
    Seismic Zone:           0
    High Wind Region:       2
    Hillside
      Construction:         Degree of Slope: Level
Site Position:             Unknown
                           Site Accessibililty: Excellent
Soil Condition:       Excellent

---

Architect Fees:              7% is included.
Profit and Overhead:         20% is included.

---

Depreciation:
  Condition: Average        Effective Age: 19 years
Depreciation:  22 %

---

SUMMARY OF COSTS:
Replacement

Cost

   Site Preparation
2,913
   Foundation Wall
12,322
   Interior Foundations
8,491
   Slab On Ground
63,668

SRS 0008

```
    Framing
150,776
    Exterior Wall              2 % Wall Openings
159,533
                             100 % Brick, on masonry
    Structural Floor
186,663
    Roof
163,391
        Material             100 % Built-up, tar and gravel or rock
        Pitch                100 % Flat
    Floor Finish
120,783
                              25 % Carpeting
                              75 % Tile, vinyl composite
    Ceiling Finish
140,237
                             100 % Suspended acoustical
    Partitions               5,000 ft.
159,622
        Structure            100 % Studs, girts, etc.
        Finish               100 % Drywall
    Plumbing                 80 Total Fixtures
222,850
    Heating
100,405
                             100 % Forced warm air
    Cooling
169,782
                             100 % Forced cool air
    Electrical
362,452
                             100 % Average
    Built-ins
270,487
    Elevators
136,843
        2 Passenger
    Manual Fire Alarm        100 %
67,830
```

---

```
    SUBTOTAL
$2,499,047
```

---

```
    Depreciated Cost   (78%)
$1,949,257
```

---

```
    Misc. Additional Features:
                             Double shrk wall adjustment
159,622
    Total Additions
159,622
```

---

```
TOTAL SECTION 1
$2,108,879
```

8



**GAB Robins**

GAB Robins North America, Inc.

632 ED CAREY DRIVE
SUITE 700
HARLINGEN, TX, 78550-7965
T : 956-423-0770
F :956-423-2407

SRS  0009

## ACKNOWLEDGEMENT

March 6, 2001

CNA COMMERCIAL INSURANCE
P O BOX 219011
DALLAS, TX 75221 9011

Attn: Evelyn V. Fisk

| | |
|---|---|
| Policy Number | :UNKNOWN |
| Claim Number | :64673311 |
| Customer Code | :084145 |
| GAB File No. | :34718-43410 |
| Insured | :VALLEY DIAGNOSTIC |
| Claimant | : VALLEY DIAGNOSTIC |
| Type of Claim | :PR |
| Date of Claim | :03/04/2001 |
| Date Assigned | :03/06/2001 |
| Adjuster | :DENNIS   NICKOLOFF |

We acknowledge receipt of your assignment.  The adjuster indicated above, is responsible for responding to your needs.

Handling of your assignment will be in accordance with GAB Robins standard diaries or customer specific instructions.

Should you need additional information, please contact our office at 956-423-0770.

Thank you for this assignment.

cc:

GAB - A500OL

(Copyright (c) 2000 GAB Robins North America, Inc., All Rights Reserved)

Version 1.3.2.1



**GAB Robins** ™

GAB Robins North America, Inc.

SRS  0010

632 Ed Carey Drive
Suite 700
Harlingen, TX.
78550-7965
T: 956-423-0770
F: 956-423-2407

March 6, 2001

Valley Diagnostic
2200 Haine Dr.
Harlingen, TX. 78550

RE :   **GAB File No.**  : 34718-43410
       **Insured**       : VALLEY DIAGNOSTIC
       **Policy #**      :
       **Claim #**       : 64-673311
       **Date of Loss**  : 03-04-01

Valley Diagnostic:

We wish to acknowledge receipt of your claim for damage under your insurance policy.

Investigation of this claim has been referred to this office.  The adjuster/appraiser assigned to your claim is Dennis Nickoloff, at 956-423-0770.

He/she can be reached at the above telephone number in the event you have not heard from him/her by the time you receive this letter.

The adjuster/appraiser will advise you of any items, statements or documents you will need to provide in order for your claim to be processed.  Until that time you are to protect your property from any further damage.  Please contact your adjuster/appraiser immediately if you require assistance in this regard.

You will also need to arrange a mutually agreeable time for the adjuster/appraiser to personally inspect your damage, if required.  Thank you for your assistance and cooperation.

Yours very truly,

Dennis Nickoloff
Adjuster

DN/es

cc:    CNA Commercial Insurance
       P O Box 219011
       Dallas, TX.  75221-9011

00   10

GAB N167K(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc., All Rights Reserved)

# GAB

## CALCULATOR COST FORM Form 121 (12/90)

For use with the Calculator Cost Method

**MARSHALL VALUATION SERVICE SQUARE FOOT COS**

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 1. | SUBSCRIBER MAKING SURVEY | Gao Rooms | | DATE OF SURVEY | 3/22/01 |
| 2. | NAME OF BUILDING | Valley Diagnostic | | OWNER | SRS 0011 |
| 3. | LOCATED AT | 2200 Frog Dr, Harlingen  Tx500 | | | |
| 4. | OCCUPANCY | Medical Office Bldg | | | |
| 5. | BUILDING CLASS AND QUALITY | Cls C Qual Average | Cls ___ Qual | Cls ___ Qual | Cls ___ Qual |
| 6. | EXTERIOR WALL | Brick | | | |
| 7. | NO. OF STORIES & HEIGHT PER STORY | 2  Ht  12 | No. ___ Ht | No. ___ Ht | No. ___ Ht |
| 8. | AVERAGE FLOOR AREA | 21,540 + | | | |
| 9. | AVERAGE PERIMETER | 620 | | | |
| 10. | AGE AND CONDITION | Age 19 Cond. V Good | Age ___ Cond. | Age ___ Cond. | Age ___ Cond. |
| 11. | REGION  Western ☐  Central ☑  Eastern ☐ | 12. CLIMATE  Mild ☐  Moderate ☑  Extreme ☐ | | | |

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 13. | BASE SQUARE FOOT COST | 71.06 | | | |
| | **SQUARE FOOT REFINEMENTS** | | | | |
| 14. | HEATING, COOLING, VENTILATION | + 3.75 | | | |
| 15. | ELEVATOR DEDUCTION | Included | | | |
| 16. | MISCELLANEOUS | N/A | | | |
| 17. | TOTAL LINES 13 THROUGH 16 ▷ | 74.81 | | | |
| | **HEIGHT AND SIZE REFINEMENTS** | | | | |
| 18. | NUMBER OF STORIES - MULTIPLIER | 2.0 | | | |
| 19. | HEIGHT PER STORY - MULTIPLIER (See Line 7) | 1.0 | | | |
| 20. | FLOOR AREA-PERIMETER MULTIPLIER (Lines 8 & 9) | .923 | | | |
| 21. | COMBINED HEIGHT AND SIZE MULTIPLIER (Lines 18x19x20) | 1.846 | | | |

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| | **FINAL CALCULATIONS** | | | | |
| 22. | REFINED SQUARE FOOT COST   (Line 17 x 21) | 138.10 | | | |
| 23. | CURRENT COST MULTIPLIER   (Sect. 99 p. 3) | 1.06 | | | |
| 24. | LOCAL MULTIPLIER   (Sect. 99 p. 5 thru 10) | .82 | | | |
| 25. | FINAL SQ. FT. COST   (Line 22 x LINE 23 x LINE 24) | 120.04 | | | |
| 26. | AREA (BACK OF THIS FROM) | 21,540 | | | |
| 27. | LINE 25 x LINE 26 | 2,585,662 | | | |
| 28. | LUMP SUMS   (LINE 34) | + 159,622 | | | |
| 29. | REPLACEMENT COST   (LINE 27 + LINE 28) | 2,745,284 | | | |
| 30. | DEPRECIATION %   (Sect. 97) | .28% | | | |
| 31. | DEPRECIATION AMOUNT   (LINE 29 x LINE 30) | 768,680 | | | |
| 32. | DEPRECIATED COST   (LINE 29 – LINE 31) | 1,976,605 | | | |

## TOTAL OF ALL SECTIONS

CO   11

| | REPLACEMENT COST | DEPRECIATED COST | INSURABLE VALUE |
|---|---|---|---|
| 33. | 2,745,284 | 1,976,605 | |

See back of this form for drawings area and insurable value calculations.



**TRANSACTION REPORT**

P. 01

MAR-23-01 FRI 10:28 AM

FOR: GAB ROBINS N. A. INC.    9564232407

SRS 0013

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|------|-------|----------|---------|-------|------|------|
| MAR-23 | 10:27 AM | GAB HOUSTON | 1'15" | 3 | SEND | OK |

*2 Copies to Bill Kern*

00  **13**

 **GAB**

SRS 0014

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : First Report*

March 7, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

---

**SOURCE AND DATE OF ASSIGNMENT AND DATE INSPECTED**

We received this assignment by facsimile on 03-01-01. The risk and damage were inspected on 03-01-01.

**SUGGESTED RESERVES**

|  | RCV |
|---|---|
| Building | $ 125,000.00 |
| Contents | $ 100,000.00 |
| BI | $ 50,000.00 |

\** Reserves are based on preliminary inspection only.

CO 14

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

**GAB**

SRS  0015

Page 2

Valley Diagnostic

34718-43410

## ABSTRACT OF COVERAGE

At the time of assignment, no coverage information was provided.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

This occurred during the early morning hours of Sunday, 3/4/01. The water was discovered by a maintenance employee who was in the building for another purpose. He shut off the water as soon as the source was discovered and contacted management. More employees were called as was All Valley Restoration, who assisted greatly in the water extraction, drying and de-humidification of the building.

## SUBROGATION

Based on current information, we believe no subrogation will be involved.

## RISK

The risk is a two story brick medical building of approximately 42,000 square feet.

## DETERMINATION OF VALUE

A valuation report will be generated and included with our next report :

## SCOPE OF DAMAGE

The water flooded an area of approximately 75'x 75' on the second floor. This is an area mostly consisting of offices. After penetrating the floor and first floor ceiling, the water ran down into the first floor, which houses the radiology department. As it did so, approximately 24,000 x-rays and their folders were wet. Additionally small office machinery and equipment was covered with water.

The building carpet has been dried but, may need replacement due to discoloration and staining. The office furnishing will need to be reviewed for damage as well. Our recent inspection did not disclose any large or widespread damage to furnishing but, the Insured is concerned about what may occur in days to come. We will re-inspect these items on our next visit.

## ADJUSTMENT

All Valley Construction is preparing a detailed estimate, which we will review on Monday 3/12/01 with them and the building architects.

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 **GAB**

SRS 0016

Page 3          Valley Diagnostics          34718-43410

## EXPERTS

Belfor USA was contacted by your office directly and met us at the risk location. They will be doing restoration work on the wet x-rays. They also inspected the specialty equipment and spoke with the insured's service vendors who were on site inspecting and repairing radiology equipment. At this point, we do not believe that any of that equipment was damaged severely.

## SALVAGE

To be determined, following review of the damaged contents.

## FUTURE HANDLING

We will secure an agreed repair figure with the Insured's contractor and advise you accordingly on this figure.

The Insured will be checking and sorting small office equipment and setting aside those items that will need to be replaced.

Belfor will handle the restoration work on the x-rays and any other documents that were affected.

We understand that one of your General Adjusters will be assigned this loss to work to conclusion. If this occurs, please have that person call or contact me so that we can transition the handling of the file over to him or her.

Next report on or before 04-06-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

CO 16

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

# FAX COVER

To:  HELEN —                          SRS 0017

Company:

Phone:

Fax:

From:  Dennis

Title:

Extension:

Date:  3/16/01

Pages including this cover page:

Notes:

HELEN —
This was done on the 7th
So, ACCORDING to TAS Next
Report is due 21 days from
then or 3/28/01 28th. I have it
on my calendar to do on the
23rd — Let me know if this
is not correct.
                                  Dennis

CO 17

P. 01

**TRANSACTION REPORT**

MAR-16-01 FRI  8:36 AM

FOR: GAB ROBINS N. A. INC.    9564232407

SRS  0018

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|------|-------|----------|---------|-------|------|------|
| MAR-16 | 8:35 AM | GAB HOUSTON | 1' 27" | 4 | SEND | OK |

MAR - 6 '01  TUE 13:38    GAB ROBINS  HOUSTON TX    FAX NO. 7132703800    P. 01
From MediInsights    Tue Mar 06 12:27:51 2001    Page 1 of 2

*Denis*

a    **Assignment Form – Property Appraisals or Liability Investigations** SRS 0019

CNA Commercial Insurance
PO Box 219011
Dallas, TX 75221-9011
Phone: 214-220-5300
Fax: 214-220-1688
ALC – 64
GAB Customer Code # CNA 104013
Crawford Program # 14262

March 6, 2001

| Claim No 64-673311 | Desk Code PG | Date of Loss 03-04-01 | Loss Type: 1st P Property Appraisals (Drop-Down Box) |
|---|---|---|---|
| Claim Specialist Evelyn V. Fisk | | Phone Number 800-262-1113 Ext. 5524 | E-Mail Address evelyn.fisk@cna.com |
| Insured Valley Diagnostic | | Address 2200 Haine Dr Harlingen TX 78553 | Phone 956 421 5196 |
| Claimant | | Address | Phone |
| Contacts Rod Miller or Ruben Flores | | Address same | Phone same |

Description of Loss:  Large water damage to building and contents: Radiology suite.

Location of Property to be Inspected:  same

Description of Property:  radiology files, machinery, building wet when toilet on 2nd floor overflowed Saturday evening and was not discovered until about Noon Sunday.

Reported Damage:  Ceilings down, machinery wet, film and files wet, building damage.
Insd has hired Valley Wide Restoration to remove water and attempt to dry the film files.

☒ **Property Agreed Appraisal**

☒ Contents
☒ Structure
☐ Type of Construction
☐ Other (Specify in Special Instruction)

**Task Assignment/ Investigations**
☐ Police Report
☐ Death Certificate
☐ Coroner's Report
☐ Autopsy Report
☐ Contract/Lease

**Task Assignment/ Investigations**
Scene Diagram
☐ Interview Investigating Officer
☐ Canvas Scene for Witness
☐ Statement of Insured
☐ Statement of Claimant
☐ Statement of Witness
☐ Other  (Specify in Special Instruction)

---

## WHILE YOU WERE OUT

TO  Dennis                     DATE  3/6/01   TIME  1:38
M  Adam Garcia                 OF
PHONE  453 - 5587              FAX

☐ CALLED TO SEE YOU     REMARKS
☒ TELEPHONED
☐ WILL CALL AGAIN
☒ PLEASE PHONE
☒ Adams                 SIGNED
8803

**ATTN: CLAIMS SPECIALIST**

**GAB ICS: HOUSTON, TX**

**TEL# 713-968-5700**

**FAX# 713-270-3800**

00  19

SRS 0020

Special Instructions: RUSH-Insured business (Radiology dept) is shut down. All Valley Restoration Adam Garcia 956 453 5587, office 956 412 1039 has a water clean up crew in there. I have asked Belfor Kevin Jones 817 291 4165 mobile to go see what they can do to help save the films and files and get the ambient moisture out of there. They can also ck the machinery which is wet. I asked Belfour to coordinate with everyone.

SPECIAL DELIVERY INSTRUCTIONS (Complete only if you want the report faxed or mailed to an address other than captioned in the above heading)
Insure

2

CO 20

```
*********************************************************************************
*                              TRANSACTION REPORT                    P. 01     *
*                                                             MAR- 7-01 WED  4:39 PM  *
*               FOR: GAB ROBINS N. A. INC.    9564232407        SRS  0021      *
*------------------------------------------------------------------------------*
*   DATE   START    RECEIVER         TX TIME PAGES TYPE       NOTE             *
*------------------------------------------------------------------------------*
*   MAR- 7  4:38 PM 12142201688        1'21'   3  SEND       OK                *
*                                                                              *
*********************************************************************************
```

0  21



**GAB**

*Attn: John Hinz*

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

SRS 0022

*Report : Second Report*

March 23, 2001

**CNA**
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

On March 13, 2001 we met at with CNA General Adjuster Ivars A. Rudzitis at the Risk. The Insured's General Contractor, All Valley Construction attended as well as Valley Diagnostic Radiology Manager Ruben Flores, Executive director Rod Miller, Valley Diagnostic's supervisor of maintenance and local agent Larry Schoenemann.

Mr. Rudzitis will assume control of this file. He has asked that we maintain an open file to assist with coordinating local affairs. A request was made for a building valuation using both the Boeckh software system and the Marshall Valuation System. Attached are copies of the results of our analysis. The originals will be provided to Mr. Rudzitis during his next visit to the area. Original photographs will be turned over to Mr. Rudzitis as well.

**ENCLOSURES**

1. Diagram
2. Boeckh Valuation
3. Marshall Valuation

**SUGGESTED RESERVES**

Adjusted reserves have been established by CNA General Adjuster Ivars A. Rudzitis

**ABSTRACT OF COVERAGE**

Copies of the Insured policy were secured from the local agent's office by Mr. Rudzitis.

00   22

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS 0023

 **GAB**

Page 2                              Valley Diagnostic                              34718-43410

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## RISK

The risk is a two story, brick, medical office building of approximately 43,078 square feet. A diagram has been prepared and, a copy is attached.

## DETERMINATION OF VALUE

Our valuation results are attached. The Boeckh software produced an RCV of $2,499,047 and an ACV of $1,949,257. The Marshall Valuation resulted in an RCV of $2,585,662 and an ACV of $1,861,677. We believe that the slight difference may be due the fact that our Marshall Valuation local and cost multipliers are approximately 18 months old. These factors generally do not change significantly so, the difference between the two systems may be simply be just that.

## ADJUSTMENT

All Valley Construction prepared a detailed estimate, which was reviewed on Tuesday 3/13/01 by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

CO 23

To be determined, following review of the damaged contents and equipment.

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS  0024

 **GAB**

Page 3                                    Valley Diagnostic                     34718-43410

## FUTURE HANDLING

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 04-23-01.

*Dennis Nickoloff*
e-mail address:  nickolod@gabrobins.com

24

GAB - N172                    (ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS 0025

☐  Commercial Building Valuation
System                                    Standard

03/26/2001

Property Owner:              Valley Diagnostic
Cost as of:        03/1999
Property Address:            2200 Haine
                             Harlingen, TX 78550

Building Description         Section 1
   Occupancy:
        100%    501          Medical Clinic

   Construction Type:        100% Masonry Non-Combustible
   Number of Stories:        2
   Gross Floor Area:         43,078 sq.ft.
   Total Perimeter:          626 ft.
   Construction Quality:     2.5
   Year Built:               1982
   Climatic Region:          Warm
   Seismic Zone:             0
   High Wind Region:         2
   Hillside
      Construction:          Degree of Slope: Level
Site Position:        Unknown
                      Site Accessibililty: Excellent
Soil Condition:       Excellent

Architect Fees:              7% is included.
Profit and Overhead:        20% is included.

Depreciation:
   Condition: Average        Effective Age: 19 years
Depreciation:  22 %

SUMMARY OF COSTS:
Replacement

Cost

   Site Preparation
2,913
   Foundation Wall
12,322
   Interior Foundations
8,491
   Slab On Ground
63,668

CO  25

SRS 0026

```
Framing
150,776
    Exterior Wall              2 % Wall Openings
159,533
                            100 % Brick, on masonry
    Structural Floor
186,663
    Roof
163,391
        Material            100 % Built-up, tar and gravel or rock
        Pitch               100 % Flat
    Floor Finish
120,783
                             25 % Carpeting
                             75 % Tile, vinyl composite
    Ceiling Finish
140,237
                            100 % Suspended acoustical
    Partitions              5,000 ft.
159,622
        Structure           100 % Studs, girts, etc.
        Finish              100 % Drywall
    Plumbing                80 Total Fixtures
222,850
    Heating
100,405
                            100 % Forced warm air
    Cooling
169,782
                            100 % Forced cool air
    Electrical
362,452
                            100 % Average
    Built-ins
270,487
    Elevators
136,843
        2 Passenger
    Manual Fire Alarm        100 %
67,830
```

_____

SUBTOTAL
$2,499,047

_____

Depreciated Cost   (78%)
$1,949,257

_____

TOTAL SECTION 1
$1,949,257

_____

    Boeckh costs include labor and material, normal profit and overhead
as of date of report.  Costs represent
        general estimates which are not to be considered a detailed
quantity survey.  These costs include
        generalities and assumptions that are common to the types of

SRS 0027

structures represented in the software.

(C) 1999 E. H. Boeckh, a Division of Thomson Publishing
Corporation. All Rights Reserved.

---

□                                        Commercial Building Valuation
System
                                            Standard

03/26/2001

---

Policy:
Exp. Date:
  (none)
Cost as of:    03/1999
Property Owner:
  Valley Diagnostic

Texas Ins. Managers

---

| SUMMARY OF COSTS: | | | Replacement |
|---|---|---|---|
| $/sq.ft.  Depreciated  $/sq.ft. | | | Cost |
| Cost       Cost        Cost | | | |
| Section: 1 | | | $2,499,047 |
| $58.01    $1,949,257   $45.25 | | | |
| 100%   501   Medical Clinic | | | |

---

| TOTAL: | | | $2,499,047 |
|---|---|---|---|
| $58.01    $1,949,257   $45.25 | | | |

---

   Boeckh costs include labor and material, normal profit and overhead
as of date of report.  Costs represent
        general estimates which are not to be considered a detailed
quantity survey.  These costs include
        generalities and assumptions that are common to the types of
structures represented in the software.

        (C) 1999 E. H. Boeckh, a Division of Thomson Publishing
Corporation. All Rights Reserved.

---

CO    27





# GAB

**CALCULATOR COST FORM** Form 121 (12/90)

*For use with the Calculator Cost Method*

**MARSHALL VALUATION SERVICE SQUARE FOOT COST**

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 1. | SUBSCRIBER MAKING SURVEY | GAO Rocins | | DATE OF SURVEY | 3/22/01 |
| 2. | NAME OF BUILDING | Valley Diagnostic | | OWNER | |
| 3. | LOCATED AT | 2200 Haine Dr, Harlingen — 78550 | | | SRS 0029 |
| 4. | OCCUPANCY | Medical Office Bldg | | | |
| 5. | BUILDING CLASS AND QUALITY | Cls C Qual Average | Cls ___ Qual ___ | Cls ___ Qual ___ | Cls ___ Qual ___ |
| 6. | EXTERIOR WALL | Brick | | | |
| 7. | NO. OF STORIES & HEIGHT PER STORY | No. 2 Ht 12 | No. ___ Ht ___ | No. ___ Ht ___ | No. ___ Ht ___ |
| 8. | AVERAGE FLOOR AREA | 21,540 = | | | |
| 9. | AVERAGE PERIMETER | 626 | | | |
| 10. | AGE AND CONDITION | Age 19 Cond. V Good | Age ___ Cond. ___ | Age ___ Cond. ___ | Age ___ Cond. ___ |
| 11. | REGION | | 12. CLIMATE | | |

**11. REGION:** Western ☐   Central ☑   Eastern ☐

**12. CLIMATE:** Mild ☐   Moderate ☑   Extreme ☐

| | | SECTION I | SECTION II | SECTION III | SECTION IV |
|---|---|---|---|---|---|
| 13. | BASE SQUARE FOOT COST | 71.06 | | | |
| | **SQUARE FOOT REFINEMENTS** | | | | |
| 14. | HEATING, COOLING, VENTILATION | + 3.75 | | | |
| 15. | ELEVATOR DEDUCTION | Included | | | |
| 16. | MISCELLANEOUS | N/A | | | |
| 17. | TOTAL LINES 13 THROUGH 16 ▷ | 74.81 | | | |
| | **HEIGHT AND SIZE REFINEMENTS** | | | | |
| 18. | NUMBER OF STORIES – MULTIPLIER | 2.0 | | | |
| 19. | HEIGHT PER STORY - MULTIPLIER (See Line 7) | 1.0 | | | |
| 20. | FLOOR AREA-PERIMETER MULTIPLIER (Lines 8 & 9) | .923 | | | |
| 21. | COMBINED HEIGHT AND SIZE MULTIPLIER (Lines 18x19x20) | 1.846 | | | |
| | **FINAL CALCULATIONS** | SECTION I | SECTION II | SECTION III | SECTION IV |
| 22. | REFINED SQUARE FOOT COST (Line 17 x 21) | 138.10 | | | |
| 23. | CURRENT COST MULTIPLIER (Sect. 99 p. 3) | 1.06 | | | |
| 24. | LOCAL MULTIPLIER (Sect. 99 p. 5 thru 10) | .82 | | | |
| 25. | FINAL SQ. FT. COST (Line 22 x LINE 23 x LINE 24) | 120.04 | | | |
| 26. | AREA (BACK OF THIS FROM) | 21,540 | | | |
| 27. | LINE 25 x LINE 26 | 2,585,662 | | | |
| 28. | LUMP SUMS (LINE 34) | — | | | |
| 29. | REPLACEMENT COST (LINE 27 + LINE 28) | 2,585,662 | | | |
| 30. | DEPRECIATION % (Sect. 97) | .28% | | | |
| 31. | DEPRECIATION AMOUNT (LINE 29 x LINE 30) | 763,995 | | | |
| 32. | DEPRECIATED COST (LINE 29 – LINE 31) | 1,261,677 | | | |

**TOTAL OF ALL SECTIONS**

00  29

| 33. | REPLACEMENT COST | DEPRECIATED COST | INSURABLE VALUE |
|---|---|---|---|
| | 2,585,662 | 1,861,677 | |

See back of this form for drawings area and insurable value calculations.



*This showed up on my Repor list for 4/3 — WE Dio this Repo + will place on 21 day diary in futore (because of 5 days).*

*Dennis*

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

SRS 0030

*Report : Third Report*

April 3, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

## ENCLOSURES

1. Boeckh Valuation (revised)
2. Marshall Valuation (revised)

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## RISK

## DETERMINATION OF VALUE

Following a discussion with Mr. Rudzitis, we revised our valuations to reflect the unusual double sheetrock wall treatment in the Risk. The Boeckh software produced a revised RCV of $2,658,669 and an ACV of $2,108,879. The Marshall Valuation resulted in a revised RCV of $2,745,284 and an ACV of $1,976,605.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 **GAB**

SRS 0031

Page 2                           Valley Diagnostic                          34718-43410

## ADJUSTMENT

As noted in our previous report, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 04-19-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

31

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

P. 01

**TRANSACTION REPORT**

APR- 3-01 TUE 10:05 AM

FOR: GAB ROBINS N. A. INC.    9564232407

SRS 0032

| DATE | START | RECEIVER | - TX TIME | PAGES | TYPE | NOTE |
|------|-------|----------|-----------|-------|------|------|
| APR- 3 | 10:04 AM | GAB HOUSTON | 1'26" | 3 | SEND | OK |

CO  32



P. 01

## TRANSACTION REPORT

APR- 2-01 MON  8:45 AM

FOR: GAB ROBINS N. A. INC.   9564232407

SRS 0034

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|------|-------|----------|---------|-------|------|------|
| APR- 2 | 8:44 AM | GAB HOUSTON | 1'16″ | 3 | SEND | OK |

CO  **34**

```
                                                                          P. 01
                              TRANSACTION REPORT
                                                        MAR-29-01 THU  1:48 PM

                  FOR: GAB ROBINS N. A. INC.    9564232407
                                                           SRS  0035

     DATE   START    RECEIVER       TX TIME PAGES TYPE       NOTE

     MAR-29  1:45 PM 19419247470       2'19'   6  SEND       OK
```

CO   35



SRS  0036

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Tenth and Final Report*

August 8, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn:  Evelyn Fisk

Cc:  Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

---

We acknowledge your telephone call of 08-08-01 instructing us to close our file.

**ENCLOSURES**

1. Photographs of Risk and damage

**CAUSE OF LOSS**

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow.  Water flooded approximately 4,400 square feet on each of the two floors.  The Insured's maintenance department maintains the toilets.

**SUBROGATION**

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves. Mr. Steven Burke is the attorney at that firm (214-462-3054).

**ADJUSTMENT**

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis.  It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

---

36

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



Page 2                           Valley Diagnostic                           34718-43410

## EXPERTS

Belfor USA took possession of the X-ray files for drying, cleaning and restoration.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

Our file is now closed.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

CO  37

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS  0038

TAILORED SERVICE
PREPARED BY GAB Robins FOR

PROPERTY
CNA NATIONAL VENDOR PROGRAM

**GAB Robins**

GAB Robins North America, Inc. TAS [    ]
*revision date (9/00)*
*template revision date (07/2000)*
Customer Code
CNA  084145 / RSKCo  379100
under group 799  Use these code
numbers on all files received on
9-25-2000 and after.

*Company Name, Address, Tele. & Fax*
CNA INSURANCE COMPANY. CNA
PLAZA. CHICAGO, IL 60685,
TELEPHONE 312-822-5000
PROGRAM INCLUDES CNA
COMMERCIAL. RSKCo AND CNA
HEALTHPRO

TAS Inception – 9/2000
TAS Expiration – 9/2003
Type of TAS - PROPERTY
Applicable Standard -

Territory - USA

1. Assignments – All assignments must be received from CNA or the GAB Robins reception center in Tennessee.  If received from any other source. you must contact the CNA claim office for approval to handle. The call center will be in operation from 8am Eastern time to 5pm Pacific time.

2. Acknowledgement – The GABR call center will fax an acknowledgement to CNA listing the office and the phone number where the assignment is made within an hour of receipt. The GABR office receiving the assignment will fax to the CNA claim specialist/adjuster the name and the phone number of the GAB appraiser handling the assignment within 6 hours of the assignment.

3. Reporting Requirements – Appraisals – final report within 4 business days following the date of assignment. In the rare instances when not completed. first status report within 4 business days following the date of assignment and subsequent status reports every 21 days or the estimated completion date, which ever is earlier.

4. Settlement Authority – No authority, **agreed appraisal** only.  **Agreed appraisal is defined as the cost of the repairs agreed with the property owner, the property owner's contractor or a reputable contractor in the local area that will do the work based on your estimate.**

5. Checks – Issued by CNA.

6. Reports – Appraisal – must confirm cause of loss and damage on standard short form reports.  First report should close the file; however, if first report is a status report appraiser must give estimated completion date.  Fax completed assignment to CNA claim specialist/adjuster and mail original hardcopy reports and all enclosures to the CNA claim office.

7. Billing – use - pricing attached for the CNA program.  All billing documents are sent to the CNA claim specialist/adjuster. Itemize the additional charges such as mileage and photos. Any additional charges require the prior approval of CNA claim specialist/adjuster.  All T&E files must have an itemized listing of services, claim number, amount paid, name of appraiser, name of insured. invoice number and charges.  Interim billing of files with the permission of claim specialist/adjuster only.

8. Subrogation - Immediate notification of subrogation potential should be given to the CNA claim specialist/adjuster.

9. Photographs – Appraisal – no more than 5 photographs per appraisal without the permission of the CNA claim specialist/adjuster. All photos should be mounted on photo sheets and a description of the photos.  All photos mounted on photo sheets with dates and description.  One photo must be taken of the risk on all losses.  Expert photos with the permission of the CNA.   One photo should show front elevation of risk.

10. Value – Appraisal – determine the pre-loss replacement value and actual cash value of the structure and/or business personal property and put this figure on top of the 420 or within the Boeckh automated estimate

38

11. Estimate (Repair-Replace) – In the rare instance that estimate in not prepared, all losses will have a complete scope of loss created and submitted with the first report.  An itemized estimate will be completed within 48 hours after inspection and will suggest depreciation by trade/line item.  Content items on appraisals will have a list of the damaged contents and the suggested

depreciation by trade item.

SRS  0039

12. <u>Salvage –</u> Appraisal – advise the CNA claim specialist/adjuster of salvage and protect if possible.

13. <u>Branch Assists</u> – Advise the claim specialist/adjuster that additional help is needed and obtain permission to use a branch assist.

14. <u>Proofs of Loss/Releases</u> – Not involved, unless requested by CNA.

15. <u>Index Bureau - PILR Reports, Etc.</u>, - File as appropriate.

16. <u>Special Instructions</u> –

1.  Inspection of losses must be done within 48 hours from the day of the assignment. Contact must be made with the property owner or with the appropriate representative on same day of assignment if the assignment is received by 2pm local time. If after 2pm then contact must be made by noon of the next business day. If unable to make contact a contact letter must be sent within 24 hours.

2.  CNA claim specialist/adjuster must be contacted immediately, under usual circumstances from the scene, in the following instances 1) extent of damages varies substantially from the assignment report, 2) the gross loss is over app. $25,000, 3) extent of damage varies substantially from the assignment sheet, 4) coverage appears to be questionable, 5) fraud or arson involved, 6) need for outside expert, 7) subrogation and salvage involved in losses over $25,000, 8) when a lawsuit is filed. or 9) complaints received from insured, agent, claimants and state insurance department.

3.  If the claim warrants the use of a GA, permission must be obtained from CNA examiner by phone prior to the use of the GA.

4.  If there are any questions on the claim, call the CNA assigning adjuster to discuss questions you may have.

5.  Excess mileage is defined as over 75 miles one way from the office. Any claim where you will need to travel more than 75 miles one way, the CNA adjuster must approve travel by phone before making the trip. Pro rated travel must also be considered when billing CNA.

6.  If a local GAB Robins adjuster does not have the needed expertise to handle a specific file and it is necessary to bring in another GAB Robin's adjuster, you are required to call the CNA adjuster to obtain permission. It is important to discuss any deviations with the CNA so they have the opportunity to approve our activity.

7.  General Adjusters may not be used without the permission of the CNA representative.

## Pricing on second page

TAILORED SERVICE
PREPARED BY GAB Robins FOR CNA Insurance
Company

PAGE 2    PROPERTY TAS
*Company Name, Address, Tele. & Fax*
CNA INSURANCE COMPANY, CNA PLAZA,
CHICAGO, IL 60685, TELEPHONE 312-822-5000
PROGRAM INCLUDES CNA COMMERCIAL,
RSKCo AND CNA HEALTHPRO

Pricing:

| Severity Band | Price |
|---|---|
| 1.  Loss between $0    - $   500 | $105 |
| 1.  Loss between $501   - $ 2,500 | $160 |
| 2.  Loss between $2501  - $  5,000 | $220 |
| 3.  Loss between $5,001 - $ 10,000 | $290 |
| 4.  Loss between $10,001 - $ 15,000 | $375 |
| 5.  Loss between $15,001 - $ 20,000 | $485 |
| 6.  Loss between $20,001 - $ 25,000 | $580 |
| 7.  Loss over $25,000 | $60/hr |

Services Included in the Price:
•   80 Free Miles
•   5 Photos
•   Itemized estimate to include ACV
•   1st Party ITV (replacement value) Estimates
•   Supplements

00   39

CUSTOMER TAS DISTRIBUTIONS SUPERSEDE GAB STANDARD PROCEDURES

SRS 0040

- Long Distance calls
- Fax Charges
- Copying Charges
- Miscellaneous expenses incurred in the normal handling of a loss/claim

**Extra Charges:**
- Additional Photos @ $1.75 per photo (First 5 photos are free)
- Additional Mileage @ $1.25 per mile (First 80 miles are free)
- Expert Fees (requires CNA's prior approval before using)
- Out of town expenses such as airfare, lodging, food etc. (requires CNA's prior approval before using)

8.  Pricing is for all field adjusters but does not include General Adjusters. Use of GA's is with the permission of the CNA or RSKCo only at the standard published rates.

9.  Additional tasks requested as part of the appraisal will be billed based on the time of completing the task only, at the $60.00 per hour inclusive rate. No additional drive time will be charged unless the specific task requires driving time to get to the task site.

10. Any file assigned as a full adjustment will be handled at the $60.00 per hour inclusive rate for all activity in addition to the property appraisal flat charge if the gross amount of the appraisal is below $25,000.00. If the gross amount of the appraisal is over the $25,000.00 limit, the entire full adjustment is billed at the $60.00 rate for the time involved.

40

SRS 0041

- Long Distance calls
- Fax Charges
- Copying Charges
- Miscellaneous expenses incurred in the normal handling of a loss/claim

**Extra Charges:**
- Additional Photos @ $1.75 per photo (First 5 photos are free)
- Additional Mileage @ $1.25 per mile (First 80 miles are free)
- Expert Fees (requires CNA's prior approval before using)
- Out of town expenses such as airfare, lodging, food etc. (requires CNA's prior approval before using)

8. Pricing is for all field adjusters but does not include General Adjusters. Use of GA's is with the permission of the CNA or RSKCo only at the standard published rates.

9. Additional tasks requested as part of the appraisal will be billed based on the time of completing the task only, at the $60.00 per hour inclusive rate. No additional drive time will be charged unless the specific task requires driving time to get to the task site.

10. Any file assigned as a full adjustment will be handled at the $60.00 per hour inclusive rate for all activity in addition to the property appraisal flat charge if the gross amount of the appraisal is below $25,000.00. If the gross amount of the appraisal is over the $25,000.00 limit, the entire full adjustment is billed at the $60.00 rate for the time involved.

SRS 0042



# REMODEL NOTES & LEGEND

1. REMODEL OF ERDMAN BUILDING, STEEL FRAME, BRICK VENEER AND BUILT-UP ROOF.

2. "HARVEST" VINYL IN NEW CARPET. FIELD APPLIED VINYL FR MATING W/ EXISTING "CUFF" VINYL NEW TOILETS.

3. CARPET UNDER... (CT AT TOILETS.)

4. SEE ORIGINAL JOB NOTE FR TYPICAL SYMBOLS

5. ————  EXISTING WALL & DOOR, TO REMAIN

   ————  NEW WALL & DOOR (IF REL.—RELOCATE)

| SHEET NUMBER | JOB NUMBER | UPPER LEVEL PLAN |
|---|---|---|
| 3 | D9719 | |

| DRAWN | DATE | SCALE |
|---|---|---|
| 7 DEC '89 | REL REV FOR PRICING | |
| 11 DEC '89 | REV. TO PRICING | |
| 21 DEC '89 | CONTRACT! | |

00 42







SRS 0045

45



SRS 0046

## PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:     INSTANT [ ]     NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 1
DESCRIPTION: Front of Risk (North)



PICTURE NUMBER: 2
DESCRIPTION: Rear (E. Side)

CO   46



**GAB**

GAB Robins North America, Inc.

## PHOTO SHEET

SRS 0047

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:     INSTANT [ ]     NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 3
DESCRIPTION: Close View of front of Risk

PICTURE NUMBER: 4
DESCRIPTION: Rear (SE corner)

00   47



**GAB**

GAB Robins North America, Inc.

**PHOTO SHEET**

SRS 0048

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:        INSTANT [  ]     NEGATIVE [ X ] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 5
DESCRIPTION: X-Ray
file room sustained
water damage



PICTURE NUMBER: 6
DESCRIPTION: 1st floor
hail - water ran down
from above.

69  48



**GAB**

GAB Robins North America, Inc.

PHOTO SHEET

SRS  0049

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:   INSTANT [ ]   NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 7
DESCRIPTION: Toilets
2 level that
overflowed



PICTURE NUMBER: 8
DESCRIPTION: 2nd floor
Hall - Lawsuit loss

Water extracted from
Carpet

00    49



GAB Robins North America, Inc.

SRS  0050

## PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:  INSTANT [ ]  NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 9
DESCRIPTION: office
on 2nd level —
Water extracted
from carpet



PICTURE NUMBER: 10
DESCRIPTION: 2nd
floor hall

00  50



**GAB**
GAB Robins North America, Inc.

PHOTO SHEET

SRS  0051

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:   INSTANT [ ]   NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 11
DESCRIPTION: 2nd fl
Hall - work area



PICTURE NUMBER:
DESCRIPTION: Neg
( )

51



## GAB
GAB Robins North America, Inc.

PHOTO SHEET

SRS 0052

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: | INSTANT [ ]  NEGATIVE [X] | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 12
DESCRIPTION:
Photos 12-21
Are of various
equipment that was
water damaged/R
wet. All is 1st
floor — in R Mal
X-Ray dept.

PICTURE NUMBER: 13
DESCRIPTION:

52



**GAB**

GAB Robins North America, Inc.

PHOTO SHEET

SRS 0053

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:      INSTANT [ ]     NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: /4
DESCRIPTION:

PICTURE NUMBER: 15
DESCRIPTION:

00    53



**GAB**
GAB Robins North America, Inc.

SRS 0054

## PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | | |
|---|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | | D. Nickoloff |
| FILM:   INSTANT [  ]   NEGATIVE [ X ] | | DATE TAKEN: | | 03-06-01 |



PICTURE NUMBER: 16
DESCRIPTION:

PICTURE NUMBER: 17
DESCRIPTION:

00  54



**GAB**
GAB Robins North America, Inc.

**PHOTO SHEET**

SRS 0055

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM:    INSTANT [ ]    NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 18
DESCRIPTION:



PICTURE NUMBER: 19
DESCRIPTION:

55



**GAB**

GAB Robins North America, Inc.

SRS 0056

## PHOTO SHEET

| OWNER/CLAIMANT: | Valley Diagnostic | | |
|---|---|---|---|
| LOCATION: | 2200 Haine Dr., Harlingen, TX | DATE OF LOSS: | 03-04-01 |
| CO. CLAIM NO: | 64-673311 | GAB ROBINS FILE NO: | 34718-43410 |
| POLICY NO: | | PHOTOGRAPHED BY: | D. Nickoloff |
| FILM: INSTANT [ ] NEGATIVE [X] | | DATE TAKEN: | 03-06-01 |



PICTURE NUMBER: 2c
DESCRIPTION:



PICTURE NUMBER: 2i
DESCRIPTION:

00  56

```
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
x                                                                              P.01       x
x                         TRANSACTION REPORT                                              x
x                                                          APR-18-2003 FRI 01:36 PM       x
x      FOR:  GAB ROBINS              713 270 3800              SRS  0057                   x
x--------------------------------------------------------------------------------------   x
x   DATE  START   RECEIVER         TX TIME   PAGES TYPE      NOTE            M#  DP         x
x--------------------------------------------------------------------------------------   x
x   APR-18 01:35 PM 919739933221    1'11"     7  SEND        OK             166            x
x                                                                                         x
x--------------------------------------------------------------------------------------   x
x                                      TOTAL :     1M 11S  PAGES:   7                      x
x                                                                                         x
xxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxxx
```



**GAB Robins**™

GAB Robins North America, Inc.

8700 Commerce Park
Suite 235
Houston, TX 77036
T: 713-988-6700
F: 713-270-3800

## FAX COVER SHEET

Date: 4-18-03

To: Nancy Krantz

From: Tracy x222

Number of pages (including cover sheet): 7

RE: Valley Diagnostic



## GAB Robins

GAB Robins North America, Inc.

SRS 0058

8700 Commerce Park
Suite 235
Houston, TX 77036
T: 713-988-6700
F: 713-270-3800

## FAX COVER SHEET

Date: 4-18-03

To: Nancy Krantz

From: Trag   X222

Number of pages (including cover sheet): 7

RE: Valley Diagnostic

Fax number: 973-993-3221

Faxed by: Trag   X222

00  58

GAB N167I(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc., All Rights Reserved)

SRS 0059



UPPER LEVEL PLAN

DRAWN | DATE 6 ·22 ·91 | SCALE 1/8"=1'-0"
7 DEC '91 | Rev. Per PK Pricing
21 DEC '91 | Rev. To Pricing
21 DEC '91 | CONTRACT 1

JOB NUMBER
D9719

SHEET NUMBER
3

REMODEL NOTES & LEGEND

1. REMODEL OF ERDMAN BUILDING, STEEL FRAME, BRICK VENEER AND BUILT-UP ROOF.

2. "HARVEST" VINYL IN NEW CARPET TO MATCH EXISTING (MATCH EXISTING). FAV - FIELD APPLIED VINYL FR MATCH AND FOR COMPATIBILITY W/ EXISTING. "BUFF" VINYL @ EXIST. OFFICE-DIV-FRAME TILE AT NEW TOILETS.

3. CARPET IN ALL AREAS VT - VINYL WITH R15 OR DIV-CERAMIC TILE (CT AT TOILETS.)

4. SEE ORIGINAL JOB NOTES FOR TYP. ALL SYMBOLS

5. ⌐___ EXISTING WALL & FLOOR, TO REMAIN

   ⌐ 30° NEW WALL & FLOOR (IF REL - RELOCATE)

6. VERIFY THROUGHOUT

7. THIS CONTRACT INCLUDES EXISTING 1ST PHASE

8. FIELD VERIFY DIMENSIONS OF EXISTING CONDITIONS PRIOR TO BEGINNING OF WORK

 **GAB**

SRS 0060

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Third Report*

April 3, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

---

**ENCLOSURES**

1. Boeckh Valuation (revised)
2. Marshall Valuation (revised)

**CAUSE OF LOSS**

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

**SUBROGATION**

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

**RISK**

**DETERMINATION OF VALUE**

Following a discussion with Mr. Rudzitis, we revised our valuations to reflect the unusual double sheetrock wall treatment in the Risk. The Boeckh software produced a revised RCV of $2,658,669 and an ACV of $2,108,879. The Marshall Valuation resulted in a revised RCV of $2,745,284 and an ACV of $1,976,605.

60

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



SRS 0061

Page 2                    Valley Diagnostic                    34718-43410

## ADJUSTMENT

As noted in our previous report, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 04-19-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

CO 61

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

**TRANSACTION REPORT**

P. 01

APR-13-01 FRI 11:02 AM

FOR: GAB ROBINS N. A. INC.    9564232407    SRS 0062

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|------|-------|----------|---------|-------|------|------|
| APR-13 | 11:01 AM | GAB HOUSTON | 1'05" | 3 | SEND | OK |

CO 62

# FAX COVER

To: John Hirs

Company: D&B Robins N.A., Inc.          SRS 0063

Phone: (713) 988-6700

Fax:

From: Dennis Nickoloff

Title:

Extension:

Date: 4-13-01

Pages including this cover page: 3 pages

Notes:

Re: # 34718-43410

CNA 4th Report

Thanks

63



SRS 0064

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Fourth Report*

April 13, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



SRS 0065

Page 2                          · Valley Diagnostic                          34718-43410

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 05-04-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

65

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



SRS 0066

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Fifth Report*

April 30, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

---

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.


## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.


## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.


## EXPERTS

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

66

---

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

 **GAB**

SRS 0067

Page 2            Valley Diagnostic            34718-43410

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjuster as his needs dictate.

Next report on or before 05-21-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

60    67

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS 0068

## CNA REPORT DUE

Adjuster: Dennis Nickoloff

File #: 34718-43410

Insured: Valley Diagnostic

Claimant:

Report due date: 5/16/01

Fax copy to John Hinz

P. 01

## TRANSACTION REPORT

MAY-16-01 WED  9:03 AM

FOR: GAB ROBINS N. A. INC.    9564232407

SRS 0069

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|------|-------|----------|---------|-------|------|------|
| MAY-16 | 9:02 AM | GAB HOUSTON | 51″ | 2 | SEND | OK |

69





SRS 0070

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Sixth Report*

May 16, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

---

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

**CAUSE OF LOSS**

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

**SUBROGATION**

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

**ADJUSTMENT**

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

**EXPERTS**

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

GAB - N172

CO 70

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



SRS 0071

Page 2                              Valley Diagnostic                        34718-43410

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjusters as their needs dictate.

Next report on or before 06-06-01.

*Dennis Nickoloff*

e-mail address:  nickolod@gabrobins.com

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS 0072



**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Seventh Report*

June 1, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves.

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

00 72

Belfor USA has taken possession of the X-ray files and are in the process of drying, cleaning and restoring them.

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS 0073



Page 2                                     Valley Diagnostic                              34718-43410

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjusters as their needs dictate.

Next report on or before 07-06-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

73

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



SRS 0074

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Ninth Report*

August 2, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves. Mr. Steven Burke is the attorney at that firm (214-462-3054).

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA took possession of the X-ray files for drying, cleaning and restoration.

**74**

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS 0075



Page 2                                    Valley Diagnostic                          34718-43410

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

**SALVAGE**

To be determined, following review of the damaged contents and equipment.

**FUTURE HANDLING**

We will continue to assist your General Adjusters as their needs dictate.

**Please advise if you wish us to maintain an open file.**

Next report on or before 09-06-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

75

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)



SRS 0076

**GAB ROBINS N.A., INC.**
632 Ed Carey Drive, Suite 700
Harlingen, Texas 78550-7965
Phone 956/423-0770
FAX #956/423-2407

*Report : Eighth Report*

July 3, 2001

CNA
PO Box 219011
Dallas, Texas 75221-9011

Attn: Evelyn Fisk

Cc: Mr. Bill Knarr

| | |
|---|---|
| Policy No. | Unknown |
| Policy Period | Unknown |
| Claim No. | 64-673311 |
| GAB File No. | 34718-43410 |
| Insured | Valley Diagnostic |
| Claimant | |
| Agency | |
| Agency Location | |
| Type of Claim | Property |
| Date of Claim | 03-04-01 |

---

We acknowledge your telephone call of 05-08-01 informing us that Mr. Bob Dudek will be handling this file while Mr. Rudzitis is recovering from heart surgery.

## CAUSE OF LOSS

The hinge pin of a second floor toilet fill valve worked itself loose, causing the tank to overflow. Water flooded approximately 4,400 square feet on each of the two floors. The Insured's maintenance department maintains the toilets.

## SUBROGATION

Subrogation possibilities are being explored by Mr. Rudzitis, using a law firm in Dallas, TX that handles lawsuits arising from malfunctioning toilet flush valves. Mr. Steven Burke is the attorney at that firm (214-462-3054).

## ADJUSTMENT

As noted in our previous reports, All Valley Construction prepared a detailed estimate, which was reviewed on by Mr. Rudzitis. It was our understanding that a re-inspector from one of your other offices would also be reviewing the estimate.

## EXPERTS

Belfor USA took possession of the X-ray files for drying, cleaning and restoration.

76

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

SRS 0077

 **GAB**

Page 2                                   Valley Diagnostic                          34718-43410

The Insured has contacted local and national representatives of the various radiology equipment that sustained water damage. They will be reporting to the Insured on the results of their inspections. It is also our understanding that Mr. Rudzitis is also contacting an expert to provide an opinion for CNA on the damage done by the water.

## SALVAGE

To be determined, following review of the damaged contents and equipment.

## FUTURE HANDLING

We will continue to assist your General Adjusters as their needs dictate.

**Please advise if you wish us to maintain an open file.**

Next report on or before 08-06-01.

*Dennis Nickoloff*
e-mail address: nickolod@gabrobins.com

GAB - N172

(ACIS Copyright (c) 1994 GAB Business Services, Inc. All Rights Reserved)

**GAB Robins™**

GAB Robins North America, Inc.

CNA
PO Box 219011
Dallas, TX 75221-9011

Attn: Evelyn Fisk

632 Ed Carey Dr.
Suite 700
Harlingen, Tx. 78550
T: 956-423-0770
F: 956-423-2407

SRS 0078

**BILLING SUMMARY**                           08/08/2001     Final        x

| | | |
|---|---|---|
| GAB Robins File: | 34718-43410 | Supplemental |
| Insured | : Valley Diagnostic | Interim |
| Claim Number | : 64-673311 | |
| Policy Number | : | |
| Adjuster | : D. Nickoloff #4205-3 | |

Cust. Charge

| PROPERTY: | Damage Appraisal | Flat Rate: | | | |
|---|---|---|---|---|---|
| | No Frills: | Flat Rate: | | | |
| | Automobile Appraisal | Flat Rate: | | | |
| Estimated Loss: | | $0.00 | | | |
| OR: | Time & Expense | | | | |
| | Hours | 20.1 | | | |
| | At Rate of | $ 60.00 | | $ | 1,206.00 |
| CASUALTY : | Time & Expense Hours | | | | |
| | At Rate of | | | $ | - |
| | Flat Rate Assignment | | | $ | - |
| | Recorded Statement | | | $ | - |
| | Scene Investigation | | | $ | - |
| | Other | | | $ | - |
| EXTRAS | Mileage | 25 | | | |
| | less included | -25 | | | |
| | Chargeable miles at $1.55/mile | 0 | $  1.55 | $ | - |
| | [Office use only # of miles] | 0 | | | |
| | [Adjuster Credit] | $  1.10 | $ | | - |
| | Photos Total | 21 | | | |
| | Less Included | -5 | | | |
| | Billable Photos Times Rate | 16 | $  1.75 | | $28.00 |
| | Telephone/ Fax charges | | | $ | - |
| | Public Records | | | $ | - |
| | Police or Fire reports cost | | | $ | - |
| | Support Staff @ $35.00 per hour | | | $ | - |
| | Parking | | | $ | - |
| | Other | | | $ | - |
| | SubTotal | | | $ | 1,234.00 |
| | Sales Tax 8 1/4% | | | $ | 101.81 |
| | | | | | |
| | Total Billing: | | | $ | 1,335.81 |
| | Mgr Approval_____ | | | | 78 |

*held back because amounts
were not matching. Diff* Thank you for using GAB Robins.
*... Photos not included in invoice. Antion ..*

# FAX COVER

To: *Evelyn Fisk*

Company: *CNA*

SRS 0079

Phone:

Fax: *(214) 220-1688*

From:

Title:

Extension:

Date: *8/9/01*

**GAB Robins**®

GAB Robins North America, Inc.

Dennis Nickoloff
**General Adjuster**
**Supervising Adjuster**

T: 956.423.0770
T: 956.383.7541
F: 956.423.2407
nickolod@gabrobins.com

632 Ed Carey Drive
Suite 700
Harlingen, TX 78550-7965

Pages including this cover page: *3 pages*

Notes:

*Re: Clm. # 64-673311*

*Ind. Valley Diagnosis*

*10th + Final Report*

*Thank you!*

P. 01

## TRANSACTION REPORT

AUG-9-01 THU  4:10 PM

FOR: GAB ROBINS N. A. INC.     9564232407

SRS 0080

| DATE | START | RECEIVER | TX TIME | PAGES | TYPE | NOTE |
|------|-------|----------|---------|-------|------|------|
| AUG- 9 | 4:08 PM | 12142201688 | 1'56" | 3 | SEND | OK |

80



**GAB Robins**

GAB Robins North America, Inc.

SRS 0081

9000 SW Freeway
Suite 400
Houston, TX 77074
T: 713-988-6700
F: 713-270-3800

March 11, 2002

Evelyn Fisk
C N A Insurance Company
P.O. Box 219011
Dallas, TX 75221-9011

**RE :    Unpaid Invoice(s)**

Attached you will find a copy of invoice(s) listed below.  Our records indicate that the following invoice(s) has/have not been paid:

| YOUR CLAIM NUMBER | INVOICE NUMBER | INVOICE AMOUNT | INVOICE DATE | GAB FILE NUMBER | NOTICE |
|---|---|---|---|---|---|
| 64673311 | 7311404074 | 1307.81 | 08-09-01 | 34718-43410 | 1st |
| 64814522 | 7311404360 | 327.76 | 11-26-01 | 34718-43843 | 1st |

**Please review the attached invoice(s) and place in line for payment.  If payment has already been issued, please forward a copy of canceled check(s) to my attention at the above address.**

We appreciate your business and thank you for your attention to this matter.

*Tracy Todd*

Tracy Todd
713-988-6700 x222

attachment(s)

81

GAB N167I(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc., All Rights Reserved)

# GAB Robins™

GAB Robins North America, Inc.

SRS 0082

8700 Commerce Park
Suite 235
Houston, TX 77036
T: 713-988-6700
F: 713-270-3800

May 19, 2003

Accounts Payable
C N A Insurance Company
P.O. Box 219011
Dallas, TX 75221

RE :    Unpaid Invoice(s)

Attached you will find a copy of invoice(s) listed below.  Our records indicate that the following invoice(s) has/have not been paid:

| YOUR CLAIM NUMBER | INVOICE NUMBER | INVOICE AMOUNT | INVOICE DATE | GAB FILE NUMBER | NOTICE |
|---|---|---|---|---|---|
| 64676880 | 7311103002 | 113.66 | 08-15-01 | 34705-21874 | 2nd |
| 64813631 | 7311103235 | 811.88 | 11-27-01 | 34705-21956 | 1st |
| 64817596 | 7311301944 | 454.65 | 04-11-02 | 34716-35131 | 1st |
| 64673311 | 7311404074 | 1307.81 | 08-09-01 | 34718-43410 | 2nd |
| 64688572 | 7310722391 | 113.66 | 09-18-02 | 34724-86309 | 1st |
| 64821205 | 7310722371 | 627.85 | 09-18-02 | 34724-86905 | 1st |
| 64689689 | 7310723127 | 405.94 | 10-23-02 | 34724-87111 | 1st |
| 64689866 | 7310722969 | 409.73 | 10-14-02 | 34724-87279 | 1st |
| 64821046 | 7310724688 | 850.86 | 03-13-03 | 34724-88578 | 1st |
| 64821046 64692046 64821066 | 7310724689 | 720.95 | 03-13-03 | 34724-88580 | 1st |
| 64668208 | 7311605115 | 522.59 | 01-25-01 | 34737-66266 | 1st |
| 64681648 | 7311605723 | 113.14 | 01-16-02 | 34737-66768 | 1st |

**Please review the attached invoice(s) and place in line for payment.**  If payment has already been issued, please forward a copy of canceled check(s) to my attention at the above address.

We appreciate your business and thank you for your attention to this matter.

John Hinz
General Manager
713-988-6700 x214

JH/tt

attachment(s)

82

GAB N167I(5/95)

(ACIS Copyright(c) 1995 GAB Robins North America, Inc., All Rights Reserved)



**GAB Robins**
GAB Robins North America, Inc.

632 ED CAREY DRIVE
SUITE 700
HARLINGEN, TX 78550-7365
T : 956-423-0770
F :956-423-2407

SRS  0083

## SERVICE INVOICE

084145
CNA INSURANCE COMPANY
P O BOX 219011
ATTN: EVELYN FISK
DALLAS, TX 75221-9011

**FINAL BILLING**

Mail Remittance To :
GAB Robins North America, Inc.
P.O. Box 7247-7162
Philadelphia, PA 19170-7162
IRS - 13-2747054

**Invoice Number : 7311404074**
CUSTOMER SPECIFIC PRICING

| | | | |
|---|---|---|---|
| **GAB File Number**<br>34718-43410A | **TAS No.** | **Invoice Date**<br>08/09/01 | **Catastrophe No.** |
| **Insured**<br>VALLEY DIAGNOSTIC | | | |
| **Policy Number**<br>UNKNOWN | **Policy Term**<br>01/01/2001-12/31/2001 | | **Claim Number**<br>64673311 |
| **Claimant**<br>VALLEY DIAGNOSTIC | | | |
| **Agency & Location** | | **Cust. Producer Code** | |
| **Acc/Loss/Occur Location**<br>HARLINGEN,TX | **Loss Zip**<br>78550 | | **Type of Loss/Claim**<br>PR |
| **Acc/Loss/Occur Date**<br>03/04/2001 | **Assign Date**<br>03/06/2001 | | **Product Code**<br>1CP |

**Expenses**

| | |
|---|---|
| Service | 1,206.00 |
| Miscellaneous | .00 |
| Sub Total | 1,206.00 |
| Taxes/Overhead | 101.81 |
| **Total Invoice** | **$1,307.81** |

FILE COPY

83

GAB A991

(Copyright (c) 2000 GAB Robins North America, Inc., All Rights Reserved)

Version 2.0.1.1

**EXHIBIT 2**

SRS  0084





Nickoloff

EXHIBIT NO. 2

S. SWANTNER

Sunbelt Reporting & Litigation Services