51

United States District Court
Southern District of Texas
FILED
NOV 1 2 2003
Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-205 |
| | § | |
| AMERICAN STANDARD, INC. | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S RESPONSE TO AMERICAN STANDARD, INC.'S MOTION IN LIMINE**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff TRANSCONTINENTAL INSURANCE COMPANY ("Transcontinental" or "Plaintiff") submits the following Response to American Standard, Inc.'s Motion in Limine. In connection with that Motion, American Standard, Inc. ("American Standard" or "Defendant") separately briefed: (1) the admissibility of the ballcock assembly, (2) the admissibility of references to post-sale "duties", and (3) the admissibility of subsequent design changes. This response will address each of those three issues.

## I.

## ADMISSIBILITY OF THE BALLCOCK ASSEMBLY

Defendant's Motion in Limine to exclude the ballcock from evidence should be denied because:

- **Defendant inspected and photographed the ballcock assembly prior to any change in condition.**
- **Discoloration of the fracture surfaces clearly shows which fractures occurred pre-flood.**

- **Plaintiff has exercised due care in the preservation and handling of evidence.**

What American Standard calls the "ballcock assembly," Transcontinental calls the "fill valve." By whatever name, this device is the central piece of evidence in this case. Both sides agree that this fill valve failed. Transcontinental submits that the fill valve failed because it is made of an inappropriate material. American Standard argues that the valve failed because someone applied external force to it. A visual inspection of the fill valve shows obvious signs of brittleness and degradation. Not surprisingly, American Standard now seeks to keep this key piece of evidence from the jury.

The only specific reason given for excluding this evidence is the fact that one of Transcontinental's experts heard a slight noise consistent with additional cracking as the fill tube was being removed from the tank for further inspection. Yet, this noise, and any associated cracking, was *neither substantial nor material.*

In the first place, American Standard's Motion fails to disclose to the Court that American Standard had already inspected and photographed the plastic fill tube prior to the attempted removal of the tube from the tank (and thus, prior to any additional cracking). *See* Affidavit of Paul L. Carper attached hereto as Exhibit "B" at paragraph 4. Carper is one of Plaintiff's retained experts. Shortly after the flood, Carper had the toilet and all of its parts taken to his place of business for safekeeping. Carper Affidavit at paragraph 3. On July 11, 2002, Rett Holidy (defense counsel), and Drew Yuhas (an in-house American Standard expert[1]), visited Carper's place of business, at which time they inspected and photographed the subject toilet with

[1] Defendant's Rule 26(a)(1) initial disclosures states that Mr. Yuhas "will testify concerning the manufacture of the component parts of the toilet in question and his opinions as to the cause of the leak."

the fill valve still in place. At the time of this inspection, the condition of the toilet had not changed since the time of the flood.

Plaintiff has retained Dr. Thomas Eagar to opine as to the cause of the cracks which led to the failure. Dr. Eagar will opine that the fill valve has become "extremely brittle and friable" due to environmental degradation over time. The valve material is gray at the time of manufacture and, if degraded, turns white over time. *See* Affidavit of Thomas W. Eagar attached hereto as Exhibit "A", at paragraph 7. Upon examination, approximately 99% of the total surface area of the various cracks in the fill tube are white in color. This means that they have been exposed to the tank's water and affords a basis on which to distinguish between cracking and plastic degradation which occurred prior to the flood and any cracking which may have occurred during the removal of the valve from the tank. Eagar Affidavit at paragraph 7. Thus, the discoloration shows that any additional cracking was slight in nature and can be distinguished.

On the other hand, Transcontinental would be greatly prejudiced by inability to show the jury the central piece of evidence in the case. The ability of a jury to see with their own eyes the brittleness and discoloration (which is obvious from looking at the valve) would deprive them of key evidence. The gray and white regions of the valve illustrate the locations and extent of the plastic degradation more effectively than can be illustrated in photographs. Eagar Affidavit at paragraph 6.

Had the valve *not* separated, Plaintiff would have sought to separate the valve intentionally so that the fracture surfaces could be appropriately studied. Dr. Eagar developed a protocol to separate the fill valve into two parts prior to the removal of the fill valve from the tank. Eagar Affidavit at paragraph 6. As pointed out above, the circumferential cracks extended 95% of the way around the tube. In other words, it would have been Plaintiff's intention to seek

the agreement of counsel to separate the tube in any event in order to obtain the best view of the fracture surfaces.

Notwithstanding, Plaintiff submits that its experts exercised all due and appropriate care in the handling of the toilet and the fill valve. In the first place, the toilet was packed in styrofoam "peanuts" for transportation from the clinic to Mr. Carper's facility. Carper Affidavit at paragraph 3. On June 9, 2003, Carper removed the fill valve for shipment to Dr. Eagar's office. He did so by first removing a retaining nut on the bottom of the tank. Next, he gripped the bottom of the fill valve below the fracture surfaces between his thumb and forefinger. Applying slow and careful pressure, Carper lifted the valve straight upward, at which point he heard a slight sound consistent with additional cracking. No force was applied at or above the fracture zone. *See* Carper Affidavit at paragraph 6. He then carefully wrapped the valve for shipment to Dr. Eagar. *See* Carper Affidavit at paragraph 6 and Eagar Affidavit at paragraph 4. On these facts, Transcontinental urges that any changes, however slight in nature, were due, not to a lack of appropriate care, but instead to the extreme brittleness and friability of the material.

Though couched in terms of Rule 403, American Standard is essentially trying to impose a sanction on Transcontinental for spoliation of evidence. Plaintiff submits that this is an issue which should be decided as a matter of Texas substantive law. Texas courts have limited spoliation instructions to cases where there has been an intentional destruction of relevant evidence. *Wal-Mart Stores, Inc. v. Johnson*, 2002 W.L. 32098152 Texas (decided May 22, 2003).

In support of its Motion, American Standard cites the *Carroll v. Ford Motor Company* case reported at 462 S.W.2d 57 (Tex. Civ. App.—Houston [14th Dist.] 1970). This case is in no way similar factually to the case at hand. In *Carroll*, the plaintiff was alleging a defect in the master brake cylinder of his car. The plaintiff first experienced a brake failure after about 6,000

miles. The plaintiff then sold the car. After it passed through several hands, it was repurchased by the plaintiff several years later. At the time the brake cylinder was removed, the car had 46,000 miles on it. Additionally, the mechanic who removed the master brake cylinder testified that he could not swear under oath that the pieces of the cylinder which he had placed in the box were the same as those he had removed from the vehicle. The court sustained the objection to the introduction of the cylinder in that case on the ground that "there was no evidence to demonstrate that the brake cylinder was the same master brake cylinder which was in the plaintiff's automobile at the time of the collision." *Carroll* at 60.

Likewise, the *Iwanaga v. Daihatsu America, Inc.* case, 2001 W. L. 1910564 (W.D. Tex.) cited by American Standard is factually inexplicable. In *Iwanaga*, the ruling was based on the intentional violation of a court order specifically denying the plaintiff's request to remove the seat in question. Moreover, the court found that the removal of the seat had occurred under "dubious circumstances," and that the court lacked proof regarding the chain of possession of the seat once it was removed. Any fair reading of the case discloses that clearly, the court's sanction was predicated on a plaintiff intentionally violating a court order. Further, the chain of custody in this case at all relevant times is established by the attached Affidavits of Eagar and Carper.

In this case, American Standard took the opportunity to inspect and photograph the subject toilet valve prior to its removal from the tank. The changes in the valve are not only slight, the coloration of the fracture surfaces allows one to determine the difference between post-flood and pre-flood cracking. This is a key piece of evidence critical to the jury's understanding of the issues which it must decide and there is no evidence of intentional mishandling of evidence, nor any fact patterns even remotely similar to the cases cited by American Standard.

## II.

## EXCLUDING REFERENCES TO POST-SALE WARNINGS

Defendant's motion in limine for post-sale duties should be denied because:

- **Texas law is not settled with respect to post-sale duties.**
- **Even if this Court declines to adopt post-sale duties, this motion in limine only should apply to the marketing defect claim and not the design claim.**

*Texas law is not settled with respect to post-sale duties.*

In Texas, a manufacturer may be negligent for breach of a post-sale duty, if it is established that the manufacturer assumed a duty and then did not use reasonable means to discharge the duty. *See Bell Helicopter Company v. Bradshaw*, 594 S.W.2d 519, 533 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.). In *Bell Helicopter Company*, the Corpus Christi Court of Appeals held a manufacturer liable for breach of a post-sale duty under a negligence theory. That court stated that is was not:

> Necessary for us to hold in this case that a manufacturer has a duty to remedy dangerous defects in a product which are not discovered until after manufacture and sale. However, where the record reflects, as in this case, an apparent assumption of such a duty by a manufacturer, it is not wholly improper for us to measure its conduct against such duty with respect to plaintiffs' allegations of post-manufacture negligence.

Moreover, the Restatement of Torts (Third) Section 10 does impose such a duty on a manufacturer and Texas law is not settled with respect to the adoption of this section. The Texas Supreme Court has expressly stated:

> Thus, we express no opinion whether those Restatement sections are consistent with established Texas law. *Torrington v. Stuzman*, 46 SW 3d 829, 836-37 (Tex. 2000).

However, the Texas Supreme Court has cited the Restatement (Third) on multiple occasions. *See General Motors Corp. v. Sanchez*, 997 S.W.2d 584, 594 (Tex. 1999); *Hyundai Motor co. v. Rodriguez*, 995 S.W.2d 661, 667, n.23 (Tex. 1999). Moreover, in *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, (Tex. 1999), the Court compared numerous sections of Texas state law to the Restatement (Third) and found them all consistent with state law. Therefore, it is not inconsistent with Texas law to find that Defendant had a post-sale duty to warn and therefore, Defendant's motion to should be denied.

*The Motion in Limine only applies to the Marketing Defect Claims and not the Design Defect Claims*

Even if this Court declines to hold that Defendant had a post-sale duty to warn, the evidence of post-sale studies and post-sale design changes are admissible to support Plaintiff's design defect claims. It is undisputed that Defendant changed the design of its product after the sale **but before** the event that caused the property damage. Thus, Plaintiff may use this evidence to show the product was defective even absent a duty to issue post-sale warnings.

## III.

## EXCLUDING EVIDENCE OF SUBSEQUENT DESIGN CHANGES

Defendant's Motion in Limine to exclude subsequent remedial measures should be denied because:

- **Federal Rule 407 does not prohibit the introduction of pre-event design changes.**
- **Defendant has judicially admitted the feasibility of an alternative design.**
- **Evidence of pre-event design change is relevant under the Texas Products Liability Statute.**

It is important to distinguish between design changes which occurred after the date of manufacture and design changes which occur after the event in question. . This distinction is critical because **American Standard admits that acetal products are unsuitable for use in plumbing products, "a conclusion reached by DuPont, the creator of Delrin (the acetal used in this product), in the 1990's)."** *See* Motion to Exclude or Alternatively Limit the Testimony of Plaintiff's Expert ("Motion to Exclude") at p. 2. Federal Rule 407 applies to strict product liability actions. *See Prentiss & Carlisle Co. v. Koehring*, Waterhouse Div., 972 F.2[nd] 6, 10 (1st Cir. 1992). On its face Rule 407 refers to measures which are taken **"after an injury or harm allegedly caused by an event."** Thus, Rule 407 does not apply when the modification preceded the event involved in this case. *See Moulton v. Rival Co.*, 116 F.3[rd] 22, 26 n.4 (1st Cir. 1997). Thus, design changes which occurred after the date of manufacture but prior to the event are not addressed by Rule 407. Even design changes which occur after the flood are admissible to prove feasibility. American Standard attempts to address this point by stating that it **"does not controvert the feasibility of change or the feasibility of an alternative design."** Defendant's Brief in Support of its Motion in Limine for Subsequent Design Changes at page 2. It is critical to understand the outer contours of this admission.[2] In its Motion to Exclude, American Standard takes Dr. Eagar to task saying that he has not created an alternative design nor analyzed the feasibility of alternative designs from the standpoint of technological feasibility as well as economic feasibility. To prevent evidence of subsequent remedial measures by conceding "feasibility," American Standard must concede the feasibility of safer alternative designs that would have significantly reduced the risk of injury without impairing utility and that such a design was economically and technologically feasible at the time the product left the

[2] Compare text on p. 8 of American Standard's Motion to Exclude or Alternatively Limit the Testimony of Plaintiff's Material Expert, Dr. Thomas W. Eagar.

manufacturer's control. If this is the scope of Defendant's concession, then Plaintiff agrees that post-flood remedial measures would fall within the bar of Rule 407.

Respectfully submitted,

C. WESLEY VINES
Texas Bar No. 20586050
RICHARD M. MUNOZ
Texas Bar No. 24013212
**COZEN AND O'CONNOR**
2300 BankOne Center
1717 Main Street
Dallas, Texas 75201-7335
214-462-3000 - telephone
214-462-3299 - facsimile

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served on all parties to this lawsuit, by and through their counsel of record, on the 10th day of November, 2003, addressed as follows:

***Via Federal Express***
James R. Old, Jr., Esq.
GERMER GERTZ, L.L.P.
550 Fannin, Suite 700
Beaumont, TX 77701

***Via Federal Express***
Dale M. "Rett" Holidy, Esq.
GERMER, GERTZ, L.L.P.
Three Allen Center
333 Clay, Suite 4105
Houston, TX 77002

C. WESLEY VINES

DALLAS1\121860\1 112639.000

# EXHIBIT "A"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-02-205 |
| | § | |
| AMERICAN STANDARD, INC. | § | |
| Defendant. | § | |

**AFFIDAVIT OF THOMAS W. EAGAR**

| | |
|---|---|
| THE STATE OF MASSACHUSETTS | § |
| | § |
| COUNTY OF ________________ | § |

Before me, the undersigned authority, personally appeared THOMAS W. EAGAR, who by me first duly sworn deposes and states the following:

1. My name is DR. THOMAS W. EAGAR. I am over the age of 21 years, and I am fully competent in all respects to make the statements set forth herein. I have personal knowledge of the facts stated herein and they are all true and correct as stated.

2. I am presently a Professor of Materials Engineering and Engineering Systems at the Massachusetts Institute of Technology.

3. At the request of Plaintiff's counsel, I investigated the failure of an American Standard toilet valve which flooded the Valley Diagnostic Clinic in Harlingen, Texas on or about March 5, 2001.

4. On or about June 11, 2003, the subject valve was received in my office. The valve was shipped to me by Paul Carper of Verité Forensic Engineering, L.L.C. My visual inspection of the package and of the materials inside indicated that proper care and protection had been taken for the safekeeping of the toilet valve during shipment.

5. When I received the toilet valve, although still in one piece, the simple pressure exerted by picking the valve up caused the two pieces to fully separate. This final separation is simply a result of the fact that this material is extremely brittle and friable due to the severity of the environmental degradation.

6. The toilet valve exhibits both longitudinal (vertical) and circumferential cracks. The material is extremely brittle and friable due to environmental degradation over time. In my opinion, the initial cracks were longitudinal. It is further my opinion that the gray and white regions of the valve illustrate the locations and extent of the plastic degradation more effectively than can be illustrated in photographs. The valve itself is valuable evidence for the triers of fact.

In addition, I had drafted a protocol to separate and analyze the fracture, prior to its being shipped to me. If it had not separated when I lifted it from its packing, I would have sought to separate it in order to complete my analysis of the failure. Thus, the separation of the degraded valve is immaterial to the evaluation of the evidence. If it had not fallen apart in handling, it would have been separated intentionally.

7. The valve material is gray at the time of manufacture and, if degraded, turns white over time. Examination of the various fractures reveals that approximately 95% of the surface area of the circumferential cracks were white in color, with most of the remaining 5% surface area being off-white in color. Overall (including the longitudinal cracks), approximately 99% of the surface area of the cracks are white in color. This means that they have been exposed to the tank's water and affords a basis on which to distinguish between cracking and plastic degradation which occurred prior to the flood and any cracking which may have occurred during the removal of the valve from the tank.

8. A true copy of my curriculum vitae was attached to the Plaintiff's Expert Designations in this case. It lists among my professional interests the selection of materials and failure analysis. It lists a number of professional societies in which I am or have been active. It lists my teaching experience, including experience in chemistry, essentials of engineering, materials selection, product design, and failure analysis. My résumé lists 195 articles, 13 patents, and 76 different cases in which I have given testimony either in deposition or at trial. Any discussion of these professional organizations, publications and deposition testimony would reveal that I have considerable background in design and failure analysis with regard to plumbing fixtures and/or systems and in the provision and drafting of warnings. I have, for example, assisted and advised in the design and qualification of plumbing installations. I have issued reports and opinions to the Massachusetts State Plumbing Board and provided consulting services to the Plumbing, Heating, and Cooling Contractors of Greater Boston.

Further affiant saith not.

This 6th day of November, 2003.

Thomas W. Eagar
THOMAS W. EAGAR

SUBSCRIBED AND SWORN TO BEFORE ME this 6th day of November, 2003.

Jerilyn Hill
Name: Jerilyn Hill
Notary Public in and for the State of MASSACHUSETTS
My Commission Expires: 12-29-2006

DALLAS1\121728\1 112639.000



# EXHIBIT "B"

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY<br>Plaintiff, | §<br>§<br>§<br>§ | |
| v. | § | CIVIL ACTION NO. B-02-205 |
| AMERICAN STANDARD, INC.<br>Defendant. | §<br>§<br>§ | |

**AFFIDAVIT OF PAUL L. CARPER**

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF Harris | § |

Before me, the undersigned authority, personally appeared PAUL L. CARPER, who by me first duly sworn deposes and states the following:

1. My name is PAUL L. CARPER. I am over the age of 21 years, and I am fully competent in all respects to make the statements set forth herein. I have personal knowledge of the facts stated herein and they are all true and correct as stated.

2. I am a licensed professional engineer in the State of Texas. I am employed by Verité Forensic Engineering, L.L.C. (VFE). I was retained to determine the cause of the water damage at the Valley Diagnostic Clinic. It is my opinion that the flood was a result of the toilet fill valve fracturing while in service, allowing the uncontrolled flow of water to the tank.

3. I first visited Valley Diagnostic Clinic on March 19, 2001. At the time of that visit, the plastic toilet fill valve was still in the tank. The toilet was still attached to the floor of the second floor bathroom where the flood originated. At my request and under my direction, the toilet and all of its component parts (including the fill valve) were packed with styrofoam "peanuts" and shipped to VFE's facility in Humble, Texas, where it was received on March 23, 2001.

4. On July 11, 2002, Mr. Rett Holiday (one of Defendant's counsel) and Mr. Drew Yuhas (an employee of American Standard) visited VFE's facility, at which time they inspected and photographed the subject toilet with the fill valve still in place. At the time of this inspection, the condition of the toilet had not changed from the time of the flood.

5. The toilet remained unchanged and in VFE's possession and control until June 9, 2003, when I removed the toilet's fill valve so that it could be shipped to the laboratory of Dr. Thomas W. Eagar at the Massachusetts Institute of Technology. On June 16, 2003, the entire toilet (minus the previously shipped fill valve) was sent to Dr. Broutman, one of Defendant's experts.

6. The sequence of removing the valve was as follows:

I first removed the retaining nut from the bottom of the tank. At this point, only the friction of the rubber gasket holds the valve in place. I reached into the tank below the fracture area, gripping the bottom of the valve between my thumb and forefinger. Despite my slow and careful application of pressure, as the valve was being lifted straight upward, I heard a slight sound consistent with additional cracking. No force was applied at or above the fracture zone. The valve then was carefully wrapped and shipped to Dr. Eagar.

Further affiant saith not.

This 7 day of November, 2003.

[signature]
PAUL L. CARPER

SUBSCRIBED AND SWORN TO BEFORE ME this 7 day of November, 2003.

[signature]
Name: Sharon B. Barbee
Notary Public in and for the State of TEXAS
My Commission Expires: 6-7-2007

SHARON B. BARBEE
Notary Public
STATE OF TEXAS
My Comm. Exp. June 9, 2007