IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 1 2 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. B-02-205 |
| AMERICAN STANDARD, INC. | § § | |
| Defendant. | § § | |

**PLAINTIFF'S RESPONSE TO AMERICAN STANDARD, INC.'S
MOTION TO EXCLUDE OR, ALTERNATIVELY, LIMIT THE TESTIMONY
OF PLAINTIFF'S MATERIAL EXPERT, THOMAS W. EAGAR
*AND REQUEST FOR HEARING***

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff TRANSCONTINENTAL INSURANCE COMPANY ("Transcontinental" or "Plaintiff") hereby responds as follows to American Standard, Inc.'s ("American Standard") Motion to Exclude or, Alternatively, Limit the Testimony of Plaintiff's Material Expert, Thomas W. Eagar. In conjunction herewith, Plaintiff respectfully requests a hearing on Dr. Eagar's qualifications.

American Standard seeks to exclude or limit the testimony of Dr. Eagar on three grounds: (1) Dr. Eagar is not qualified to render his opinions, (2) any opinions concerning a post-sale duty to warn are inadmissible under Texas law, and (3) Dr. Eagar's testimony regarding an alleged negligent failure to warn is speculative, incomplete, and based on conclusions he is not qualified to make.

## I. - INTRODUCTION

As a starting point, the principal reason that American Standard does not appreciate the qualifications of Dr. Eagar is simply because they have, to date, refused to take Dr. Eagar's deposition. Plaintiff filed its expert designation on June 27, 2003 almost four and a half months ago. On numerous occasions Plaintiff, through its counsel, has offered to exchange expert depositions, which offer has been refused. Moreover, on July 10, 2003, a complete copy of Dr. Eagar's file was sent to opposing counsel. *See* Exhibit "C" hereto (cover letter enclosing file).

Perhaps even more to the point, Defendant's Motion to Exclude is filled with "bullet points" referencing things which they "expect" Dr. Eagar to offer (see for example Motion to Exclude at pages 2 and 3). The reason that Defendant *expects* Dr. Eagar to make these points is because he has already done so in their presence. As the Court is aware, the parties attended a mediation in this case. Dr. Eagar presented a lengthy PowerPoint presentation to American Standard in American Standard's corporate headquarters at the time of mediation.[1] The mediation was not conducted until October 14, 2003. Because Defendant had not sought to depose Dr. Eagar in advance of the mediation, Plaintiff elected essentially to present Dr. Eagar's "direct testimony" by means of this presentation. A copy of the presentation is attached hereto as Exhibit "A." Additionally, Dr. Eagar addressed in the presentation a number of scientific studies showing that the product used to make the toilet fill valve in question was inappropriate for use in plumbing fixtures. A list of those articles (which have been produced to the Defendant) is attached hereto as Exhibit "B." Plaintiff submits that Dr. Eagar's report more than

---

[1] Obviously it is somewhat atypical to disclose matters learned at mediation. However, as Defendant has seemed fit to raise these points in its Motion to Exclude Plaintiff has little choice but to respond.

fairly discloses the four corners of his expected testimony, and there is no issue of "unfair surprise." Plaintiff continues to be willing to exchange expert depositions.

Finally, Plaintiff respectfully requests the Court to set a date and place (perhaps at the December 2, 2003 pretrial conference) at which Plaintiff can produce Dr. Eagar so that he may be questioned in the Court's presence as to his qualifications.

## II. – DR. EAGAR IS HIGHLY QUALIFIED TO RENDER THE OPINIONS SET FORTH IN HIS REPORT

Dr. Eagar's report and résumé were attached to Plaintiff's Expert Designation (and are attached to Defendant's Motion to Exclude). The Plaintiff's central contention in this case is that the toilet fill valve was made from a material which was unsuitable for use in plumbing products and that this unsuitability led to the failure in question. As to the first issue, Plaintiff submits that American Standard has conceded this point and ought, as a matter of good faith, to stipulate to this issue. In the Motion to Exclude, on page 2 Defendant states:

> **[A]cetal products [are] unsuitable for use in plumbing products –a conclusion reached by DuPont, the creator of Delrin (the acetal used in this product) *in the 1990's.***

(Italics in original). The inappropriateness of this material is hardly "bad science" which the Court, as a gatekeeper, should exclude.

Even though American Standard concedes that its product is unsuitable for its intended use, they seek to challenge Dr. Eagar's qualification to say so. Dr. Eagar's June 27 report states essentially that he looked at the fill valve visually and with aid magnification, looked at various photographs of the valve as it was installed in the tank, reviewed a chemical analysis of the valve plastic and reviewed the available scientific literature (for example the articles which have been produced to Defendant). The Daubert standard (as codified in Rule 702) does not require that Dr. Eagar actually have been the individual who conducted the tests on acetal. The tests have

been done and have long been published in the literature. Dr. Eagar's reliance on these articles and tests is entirely reasonable, particularly in a case where the Defendant itself no longer uses this material.

Next, Dr. Eagar states that the toilet valve in question is "severely degraded." He notes that it has changed from medium grade to white and that there is an extensive crack, the fracture surfaces of which have turned white due to exposure. Dr. Eagar, whose résumé discloses that he is the former head of material science at the Massachusetts Institute of Technology, simply makes the reasonable connection between the fact that this product is known to degrade and crack when exposed to naturally occurring elements in local water supplies and evidence that the cracks in this particular valve were in fact caused by exposure to the local water supplies.

Having looked at the ballcock assembly and having seen photographs of the toilet as a whole, Dr. Eagar notes that there are no warnings attached to the device. Dr. Eagar's résumé lists teaching experience in chemistry, materials selection, product design and failure analysis. His résumé lists a 195 articles and over 76 different cases in which he has given testimony. His background in design and failure analysis and his provision and drafting of warnings would have become obvious through any reasonable questioning into his résumé. *See* Affidavit of Dr. Eagar, attached as Exhibit "A" to Plaintiff's response to Defendant's Motion in Limine. Once again, the failure of Defendant to appreciate Dr. Eagar's credentials is largely a function of its continued to refusal to depose him.

Among other things, Defendant complains that Dr. Eagar has not attempted to create an "alternative ballcock assembly or analyze the efficacy of alternative designs." Yet, Defendant *expressly concedes the feasibility of alternative designs* in its motion to limit evidence of

subsequent remedial measures. *See* Brief in Support of Motion in Limine for Remedial Design Changes, page 2. In any event, Dr. Eagar cites brass fixtures as an alternative.

Defendant argues that Dr. Eagar's opinions are not reliable because he did not take to task every conceivable opposing theory, however plausible or implausible. In the first case, it must be remembered that Dr. Eagar's report was due prior to the Defendant's reports. Thus one would not have expected his Rule 26 report to have offered his "prospective rebuttal." Defendant also alludes to an alleged "loose pin" in the arm of the ballcock. They cite a comment found in the report of an outside adjuster (Dennis Nickoloff). As set forth in his deposition, Mr. Nickoloff was simply including hearsay (from a source he could not recall) as a potential cause. He did no independent testing and does not consider himself an expert. For all of these reasons, Plaintiff has filed a Motion in Limine to exclude any such testimony from Mr. Nickoloff or any portions of his report which address this subject.

### III. – THE EXISTENCE OR NON-EXISTENCE OF A POST-SALE DUTY TO WARN DOES NOT AFFECT THE ADMISSIBILITY OF POST-SALE TESTING

Plaintiff submits that the acetal product in the subject valve is defective in that it is inappropriate for use in plumbing products. There is an abundance of literature showing that the acetal used in this very product was unsuitable. Admittedly much (but not all) of that literature came out after this product was made. If there is a post-sale duty to warn, then the Defendant should have acted on this information. If there is no such duty, then the Defendant need not have warned its former customers. *This does not mean, however, that the product was not defectively designed.* It is important to distinguish between the two distinct products liability theories being pursued by the Plaintiff: (1) defective design and (2) defective marketing. In short, post-manufacturing studies of a defect in a product must be admissible to show the defect in the design even if they are not admissible to show a subsequent obligation to warn the end user.

## IV. – DR. EAGAR IS QUALIFIED TO RENDER
## AN OPINION CONCERNING WARNINGS

In the first place, while the Pretrial Order includes a claim for negligence, Plaintiff proceeds against American Standard, in part, on a strict liability claim due to a defectively marketed product. Dr. Eagar's report states that the product degrades when exposed to naturally occurring conditions in local water supplies, including the water supply in the Rio Grande Valley. Dr. Eagar's simple conclusion is that there are no warnings (of any kind) which are permanently affixed to the device which warn the consumer of this fact. Once again, Dr. Eagar's background with respect to warnings is contained within the materials disclosed in his résumé and could easily have been and can still be fully explored upon the taking of his deposition.

## V. – CONCLUSION

Frankly, the opinions rendered by Dr. Eagar are hardly controversial. The Defendant concedes that acetal is an inappropriate material out of which to make a toilet valve. Even before this event, Defendant stopped making toilet valves out of this material. The Defendant concedes that there are feasible alternatives to this product. Even had it not, Dr. Eagar's report discloses that brass plumbing products were not susceptible to this degradation. This is a defective product and there were safer designs. With regard to causation, Dr. Eagar has examined under magnification the fracture surfaces and, based on that examination, concludes that these fractures were caused by degradation (as opposed to some other force). These opinions and the basis for them are more than adequately disclosed in the report and résumé tendered some four and a half months ago. American Standard is in possession of Dr. Eagar's complete file and a detailed PowerPoint presentation of the bulk of his expected testimony. For these reasons, the Motion to Exclude should be denied. Should the Court, however, wish to consider further evidence of Dr.

Eagar's qualifications, Plaintiff respectfully requests that it be afforded an opportunity to present

Dr. Eagar to the Court at a time and place of the Court's choosing.

Respectfully submitted,

C. WESLEY VINES
Texas Bar No. 20586050
RICHARD M. MUÑOZ
Texas Bar No. 24013212
**COZEN O'CONNOR**
2300 BankOne Center
1717 Main Street
Dallas, Texas 75201-7335
214-462-3000 - telephone
214-462-3299 - facsimile

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the above and foregoing document was served on all parties to this lawsuit, by and through their counsel of record, on the 10th day of November, 2003, addressed as follows:

*Via Federal Express*
James R. Old, Jr., Esq.
GERMER GERTZ, L.L.P.
550 Fannin, Suite 700
Beaumont, TX  77701

*Via Federal Express*
Dale M. "Rett" Holidy, Esq.
GERMER, GERTZ, L.L.P.
Three Allen Center
333 Clay, Suite 4105
Houston, TX  77002

C. WESLEY VINES

DALLAS1\121889\1 112639.000

**PLAINTIFF'S RESPONSE TO AMERICAN STANDARD, INC.'S MOTION TO EXCLUDE OR, ALTERNATIVELY, LIMIT THE TESTIMONY OF PLAINTIFF'S MATERIAL EXPERT, THOMAS W. EAGAR AND REQUEST FOR HEARING**              PAGE 8

# EXHIBIT "A"

# Acetal in Plumbing (Toilet Valves)

## Thomas Eagar, ScD.



# Acetal Plastics[1,2]

○ Acetal tradenames:
　Delrin homopolymer (DuPont)
　Celcon copolymer (Hoechst Celanese)

○ Chemical name: Polyoxymethylene (POM)
　Polymerized formaldehyde (with ethylene oxide for copolymer)

○ General Characteristics
　Highly crystalline
　High strength, stiffness
　Low water absorption
　Good toughness, but notch-sensitive
　Predictable mechanical properties
　Fast and easy to mold
　Low cost compared to metals



# Acetal History

1957: Delrin introduced for evaluation.[3]

1959: First Delrin uses announced, as replacements for metals in fishing rods and plumbing valves.[4]

1959: Du Pont scientists publish report showing that "polyoxymethylenes are not soluble at room temperature in any of hundreds of solvents".[5]

1960: First paper on degradation of acetal polymer.[6]

1961: Delrin identified as the first plastic that was useful for water pumps.[7]

1962: Celcon commercialized.[3]

1970-mid 1980s: Studies show problems with acetal in water at room temperature and 5 PPM or less chlorine—oxygen also a factor.

1986: Last announcement of acetal polymer grades for plumbing applications.[8]



# Acetal History (cont'd)

Early 1990s: DuPont discontinues sales of Delrin for toilet valves.

1993: Study of chlorine degradation of acetal polymers in potable water applications shows that acetal is attacked by chlorine at .5 PPM concentration.[9]

1994: Broutman study concludes that degraded layers of "less than 5 mils (.005") are sufficient to severely embrittle" acetal copolymers.[10]

1995: Manufacturers of acetal fittings utilized with polybutylene pipe settle class action suit for $950 million.[12]



# US Sales History of Acetal in Hardware and Plumbing Applications*





*From *Modern Plastics* annual statistical review of the US plastics industry. Data available from 1963-1993[13].

# Acetal Chlorine Resistance

○ Acetal is sensitive to greater than 1 PPM hypochlorite (1988).[2]

○ Delrin listed as unsatisfactory chemical resistance at 3-5 PPM Cl at room temperature and less than one year exposure. Rated 1 out 10 for decomposition in Cl (1994).[14]

○ Acetal fittings are sensitive to more than 1 PPM Cl (1996).[15]



# Degradation of Acetal

○ Acetal can degrade several ways[6]:

   Depolymerization

   Oxidation

   Thermal Degradation

   Hydrolysis and acidolysis

● Chlorine in water (hypochlorous acid) causes oxidative and hydrolytic degradation.[11]

● Degradation causes the formation of brittle layer on the surface.[10]



# Warnings

American Standard:

"Use of cleaning products containing calcium hypochlorite (chlorine) shall constitute improper maintenance and will also void this warranty"

○ Who will see this?

○ Who will understand it?



# Chloride Content of River Water[16]

| Location | Cl (mg/L) |
|---|---|
| Wenatchee, WA | 2 |
| Sacramento, CA | 2 |
| Atlanta, GA | 3 |
| Charleston, SC | 8 |
| Steubenville, OH | 8 |
| Morrisville, PA | 10 |
| Great Falls, MT | 16 |
| Decatur, AL | 21 |
| St Louis, MO | 23 |
| Evandale, TX | 25 |
| Kansas City, MO | 27 |
| Los Angeles, CA | 100 |



# ASSE Standard #1002

## Section 4.1.2: Corrosion Resisting Parts

"All non-ferrous parts in contact with the water flowing through the device shall have a corrosion resistance at least equal to a copper alloy of not less than 58% copper"



# Valley Diagnostics—Defendant's Answers to Interrogations

*"Chemical composition of DuPont Delrin may degrade over time when exposed to chlorine; however, defendant denies that exposure to chlorine would cause a failure in the course of normal foreseeable use of the product"*





# Defendant's Expert, Dr. Lawrence Broutman

o *"Assembly was reasonably designed and manufactured based upon state of the art at time of manufacture"*

o *"Material used. . .was reasonable. . . at the time and based upon the information reasonably available to American Standard"*

o *Mechanical forces applied to the ballcock lead [sic] to failure"*

   Note: mechanical analysis assumes no strength degradation of Delrin in service.



# Defendant's Expert, Fred Delgado

o *"Valley Diagnostic's negligence was the direct and proximate cause of the occurrence in question"*

o *"If properly maintained, this occurrence would not have occurred"*

o *"Someone employed by Valley Diagnostic Clinic manually handled the float rod connected to the ballcock . . . causing the toilet valve to crack"*



# American Standard Position: Summary

- Exposure to harmful levels of chlorine is not foreseeable in normal course of use of the product.

- Valley Diagnostics personnel broke the valve by pulling on the float rod.

- Valley Diagnostics maintenance was improper.

- Delrin can degrade if exposed to chlorine.

- The strength of the Valley Diagnostics unit was not degraded.

- A product insert warning about use of calcium hypochlorite is sufficient.

- DuPont has been sued by American Standard.

- American Standard had no reasonable way of knowing Delrin was deficient.



# Valley Diagnostics Position: Summary

○ The plastic had decomposed and was substatially weaker than when purchased.

○ Failure of Delrin in water containing even normal amounts of chlorine has been known for decades.

○ Use of Delrin violated ASSE #1002.

○ American Standard failed to issue a product recall when deficiency of Delrin was discovered.



# References

1.  Strong, A. Brent, *Plastics Materials and Processing*, Columbus, OH: Prentice Hall Publishing (1996).

2.  Sinker, Stephen M., "Homopolymer and Copolymer Acetal", in *ASM Engineered Materials Handbook 2: Engineering Plastics*, Metals Park, OH: ASM International (1988)

3.  Sittig, Marshall, *Polyacetal Resins*, Houston: Gulf Publishing (1963).

4.  "Plastics Top 5 ½ Billion Pound Mark", *Modern Plastics* 37-5 (January 1960).

5.  Alsup, R.G., et al, "The Effect of Solvents on High molecular Weight, Stable Acetal Resins", in *Journal of Applied Polymer Science*, 1-2 (1959).

6.  Kern, V.W., Cherdron, H. "Der Abbau von Polyoxymethylenen", in *Makrol,Chem.* 112 (1960).

7.  "Production Hits 6.7 Billion lb.", *Modern Plastics* 39-5 (January 1962).

8.  "Materials '86", *Modern Plastics* 63-5 (January 1986).

9.  Oner, M. and White, D. "Investigation of the degradation of commercial polyoxymethylene copolymer in water service applications", in *Polymer Degradation and Stability* 40 (1993).

10.  Broutman, L.J. and Kamyowski, G.W., "Surface Embrittlement of Polyacetals in Chlorinated Water", *ANTEC '94 Conference Proceedings*, Society of Plastics Engineers (1994).

11.  Stivala, S., et al, "Mechano-chemical degradtion of polyacetal fittings in potable water applications", *ANTEC '94 Conference Proceedings*, Society of Plastics Engineers (1994).

12.  Bregar, B. "Settlement looms over PB pipe battle", Plastics News 7-37 (13 Nov. 1995).

13.  *Modern Plastics* annual statistical review of the US plastics industry, 1963-1993.

14.  "Chemical Resistance", *Plastics Design Library* (1994).

15.  Ezrin, M., *Plastics Failure Guide*, New York: Hansen (1996).

16.  Kemmer, F. (ed), *The NALCO Water Handbook, 2nd ed.,* New York: McGraw-Hill. P. 2.2, 2.3 (1988)

# Crack Formation in Acetal[9,10,11]



Hypochlorous acid attacks acetal surface (Cl concentration of .5 PPM)[12]

Brittle surface layer forms (problematic at .005″)[8,11]

Microcracks initiate in brittle surface area at areas of high stress concentration



Microcracks grow as brittle layer thickens and stresses continue

Cracks pass through entire wall, part fails

# Acetal is attacked at .5 PPM Chlorine Concentration



## PERFORMANCE

### Chemical Resistance

The factors affecting chemical resistance are:

* Concentration
* Time
* Temperature
* Stress Level

| CHEMICAL | BEHAVIOUR |
|---|---|
| Acetic acid (5%) | resistant |
| Acetic acid (50%) | unsatisfactory |
| Acetone | resistant |
| Air (all pressures) | resistant |
| Alcohol (all types) | resistant |
| Ammonia (10%) | unsatisfactory |
| Aniline | limited resistance |
| Benzene | resistant |
| Bleaching fluid (10% chlorine) | unsatisfactory |
| Brake fluid | resistant |
| Butane | resistant |
| Calcium chloride (10%) | resistant |
| Carbon dioxide | resistant |
| Carbon monoxide | resistant |
| Chloracetic acid (10%) | unsatisfactory |
| Chlorinated water < 0.5 ppm | unsatisfactory |
| Chlorinated water < 0.5 ppm | resistant |
| Chloroform | limited resistance |
| Chromic acid (10%) | unsatisfactory |
| Citric acid | resistant |
| Cyclohexane | resistant |
| Detergents | resistant |
| Diesel fuel | resistant |
| Ethanol | resistant |
| Ethyl acetate | resistant |

Delrin* has excellent resistance to moisture, gasoline, lubricants, solvents and many neutral chemicals.

* "Design with Delrin", Du Pont European Design Guide (available at plastics.dupont.com)

# Stress Concentrations Must be Avoided in Acetal Designs

○ Acetal is known to be very sensitive to notch failure[1]

○ Stress concentrations must be avoided by using bosses and radii (see Du Pont "Design Basics" below).

○ Toilet valve failed at corner with insufficient radius





\* "Design with Delrin", Du Pont European Design Guide (available at plastics.dupont.com)

# EXHIBIT "B"

# Selected References from
## "Acetal in Plumbing (Toilet Valves)"

**Thomas Eagar, Sc.D.**
**10 October 2003**

# Table of Contents

Note: *All references are numbered according to the reference list in Dr. Eagar's presentation. Modern Plastics references have been omitted from this book, but may be found in the University of Michigan reference collection.*

1. Strong, A. Brent, *Plastics Materials and Processing*, Columbus, OH: Prentice Hall Publishing (1996).
2. Sinker, Stephen M., "Homopolymer and Copolymer Acetal", in *ASM Engineered Materials Handbook 2: Engineering Plastics,* Metals Park, OH: ASM International (1988)
3. Sittig, Marshall, *Polyacetal Resins,* Houston: Gulf Publishing (1963).
4. **"Plastics Top 5 ½ Billion Pound Mark",** *Modern Plastics* 37-5 (January 1960). **(OMITTED—see University of Michigan Libraries)**
5. Alsup, R.G. et al, "The Effect of Solvents on High molecular Weight, Stable Acetal Resins", in *Journal of Applied Polymer Science*, 1-2 (1959).
6. Kern, V.W., Cherdron, H. "Der Abbau von Polyoxymethylenen", in *Makro,Chem.* 112 (1960).
7. **"Production Hits 6.7 Billion lb.",** *Modern Plastics* 39-5 (January 1962). **(OMITTED—see University of Michigan Libraries)**
8. **"Materials '86",** *Modern Plastics* 63-5 (January 1986). **(OMITTED—see University of Michigan Libraries)**
9. Oner, M. and White, D. "Investigation of the degradation of commercial polyoxymethylene copolymer in water service applications", in *Polymer Degradation and Stability* 40 (1993).
10. Broutman, L.J. and Kamyowski, G.W., "Surface Embrittlement of Polyacetals in Chlorinated Water", *ANTEC '94 Conference Proceedings*, Society of Plastics Engineers (1994).
11. Stivala, S. et al., "Mechano-chemical degradtion of polyacetal fittings in potable water applications", *ANTEC '94 Conference Proceedings*, Society of Plastics Engineers (1994).
12. Bregar, B. "Settlement looms over PB pipe battle", Plastics News 7-37 (13 Nov. 1995).
13. *Modern Plastics* annual statistical review of the US plastics industry, 1963-1993. **(OMITTED—see University of Michigan Libraries)**
14. "Chemical Resistance", *Plastics Design Library (*1994).
15. Ezrin, M., *Plastics Failure Guide,* New York: Hansen (1996).
16. Kemmer, F. (ed), *The NALCO Water Handbook, 2nd ed.*, New York: McGraw-Hill. P. 2.2, 2.3 (1988)

# EXHIBIT "C"



PHILADELPHIA
ATLANTA
CHARLOTTE
CHERRY HILL
CHICAGO
DALLAS
LAS VEGAS
LONDON
LOS ANGELES

**COZEN**
_____
**O'CONNOR**
ATTORNEYS

NEW YORK
NEWARK
SAN DIEGO
SAN FRANCISCO
SEATTLE
WASHINGTON, DC
WEST CONSHOHOCKEN
WILMINGTON

A PROFESSIONAL CORPORATION

2300 BANKONE CENTER    1717 MAIN STREET    DALLAS, TX 75201-7335
214.462.3000    800.448.1207    214.462.3299 FAX    www.cozen.com

July 10, 2003

C. Wesley Vines
Direct Phone 214.462.3008
Direct Fax  866.451.7977
wvines@cozen.com

**_VIA FEDERAL EXPRESS_**
James R. Old, Jr., Esq.
Germer, Bernsen & Gertz, L.L.P.
550 Fannin, Suite 700
Beaumont, TX  77701

Re:    Civil No. B-02-205
       _Transcontinental Insurance Company v. American Standard, Inc._
       Our File No. 112639.000

Dear Jay:

Enclosed please find the following documents regarding the above-referenced matter:

1.    A copy of Dr. Tom Eagar's entire file; and

2.    A copy of Paul Carper's entire file. My secretary spoke with Mr. Carper's office today. She was informed that copies of Mr. Carper's photographs were sent to Rett Holidy.

Please issue a check payable to Cozen O'Connor in the amount of $31.66 to cover the cost of reproducing these files (a copy of the invoice is enclosed for your records). If you have any questions or require anything further in this regard, please give me a call.

Very truly yours,

COZEN O'CONNOR

_C. Wesley Vines_

By:    C. WESLEY VINES (dk)

CWV/dk
Enclosures
cc w/o encls:  Dale M. "Rett" Holidy, Esq
DALLAS1\112113\1 112639.000