

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

NOV 2 8 2003

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| TRANSCONTINENTAL INSURANCE COMPANY | § § § | |
| | § | CIVIL ACTION NO. B-02-205 |
| V. | § | JUDGE ANDREW S. HANEN, |
| | § | (JURY) |
| AMERICAN STANDARD INC. | § | |

### AMERICAN STANDARD INC.'S SUPPLEMENTAL BRIEF
### IN SUPPORT OF ITS POSITIONS ON PENDING *IN LIMINE* MOTIONS

TO THE HONORABLE ANDREW S. HANEN:

Defendant, AMERICAN STANDARD INC. (hereinafter "American Standard"), submits the following supplemental brief addressing the *in limine* motions pending before the Court.

### BACKGROUND

On November 12, 2003, the Court held a pending motions hearing. At the hearing, the Court addressed the parties' motions in limine and clarified that it would take up pending summary judgment and *Daubert* motions at the final pretrial conference set for December 2, 2003.

The Court granted Plaintiff's Motion in Limine as to exclusions Nos. 1, 3, 5-11. The Court indicated however that it would entertain further argument pertaining to American Standard's post-event examination of other toilets at the Clinic, exclusion No. 3. The Court denied Plaintiff's motion as to exclusion No. 4. The Court did not rule on exclusion No. 2, the reports or opinions prepared or offered by Dennis Nickoloff. Addressing American Standard's Motion in Limine, the Court granted the motion with respect to exclusions Nos. 1-4, 6, 11-15, 19-20. The Court instructed however that with respect to exclusion No. 15, "Tests and Analyses of Products", the parties could use such evidence for impeachment purposes.



The Court, in part, granted American Standard's motion as to exclusion No. 22, the ballcock assembly. Specifically, the Court instructed that Plaintiff could not introduce the ballcock assembly during *voir dire* or opening statements. However, the Court stated that it would admit the ballcock assembly during trial and invited American Standard to draft a special instruction. Lastly, the Court, in part, granted American Standard's motion as to exclusion No. 23. The Court instructed that it would not admit evidence related to "polybutylene pipe" litigation and class action litigation or settlements regarding plastic materials used in household products. The Court did not rule on Nos. 16, 17, 18 and 21 of American Standard's motion.

This supplemental brief presents new authority and arguments supporting (1) the exclusion of evidence regarding subsequent design changes (American Standard's Motion in Limine, No. 18), (2) the exclusion of the ballcock assembly throughout the duration of the trial (American Standard's Motion in Limine, No. 22), and (3) the admissibility of Dennis Nickoloff's reports or opinions (Plaintiff's Motion in Limine, No. 2).

<div align="center">

**ARGUMENT**

</div>

A.    American Standard's Exclusion No. 18: Subsequent Design Changes

Any and all design changes made to the product after 1983, the date of manufacture, are inadmissible pursuant to Rules 401, 402, 403 and 407 of the Federal Rules of Evidence. Rule 407 of the Federal Rules of Evidence bars evidence of design changes made after March 4, 2000, the date of the event in question. *See* FED. R. EVID. 407. The Fifth Circuit, under Rules 401, 402, and 403 has consistently held that evidence of design change occurring after the date of manufacture but before the event in question is likewise inadmissible. *See Roberts v. Harnischfeger Corp.,* 901 F.2d 42, 44 (5th Cir. 1989) (citing *Arceneaux v. Texaco, Inc.,* 623 F.2d 924, 928 (5th Cir. 1980) (the court excluded evidence that the company changed its design and




warning policy after the product in question was manufactured but before the event in question); *Arceneaux v. Texaco, Inc.*, 623 F.2d 924, 928 (5th Cir. 1980) (excluded evidence of post-manufacture, pre-accident design changes as irrelevant). The public policy supporting exclusion of post-manufacture design changes is clear and well stated in the above authorities and those regarding the absence of a post-sale duty to warn. Consequently, Plaintiff may not introduce any evidence of design changes after 1983.

B. American Standard's Exclusion No. 22: Ballcock Assembly

The ballcock assembly (and references to or photos of it in its current state) is inadmissible because it is not in the same or similar condition as it was in at the time of the occurrence in question. *See Silvestri v. General Motors Co.*, 271 F.3d 583, 593 (4th Cir. 2001) (court dismissed design defect claim where product in question had been substantially altered from its post-accident condition); *Iwanaga v. Diahatsu Amer. Inc.*, 2001 WL 1910564 at * 10-11 (W.D. Tex. 2001) (non-published; court excluded evidence at trial of the product in question because such evidence had been substantially altered between the time of the event in question and trial). Additionally, as was explained in prior argument before the Court, given the existence of numerous photographs taken prior to the time the Plaintiff's expert broke it, the ballcock in its current state is not necessary to aid the jury in determining any material fact (thus it is not relevant) and it would be exceedingly prejudicial if allowed before the jury in any way. *See* FED. R. EVID. 403.

The Court has suggested that a curative instruction may be used in conjunction with allowing use of or reference to the "broken" ballcock assembly. American Standard maintains that no special instruction could possibly cure the prejudice created by admitting the ballcock




assembly. However, in the event the Court admits such evidence, and subject to its objections as set forth previously, American Standard proposes the following instruction:

> You are instructed that the ballcock assembly is being admitted to give you an opportunity to see the actual device in question; however, long after the occurrence in question it was broken into two pieces as a result of handling during this lawsuit. The break was not a result of the occurrence in question. The break occurred independent of that event. It is not in the same condition now that it was at the time of the occurrence in question. Transcontinental Insurance does not contend, and you should not infer that the break occurred as a result of any act or omission by American Standard

## C.    Admitting Dennis Nickoloff's Reports & Opinions

The statements contained in Nickoloff's reports regarding the cause of the loss and lack of anticipated subrogation claims, are admissible non-hearsay statements because they are not offered for the truth of the matter asserted. Rather, the statements are offered to demonstrate (1) the fact said, not the truth of their content, and (2) the probable state of mind of both Valley Diagnostic and Transcontinental. *See* Fed. R. Evid. 801(c); *United States v. Cantu,* 876 F.2d 1134, 1137 (5th Cir. 1989) ("statement was offered as evidence of [defendant's] state of mind… Thus, the significance of the statement lies solely in the fact that they were made; the truth of the statement is irrelevant for that purpose. The trial court erred in concluding that the proffered statements were hearsay."); *United States v. Sanders,* 639 F.2d 268, 270 (5th Cir. 1981) ("[I]f the statement was offered on a non-assertive basis, i.e., proof only of the fact it was said, the statement would not be subject to the hearsay objection.").

Respectfully submitted,

**GERMER GERTZ, L.L.P.**

By: _James R. Old, Jr._ *w/ permission by Rett Holidy*

    **JAMES R. OLD, JR.**
State Bar No. 15242500
Post Office Box 4915
Beaumont, Texas 77704
(409) 654-6700 Telephone
(409) 835-2115 Facsimile

**ATTORNEY-IN-CHARGE FOR DEFENDANT,
AMERICAN STANDARD INC.**

**OF COUNSEL:**
**DALE M. "RETT" HOLIDY**
**STATE BAR NO. 00792937**
**FEDERAL ID NO. 21382**
**GERMER GERTZ, L.L.P.**

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the above and foregoing document has been served on Plaintiffs' counsel of record by Certified Mail, postage pre-paid and properly addressed and on all other known counsel of record by U. S. Mail, postage prepaid and properly addressed on this _26_ day of November, 2003.

_James R. Old, Jr._ *w/ permission by Rett Holidy*
**JAMES R. OLD, JR.**

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 1

**H**
Only the Westlaw citation is currently available.

United States District Court, W.D. Texas, San Antonio Division.

Randall IWANAGA and Kathleen Iwanaga, Plaintiffs,
v.
DAIHATSU AMERICA, INC. Defendant.

No. SA 99-CA-711 WWJ.

Oct. 19, 2001.

ORDER

JUSTICE, Senior J.

*1 On September 14, 2001, the Honorable Nancy Stein Nowak, United States Magistrate Judge, filed her Memorandum and Recommendation (Doc. No. 118) with regard to four pending motions filed by the defendant in the above-entitled and numbered civil action, Daihatsu America, Inc. ("DAI"): 1) motion for a *Daubert* hearing and to strike plaintiffs' expert testimony on accident reconstruction and seat design, as proffered by Jahan Eftekhar (Doc. No. 84); 2) motion for a *Daubert* hearing and to strike plaintiffs' expert testimony on occupant kinematics and biomechanics, as proffered by John J. Smith (Doc. No. 85); 3) motion for summary judgment on plaintiffs' negligence and strict liability claims premised on the argument that plaintiffs' expert witnesses, Eftekhar and Smith, should be excluded under *Daubert* (Doc. No. 89); and 4) motion for sanctions due to spoliation of the vehicle made the basis of this lawsuit (Doc. No. 90). The Court has carefully considered these motions, all relevant responses and replies, and all relevant authorities in making its determination. As explained below, in all respects, the Court accepts the findings and recommendations of the Magistrate Judge.

STANDARD OF REVIEW

Absent objection or clear error, the Court may accept the recommendations of a United States Magistrate Judge in whole or in part. 28 U.S.C. §

636(b)(1)(A); F.R.C.P. 72(b). Where a party makes specific and timely objections to the Magistrate Judge's recommendations, the District Court must review *de novo* those portions of the Magistrate Judge's recommendation to which the party objects. *Id.*

DEFENDANT'S OBJECTIONS

Defendant first objects to the denial of its Second Motion to Strike Plaintiffs' expert, Jahan Eftekhar, asserting that he lacks the qualifications and expertise required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny, and that his opinions are not sufficiently reliable under the *Daubert* standards. Having reviewed Mr. Eftekhar's qualifications and deposition testimony, the Court finds that this objection is without merit. The findings and recommendation of the Magistrate Judge shall be, and are hereby, accepted.

Defendant next objects that the Magistrate Judge improperly recommended denying its Motion to Strike Plaintiffs' Expert, John J. Smith for similar reasons. Having reviewed Mr. Smith's qualifications and deposition testimony, the Court finds that this objection is without merit. The findings and recommendation of the Magistrate Judge shall be, and are hereby, accepted.

Defendant finally objects to the proposed denial of its motion for summary judgment, arguing that, should the Court accept the Magistrate Judge's proposed sanctions of the Plaintiffs for spoliation, the Plaintiffs will not have provided sufficient evidence for the case to go forward. The Court finds that this objection is also without merit. The findings and recommendation of the Magistrate Judge shall be, and are hereby, accepted.

THE PLAINTIFF'S OBJECTION

*2 The Plaintiffs' sole objection is to the Magistrate Judge's proposed sanction for spoliation, which would exclude "as unreliable all evidence (i.e., testing, photographs, charts, videotapes and other related research) gathered after removal of the seat." Doc. No. 118 at 20. The Magistrate Judge is without a doubt correct that the seat removal occurred under "dubious circumstances." Plaintiffs removed the seat and manipulated it out of the presence of Defendants, without videotaping the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 2

process or otherwise documenting it in a reliable way. Because Plaintiffs are "unable to provide any objective proof regarding the chain of possession of the seat once it was removed," the Magistrate Judge (and this Court) are "unable to make any determination as to whether there was any spoliation of the seat." *Id.* There is also no doubt that Plaintiffs were bound by a specific order from the Magistrate Judge not to remove the seat out of the presence of the Defendant. Plaintiffs admit that they were told,

"[T]o the extent plaintiffs request permission to remove the front driver's seat from the automobile in question, they have provided no statutory, rule-based or case-law authority upon which the Court can assess their request. Accordingly, it is denied. Doc. No. 120 at 8. Plaintiffs object, incredibly, that because they did not, actually, ask permission, they were not, actually, bound to obey the Court's order. Whatever their reasons, however difficult discovery may have been, Plaintiffs failure to follow a direct court order-not the behavior of Defendants-placed the reliability of their evidence in question. The only fair remedy is to grant, in part, Defendants' motion for sanctions, as the Magistrate Judge recommended. Thus, it is found that Plaintiffs' objection is without merit. The findings and recommendation of the Magistrate Judge shall be, and are hereby, accepted. Any evidence (or testimony based upon evidence) that relies on the Plaintiffs' unauthorized removal of the front seat from the vehicle in question will be excluded.

In summary, all objections to the Magistrate Judge's Report and Recommendation shall be, and are hereby,

DENIED. The Magistrate Judge's findings and recommendations shall be, and are hereby,

ACCEPTED.

*MEMORANDUM AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE*

NOWAK, Magistrate J.

I. *Introduction*

This is a products liability case brought to federal court on diversity grounds. Pending before me are four motions filed by defendant, Daihatsu America, Inc. ("DAI"): (1) motion for a *Daubert* hearing and

to strike plaintiffs' expert testimony on accident reconstruction and seat design, as proffered by Jahan Eftekhar (Docket Entry 84); [FN1] (2) motion for a *Daubert* hearing and to strike plaintiffs' expert testimony on occupant kinematics and biomechanics, as proffered by John J. Smith (Docket entry 85); (3) motion for summary judgment on plaintiffs' negligence and strict liability claims premised on the argument that plaintiffs' expert witnesses, Eftekhar and Smith, should be excluded under *Daubert* (Docket Entry 89) and (4) motion for sanctions due to spoliation of the vehicle made the basis of this lawsuit (Docket Entry 90). [FN2]

FN1. It should be noted that this is DAI's second request to have Jahan Eftekhar stricken and excluded under *Daubert* (Docket Entry 58). The first request, however, was premised on plaintiffs' failure to tender him for deposition. Because Eftekhar was eventually deposed, I entered an Order denying DAI's motion as moot. (Docket Entry 116).

FN2. Plaintiffs' responses to these motions have been filed as Docket Entries 92, 93, 99, 100. DAI has filed a reply brief as to each one of these responses, Docket Entries 97, 98, 106 & 107. Plaintiffs have filed two motions for leave to file what appears to be a sur-reply brief to DAI's summary judgment motion (Docket Entry 110) and to file a surreply brief to DAI's motion for sanctions for spoliation of the vehicle (Docket Entry 109). Because plaintiffs' motions for leave to file surreply briefs have remained unopposed by DAI, they are hereby *GRANTED*.

*3 After having reviewed the arguments made by the parties, the supporting factual evidence and the applicable case law, it is my opinion that DAI's motion for summary judgment should be *denied* because plaintiffs have provided reliable and relevant expert testimony concerning the alleged design defects of the 1990 Daihatsu Rocky driver's seat system which purportedly caused plaintiff Randall Iwanaga to suffer a burst fracture to his lower back. This expert testimony, however, should

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

be limited to the visual evidence, tests and other research gathered by these experts *prior* to the unauthorized removal of the driver's seat system made the basis of this lawsuit. Specifically, any evidence obtained after the removal of the seat on June 16, 2000, and particularly the expert testimony concerning any impact markings, scratches or abrasions discovered underneath the seat and on the cross member which housed the hydraulic jack, should be excluded from the record as unreliable evidence. The reasons for my recommendations are set more fully below.

I have jurisdiction to enter this Memorandum and Recommendation under 28 U.S.C. § 636(b) and the District Court's Order referring all pretrial matters in this proceeding to me for disposition by order, or to aid in their disposition by recommendation where my authority as a Magistrate Judge is statutorily constrained. [FN3]

> FN3. Docket Entry 15. This case was reassigned to the docket of District Court Judge Justice on November 3, 2000. Docket Entry 86. Shortly thereafter, Judge Justice redesignated the case to me for disposition of all pre-trial matters. Docket Entry 88.

## II. *Factual and Procedural Background*

This product liability lawsuit stems from a single vehicle accident involving a 1990 Daihatsu Rocky driven by plaintiff Randall Iwanaga. His wife, Kathleen Iwanaga, was the right front passenger. The accident occurred on July 2, 1997. The undisputed record indicates that while attempting to exit interstate highway 10 near Seguin, Texas, at Exit No. 601, Mr. Iwanaga drove the 1990 Rocky off the exit ramp, and landed in a culvert on all four wheels. [FN4] Plaintiffs filed this lawsuit on July 1, 1999 alleging that DAI is liable, under both negligence and strict liability theories, for having placed in the market a 1990 Daihatsu Rocky ("Daihatsu Rocky"), which was defective in design and/or manufacture. [FN5]

> FN4. Docket Entry 89, Exhibit A, Deposition testimony of Randall Iwanaga, at 60-61.

> FN5. Docket Entry 1.

The court's original scheduling order envisioned that the parties would complete discovery by April 14, 2000, would file their dispositive motions by May 12, 2000, and set this case for trial on July 10, 2000. [FN6] As the early record in this case demonstrates, instead of engaging in productive discovery, the parties throughout most of their discovery period sought recourse in the court for the resolution of their discovery disputes. [FN7] As a result, the discovery in this case fell behind, prejudicing both parties, but particularly, the plaintiffs, who have the burden of proof at trial. While ruling on the discovery matters, the court extended the discovery cut-off deadline first to May 10, 2000 and then to May 17, 2000. [FN8] Shortly thereafter, DAI filed its first motion for summary judgment arguing that plaintiffs did not have any evidence to prove their case. [FN9] Contemporaneous to its summary judgment motion, DAI also filed a motion to strike plaintiffs' two experts Jahan Eftekhar and Arnold Vardiman, for failure to tender them for deposition. [FN10] In addition, DAI filed a motion to strike and for a *Daubert* hearing with respect to plaintiff's expert Eftekhar. [FN11]

> FN6. Docket Entry 6.

> FN7. Docket Entries 32 & 51 & 74.

> FN8. Docket Entries 19 & 32.

> FN9. Docket Entry 59.

> FN10. Docket Entry 58.

> FN11. Docket Entry 60.

**\*4** Plaintiffs opposed DAI's first summary judgment motion on the basis that it was prematurely brought since the parties still were trying to complete discovery at the time the motion was filed. At the very least, plaintiffs requested a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

continuance under Fed.R.Civ.P. 56(f) pending completion of discovery in the case. [FN12] On July 20, 2000, the court, however, modified the scheduling order deadlines giving the parties a new cut-off discovery deadline of October 31, 2000, with the date of November 16, 2000 to file any dispositive motions. [FN13] While these first motions were pending, DAI, on November 16, 2000, moved, again, for summary judgment. [FN14] DAI also filed a *second* motion for a *Daubert* hearing to strike plaintiffs' expert Jahan Eftekhar, as well as a motion for a *Daubert* hearing to strike plaintiffs' newly designated expert, John J. Smith. [FN15] At DAI's request, the trial date of this case was reset to November 26, 2001. [FN16]

   FN12. Docket Entry 66.

   FN13. Docket Entry 74.

   FN14. Docket Entry 89. Contrary to plaintiffs' assertion, DAI's summary judgment motion was timely in that it was filed on the last day for filing such motion under the case's scheduling order.

   FN15. Docket Entries 84 & 85, respectively.

   FN16. Docket Entry 114.

On March 2, 2001, I recommended that the District Court deny DAI's first motion for summary judgment, filed May 31, 2000 on the basis that it was prematurely brought. [FN17] On April 5, 2001, the District Court adopted my recommendation. [FN18] Now that the discovery cut-off deadline as well as the deadline for the filing of dispositive motions have expired, this Memorandum and Recommendation addresses DAI's second motion for summary judgment, DAI's second motion for a *Daubert* hearing and to strike plaintiff's expert Jahan Eftekhar, DAI's motion for a *Daubert* hearing and to strike plaintiff's expert John J. Smith, and DAI's motion for sanctions for plaintiffs' alleged spoliation of the evidence.

   FN17. Docket Entry 115.

   FN18. Docket Entry 117.

### III. *Analysis*

DAI has moved for summary judgment on the grounds that if one or both of its *Daubert* motions are granted, plaintiffs will have no evidence of design defect and/or causation to establish their products liability claim against DAI under the theories of negligence and strict liability. DAI argues that since expert testimony is critical in establishing that the 1990 Daihatsu Rocky was defective and that any alleged defect caused plaintiff Randall Iwanaga's injuries, and since plaintiffs have not produced relevant and reliable expert testimony on these issues, [FN19] DAI's motion for summary judgment on both of plaintiffs' causes of action should be granted as a matter of law. [FN20]

   FN19. According to DAI's representations to the court, plaintiffs have dropped their claims relating to alleged defects in the front belt systems. Docket Entry 89 at 2 & fn. 1 (citing to stipulation of plaintiffs' counsel during deposition of Randall Iwanaga, Exhibit A, at 48-49). Indeed, plaintiffs non-suited the manufacturer of the seat belt system. Docket Entry 26. Additionally, plaintiffs' counsel stipulated that Kathleen Iwanaga dropped her claims for any injuries she sustained in the accident. *Id.* Thus, the sole physical injuries at issue in this case are those suffered by Randall Iwanaga.

   FN20. Docket Entry 89, at 3.

### A. Summary Judgment Standard

The applicable standard in deciding a motion for summary judgment is set forth in Fed. R. Civ. P. 56, which provides in pertinent part as follows:
   The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. [FN21]

> FN21. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Mere allegations of a factual dispute between the parties will not defeat an otherwise proper motion for summary judgment. Rule 56 requires that there be no genuine issue of material fact. [FN22] A fact is material if it might affect the outcome of the lawsuit under the governing law. [FN23] A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. [FN24] Therefore, summary judgment is proper if, under governing laws, there is only one reasonable conclusion as to the verdict; if reasonable finders of fact could resolve a factual issue in favor of either party, summary judgment should not be granted. [FN25]

> FN22. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

> FN23. *Anderson,* 477 U.S. at 248; *Thomas v. LTV Corp.,* 39 F.3d 611, 616 (5th Cir.1994).

> FN24. *Id. See also Wise v. E.I. DuPont De Nemours & Co.,* 58 F.3d 193, 195 (5th Cir.1995).

> FN25. *Anderson,* 477 U.S. at 249.

**\*5** The movant on a summary judgment motion bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record which it alleges demonstrate the absence of a genuine issue of material fact. [FN26] To satisfy this burden, the movant must either submit evidentiary documents that negate the existence of some material element of the nonmoving party's claim or defense, or if the crucial issue is one for

which the nonmoving party will bear the burden of proof at trial, merely point out that the evidentiary documents in the record contain insufficient proof concerning an essential element of the nonmoving party's claim or defense. [FN27] Regardless of whether the movant accompanies its summary judgment motion with affidavits or other evidentiary materials, the motion must be granted if the evidence before the court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied. [FN28] Once the movant has carried that burden, the burden then shifts to the party opposing the motion to present affirmative evidence in order to defeat a properly supported motion for summary judgment. [FN29]

> FN26. *Celotex Corp.,* 477 U.S. at 323.

> FN27. *Edwards v. Aguillard,* 482 U.S. 578, 595 n. 16, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987); and *Celotex Corp.,* 477 U.S. at 325.

> FN28. *Id.*

> FN29. *Anderson,* 477 U.S. at 257.

For instance, in the context of a products liability suit, the Fifth Circuit has specifically noted that when a motion for summary judgment identifies an absence of evidence that supports a material fact on which the nonmovant bears the burden of proof at trial, the nonmoving party must set forth specific facts that show there is a genuine issue for trial. [FN30] The court will look at the record in the light most favorable to the nonmovant drawing all inferences most favorable to that party. [FN31] Nevertheless, "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden." [FN32] Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his case on which he bears the burden of proof at trial. [FN33]

> FN30. *See Ruiz v. Whirlpool, Inc.,* 12 F.3d 510, 513 (5th Cir.1994) (affirming

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 6

summary judgment in favor of defendant where plaintiff failed to create a genuine issue of material fact with respect to causation and design defect) (citing *Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 97 (5th Cir.1993)). *See also Celotex Corp.*, 477 U.S. at 324; *Fields v. City of South Houston, Texas*, 922 F.2d 1183, 1187 (5th Cir.1991); *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1065 (5th Cir.1995), *cert. denied*, 516 U.S. 1045, 116 S.Ct. 704, 133 L.Ed.2d 660 (1996).

FN31. *Id. See also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (holding that a nonmovant cannot discharge her burden with doubt as to the material facts, by conclusory allegations, unsubstantiated assertions, or by only a scintilla of evidence).

FN32. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir.1996) (citing *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994)).

FN33. *Celotex Corp.*, 477 U.S. at 322 ("In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of the proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."). *Id.* at 323.

Accordingly, summary judgment motions permit the court to resolve lawsuits without the necessity of trials if there is no genuine dispute as to any material facts and the moving party is entitled to judgment as a matter of law. [FN34]

FN34. *See Fields*, 922 F.2d at 1187.

**B. Plaintiffs' Prima Facie Burden of Proof Under Texas Law**

Plaintiffs' products liability claim is pleaded under the theories of strict liability and negligence. As a threshold matter, according to Texas law, plaintiffs' products liability claim under these theories requires a preliminary two-prong inquiry: (1) is there a defect, and (2) if so, who is responsible for the defect. [FN35] In this case, plaintiffs allege that the driver's seat system of the 1990 Rocky was defective in that the "C" shaped bar placed over the hydraulic jack underneath the seat proximately caused Mr. Iwanaga's injuries upon impact. Plaintiffs maintain that as the manufacturer and seller of the 1990 Rocky, DAI is responsible for the defective driver's seat system. It is undisputed that under both pleaded theories of recovery, plaintiffs must produce competent evidence of a design defect and in addition establish a causal connection between the alleged defect and plaintiffs' damages.

FN35. *See Trevino v. Yamaha Motor Corp.*, 882 F.2d 182, 184 (5th Cir.1989).

*6 For instance, under a strict liability theory, a plaintiff must establish that: (1) a product is defective; (2) the defect rendered the product unreasonably dangerous; (3) the product reached the consumer without substantial change in its condition from the time of original sale; and (4) the defective product was the producing cause of the injury to the user. [FN36] A defective product is one "that is unreasonably dangerous, i.e., dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics." [FN37] In assessing whether a product is unreasonably dangerous as designed, the fact finder may take into account the utility of the product and the risk involved in its use. [FN38] However, "[a] manufacturer is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product." [FN39]

FN36. *See Syrie v. Knoll International*, 748 F.2d 304, 306 (5th Cir.1984) (citing *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex.1967), where the Texas

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 7

Supreme Court adopted the rule of strict liability embodied in the Restatement (Second) of Torts, § 402A (1965)).

FN37. *Id.* at 306-07(citations omitted).

FN38. *Id.* at 307 (citing *Turner v. General Motors Corp.,* 584 S.W.2d 844, 847 & n. 1 (Tex.1979)).

FN39. *Id.* (citing *Acord v. General Motors Corp.,* 669 S.W.2d 111, 113 (Tex.1984)).

A negligence cause of action against a manufacturer as it has been pleaded in this case, in turn, requires a plaintiff to establish the following elements: (1) the manufacturer owed a duty to the plaintiff; (2) the manufacturer breached that duty; (3) the plaintiff was injured; and (4) the breach of duty was a proximate cause of the injury.

Generally, a person who manufactures or supplies a product owes a duty of reasonable care to users of the product and to those in the foreseeable zone of danger. These suppliers must exercise reasonable care to prevent physical harm that can reasonably be foreseen to result from the use of the product for its intended purpose, and they must take reasonable care to discover the dangerous propensities of the product and to warn those who might be endangered by it. [FN40]

FN40. *Id.* (quoting W. DORSANEO, TEXAS LITIGATION GUIDE § 320.03 [1] (1984)).

Texas courts have consistently recognized the need of expert testimony in understanding the complex issues involved in design defect and causation under both of these theories of recovery. *See Lujan v. Tempo Manufacturing Co. Inc.,* 825 S.W.2d 505, 509 (Tex.App.El Paso 1992, no writ) ("Expert testimony is appropriate whenever scientific, technical or other specialized knowledge will assist the fact finder in understanding the evidence or to determine a fact in issue.") (citing Tex.R.Civ.Evid. 702); *Selig v. BMW of North America,* 832 S.W.2d 95, 99 (Tex.App. [14th Dist] Houston 1992, no

writ) (affirming summary judgment in favor of distributor and seller on the basis that the buyer's lay testimony was insufficient to rebut expert testimony presented by distributor and seller that there was no defect in the automobile); *Allen v. Roddis Lumber and Veneer Co.,* 796 S.W.2d 758, 763 (Tex.App.Corpus Christi 1990, writ denied) ("lay testimony that furniture contained harmful levels of formaldehyde was insufficient to raise a fact issue, in that matter was one for which expert testimony was required."); *Hernandez v. Nissan Motor Corp. in U.S.A.,* 740 S.W.2d 894, 895 (Tex.App-El Paso 1987, writ denied) (court entered a take nothing judgment against the plaintiff on the grounds that he failed to present expert testimony of any defect that the automobile may have had; his lay testimony was insufficient in establishing an automobile defect under a strict products liability theory); *Fitzgerald v. Caterpillar Tractor Co.,* 683 S.W.2d 162, 164 (Tex.Civ.App.-Fort Worth 1985, writ ref'd n.r.e.)(breach of warranty case where the court, in affirming summary judgment in favor of defendant, held that lay testimony of plaintiff, who was injured when a blade of forklift became disengaged from the carriage and fell on his foot, was insufficient to raise a fact issue as to design, material or manufacture of the forklift); and *Carroll v. Ford Motor Co.,* 462 S.W.2d 57, 61-62 (Tex.Civ.App.Houston [14th Dist.] 1970, no writ) ("[t]he bare fact that an accident happens to a product, that the brakes failed as in this case, is not sufficient proof that the product was defective.").

**\*7** The two expert witnesses challenged by DAI are: Jahan Eftekhar, a mechanical engineer designated by plaintiffs to provide expert testimony on the design defects of the driver's seat system made the basis of this lawsuit and to also provide testimony of the circumstances surrounding the scene of the accident; and John J. Smith, a geophysical and electrical engineer, designated by plaintiffs to provide expert testimony on the expected occupant kinematics in the collision, the applied force on Randall Iwanaga, the probable mechanism of injury to Randall Iwanaga, and the role of the vehicle components in injury causation. DAI, in essence, challenges Eftekhar's testimony relating to any seat defects as speculative, unreliable and irrelevant, and further argues that he is unqualified to render expert opinions on the subject. DAI also objects to the testimony of Smith regarding biomechanical and injury causation on the grounds that he is not qualified in the field of

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 8

biomechanics and has insufficient training, background and experience to render competent expert opinions on the subject. DAI maintains that since these witnesses have only offered inadmissible expert testimony on design defect and causation, it is entitled to summary judgment on all of plaintiffs' causes of action. Before analyzing DAI's arguments, a discussion on the applicable standard for the admissibility of expert testimony is warranted.

*C. Applicable Standard To Admissibility of Expert Testimony*

Fed. R. Civ. Evid. 702, as amended on December 1, 2000, provides:
  If scientific, technical, or other specialized knowledge will assist the trier of fact ... a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, (1) if the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles reliably to the facts of the case. [FN41]

  FN41. Fed. R. Civ. Evid. 702. The United States Supreme Court's April 17, 2000 Order adopting this amendment to Rule 702 provides that the amended rule "shall take effect on December 1, 2000, and shall govern all proceedings thereafter commenced and, insofar as just and practicable, all proceedings then pending." Given that the revisions to Rule 702 were intended to simply codify the principles of *Daubert* and *Kumho, see* Committee Note to Rule 702, cases which were well known to the parties before this case was filed, it is both "just" and "practicable" to apply the amended rule to this case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* [FN42] and *Kumho Tire Co. v. Carmichael,* [FN43] the United States Supreme Court articulated the trial court's gate-keeping function regarding expert witness testimony. As a preliminary matter, the trial court is required to determine whether a proposed expert is qualified to give expert testimony. [FN44] If the trial court determines that the expert is qualified in the relevant field, then the court must

exercise its gate-keeper function as provided in *Daubert* and *Kumho.* In *Daubert,* the Court held that Rule 702 imposes a special obligation upon the trial judge to "ensure that any and all scientific testimony ... is not only relevant but reliable." [FN45] Under Fed.R.Evid.702, trial courts are required to make a "preliminary assessment of whether the reasoning or methodology can be applied to the facts at issue." [FN46] *Daubert* sets forth four specific factors that the trial court should ordinarily apply when considering the reliability of scientific evidence: (1) whether the technique can or has been tested; (2) whether it has been subjected to peer review or publication; (3) whether there is a known or potential rate of error; and (4) whether the relevant scientific community generally accepts the technique. [FN47]

  FN42. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

  FN43. 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

  FN44. *Id.* at 156.

  FN45. *Daubert,* 509 U.S. at 589-90.

  FN46. *Id.* at 591.

  FN47. *Id.* at 592-93.

*8 In *Kumho,* the Court made it clear that the *Daubert* gate-keeping obligation-that is, the obligation of the trial court to ensure reliability of expert testimony-applies to all types of expert testimony, not just "scientific" testimony. [FN48] Ultimately, "the district court's responsibility 'is to make certain that an expert, whether basing his testimony upon professional studies or personal experience, employs in the courtroom, the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.' " [FN49] The *Kumho* Court concluded that a trial court may consider one or more of the specific *Daubert* factors when doing so will help determine that

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 9

testimony's reliability. [FN50] "But, as the Court stated in *Daubert,* the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." [FN51] Thus, whether *Daubert's* suggested indicia of reliability apply to any given testimony depends on the nature of the issue at hand, the witness's particular expertise, and the subject of the testimony. [FN52] The Supreme Court in *Kumho* reasoned that:

> FN48. 526 U.S. at 147-48.

> FN49. *Skidmore v. Precision Printing and Packaging, Inc.,* 188 F.3d 606, 618 (5th Cir.1999) (quoting *Kumho,* 526 U.S. at 152).

> FN50. 526 U.S. at 151.

> FN51. *Id.*

> FN52. *Id. See also Black v. Food Lion, Inc.,* 171 F.3d 308, 312 (5th Cir.1999)("In the vast majority of cases, the district court first should decide whether the factors mentioned in *Daubert* are appropriate.") (Emphasis added).

[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether a particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in Daubert where they are reasonable measures of the reliability of expert testimony. The trial court must have the same kind of latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides whether or not that expert's relevant testimony is reliable.... Otherwise, the trial judge would lack the discretionary authority needed to avoid unnecessary "reliability" proceedings in ordinary

cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. [FN53]

> FN53. *Kumho,* 526 U.S. at 152 (Emphasis added).

Thus, under *Kumho,* trial courts have broad latitude to determine whether or not the proffered testimony requires an application of the *Daubert* factors. [FN54]

> FN54. I have determined that a *Daubert* oral hearing is not needed in this case, considering the voluminous evidentiary record the parties have supplied in support of their respective positions. The evidentiary record before me includes, but is not limited to: the deposition testimony of Jahan Ektekhar (including his sworn affidavit) and John J. Smith, as well as one of DAI's expert witnesses, Charles P. Hatsell, plaintiffs' deposition transcripts and sworn affidavits, the sworn affidavit of Arnold B. Vardiman, M.D., one of Randall Iwanaga's physicians, and the deposition testimony of State Trooper William R. Gilliam, the officer who responded to the accident, was at the scene shortly thereafter, and took the incident report.

As noted, in making a *Daubert* determination, the trial court must determine that the proposed testimony is both relevant and reliable. In making this reliability determination, the trial court should not require certainty, but the testimony must demonstrate that the opinions offered are more than speculation. In considering this issue, the trial court must consider the validity of the principles applied by the expert, the accuracy of the data relied upon by the expert, and the precision of the application of the principles to the relevant data. [FN55] The *Daubert* determination is intended to ensure that expert testimony is "supported by appropriate validation," and "established a standard of evidentiary reliability." [FN56]

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 10

FN55. *See Marcel v. Placid Oil,* 11 F.3d 563, 567 (5th Cir.1994).

FN56. *Daubert,* 509 U.S. at 590.

**\*9** The burden of proof on a *Daubert* issue rests on the proponent of the testimony. "The proponent need not prove that the expert's testimony is correct, but she must prove by a preponderance of the evidence that the testimony is reliable." [FN57]

FN57. *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir.1998, en banc).

*1. Jahan Eftekhar, Ph.D.*

Mr. Eftekhar has been designated by the plaintiffs to provide expert testimony concerning the design defects of the driver's seat system of the 1990 Rocky. DAI objects to Eftekhar's testimony on the following grounds: (1) that he is not qualified to testify about seat system design and his opinions on the subject are speculative and unreliable; (2) his expert testimony on a design defect in an automobile, causation and proper warnings, has already been excluded by another court and this court should do the same; (3) he has not conducted any reliable testing or scientific study or research to confirm his opinions; (4) although he is a mechanical engineer, he has never designed a seat system or component for use in an automobile sold for commercial use, and (5) has not conducted any studies that are relevant to his opinions in this case. [FN58] The record, however, does not support, DAI's arguments to exclude this witness.

FN58. Docket Entry 84, at 3-8.

According to plaintiffs' supplemental designation of witnesses filed March 31, 2000, Mr. Eftekhar's affidavit, deposition testimony and curriculum vitae, Mr. Eftekhar has a Ph.D in mechanical engineering and is a registered professional engineer in the State of Texas. He has extensive experience in mechanical engineering design, accident reconstruction, failure analysis and auto seat design. He also testified in his deposition that he has been

involved in the design of a vehicle and a seat system. [FN59] Based on his educational degree attained, work experience and personal knowledge, Mr. Eftekhar is indeed qualified to testify in this case.

FN59. Docket Entry 93, at 6, Eftekhar's deposition, at 100 & 102.

DAI has alluded that since Mr. Eftekhar's testimony was excluded once by another court that his testimony in this case should be excluded as well. [FN60] This is not a persuasive argument as the prior case to which DAI refers dealt with issues relating to design defects in an air bag system in relation to burn injuries. [FN61] Mr. Eftekhar's testimony in the instant case solely relates to purported design defects in the 1990 Rocky driver's seat system and he has not been asked to render any medical or biomechanical opinion. Both *Daubert* and *Kumho* stand for the proposition that an expert opinion rendered in a particular case must be independently analyzed. [FN62] The trial court's gate-keeping inquiry is tied to the facts of a particular case, and it is within the discretion of the court to accept a witness as an expert. [FN63] Accordingly, Eftekhar possesses sufficient qualifications to testify in this case.

FN60. Docket Entry 84, at 3 & Exhibit E.

FN61. Docket Entry 93, at 12 & Exhibit 7.

FN62. *Daubert,* 509 U.S. at 591 and *Kumho,* 526 U.S. at 150.

FN63. *Id.*

The record further shows that Mr. Eftekhar applied his engineering knowledge and experience to the specific facts of the case as elicited from his investigation of those witnesses who were present at the scene of the accident, such as State Trooper Gilliam and plaintiff Randall Iwanaga. [FN64] He performed seat loading tests and used standard scientific and mathematical formulas to develop his final opinions as to how the accident occurred, the

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



dynamics of the accident and the speed of vehicle. [FN65] These tests revealed that the vehicle's abrupt speed change and damage were not beyond the structural integrity of the driver's seat and that it was the defective seat design which caused the injuries to Randall Iwanaga. [FN66] According to his findings, he concluded that the 1990 Daihatsu was defectively designed with respect to the driver's seat system and unreasonably dangerous. The C-shaped metal bar designed underneath the driver's seat to store a hydraulic jack exacerbated Randall Iwanaga's injuries to his lower back, and more specifically to his L2 spinal vertebrae. [FN67] Mr. Eftekhar further arrived at the conclusion that in all reasonable probability, the absence of the C-shaped metal bar would have prevented the type of injuries suffered by Randall Iwanaga. In examining other comparable vehicles, such as the 1987 Suzuki Samurai, 1990 Isuzu Amigo and a 1992 Jeep Wrangler, Mr. Eftekhar discovered that none of these models contained the C-shaped metal bar underneath the seat or the hydraulic jack utilized by DAI. [FN68] Instead, they contained a scissors type jack which lies flat when not in use. [FN69] Accordingly, Mr. Eftekhar formed the opinion that safer alternatives seat designs were available at the time, and these would have included the absence of metal bars or the flat bars as utilized by the other vehicle models. In that regard, Mr. Eftekhar states in his affidavit:

FN64. Docket Entry 93, at 7.

FN65. *Id.* at 2 & 7-10 & Eftekhar's deposition testimony, at 19-26.

FN66. Docket Entry 89, Exhibit D, Eftekhar's affidavit, ¶¶ 28 -31.

FN67. *Id.* at ¶ 31.

FN68. *Id.* at ¶¶ 23-26.

FN69. *Id.* at ¶ 26.

**\*10** [A]n alternative safe design would include the utilization of the scissors type jack, which lies

flat when not in use, instead of the hydraulic jack, which if placed underneath the driver's seat, required a certain c-shape designed bar to accommodate for storing and removing. Additionally, the placement of the jack underneath the seat was unreasonably dangerous, and, as shown by the exemplar vehicles, not necessary. [FN70]

FN70. Docket entry 89, Exhibit D, Eftekhar's Affidavit, dated June 20, 2000, at ¶ 27. *See also* Docket Entry 93, Eftekhar's Deposition, at 69.

Moreover, the record reflects that he visited the site of the accident on at least three occasions in order to gage the accurate travel path of the vehicle, conducted two visual inspections of the 1990 Rocky involved in the accident, and performed several seat loading tests on exemplary seat systems as well as on the actual seat. [FN71] Plaintiffs, in their response, described in detail the methodology used by Eftekhar in reaching his final expert opinion in this case. [FN72] Any weaknesses in Eftekhar's opinions can be exposed through a thorough cross-examination, such as performed during his deposition. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." [FN73] There is no evidence before me that Eftekhar's methodology in forming what became his "final" opinion as he testified in his deposition (such as it was), is unsound or unreliable. Having said that, I must now address Eftekhar's participation in the unauthorized removal of the driver's seat system made the basis of this lawsuit.

FN71. According to Eftekhar's deposition testimony, he visited the site of the accident on June 30, 1999, September 19, 2000 and October 2, 2000. Docket Entry 93, Eftekhar's Deposition conducted on October 10, 2000, at 28 & 37. The vehicle inspections occurred on October 29, 1997 and sometime in April of 2000. *Id.* at 37.

FN72. Docket Entry 93, at 5-12.

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

FN73. *Daubert,* 509 U.S. at 596.

### a. *Unauthorized Removal of the Seat*

DAI has moved for sanctions in the form of dismissing this entire lawsuit, on the basis that plaintiffs spoliated critical evidence to the case by removing the driver's seat system without DAI's consent or approval by this court. [FN74] On June 16, 2000, Mr. Eftekhar, apparently with the approval of plaintiffs' counsel, removed the actual driver's seat system with the assistance of some of his employees, and transported it to his office for further testing. [FN75] Based on these testings, he prepared an affidavit on June 20, 2000 describing his findings. [FN76] The removal of the seat was performed in complete disregard of an order I entered on May 15, 2000 in which I specifically denied plaintiffs' request to remove the seat from the vehicle as they had failed to cite any legal authority in support of their request. Further, the removal of the seat took place outside the presence of DAI and/or its counsel or representatives and there is no evidence that plaintiffs' counsel even attempted to notify DAI's counsel of their intent to remove the seat on the date in question. [FN77] The fact that Eftekhar does not rely on the markings or on the "rough spots" found on C-shaped bar underneath the seat once the seat was removed is of no consequence as the markings are clearly relevant to rebut DAI's expert theory. [FN78] The removal of the seat occurred under dubious circumstances. Without any objective proof regarding the chain of possession of the seat once it was removed, and the actual process Eftekhar's employees utilized in removing the seat, I am unable to make any determination as to whether there was any spoliation of the seat. Further, the removal occurred outside the presence of DAI and in complete disregard of my previous order. [FN79]

FN74. Docket Entry 90.

FN75. Docket Entry 99, Eftekhar's deposition, at 18-20.

FN76. Docket Entry 89, Exhibit D, Eftekhar's Affidavit, ¶¶ 15, 17-18.

FN77. Docket Entry 90, at 5-6.

FN78. Docket Entry 109, at 4 & 6.

FN79. Plaintiffs' counsel has submitted an affidavit stating that because he had a telephone conversation with Gail Johns, District Court Judge Orlando Garcia's deputy court clerk, in which she apparently related to him that the discovery deadline was extended in the case, that somehow that representation gave him the authority to remove the seat. Plaintiffs' counsel knew that DAI strenuously objected to the removal of the seat. Docket Entry 109. Even if such "ex-parte" telephone conversation can be made part of the record, it is insufficient to overturn my previous ruling regarding removal of the seat. Docket Entry 51, at ¶ 3. Plaintiffs' counsel should have re-urged his request to remove the seat with the court, but inexplicably failed to do so.

**\*11** Accordingly, I hereby recommend that although dismissal of the entire case as DAI requests would be contrary to the rights of the individual plaintiffs in this case, DAI's motion for sanctions for spoliation of the evidence should be *granted in part* and the court should limit Eftekhar's trial testimony by excluding as unreliable all evidence (*i.e.,* testing, photographs, charts, videotapes and other related research) gathered after removal of the seat. [FN80]

FN80. *See Carroll,* 462 S.W.2d at 60, a product liability action based on a defective braking system of a vehicle. Due to the fact that the actual master brake cylinder was removed from the vehicle, the trial court excluded any evidence of the state of the cylinder after its removal.

### 2. *John J. Smith*

Plaintiffs have produced John J. Smith as their expert witness concerning the biomechanical issues surrounding Randall Iwanaga's back injuries,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

including the expected occupant kinematics in the collision, the applied force on Randall Iwanaga upon impact, the probable mechanism of injury to Randall Iwanaga and the role of the 1990 Rocky's components in the injury causation. [FN81] DAI contests the reliability and relevancy of Smith's testimony on various grounds, to wit: (1) that Smith lacks the education or training to qualify as an expert in biomechanics, in that he has not obtained a degree in the field; (2) that he lacks the experience, knowledge or skill to qualify as an expert in biomechanics, describing Smith as a "litigation biomechanic," with no actual knowledge in the field besides that obtained by testifying in various litigation proceedings; and (3) that his opinions do not meet the *Daubert* reliability requirements. [FN82]

> FN81. Docket Entry 92, at land plaintiffs' second supplemental expert witnesses, filed August 14, 2000, Docket Entry 76.

> FN82. Docket Entry 85, at 1-12.

Contrary to DAI's position, Smith is qualified to render expert testimony on biomechanics. The record indicates that Mr. Smith has a Masters of Science in electrical engineering, a Bachelor of Science in geophysical engineering and is a registered professional engineer. [FN83] Besides his engineering training, the record shows that since approximately 1992, well before this case was filed, Mr. Smith received extensive training in accident reconstruction and impact biomechanics, including numerous graduate school courses in biomechanical trauma. Even though he did not have a degree in biomechanics at the time he began working in the case and at the time of his deposition (September 8, 2000), he was nevertheless very close to completing his post-graduate courses in the area. The record indicates that Mr. Smith eventually received his Masters of Science degree in biomechanical trauma in December of 2000. [FN84] In attempting to show that Smith is not qualified to testify about biomechanics, DAI relies on one case filed in state court in Colorado in which the judge excluded Smith's expert testimony. [FN85] As Smith testified during his deposition, the judge excluded his testimony for the sole reason that in 1997 or 1998, at the time the order in the Colorado case was

entered, Smith did not have a degree in the field. [FN86] That clearly is not the case now. Thus, it is my opinion that Smith possesses the qualifications necessary, by way of education and professional experience, to testify in this case.

> FN83. Docket Entry 92, at 4 & Exhibits 1 (Smith's curriculum vitae) & 2 (Smith's deposition testimony), at 36.

> FN84. *Id.* As plaintiffs have noted, DAI's objection to the qualifications of Mr. Smith on the basis that he lacks a degree in biomechanics is diminished by the fact that DAI's own expert, Charles P. Hatsell, does not have a biomechanics degree. Docket Entry 92, at 2.

> FN85. Docket Entry 92, at 9.

> FN86. *Id.* & Exhibit 2, at 258.

At his deposition, Mr. Smith testified that he received research materials, photographic evidence, test results and reports prepared by Eftekhar, medical information from Randall Iwanaga's physicians on the extent of his lower back injuries, and the accident report prepared by State Trooper Gilliam. [FN87] He also applied mathematical formulas and Newton's law of motion to assess the speed of the vehicle and the energy transmitted from the C-shaped bar to Randall Iwanaga's spine. On the day prior to his deposition, he visited the site of the accident and conducted a visual inspection of the same. He then examined the 1990 Rocky and inspected its driver's seat system. Based on his examinations, studies and visual inspections, Smith testified that the vehicle left the exit ramp and traveled off the road for approximately 80 to 100 feet onto a steep slope. Once on the steep slope, according to Smith, Randall Iwanaga "unloaded" from the seat upon impact with the ground. Randall Iwanaga then "reloaded" back to the seat at a significantly elevated level. According to Smith, the impact with the seat applied a vertical load to Randall Iwanga's spinal column. [FN88] Based on his experience and education, and after having applied reliable scientific principles and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

Page 14

mathematical formulas, Smith reached his final opinion that the C-shaped metal bar caused the vertical load to be transmitted to Randall Iwanaga's spine. Smith's methodology in reaching his final opinion on causation does not appear unsound or unreliable. Having said that, however, there is one significant problem with Smith's expert testimony.

FN87. *Id.* at Exhibit 2, at 79-84, 92-100, 136-37, 149, 176, 195 & 235.

FN88. *Id.*

*12 By the time Smith was retained in the case, Eftekhar had already removed the seat from the 1990 Rocky. As a result, he never inspected the driver's seat system when it was still a part of the vehicle. Furthermore, during his deposition, Smith relies, at least in part, on the marks/scratches and/or abrasions on the C-shaped bar which were discovered *after* the unauthorized removal of the seat. [FN89] In that regard, Smith testified that these marks are consistent with the impact of the C-shaped bar with the seat loaded with Randall Iwanaga. Accordingly, I recommend that to the extent that Smith's opinion on causation is dependent upon his observation of markings on the C-shaped metal bar, that opinion testimony is inadmissible due to the fact that it is based on evidence discovered or gathered after the seat was removed which is inadmissible for the reasons previously discussed. [FN90]

FN89. *Id.* at 9 & Exhibit 2, at 140-144 & 227.

FN90. *See* discussion on the unauthorized removal of the seat, *supra.*

### IV. *Recommendation*

Based on the foregoing, it is my recommendation that DAI's motion for summary judgment (Docket Entry 89) be *DENIED* on the grounds that through the reliable and relevant expert testimony of Eftekhar and Smith, plaintiffs have established that genuine issues of material fact exist with respect to: the correct travel path of the 1990 Rocky on the site

of the accident, the position of Randall Iwanaga on the driver's seat, whether the 1990 Rocky driver's seat system is a defective product and whether said defect proximately caused Randall Iwanaga's injuries. [FN91] Accordingly, it is my recommendation that DAI's motions for a *Daubert* hearing and to strike plaintiffs' experts, Jahan Eftekhar and John J. Smith (Docket Entries 84 & 85) be *DENIED.* I further recommend that DAI's motion for sanctions due to plaintiffs' spoliation of the vehicle made the basis of the lawsuit (Docket Entry 90) be *GRANTED IN PART* and that any evidence obtained or relied upon by plaintiffs' experts Eftekhar and Smith after the unauthorized removal of the driver's seat system be excluded from the record for all purposes, including trial of this cause.

FN91. Docket Entry 100, at ¶¶ 9-22.

### V. *Instructions For Service And Notice of Right to Object/Appeal*

The United States District Clerk shall serve a copy of this Memorandum and Recommendation on each and every party either (1) by certified mail, return receipt requested, or (2) by facsimile if authorization to do so is on file with the Clerk. According to Title 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), any party who desires to object to this report must serve and file written objections to the Memorandum and Recommendation within 10 days after being served with a copy unless this time period is modified by the District Court. A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the District Court need not consider frivolous, conclusive or general objections. Such party shall file the objections with the Clerk of the Court, and serve the objections on all other parties and the Magistrate Judge. A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the District Court. [FN92] Additionally, any failure to file written objections to the proposed findings, conclusions and recommendations contained in this Memorandum and Recommendation within 10 days after being served with a copy shall bar the aggrieved party,

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 2001 WL 1910564 (W.D.Tex.))

except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. [FN93]

FN92. *See Thomas v. Arn,* 474 U.S. 140, 149-152, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

FN93. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428- 29 (5th Cir.1996).

2001 WL 1910564 (W.D.Tex.)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

Page 1

⚑
Briefs and Other Related Documents

United States Court of Appeals,
Fourth Circuit.

Mark N. SILVESTRI, Plaintiff-Appellant,
v.
GENERAL MOTORS CORPORATION,
Defendant-Appellee.

No. 00-2523.

Argued Sept. 27, 2001.
Decided Nov. 14, 2001.

Motorist brought product liability action against automobile manufacturer alleging that airbag in his vehicle did not deploy as warranted. The United States District Court for the District of Maryland, William M. Nickerson, J., dismissed the action. Motorist appealed. The Court of Appeals, Niemeyer, Circuit Judge, held that: (1) motorist had duty to preserve automobile, and (2) dismissal of lawsuit due to spoliation of evidence was not unduly harsh.

Affirmed.

Traxler, Circuit Judge, filed opinion concurring in part and dissenting in part.

West Headnotes

**[1] Federal Courts** ☞416
170Bk416 Most Cited Cases

The federal law of spoliation applies to a case litigated in a federal court because the power to sanction for spoliation derives from the inherent power of the court, not substantive law.

**[2] Federal Civil Procedure** ☞1636.1
170Ak1636.1 Most Cited Cases

"Spoliation" refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.

**[3] Federal Civil Procedure** ☞1636.1
170Ak1636.1 Most Cited Cases

The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the power is limited to that necessary to redress conduct which abuses the judicial process.

**[4] Federal Civil Procedure** ☞1636.1
170Ak1636.1 Most Cited Cases

The policy underlying a court's inherent power to impose sanctions for spoliation is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth; because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions, all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition.

**[5] Federal Civil Procedure** ☞1636.1
170Ak1636.1 Most Cited Cases

While the spoliation of evidence may give rise to court imposed sanctions deriving from a court's inherent power, the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses.

**[6] Federal Civil Procedure** ☞1636.1
170Ak1636.1 Most Cited Cases

While a district court has broad discretion in choosing an appropriate sanction for spoliation, the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine; in addition, a court must find some degree of fault to impose sanctions.

**[7] Federal Civil Procedure** ☞1636.1
170Ak1636.1 Most Cited Cases

When imposing spoliation sanctions, a trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct; however, dismissal should be

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

avoided if a lesser sanction will perform the necessary function.

**[8] Federal Courts** ⟐812
170Bk812 Most Cited Cases

The Court of Appeals reviews a district court's exercise of its discretion for abuse.

**[9] Federal Civil Procedure** ⟐1551
170Ak1551 Most Cited Cases

Motorist, as plaintiff, had duty to preserve automobile in which he was injured for inspection and testing by automobile manufacturer, as defendant, in product liability lawsuit that was dismissed due to spoliation of evidence; although motorist was not vehicle's owner and neither he nor his agents destroyed the evidence, no notice of claim was given to manufacturer even though motorist was preparing for litigation and motorist did not attempt to buy damaged vehicle or even request that it be maintained in its post-accident condition until manufacturer could inspect it.

**[10] Federal Civil Procedure** ⟐1551
170Ak1551 Most Cited Cases

The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation; if a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence.

**[11] Federal Civil Procedure** ⟐1636.1
170Ak1636.1 Most Cited Cases

Dismissal of product liability lawsuit due to spoliation of evidence was not unduly harsh, where automobile manufacturer, as defendant, was severely prejudiced by spoliation since it was not able to test the allegedly faulty device, and motorist, as plaintiff, was negligent in failing preserve the evidence or at least notify manufacturer of possible claim so that it could inspect the vehicle.

**[12] Federal Civil Procedure** ⟐1636.1

170Ak1636.1 Most Cited Cases

Dismissal is severe and constitutes the ultimate sanction for spoliation, and consequently, it is usually justified only in circumstances of bad faith or other like action; but even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case.

**[13] Pretrial Procedure** ⟐435
307Ak435 Most Cited Cases

Under New York law, sometimes even the inadvertent, albeit negligent, loss of evidence will justify dismissal because of the resulting unfairness.

**[14] Federal Civil Procedure** ⟐1636.1
170Ak1636.1 Most Cited Cases

To justify the harsh sanction of dismissal, a district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.
***585** ARGUED: Marc Seldin Rosen, Shar, Rosen & Warshaw, L.L.C., Baltimore, MD, for Appellant. Harold Bruce Dorsey, Piper, Marbury, Rudnick & Wolfe, L.L.P., Baltimore, MD, for Appellee. ON BRIEF: Proctor D. Robison, Ann Arbor, MI, for Appellant. Jeffrey M. Yeatman, Piper, Marbury, Rudnick & Wolfe, L.L.P., Baltimore, MD, for Appellee.

Before WIDENER, NIEMEYER, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Judge WIDENER joined. Judge TRAXLER wrote an opinion concurring in part and dissenting in part.

**OPINION**

NIEMEYER, Circuit Judge:

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

Page 3

Mark Silvestri filed this products liability action against General Motors Corporation, alleging that the airbag in a 1995 Chevrolet Monte Carlo he was driving did not deploy as warranted when he crashed into a utility pole and that, as a result, his injuries from the accident were enhanced. Because Silvestri failed, before the vehicle was repaired, to give General Motors notice of his claim and an opportunity to inspect the vehicle--which the district court concluded was "the sole piece of evidence in this case"--the court dismissed Silvestri's action, finding dismissal to be the appropriate sanction for the spoliation of evidence in this case. For the reasons that follow, we affirm.

*586 I

On November 5, 1994, Mark Silvestri was involved in a single vehicle crash in Preble, New York. Driving his landlady's Chevrolet automobile while intoxicated and at an excessive rate of speed, Silvestri lost control of the vehicle on a curve and slid off the road. The vehicle crashed through a split-rail fence and, as it was spinning, the front of the vehicle obliquely struck a utility pole. The vehicle rotated around the pole and continued past it, coming to rest in the front yard of a residence. During the accident, the airbag in the Chevrolet did not deploy. Although it appears that Silvestri was wearing his seatbelt, he sustained severe facial lacerations and bone fractures, permanently disfiguring his face. He contends that, had the airbag deployed, he would not have sustained these disfiguring injuries.

While Silvestri was in the hospital, his parents retained attorney William G. Moench to protect Silvestri's legal interests, both with respect to Silvestri's ticket for driving while intoxicated and his potential civil action against General Motors. When Moench later contacted Silvestri, Silvestri requested that Moench continue to represent him until his period of incapacitation ended and he was able to meet with Moench in person. Later, Silvestri discharged Moench, perhaps over a dispute with Moench about the advancement of litigation costs, which then had grown to $3000, and retained present counsel.

While acting on behalf of Silvestri, Moench retained two accident reconstructionists, Erik Carlsson and Albert Godfrey, to inspect the damaged Chevrolet and to visit the crash scene so

that they could render expert opinions regarding the circumstances of the crash. Carlsson later testified that it was his understanding that he was conducting his investigation "in anticipation of filing a lawsuit against General Motors." Carlsson and Godfrey inspected and photographed the vehicle and inspected the site, and each prepared a report of his findings. Because Carlsson considered it important that General Motors have an opportunity to see the car, Carlsson "suggested" to Attorney Moench, at the time he conducted his inspection, that "the car has to be kept"; and Carlsson stated, "General Motors needs to see the car." He also told Moench after the inspection that "he does indeed have a case [against General Motors] because the airbag should have deployed."

At his inspection, which took place approximately a week after the accident, Carlsson examined the vehicle and took photographs. However, he took only one measurement of the vehicle and conducted no inspection of its undercarriage. While the one measurement he took was a "crush" measurement, he made no note of the measurement. At his deposition several years later, he "seem[ed] to recall" that the "crush" measurement was 18 inches, but he could not definitely remember the measurement. Similarly, Godfrey failed to make notes of any measurements that he may have taken during his inspection. He did, however, photograph a ruler on the hood of the vehicle to measure the extent to which the front of the hood was bent off centerline. When inspecting the site of the accident, Godfrey failed to measure the skid marks left by the vehicle, confessing that he formed his initial opinion about Silvestri's speed at the time of the accident by "eyeball[ing]" the skid marks.

After their inspections, both Carlsson and Godfrey prepared written reports, dated December 6, 1994, which they submitted to Moench. In his report, Carlsson concluded that the vehicle had been subjected to two impacts at the accident, a side impact and a frontal collision. The report stated, "It is evident that the damage *587 was caused by the vehicle striking a wooden fence. A piece of wood is stuck in the passenger side door, and another piece in the rear tire." "The frontal impact was evidently, as depicted in the police report, with the utility pole.... The damage indicates a collision with a narrow object, the initial point of impact being slightly to the right of the vehicle's center

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

Page 4

line." Carlsson explained further, "In spite of the substantial front end damage that affected the rails of the frame, the vehicle's airbag did not deploy at the accident. Yet, the diagnostics of the airbag showed no defect or malfunction." Carlsson concluded, "The failure by the airbag to deploy in this accident must be considered a defect that unnecessarily added to Mr. Silvestri's injuries."

In Godfrey's written report, Godfrey stated his opinion that the vehicle "struck the utility pole at an angle of approximately 25 Degrees and rotated through the window of 30 Degrees either side of the center line of the vehicle whereby the dual airbags in the vehicle should have inflated, however, failed to do so." He concluded, "A major question arises as to why the air bags did not inflate upon impact with the utility pole. Had the air bags worked properly the operator would not have struck his face on the steering wheel causing the massive facial injuries that were incurred."

Notwithstanding the anticipation of litigation against General Motors, neither Moench nor Silvestri took any steps to preserve the vehicle or to notify General Motors of the existence of the vehicle and Silvestri's potential claim. Indeed, General Motors was not notified about the accident until almost three years later when Silvestri commenced this action against the corporation. Yet, the vehicle remained in its damaged condition for more than three months after the accident. In early 1995, the title-owner of the vehicle, Carl E. Burhans, the husband of Silvestri's landlady, transferred title of the vehicle to his insurance company, and his insurance company in turn sold the vehicle to Prestige Collision, Inc., which repaired the vehicle and then sold it. General Motors ultimately found the vehicle in June 1998 in Quebec, Canada, in the possession of Real T. Durand. When, in 1998, General Motors inspected the airbag sensing and diagnostic module, which monitors and retains in its memory defects in the airbag system, it found that the module had not been damaged in the accident. The module revealed that there had been no defect in the airbag system. Silvestri's expert, however, questioned whether this was the original module that had been in the vehicle at the time of the accident.

After General Motors was named the defendant in this action, its reconstruction expert, Keith Schultz,

evaluated the evidence collected by Carlsson and Godfrey, as well as the sensing and diagnostic module from the repaired vehicle. Based on the available evidence, Schultz concluded that the oblique impact of the vehicle with the utility pole did not meet the airbag deployment criteria set forth in General Motors' warranty to provide head and face protection in a frontal impact. He stated, "My investigation indicates that the impact speed and direction and conditions of the subject accident were not sufficient to cause the deployment of the SIR [Supplemental Inflatable Restraint] system and that the subject airbag properly did not deploy." He added, "It is my opinion that the injuries sustained by [Silvestri], due to the violent impact of wood from a fence impacting the vehicle compartment, could have been greater if the SIR had deployed as claimed by [Silvestri]." Schultz explained further that "the plaintiff was injured not by an impact with a telephone pole but rather when the vehicle ran *588 through a wooden fence, violently projecting portions of the fence into the passenger compartment of the vehicle. The change in velocity, or the 'delta V', of the vehicle when it impacted the telephone pole was not sufficient and not directionally correct to deploy the airbags." Schultz added a serious caveat to his opinions, however, indicating that Silvestri's failure to preserve the vehicle in its condition after the accident "hinders General Motors['] ability to defend plaintiff's claim of a product defect." He explained,

Although the information stored in the SDM [Sensing and Diagnostic Module] indicates that the airbag system was operating properly at the time of the accident, a detailed inspection of the condition of the vehicle post-accident before any body repairs are performed is critical to performing a crush analysis of the vehicle. A crush analysis is performed by actually measuring the amount of crush at numerous points on the vehicle. These crush measurements are used to create a crush profile of the vehicle, which, in turn, is used to determine the change in velocity, or "delta V" of the vehicle in the accident. Such information is important to a detailed reconstruction of the accident.

He concluded that the destruction of this evidence had prejudiced General Motors' defense.

Following receipt of Schultz's report, both Carlsson

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

Page 5

and Godfrey changed some of their conclusions about their observations of the vehicle following the accident. For example, although Carlsson initially stated that the windshield on the vehicle had collapsed and fallen completely inward, making no reference to seeing any blood, he changed his report later to say that he saw blood on the windshield. Carlsson also originally concluded that Silvestri's face struck the windshield rather than the steering wheel and that he had not seen any deformation to the steering wheel nor any evidence that the steering column had been "stroked" (compressed) as a result of the accident. But in his later opinions, he concluded that Silvestri's face struck the steering wheel with a force sufficient to deform the steering wheel and cause the steering column to be stroked.

Godfrey likewise changed his opinions as well as his "original" observations. In his deposition, taken before Schultz's report became available, Godfrey stated that he did not take any crush measurements of the car and therefore did not calculate the equivalent barrier speed of the vehicle as it struck the utility pole. After Schultz's report, however, Godfrey gave a specific crush measurement of "approximately" 24 inches and a calculation of the equivalent barrier speed of 24 miles per hour, based on "a rule of thumb" of one mile per hour for each inch of crush. Not only had Godfrey previously indicated that he never took a crush measurement, Carlsson, who did take a crush measurement but did not make a note of it, "seemed to recall" that it was probably 18 inches. Under Godfrey's "rule of thumb," this would result in an 18 miles-per-hour barrier speed. In addition, Godfrey originally testified that he did not believe that anyone could calculate the angle at which Silvestri hit the steering wheel. But in a subsequent report, issued after Schultz's report, he stated that the front of Silvestri's skull and face hit the right side of the steering wheel.

Following discovery, General Motors filed a motion for summary judgment on various grounds, including the ground that Silvestri could not establish a *prima facie* case for a product defect. General Motors also asked that the case be dismissed based on Silvestri's spoliation of evidence. The district court concluded that Silvestri had not stated a *prima facie* case and *589 therefore did not address the spoliation issue. On appeal, we concluded that under the law of New

York, which the parties agreed governed this case, Silvestri had stated a *prima facie* case. In response to General Motors' alternative request that we address the spoliation issue, we declined and remanded the case to the district court, stating that "the district court has broad discretion to address the matter, and in this case, the district court did not address spoliation in its ruling on General Motors' motion for summary judgment." *Silvestri v. General Motors Corp.,* 210 F.3d 240, 245 (4th Cir.2000).

On remand, the district court addressed General Motors' spoliation claim and dismissed the case on that basis. The district court concluded that Silvestri had breached his duty either to preserve the vehicle or to notify General Motors about its availability and his claim. The court concluded that Silvestri's failure to discharge this duty caused General Motors to be "highly prejudiced." After recognizing that the determination of whether the airbag should have deployed could only be determined by a reconstruction of the accident, the court explained that General Motors was denied the opportunity to reconstruct the accident accurately because of its inability to take the necessary crush measurements. As the court said:

> Therefore, Defendant is now forced to rely on the few measurements taken by Plaintiff's experts, Carlsson and Godfrey. As to these measurements, Carlsson admitted, during his deposition, that he only took one crush measurement--that of what he believed to be the area of "maximum crush." ... Not only was this lone measurement uncorroborated, but it was also inadequate. Defendant's expert opines, that plaintiff does not dispute, that crush measurements are generally taken at numerous points on the vehicle.... Based on the inability to take crush measurements alone, there is little doubt that defendant has been highly prejudiced.

In addition, the court noted that General Motors was prejudiced in its examination of the sensing and diagnostic module which monitored the airbag deployment system because Silvestri's expert challenged the results of the examination. As the court explained:

> In his second report, Carlsson cast doubt on whether or not the airbag system inspected in 1998, which indicated no system faults, was, in fact, the same system in the car at the time of the accident.... Defendant, at this late date, has no

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

way of proving that the systems are the same. This is critical to Defendant's case as their defense rests, in large part, on the fact that, because the airbag system showed no faults, the conditions of the accident must not have met the threshold requirement to deploy the airbag.

The court added that not only was Silvestri put on notice that the evidence should have been preserved or General Motors notified, but he also "remained silent until almost three years later when his suit was filed."

From the district court's order of dismissal, Silvestri noticed this appeal.

## II

On appeal, Silvestri contends that he is not responsible for any spoliation of evidence because (1) he had no duty to preserve the vehicle in question as he was not its owner, and (2) any act of spoliation was that of attorney Moench, hired by his parents, not him, and therefore was not imputable to him. He also argues that the sanction of dismissal was too harsh because General Motors was not so severely *590 prejudiced that it could not adequately defend itself in the action.

[1] In their briefs and at oral argument, the parties have agreed that the law of New York--where the accident occurred--supplies the applicable principles of spoliation, and they have cited that law to the court. We conclude, however, that a federal law of spoliation applies because, as we note below, the power to sanction for spoliation derives from the inherent power of the court, not substantive law. Nevertheless, we have recognized the articulation of spoliation principles from some of the New York cases cited to us.

## A

[2][3] Spoliation refers to the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation. *West v. Goodyear Tire & Rubber Co.,* 167 F.3d 776, 779 (2d Cir.1999) (citing *Black's Law Dictionary* 1401 (6th ed.1990)). The right to impose sanctions for spoliation arises from a court's inherent power to control the judicial process and litigation, but the

power is limited to that necessary to redress conduct "which abuses the judicial process." *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45-46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (recognizing the inherent power of the courts to fashion appropriate sanctions for conduct that disrupts the judicial process); *see also United States v. Shaffer Equip. Co.,* 11 F.3d 450, 462 (4th Cir.1993) (recognizing "that when a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of justice or undermines the integrity of the process, the court has the inherent power to dismiss the action"); *cf.* Fed.R.Civ.P. 37(b)(2) (authorizing sanctions for violations of discovery orders).

[4] The policy underlying this inherent power of the courts is the need to preserve the integrity of the judicial process in order to retain confidence that the process works to uncover the truth. "[B]ecause no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions--all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition." *Shaffer Equipment,* 11 F.3d at 457. The courts must protect the integrity of the judicial process because, "[a]s soon as the process falters ... the people are then justified in abandoning support for the system." *Id.*

[5] Thus, while the spoliation of evidence may give rise to court imposed sanctions deriving from this inherent power, the acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses.

[6][7] While a district court has broad discretion in choosing an appropriate sanction for spoliation, "the applicable sanction should be molded to serve the prophylactic, punitive, and remedial rationales underlying the spoliation doctrine." *West,* 167 F.3d at 779. In addition, a court must find some degree of fault to impose sanctions. We have recognized that when imposing spoliation sanctions, "the trial court has discretion to pursue a wide range of responses both for the purpose of leveling the evidentiary playing field and for the purpose of sanctioning the improper conduct." *Vodusek v. Bayliner Marine Corp.,* 71 F.3d 148, 156 (4th Cir.1995). But dismissal should be avoided if a

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

lesser sanction will perform the necessary function. *West,* 167 F.3d at 779.

[8] We review the district court's exercise of its discretion for abuse. *591*Hartford Ins. Co. v. Am. Automatic Sprinkler Sys., Inc.,* 201 F.3d 538, 543-44 (4th Cir.2000); *West,* 167 F.3d at 779.

### B

[9] Silvestri contends first that he had no duty to preserve the vehicle because he was not its owner and because neither he nor his agents were in any way engaged in the destruction of the evidence. This argument assumes too narrow an understanding of the duty at issue.

[10] The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation. *Kronisch v. United States,* 150 F.3d 112, 126 (2d Cir.1998). If a party cannot fulfill this duty to preserve because he does not own or control the evidence, he still has an obligation to give the opposing party notice of access to the evidence or of the possible destruction of the evidence if the party anticipates litigation involving that evidence. *See Andersen v. Schwartz,* 179 Misc.2d 1001, 687 N.Y.S.2d 232, 234-35 (N.Y.Sup.Ct.1999) (holding that in a products liability action arising from a vehicle collision where the vehicle was not owned by the plaintiffs, the plaintiffs nonetheless had an obligation to notify General Motors of the date and time of the initial and only inspection of the vehicle because the plaintiffs were aware that General Motors would be brought in as a defendant).

In this case, it is true that Silvestri did not own the vehicle, nor did he even control it in a legal sense after the accident because the vehicle belonged to his landlady's husband. But it is apparent that Silvestri had access to the vehicle, as his attorney Moench and his retained experts were given apparently unlimited access to the vehicle for inspection purposes. Moreover, the vehicle was preserved in its post-accident condition for perhaps two to three months, or more, a period during which Silvestri, his lawyer, and his experts recognized not only that they would be suing General Motors but also that General Motors should be given an

opportunity to inspect the vehicle. Within a couple of weeks of the accident, Silvestri's counsel had a conversation with his experts about the need to preserve the vehicle and have General Motors inspect it. One of Silvestri's expert witnesses, Erik Carlsson, testified that it was his understanding that his inspection of the vehicle was being conducted in anticipation of filing a lawsuit against General Motors and that he advised Moench that Silvestri had a valid case against General Motors "because the airbag should have deployed." In recognition of this, he stated to Moench, "therefore General Motors needs to see the car."

Indeed, Silvestri himself, Silvestri's parents, Moench, and the experts all recognized the need to act quickly to preserve evidence. The reason why Moench was retained and why he promptly retained reconstruction experts was to collect evidence before it was lost. The relevance of the evidence and the type of lawsuit to file became clear when Silvestri's experts conducted their inspection and concluded that the "failure by the airbag to deploy in this accident must be considered a defect that unnecessarily added to Mr. Silvestri's injuries." Even after these experts completed their inspection and their reports, the vehicle remained in its post-accident condition, yet no notice of any claim was given to General Motors nor was General Motors advised of any opportunity to inspect the vehicle. Moreover, there is no evidence to indicate that Silvestri attempted to buy the damaged vehicle or to request that it be maintained in its post-accident condition until General Motors could inspect it. It is *592 readily apparent, therefore, that Silvestri, his attorneys, and his expert witnesses anticipated filing suit against General Motors and were fully aware that the vehicle was material evidence in that litigation. Yet, they failed to take any steps to ensure that Silvestri discharged his duty to prevent the spoliation of evidence.

Silvestri now argues, frivolously we conclude, that Moench was not his attorney and therefore that Moench's failure to preserve the evidence should not be imputed to Silvestri. The record belies any such contention. It is undisputed that following Silvestri's accident, he was incapacitated and his parents retained Moench to look after Silvestri's legal interests. Moreover, when Silvestri became aware of that fact, he explicitly ratified his parents' retention of Moench by instructing Moench to

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works



271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

Page 8

continue representing him until he and Moench could get together to discuss the matter. Apparently, when they finally did meet, some two months after the accident, they found themselves in disagreement about who would advance the quickly increasing litigation costs, which at that point had reached several thousand dollars. Silvestri discharged Moench and retained new counsel, but he did not disavow the existence of an attorney-client relationship and the benefits of that relationship. In fact, Moench also represented Silvestri in connection with the related criminal matter involving Silvestri's driving while intoxicated, and Silvestri continued to use the investigative materials that Moench and the experts developed. Moreover, when Moench later sued Silvestri for attorneys fees and costs, Silvestri filed a counterclaim alleging attorney malpractice, a claim that could arise only out of an attorney-client relationship. As the district court correctly pointed out, to allow Silvestri to partake in the benefits provided by Moench--the testimony and expert reports of Carlsson and Godfrey--and at the same time disavow the acts of Moench in failing to preserve the evidence or notify General Motors would be "particularly unjust."

The district court concluded that even independent of Moench's conduct, the spoliation of evidence was imputable to Silvestri himself. First, Silvestri knew that Moench had retained experts to examine the vehicle, and he had authorized Moench to continue on his behalf to collect data in support of a potential lawsuit. Second, he knew the significance of preserving the automobile because when Moench sued him, he counterclaimed for malpractice, alleging that Moench had failed to preserve the vehicle which was to be evidence in this lawsuit. This all occurred long before General Motors was sued or had knowledge of the suit, and yet Silvestri took no steps to assure General Motors equal access to the evidence or to give General Motors notice of his claim.

In sum, we agree with the district court that Silvestri failed to preserve material evidence in anticipation of litigation or to notify General Motors of the availability of this evidence, thus breaching his duty not to spoliate evidence.

C

[11] Silvestri contends that dismissal was an unduly harsh sanction for the spoliation that occurred in this case and that the district court could have, instead, entered an order that designated facts be taken as established for purposes of the action or that presumptions be applied in connection with the burden of proof. In this vein, counsel for Silvestri made clear during oral argument that Silvestri was disavowing his experts' demand for proof that the sensing and diagnostic module that General Motors inspected in 1998 was the same one in the vehicle during the accident. Counsel stated during argument *593 that Silvestri accepted the fact that the module that General Motors inspected in 1998 was the original one and that it revealed no system defect. Although counsel was attempting to mitigate the prejudice found by the district court by conceding this fact on appeal, the district court did not have the benefit of that concession. Even so, this issue was only one of the factors relied upon by the district court to find prejudice. Even without this factor, we still conclude that General Motors was severely prejudiced by the spoliation of evidence that occurred.

[12] We agree with Silvestri that dismissal is severe and constitutes the ultimate sanction for spoliation. It is usually justified only in circumstances of bad faith or other "like action." *Cole v. Keller Indus., Inc.,* 132 F.3d 1044, 1047 (4th Cir.1998). But even when conduct is less culpable, dismissal may be necessary if the prejudice to the defendant is extraordinary, denying it the ability to adequately defend its case. As the Supreme Court noted in *Chambers,* the district court has discretion "to fashion an appropriate sanction for conduct which abuses the judicial process." 501 U.S. at 44-45, 111 S.Ct. 2123. And it went on to point out that "outright dismissal of a lawsuit, which we had upheld in *Link* [*v. Wabash R.R. Co.,* 370 U.S. 626, 630-31, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962)], is a particularly severe sanction, yet is within the court's discretion." *Id.* at 45, 111 S.Ct. 2123.

[13] As the New York courts have recognized, sometimes even the inadvertent, albeit negligent, loss of evidence will justify dismissal because of the resulting unfairness: "The expansion of sanctions for the inadvertent loss of evidence recognizes that such physical evidence often is the most eloquent impartial 'witness' to what really occurred, and

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

271 F.3d 583
51 Fed.R.Serv.3d 694
(Cite as: 271 F.3d 583)

Page 9

further recognizes the resulting unfairness inherent in allowing a party to destroy evidence and then to benefit from that conduct or omission." *Kirkland v. New York City Housing Auth.*, 236 A.D.2d 170, 173, 666 N.Y.S.2d 609 (N.Y.App.Div.1997). In fashioning an appropriate sanction, the New York courts have focused not only on the conduct of the spoliator but also on the prejudice resulting from the destruction of the evidence. *See, e.g., Squitieri v. New York*, 248 A.D.2d 201, 669 N.Y.S.2d 589, 590-91 (N.Y.App.Div.1998) (finding dismissal appropriate where a party negligently disposed of the street sweeper at issue in the litigation, preventing the opposing party from countering the design defect claim with evidence of misuse, alteration, or poor maintenance of the sweeper); *Kirkland,* 236 A.D.2d at 173-74, 666 N.Y.S.2d 609 (finding dismissal appropriate where a party unintentionally failed to preserve the crucial piece of evidence, a stove alleged to be defective, and, therefore, no actual inspection of the item at issue could be performed because "[i]ts loss 'irrevocably stripped'[the defendant] of useful defenses").

[14] At bottom, to justify the harsh sanction of dismissal, the district court must consider both the spoliator's conduct and the prejudice caused and be able to conclude either (1) that the spoliator's conduct was so egregious as to amount to a forfeiture of his claim, or (2) that the effect of the spoliator's conduct was so prejudicial that it substantially denied the defendant the ability to defend the claim.

In the case before us, the conduct of the spoliator may have been either deliberate or negligent. We know that Silvestri's attorney knew that the vehicle was the central piece of evidence in his case against General Motors and that he had been reminded that this piece of evidence should be preserved or that General Motors should be notified. As it turned out, *594 the vehicle was not preserved, and neither Silvestri nor his attorneys notified General Motors of Silvestri's claim until almost three years after the accident; by then, the evidence had been destroyed by the repair of the vehicle. Whether Silvestri's counsel believed he was securing advantage to his client's case by deliberately remaining silent for three years or whether he simply ignored his responsibilities through carelessness is not revealed in the record. But what is revealed is a level of culpability that was at least negligent and may have

been deliberate. Accordingly, it is not clear whether Silvestri's conduct alone would justify dismissal.

When we turn to the prejudice suffered by General Motors, we agree with the district court's finding that the spoliation was "highly prejudicial." It denied General Motors access to the only evidence from which it could develop its defenses adequately. First, by not having access to the vehicle, General Motors could not develop a "crush" model to prove that the airbag properly failed to deploy. In order to establish this model, General Motors needed crush measurements taken at several places on the automobile. These measurements would reveal not only the speed at impact, but also the direction of forces imposed on the car. This information would lead to an ability to determine whether the airbag device acted as designed and therefore was critical to the central issue in the case.

Silvestri's expert, Carlsson, testified that he took one crush measurement, but he did not write it down. At his deposition, however, he seemed to recollect the measurement to be around 18 inches. Godfrey made no such measurement. Yet, Godfrey later assumed a 24-inch crush measurement to conclude that the impact causing such a crush was a vehicle traveling at 24 miles per hour. Silvestri argues that General Motors could have used these same figures to determine its own crush model. But, as Silvestri acknowledges and General Motors has pointed out, General Motors needed more than one crush measurement to develop a crush model, and in this case the one crush measurement available was unreliable.

In addition, because of the spoliation, General Motors could not resolve the critical question of how Silvestri injured his head. General Motors asserts that Silvestri's injuries were actually caused by pieces of wood that entered the vehicle from the side when the vehicle struck the fence. It points out that if the accident was caused by the fencing, then the airbag would not have prevented Silvestri's injuries. Silvestri's experts, however, have contended, inconsistently, that Silvestri either hit the steering wheel or hit the windshield. In support of their contention they rely on changed recollections about the vehicle's condition. At one point, they argued that the steering wheel had not

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works

been deformed nor had its steering column been stroked. Yet, at another point, they say that it had been deformed and stroked. These inconsistencies could have been resolved by a thorough examination of the vehicle cabin to look for wood in the car, to determine the location of blood and hair, and to take measurements of the steering column.

Thus, not only was the evidence lost to General Motors, but the evidence that was preserved was incomplete and indefinite. To require General Motors to rely on the evidence collected by Silvestri's experts in lieu of what it could have collected would result in irreparable prejudice. Short of dismissal, the district court would have been left to formulate an order that created facts as established or that created presumptions. But when Silvestri presents vehicle data as his only evidence of a *595 product defect and that data is incomplete and perhaps inaccurate, the court would have no basis for determining what facts should be taken as established. On the other hand, if the court denied Silvestri's experts from testifying, as would be an alternative, then Silvestri would have no case at all.

In short, we conclude that the district court's finding that General Motors was "highly prejudiced" was not clearly erroneous and that in the peculiar circumstances of this case, the court's order dismissing this case, although severe, was not an abuse of discretion. Accordingly, the judgment of the district court is

*AFFIRMED.*

TRAXLER, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that Silvestri failed to discharge his duty to preserve the accident vehicle or at least notify General Motors that the vehicle was potential evidence. Therefore, I concur in sections I-IIB of Judge Niemeyer's opinion.

I believe, however, that the complete dismissal of the case was an excessive sanction. Keith S. Schultz, General Motors' expert witness and corporate designee, formed the opinion that "[t]he

change in velocity, or the 'delta V', of the vehicle when it impacted the telephone pole was not sufficient and not directionally correct to deploy the air bags" because "[t]he right front corner of the vehicle struck the telephone pole as it was sliding sideways off the roadway." J.A. 378. During his deposition, Schultz agreed that "General Motors does not need any information between what the vehicle looked like from these photographs immediately after the accident and the present time in order to support its position," J.A. 584, and that he had "sufficient information in order to form the opinions that [he had] expressed," J.A. 268.

In light of Schultz's ability to form an expert opinion, I am not convinced that General Motors suffered such prejudice that dismissal was the only solution. The district court did not conduct a hearing before dismissing the case, and there is nothing in the record indicating whether the court considered lesser sanctions. I would remand for the district court to consider imposing a sanction short of outright dismissal. Accordingly, I respectfully dissent only from section IIC of the majority opinion.

271 F.3d 583, 51 Fed.R.Serv.3d 694

Briefs and Other Related Documents (Back to top)

• 2001 WL 34110583 (Appellate Brief) Reply Brief of Appellant (Apr. 03, 2001)

• 2000 WL 33992316 (Appellate Brief) Brief of Appellant (Dec. 13, 2000)

END OF DOCUMENT

Copr. © West 2003 No Claim to Orig. U.S. Govt. Works